**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| XIANGDONG CHEN, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> X FINANCIAL, YUE TANG, JIE ZHANG, SHAOYONG CHENG, DING GAO, SHENGWEN RONG, ZHENG XUE, LONGGEN ZHANG, RICHARD ARTHUR, COLLEEN A. DEVRIES, and COGENCY GLOBAL INC., <br><br> Defendants. | Case No. <br><br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Xiangdong Chen ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of X Financial ("X Financial" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired X Financial American Depositary Shares ("ADSs") pursuant and/or traceable to the Company's September 19, 2018 initial public offering (the "IPO") seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      Defendant X Financial is a finance technology company based in Shenzhen, China. The Company operates a peer-to-peer ("P2P") platform that matches borrowers and lenders.  The Company's primary source of revenue is the fees it charges for facilitating and processing loans between the two groups on its platform.

3.      X Financial facilitates two primary types of loans.  The Company's Xiaoying Card Loan ("card loan") product is a credit card balance transfer product.  The Company describes card loans as "our flagship product targeting prime borrowers."  X Financial derived 36.7% of its revenues in 2017 from card loans, making it the Company's largest product.  X Financial offers its card loan product in amounts, or "ticket sizes," from RMB2,000 to RMB60,000.

1

4.      X Financial's Xiaoying Preferred Loan ("preferred loan") is a product marketed primarily to small- and medium-sized enterprises ("SMEs").  Preferred loans, the Company's second largest product, accounted for 22.6% of the Company's revenues in 2017.  The Company offers its preferred loans at a variety of ticket sizes, typically depending on the type of investor, but generally between RMB100,000 and RMB600,000, making preferred loans significantly larger than card loans.

5.      Despite the differences in the loan products, for 2018, and thereafter, X Financial decided to combine the two units into a single business segment, called Xiaoying Credit Loan, and generally does not break out operational results for each.

6.      Delinquency rates, at least historically, were significantly higher for card loans than preferred loans.  For example, net default rates were 10.19% and 3.10% for card loans and preferred loans, respectively, in 2017.  However, given the typically larger size of preferred loans, even lower delinquency rates in preferred loans corresponded to significant losses.  X Financial has reported, for example, that, as of December 31, 2017, its card loans had approximately RMB2.7 billion in total undiscounted future payments, while its preferred loans had roughly RMB4.5 billion in total undiscounted future payments.

7.      Delinquency results in losses for X Financial in different ways.  X Financial requires its borrowers to enter into a variety of insurance agreements for the unsecured card and preferred loans it facilitates.  A third-party company, ZhongAn, provided 94% of these insurance plans as of June 30, 2018.  When a borrower defaults, ZhongAn reimburses the investor, but has recourse to X Financial, subject to certain caps.  ZhongAn may also increase premiums to new borrowers to account for defaults, which makes X Financial's products less attractive to the Company's customers.

8.      The need to minimize losses and the risk of default was paramount to X Financial and its investors.  For this reason, X Financial claimed to provide services to "prime" borrowers, while

avoiding subprime debtors, with credit needs not fully met by traditional banks. X Financial highlighted its ability to find underserved prime borrowers by using social and behavioral data taken from the Internet and mobile platforms such as social networking sites, as well as traditional indicators of credit-worthiness, and applying its proprietary technology to assess the risk of, and properly price loans to, borrowers.

9. China's P2P lending market grew rapidly between 2007 and 2014, peaking at more than 5,000 firms, during a time when there was a limited regulatory framework for the industry. But a series of failures and scandal-making frauds in 2015 and 2016 prompted Chinese regulators to step in. China's regulators did so by implementing a "rectification" campaign between 2016 and 2018 in which new regulations were rolled out. For example, new regulations required P2P platforms to register with local authorities and imposed caps on certain fee rates for facilitating loans. Most of the new regulations came with compliance deadlines in 2018.

10. Leading up to the IPO, X Financial claimed the Company was growing rapidly, notwithstanding the costs and business reorientation necessary to comply with the new rectification measures, such as the reduction in certain fee rates to come under the new limits. For example, X Financial stated that the Company facilitated approximately RMB19.0 billion, RMB34.4 billion, and RMB19.9 billion of loans on its platform for the years 2016 and 2017, and for the six months ended June 30, 2018, respectively.

11. On August 28, 2018, X Financial filed with the SEC a registration statement on Form F-1 for the IPO, which, after several amendments, was declared effective on September 18, 2018 (the Form F-1, together with all amendments, is referred to herein as the "Registration Statement"). The next day, on September 19, 2018, the Company filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement. The Registration Statement was used to

sell to the investing public more than 11.7 million X Financial ADSs (including the exercise of the underwriters' overallotment option) at $9.50 per ADS. Defendants generated more than $111 million in gross offering proceeds from their sale of X Financial ADSs in the IPO.

12.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, the Registration Statement made false and/or misleading statements and/or failed to disclose that: (i) the Company's total loan facilitation amount was not growing, but rather was contracting; (ii) the number of investors actively using X Financial's platform was shrinking; (iii) demand from SMEs for the Company's preferred loans was plummeting; (iv) the Company's preferred loans had performed so poorly that it had begun drastically scaling back its preferred loans in the first quarter of 2018, several months before the IPO, and was in the process of phasing out such loans completely; (v) demand for the Company's card loans was also plummeting; (vi) the revenue and loan facilitation growth provided in the Registration Statement leading up to the IPO was achieved by relaxed credit and due diligence standards, under which the Company had underwritten tens of millions of dollars' worth of poor quality loans that suffered from a disproportionately high risk of default as compared to the Company's earlier loan vintages; (vii) the Company was suffering from accelerated delinquency rates from poor quality loans that it had underwritten in the first, second, and third quarters of 2018, which had caused the Company's delinquency rate to sharply rise; (viii) the Company's product mix had significantly deteriorated; (ix) the Company's net revenue was on track to decline by 22% during the third quarter of 2018; and (x) as a result, the Registration Statement was materially false and/or misleading and failed to state information required to be stated therein.

13.     On November 19, 2018, X Financial reported its financial results for the third quarter of 2018, which ended September 30, 2018—only eleven days after the IPO.  In the third quarter 2018 press release, the Company reported that the delinquency rate for X Financial loans was 3.51% for loans past due 31 to 90 days, representing a greater than 40% sequential increase and a greater than 270% year-over-year increase.  This key metric indicated significant deterioration in the quality of the Company's loan portfolio.  In addition, X Financial reported significant reduction in loans facilitated in the quarter, reflecting a significant contraction in the Company's business.  As reported, the Company facilitated only about 806,000 loans, a decrease of 35% year over year ("YoY") and 21% quarter over quarter ("QoQ"), while the amount of loans facilitated was RMB7,560 million, a 13% decline YoY and 32% decline QoQ.  Active lending had also declined, from about 157,000 active lenders the previous quarter to only about 122,000 in the third quarter of 2018.  In addition, X Financial reported that net revenue for the quarter was RMB829.5 million, a decline of 22% QoQ, while net income was only RMB197.9, a decline of 34% QoQ, underlining the Company's inability to generate revenue in the face of the significant increases in delinquencies and the contraction of the business.  These rising delinquency rates and deterioration of loan profitability reflect the poor quality of loans that were issued prior to the IPO.

14.     The third quarter 2018 press release also provided disappointing financial guidance for the Company's fourth quarter.  It stated that X Financial only expected total loan facilitation in the range of RMB8,000 million to RMB8,500 million.  This slow growth during a historically strong season confirmed that negative origination and credit quality trends that predated the IPO were expected to continue.

15.     On November 20, 2018, X Financial held its first earnings call after the IPO to discuss its financial results.  As executives explained on the call, the negative operational and financial results

reported in the day's press release had been caused by market and other problems that had long preceded the IPO. Defendant Tang, for example, blamed the "decline in loan facilitation" on "the lows we saw in July when the market turmoil was at a peak" and said that the "[n]umber-one driver" was "the lack of funding during the July and August time." He confirmed that X Financial and its executives had access to this adverse information as it unfolded, stating we are "able to manage our risk on a very much real-time basis." Speaking specifically about preferred loans, defendant Tang told investors that demand for loans had dried up even earlier, prompting significant reductions in preferred loans "over the last three quarters" (*i.e.*, the last nine months), stating: "Then on the preferred loan, because of the operating environment for SME owners are very difficult these days, and our preferred loan did suffer a higher-than-expected loss than our earlier estimate. And as a result, actually, over the last three quarters, we have been consistently reduced our [sic] preferred loan business."

16.     During the November 20, 2018 earnings call, analysts questioned X Financial's executives about the rapidly contracting preferred loans and rising delinquency rates. In response, they conceded that low demand and "very high" delinquency rates for X Financial's preferred loans had produced a cascading effect that torpedoed the Company's overall financial results. As these executives explained, plummeting demand and high default rates had, in turn, forced the Company to make the "big [strategy change] to . . . scale down the preferred loan business." Scaling down preferred loans, meanwhile, had prompted "a change in product mix resulting from a significant increase in the proportion of revenue generated by Xiaoying Card Loan." The pivot to depending on card loans had, in turn, caused a reduction in X Financial's "average loan ticket size by 20% to even 25%" and also caused further increases in the Company's overall delinquency rate, as card loans by nature represented significantly higher risks.

17.     In subsequent financial reports, X Financial has confirmed that the problems described above started before the IPO.   For example, on a March 19, 2019 earnings call to discuss the Company's fourth quarter and fiscal year 2018 results, defendant Cheng affirmed that X Financial's loan volume had been declining "since [the] middle of last year," which had caused declines in the Company's ticket size.

18.     On April 25, 2019, X Financial filed its annual report for 2018 on Form 20-F.   The report contained a chart entitled "Delinquency Rate by Vintage of Xiaoying Preferred Loan," which illustrated the dramatic increase in delinquency rates leading up to and during the IPO—including in first, second, and third quarters of 2018—and that such negative trends were accelerating, as reflected below:



19.     Then on May 21, 2019, during X Financial's earnings call to discuss the Company's first quarter 2019 results, defendant Tang admitted that X Financial was unlikely to achieve significant loan or revenue growth because its preferred loan business had failed "over the last year" and that the Company was shelving the entire business:

> [Analyst:] *[D]o we see any potential to ramp up the growth,* in particular . . . the loan outstanding balance . . . ?
>
> [Tang:] . . . So *over the last couple of years*, preferred loan was one of our key product[s], and a lot of this served for the small and medium enterprises. And that segment over *the last year, the risk was higher than [we] expected*. *So we literally discontinued that product line*, except only serve [sic] for some of the higher-quality repeated borrower. So *that basically drives to our [sic] no growth in our loan balance*.

(Emphases added.)

20.     On November 22, 2019, X Financial's ADSs closed at $1.74 per ADS.  This price represented an 81.68% decline from the $9.50 per share price at which X Financial's ADSs had been sold to the investing public in the IPO.

21.     As of the date this complaint was filed, X Financial's ADSs continue to trade below the $9.50 per share IPO price.

22.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of X Financial's share price, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

25.     Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

26.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

27.     Plaintiff, as set forth in the attached Certification, acquired X Financial ADSs at artificially inflated prices pursuant and/or traceable to the Registration Statement for the Company's IPO and was damaged thereby.

28.     Defendant X Financial is a financial technology company based in Shenzhen, China, that provides an online lending and borrowing marketplace.  The Company conducted the IPO in New York and the ADSs sold in the IPO trade on the New York Stock Exchange ("NYSE"), under the ticker symbol "XYF."  Each X Financial ADS represents two Class A ordinary shares of the Company. The Company maintains a dual voting class structure designed to concentrate control of the Company in the hands of its Chief Executive Officer ("CEO"), defendant Yue Tang, out of proportion to his economic stake in X Financial.  Class B ordinary shares, which were issued for the first time in the IPO and exclusively to defendant Tang, each have twenty votes per share, as compared to Class A shares, which entitled their holders to only one vote per share.  Class B shares can be converted into Class A shares at the holder's election, but Class A shares cannot be converted into Class B shares.

29.     Defendant Yue (a/k/a Justin) Tang ("Tang"), was X Financial's CEO and Chairman of the Board of Directors (the "Board") at the time of the IPO.  He is also the Company's founder.  Prior to the IPO, defendant Tang owned more than 101 million X Financial ordinary shares, or

9

approximately 36% of the Company's total outstanding shares.  As of the IPO, defendant Tang's shares were converted into 97.6 million Class B shares and 3.8 million Class A shares, representing over 33% of the Company's outstanding shares and more than 90% of the Company's aggregate voting power.

30.     Defendant Jie (a/k/a Kevin) Zhang ("Zhang") was X Financial's Chief Financial Officer at the time of the IPO.

31.     Defendant Shaoyong (a/k/a Simon) Cheng ("Cheng") was a director and the President of X Financial at the time of the IPO.

32.     Defendant Ding (a/k/a Gardon) Gao ("Gao") was a director and Chief Technology Officer of X Financial at the time of the IPO.

33.     Defendant Shengwen Rong ("Rong") was a director appointee of X Financial at the time of the IPO.

34.     Defendant Zheng Xue ("Xue") was a director appointee of X Financial at the time of the IPO.

35.     Defendant Longgen Zhang ("Longgen Z.") was a director appointee of X Financial at the time of the IPO.

36.      Defendants Richard Arthur ("Arthur"), Assistant Secretary of Cogency Global Inc. ("Cogency Global"), and Colleen A. DeVries ("DeVries"), Senior Vice President of Cogency Global, served as X Financial's Authorized U.S. Representatives in connection with the IPO and each signed an iteration of the Registration Statement.

37.     Defendants Tang, Zhang, Cheng, Gao, Rong, Xue, Longgen Z., Arthur, and DeVries are referred to herein as the "Individual Defendants."  Each of the Individual Defendants, other than Rong, Xue, and Longgen Z. (who were named as director appointees in the Registration Statement), signed the Registration Statement.

10

38.     Defendant Cogency Global was X Financial's Authorized U.S. Representative for purposes of the IPO, and defendants Arthur and DeVries signed the Registration Statement as employees of Cogency Global. Defendant Cogency Global is liable for the securities law violations by defendants Arthur and DeVries in its capacity as their employer and as a control person under the Securities Act.

## SUBSTANTIVE ALLEGATIONS

### Background

39.     Defendant X Financial is a finance technology company based in Shenzhen, China. The Company operates a P2P platform that matches borrowers and lenders.  The Company's primary source of revenue is the fees it charges for facilitating and processing loans between the two groups on its platform.

40.     X Financial facilitates two primary types of loans.  The Company's card loan product is a credit card balance transfer product.  The Company describes card loans as "our flagship product targeting prime borrowers."   X Financial derived 36.7% of its revenues in 2017 from card loans, making it the Company's largest product.  X Financial offers its card loan product in amounts, or "ticket sizes," from RMB2,000 to RMB60,000.

41.     X Financial's preferred loan is a product marketed primarily to SMEs.  Preferred loans, the Company's second largest product, accounted for 22.6% of the Company's revenues in 2017.  The Company offers its preferred loans at a variety of ticket sizes, typically depending on the type of investor, but generally between RMB100,000 and RMB600,000, making preferred loans significantly larger than card loans.

42.     Despite the differences in the loan products, for 2018, and thereafter, X Financial decided to combine the two units into a single business segment, called Xiaoying Credit Loan, and generally does not break out operational results for each.

43.     Delinquency rates, at least historically, were significantly higher for card loans than preferred loans.  For example, net default rates were 10.19% and 3.10% for card loans and preferred loans, respectively, in 2017.  However, given the typically larger size of preferred loans, even lower delinquency rates in preferred loans corresponded to significant losses.  X Financial has reported, for example, that, as of December 31, 2017, its card loans had approximately RMB2.7 billion in total undiscounted future payments, while its preferred loans had roughly RMB4.5 billion in total undiscounted future payments.

44.     Delinquency results in losses for X Financial in different ways.  X Financial requires its borrowers to enter into a variety of insurance agreements for the unsecured card and preferred loans it facilitates.  A third-party company, ZhongAn, provided 94% of these insurance plans as of June 30, 2018.  When a borrower defaults, ZhongAn reimburses the investor, but has recourse to X Financial, subject to certain caps.  ZhongAn may also increase premiums to new borrowers to account for defaults, which makes X Financial's products less attractive to the Company's customers.

45.     The need to minimize losses and the risk of default was paramount to X Financial and its investors.  For this reason, X Financial claimed to provide services to "prime" borrowers, while avoiding subprime debtors, with credit needs not fully met by traditional banks.  X Financial highlighted its ability to find underserved prime borrowers by using social and behavioral data taken from the Internet and mobile platforms such as social networking sites, as well as traditional indicators of credit-worthiness, and applying its proprietary technology to assess the risk of, and properly price loans to, borrowers.

46.     China's P2P lending market grew rapidly between 2007 and 2014, peaking at more than 5,000 firms, during a time when there was a limited regulatory framework for the industry.  But a series of failures and scandal-making frauds in 2015 and 2016 prompted Chinese regulators to step in.

China's regulators did so by implementing a "rectification" campaign between 2016 and 2018 in which new regulations were rolled out.  For example, new regulations required P2P platforms to register with local authorities and imposed caps on certain fee rates for facilitating loans.  Most of the new regulations came with compliance deadlines in 2018.

47.     Leading up to the IPO, X Financial claimed the Company was growing rapidly, notwithstanding the costs and business reorientation necessary to comply with the new rectification measures, such as the reduction in certain fee rates to come under the new limits.  For example, X Financial stated that the Company facilitated approximately RMB19.0 billion, RMB34.4 billion, and RMB19.9 billion of loans on its platform for the years 2016 and 2017, and for the six months ended June 30, 2018, respectively.

48.     On August 28, 2018, X Financial filed the Registration Statement.  The next day, on September 19, 2018, the Company filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.  The Registration Statement was used to sell to the investing public more than 11.7 million X Financial ADSs (including the exercise of the underwriters' overallotment option) at $9.50 per ADS.  Defendants generated more than $111 million in gross offering proceeds from their sale of X Financial ADSs in the IPO.

**Materially False and Misleading Statements Issued in the Registration Statement**[1]

49.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

---

[1] All emphases in this section are added.

50.     For example, the Registration Statement stated that X Financial was "able to source a large number of borrowers for Xiaoying **Preferred Loan**, which **will drive the continued growth in our borrower base**."

51.     The Registration Statement similarly described its card and preferred loans as, jointly, the major products that would drive X Financial's "continued" growth.  Under a heading entitled "Our Strategies," the Registration Statement declared that X Financial would "**[cJontinue** to . . . **broaden our product offerings** to cater to the evolving market demands" and "**[eJxpand user base and enhance user acquisition**."  Notably, under the "[e]xpand user base" section, the Registration Statement highlighted the growth in both card loans and preferred loans, stating that, "[a]s of June 30, 2018, we had a total of . . . 12,464,562 cumulative registered users of Xiaoying Card Loan and Xiaoying Preferred Loan" on its platform, which the Company "plan[ned] to further leverage . . . to cross-sell products."

52.     The Registration Statement reinforced these statements by claiming that X Financial was continuing to expand both borrowers and lenders on its platform.  These statements included claims such as "**we continue to expand** our user base of both borrowers and investors" and "advanced credit analytics . . . enables us to **expand our borrower base**."  Similarly, the Registration Statement described X Financial as a "[l]eading wealth management platform with a **fast-growing** and high-quality investor base" and claimed under the "Our Strengths" section that the attractiveness of the platform to investors was "resulting in rapid expansion of [X Financial's] user base."

53.     The Registration Statement also highlighted X Financial's ability to upsell customers as its user base expanded, stating, for example: "User referral has been primarily driving the **continued growth** in our user base of both borrowers and investors . . . . [A]s our big data technology allows us to

accurately identify high quality borrowers, ***we are able to offer large credit line products to such individuals*** . . . ."

54.     The Registration Statement similarly tied the growth of X Financial's user base to its revenue, claiming that active borrowers and the amount of loans facilitated had both grown significantly.  The Registration Statement stated, in relevant part:

> ***Our revenues are dependent on our ability to acquire new borrowers and retain existing borrowers. The size of our borrower base directly affects the total amount of loans we facilitate and in turn the service fees that we collect. The number of active borrowers on our platform grew significantly***, increasing from 208,920 borrowers in 2016 to 2,249,183 borrowers in 2017, of which 207,983, or 99.6%, and 2,107,184, or 93.7%, were new borrowers, respectively. For the six months ended June 30, 2018, the number of active borrowers on our platform was 1,278,289, of which 933,470, or 73.0% were new borrowers. As a result, ***we have experienced significant growth in the amount of loans facilitated***. In 2016, 2017 and for the six months ended June 30, 2018, we have facilitated RMB18,996 million, RMB34,400 million and RMB19,879 million, respectively, of loans on our platform, respectively. We are a leading player in the online credit card balance transfer and high-credit-limit unsecured loan markets.

55.     In addition, the Registration Statement claimed that the market for X Financial's loans was healthy and would support the Company's continued growth.  For example, the Registration Statement stated, in relevant part:

> The low levels of consumption and leverage ratio indicate ***considerable room for further expansion*** of the consumer finance market in China.
>
> * * *
>
> The credit card market in China is in the process of liberalization and is comparable to the United States in the 1980s when the ***market was expanding*** . . . .

56.     The Registration Statement also highlighted the strength of X Financial's credit assessment capabilities, citing, for example, the "***strong credit performance of the loans that we facilitate***, the accompanying insurance protection, ***and our proven risk management and credit assessment capabilities***."  The Registration Statement repeatedly emphasized the purportedly high credit quality of the Company's customers, describing X Financial as "a leading technology-driven

personal finance company in China focused on serving China's underserved ***prime borrowers*** and mass affluent investors."  Similarly, the Registration Statement stated "*[w]e **strategically target the prime borrowers*** underserved by traditional financial institutions," and "[w]e believe ***we set a high standard of credit quality*** by defining our borrowers as prime borrowers, who we define as an individual having sound credit history, who has credit records with PBOC CRC and usually no late payment record of over 60 days in the previous six months."

57.     In particular, the Registration Statement highlighted the creditworthiness of the SME borrowers who used X Financial's preferred loans.  For example, the Registration Statement reassured investors that X Financial's "[h]igh-credit-limit unsecured loans are generally borrowed by small business owners whose credit worthiness can be verified."  The Registration Statement also included the following chart, which showed a consistently low delinquency rate for its preferred loans through the second quarter of 2018, which ended June 30, 2018:



58.     The Registration Statement tied the purported strengths of X Financial's risk management to what it described as low delinquency rates in its card and preferred loans products.

Under the "Our Strengths" section, for example, the Registration Statement claimed that delinquency rates for both of the Company's major products were low:

> *We focus on serving the credit needs of prime borrowers with sound credit profile and history* . . . . In 2017 and for the six months ended June 30, 2018, the APR of our Xiaoying Card Loan was 26.21% and 28.58%, respectively, while the *credit losses as measured by delinquency rate for the outstanding loans that are 91-180 days past due was 1.64% as of December 31, 2017 and 3.62% as of June 30, 2018*, and the APR of our Xiaoying *Preferred Loan* was 16.89% and 17.70%, respectively, while the *credit losses as measured by delinquency rate for the outstanding loans that are 91-180 days past due was 0.67% as of December 31, 2017 and 2.31% as of June 30, 2018*.

59.     The statements referenced in ¶¶ 50-58 were materially false and misleading because the Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the Registration Statement made false and/or misleading statements and/or failed to disclose that: (i) the Company's total loan facilitation amount was not growing, but rather was contracting; (ii) the number of investors actively using X Financial's platform was shrinking; (iii) demand from SMEs for the Company's preferred loans was plummeting; (iv) the Company's preferred loans had performed so poorly that it had begun drastically scaling back its preferred loans in the first quarter of 2018, several months before the IPO, and was in the process of phasing out such loans completely; (v) demand for the Company's card loans was also plummeting; (vi) the revenue and loan facilitation growth provided in the Registration Statement leading up to the IPO was achieved by relaxed credit and due diligence standards, under which the Company had underwritten tens of millions of dollars' worth of poor quality loans that suffered from a disproportionately high risk of default as compared to the Company's earlier loan vintages; (vii) the Company was suffering from accelerated delinquency rates from poor quality loans that it had underwritten in the first, second, and third quarters of 2018, which had caused the Company's delinquency rate to sharply rise; (viii) the Company's product mix had significantly

17

deteriorated; (ix) the Company's net revenue was on track to decline by 22% during the third quarter of 2018; and (x) as a result, the Registration Statement was materially false and/or misleading and failed to state information required to be stated therein.

60.     Moreover, the Registration Statement was required by SEC rules and regulations to provide trend information substantially the same as that required by Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe the risk."

61.     The failure of the Registration Statement to disclose the deteriorating demand and credit trends and the deterioration of the quality of X Financial's loan portfolio described above violated 17 C.F.R. § 229.303(a)(3)(ii) because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.

62.     This failure also violated 17 C.F.R. § 229.105 because these adverse trends created significant risks that were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in X Financial ADSs speculative or risky.  Indeed, the risk factors that were provided in the Registration Statement were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose that the potential future adverse impacts described were already occurring.  For example, the Registration Statement purported to warn that "[a] change in our ability to attract or retain borrowers . . . ***may***

18

*potentially affect our revenue and profitability*" at a time when defendants had already scaled back their approval of loans in the face of significant declines in demand and rising delinquency rates.

## The Truth Begins to Emerge

63.     On November 19, 2018, X Financial reported its financial results for the third quarter of 2018, which ended September 30, 2018—only eleven days after the IPO.  In the third quarter 2018 press release, the Company reported that the delinquency rate for X Financial loans was 3.51% for loans past due 31 to 90 days, representing a greater than 40% sequential increase and a greater than 270% year-over-year increase.  This key metric indicated significant deterioration in the quality of the Company's loan portfolio.  In addition, X Financial reported significant reduction in loans facilitated in the quarter, reflecting a significant contraction in the Company's business.  As reported, the Company facilitated only about 806,000 loans, a decrease of 35% YoY and 21% QoQ, while the amount of loans facilitated was RMB7,560 million, a 13% decline YoY and 32% decline QoQ.  Active lending had also declined, from about 157,000 active lenders the previous quarter to only about 122,000 in the third quarter of 2018.  In addition, X Financial reported that net revenue for the quarter was RMB829.5 million, a decline of 22% QoQ, while net income was only RMB197.9, a decline of 34% QoQ, underlining the Company's inability to generate revenue in the face of the significant increases in delinquencies and the contraction of the business.  These rising delinquency rates and deterioration of loan profitability reflect the poor quality of loans that were issued prior to the IPO.

64.     The third quarter 2018 press release also provided disappointing financial guidance for the Company's fourth quarter.  It stated that X Financial only expected total loan facilitation in the range of RMB8,000 million to RMB8,500 million.  This slow growth during a historically strong season confirmed that negative origination and credit quality trends that predated the IPO were expected to continue.

65.     On November 20, 2018, X Financial held its first earnings call after the IPO to discuss its financial results.  As executives explained on the call, the negative operational and financial results reported in the day's press release had been caused by market and other problems that had long preceded the IPO.  Defendant Tang, for example, blamed the "decline in loan facilitation" on "the lows we saw in July when the market turmoil was at a peak" and said that the "[n]umber-one driver" was "the lack of funding during the July and August time."   He confirmed that X Financial and its executives had access to this adverse information as it unfolded, stating we are "able to manage our risk on a very much real-time basis."   Speaking specifically about preferred loans, defendant Tang told investors that demand for loans had dried up even earlier, prompting significant reductions in preferred loans "over the last three quarters" (i.e., the last nine months), stating: "Then on the preferred loan, because of the operating environment for SME owners are very difficult these days, and our preferred loan did suffer a higher-than-expected loss than our earlier estimate. And as a result, actually, over the last three quarters, we have been consistently reduced our [sic] preferred loan business."

66.     During the November 20, 2018 earnings call, analysts questioned X Financial's executives about the rapidly contracting preferred loans and rising delinquency rates.  In response, they conceded that low demand and "very high" delinquency rates for X Financial's preferred loans had produced a cascading effect that torpedoed the Company's overall financial results.   As these executives explained, plummeting demand and high default rates had, in turn, forced the Company to make the "big [strategy change] to . . . scale down the preferred loan business."  Scaling down preferred loans, meanwhile, had prompted "a change in product mix resulting from a significant increase in the proportion of revenue generated by Xiaoying Card Loan."  The pivot to depending on card loans had, in turn, caused a reduction in X Financial's "average loan ticket size by 20% to even 25%" and also

caused further increases in the Company's overall delinquency rate, as card loans by nature represented significantly higher risks.

67.     In subsequent financial reports, X Financial has confirmed that the problems described above started before the IPO.  For example, on a March 19, 2019 earnings call to discuss the Company's fourth quarter and fiscal year 2018 results, defendant Cheng affirmed that X Financial's loan volume had been declining "since [the] middle of last year," which had caused declines in the Company's ticket size.

68.     On April 25, 2019, X Financial filed its annual report for 2018 on Form 20-F.  The report contained a chart entitled "Delinquency Rate by Vintage of Xiaoying Preferred Loan," which illustrated the dramatic increase in delinquency rates leading up to and during the IPO—including in first, second, and third quarters of 2018—and that such negative trends were accelerating, as reflected below:



69.     Then on May 21, 2019, during X Financial's earnings call to discuss the Company's

first quarter 2019 results, defendant Tang admitted that X Financial was unlikely to achieve significant

loan or revenue growth because its preferred loan business had failed "over the last year" and that the

Company was shelving the entire business:

> [Analyst:] *[D]o we see any potential to ramp up the growth,* in particular . . . the
> loan outstanding balance . . . ?

> [Tang:] . . . So *over the last couple of years*, preferred loan was one of our key
> product[s], and a lot of this served for the small and medium enterprises. And that
> segment over *the last year, the risk was higher than [we] expected. So we literally
> discontinued that product line*, except only serve [sic] for some of the higher-quality
> repeated borrower. So *that basically drives to our [sic] no growth in our loan balance*.

(Emphases added.)

70.     On November 22, 2019, X Financial's ADSs closed at $1.74 per ADS.  This price represented an 81.68% decline from the $9.50 per share price at which X Financial's ADSs had been sold to the investing public in the IPO.

71.     As of the date this complaint was filed, X Financial's ADSs continue to trade below the $9.50 per share IPO price.

72.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of X Financial's share price, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired X Financial ADSs pursuant and/or traceable to the IPO (the "Class").  Excluded from the Class are defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable.  X Financial ADSs are actively traded on the NYSE and millions of shares were sold in the IPO.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by X Financial or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

75.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

76.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a)      whether defendants violated the Securities Act;

b)      whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations and risks of investing in X Financial; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violations of Section 11 of the Securities Act Against All Defendants)

79.     Plaintiff repeats, re-alleges, and incorporates the allegations above as if set forth below.

80.      This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all defendants.

24

81.     This Count does not sound in fraud.   Plaintiff does not allege that the Individual Defendants had scienter or fraudulent intent, which are not elements of a Section 11 claim.

82.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

83.     The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

84.     X Financial is the registrant for the IPO.   As the issuer of the shares, X Financial is strictly liable to Plaintiff and the Class for the misstatements and omissions.

85.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

86.     By reason of the conduct alleged herein, each defendant violated Section 11 of the Securities Act.   Additionally, Cogency Global is liable for violating Section 11 of the Securities Act under principles of agency and *respondeat superior* as the employer of defendants Arthur and DeVries, who variously signed the Registration Statement.

87.     Plaintiff purchased X Financial ADSs pursuant and/or traceable to the Registration Statement for the IPO.

88.     Plaintiff and the Class have sustained damages.   The value of X Financial ADSs has declined substantially subsequent to and because of defendants' violations.

89.      At the time of their purchases of X Financial ADSs, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.   Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the

facts upon which this complaint is based to the time that Plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

## COUNT II

**(Violations of § 15 of the Securities Act Against All Defendants Except Arthur and DeVries)**

90.     Plaintiff repeats, re-alleges, and incorporates the allegations above as if set forth below.

91.     This Count is brought pursuant to Section 15 of the Securities Act against X Financial, the Individual Defendants (other than defendants Arthur and DeVries) and Cogency, arising out of their control of the primary violations of the Securities Act alleged herein.

92.     X Financial controlled Cogency Global, Arthur, and DeVries, and caused them to sign the Registration Statement, assist in preparing the Registration Statement, plan the IPO, solicit potential ADS purchasers, and ultimately effectuate the IPO. X Financial also exerted control over the Individual Defendants by virtue of the Individual Defendants' employment and/or roles and responsibilities at the Company as of, or in connection with, the IPO.

93.     Additionally, the Individual Defendants named herein each were control persons of X Financial and Cogency Global by virtue of their positions as directors and/or senior officers of X Financial and their ownership of X Financial shares. These Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of X Financial.

94.      Furthermore, Cogency Global, by virtue of its status as the employer of defendants Arthur and DeVries, was a control person of Arthur and DeVries and is responsible, under principles of agency and *respondeat superior*, for their primary violations of the Securities Act. Cogency Global exercised control over Arthur and DeVries and caused them to sign the Registration Statement in

26

connection with the IPO, as well as participate in the IPO in their capacity as X Financial's Authorized U.S. Representatives.

95.     By reason of the conduct alleged herein, the defendants named herein each violated Section 15 of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  December 9, 2019                         Respectfully submitted,

                                                **POMERANTZ LLP**

                                                */s/ Jeremy A. Lieberman*
                                                Jeremy A. Lieberman
                                                J. Alexander Hood II

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*