# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| XIANGDONG CHEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>X FINANCIAL, YUE TANG, JIE ZHANG, SHAOYONG CHENG, DING GAO, SHENGWEN RONG, ZHENG XUE, LONGGEN ZHANG, RICHARD ARTHUR, COLLEEN A. DEVRIES, COGENCY GLOBAL INC., MORGAN STANLEY & CO. INTERNATIONAL PLC, MORGAN STANLEY & CO. LLC, DEUTSCHE BANK SECURITIES INC., CHINA EVERBRIGHT SECURITIES (HK) LIMITED, CHINA MERCHANTS SECURITIES (HK) CO., LTD., and AMTD GLOBAL MARKETS LIMITED,<br><br>Defendants. | Case No. 1:19-cv-06908<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

Page(s)

NATURE OF THE ACTION AND OVERVIEW ........................................................................ 1

JURISDICTION AND VENUE ..................................................................................................... 11

PARTIES ........................................................................................................................................ 12

SUBSTANTIVE ALLEGATIONS APPLICABLE TO ALL CLAIMS ...................................... 16

    A.    Background ............................................................................................................ 16

        1.    P2P Lenders in China .............................................................................. 16

        2.    X Financial Markets Itself As More Attractive to Lenders ..................... 20

        3.    The Failure of Preferred Loans ............................................................... 22

        4.    The Rise of Delinquencies and X Financial's Undisclosed Tightening of its Approval Processes ...................................................................... 25

        5.    The Company's Conscious Reduction in Card Loan Size ....................... 32

        6.    X Financial Finally Admits the Full Truth to the Market ....................... 34

    B.    Defendants Use Material Misstatements anad Omissions in the Registration Statement to Sell X Financial ADSs to Public Investors ...................................... 36

        1.    Material Misstatements and Omissions Regarding X Financial's Ability to Target Investors Able to Repay Loans and the Company's Increasing Delinquency Rates ................................................................. 37

        2.    Material Misstatements and Omissions Regarding Preferred Loans ........ 41

        3.    Material Misstatements and Omissions Regarding Card Loans .............. 44

        4.    The Registration Statement Failed to Disclose Trends, Uncertainties and Risks Regarding X Financial's Products ........................................... 45

ADDITIONAL ALLEGATIONS APPLICABLE ONLY TO EXCHANGE ACT CLAIMS ..... 47

    A.    Additional Misrepresentations and Omissions ..................................................... 47

    B.    Scienter ................................................................................................................. 51

    C.    Loss Causation ...................................................................................................... 53

i

     D.       Presumption of Reliance ....................................................................... 54

COUNT I
     (Violations of Section 11 of the Securities Act Against All Defendants) ........................ 55

COUNT II
     (Violations of Section 12(a)(2) of the Securities Act Against the Underwriter
     Defendants) ...................................................................................................................... 56

COUNT III
     (Violations of § 15 of the Securities Act Against X Financial, Cogency and the
     Individual Defendants) ..................................................................................................... 57

COUNT IV
     (Violations of § 10(b) of the Exchange Act Against the Management Defendants
     and X Financial) ............................................................................................................... 59

COUNT V
     (Violations of § 20(a) of the Exchange Act Against the Management Defendants) ........ 60

PRAYER FOR RELIEF ........................................................................................................ 60

DEMAND FOR TRIAL BY JURY ....................................................................................... 61

Plaintiffs Xiangdong Chen and Ke Zheng ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of X Financial ("X Financial" or the "Company"), a private investigation including interviews of certain former X Financial employees, the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons or entities who: (1) purchased or otherwise acquired X Financial American Depositary Shares ("ADSs") pursuant and/or traceable to the Company's September 19, 2018 initial public offering (the "IPO") seeking to pursue remedies under §§11, 12(a) and 15 the Securities Act of 1933 (the "Securities Act") (the "Securities Act Class'); and (2) purchased or otherwise acquired X Financial ADSs during the period from September 19, 2018 through and including May 20, 2019, seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 (the "Exchange Act Class," together with the Securities Act Class, the "Classes").

2.      Defendant X Financial is a finance technology company based in Shenzhen, China. The Company operates a peer-to-peer ("P2P") platform that matches borrowers and lenders. X Financial provides a lending platform that can be graphically depicted in simplified form as follows:



The Company's primary source of revenue is the fees it charges for facilitating and processing loans between borrowers and lenders on its platform. In other words, if X Financial connects a borrower with a lender, it receives a percentage commission on the amount of that loan. X Financial also has other streams of income, but loan facilitation fees are by far its largest.

3.      From 2007 through 2015, the P2P lending industry enjoyed explosive growth in China. By 2015, there were reportedly 6,000 P2P lenders. However, the industry was virtually unregulated by Chinese authorities, leading to massive fraud.

4.      In 2016, statistics issued by the Chinese Banking Regulatory Commission showed that approximately 40% of these purported P2P lending platforms were in fact Ponzi schemes. That same year, the China Banking Regulatory Commission (CBRC), in cooperation with other regulators, issued

comprehensive rules, which included setting borrowing limits. The Chinese government also launched a "rectification campaign," allowing local officials to institute compliance probes of online lenders.

5.      As a result, many P2P lenders folded. However, leading up to the IPO in fall 2018, X Financial claimed the Company was growing rapidly, notwithstanding the costs and business reorientation necessary to comply with the new rectification measures. For example, X Financial stated that the Company facilitated approximately RMB19.0 billion, RMB34.4 billion, and RMB19.9 billion of loans on its platform for the years 2016 and 2017, and for the six months ended June 30, 2018, respectively. This implied that, if the 2018 numbers continued on trend, X Financial would facilitate RMB39.8 billion in loans in 2018.

6.      X Financial touted that its outlook was positive because, as one of the few P2P lenders whose products were backed by insurance, it attracted higher quality investors. It also promoted its tough quality control process. However, not all was as rosy as X Financial made it seem.

7.      On August 28, 2018, X Financial filed with the SEC a registration statement on Form F-1 for the IPO, which, after several amendments, was declared effective on September 18, 2018 (the Form F-1, together with all amendments, is referred to herein as the "Registration Statement"). The next day, on September 19, 2018, the Company filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.

8.      X Financial's business was changing rapidly prior to the IPO, but they did not disclose that to investors in the Registration Statement, which instead emphasized that the company's existing products were facilitating growth, when in fact they were already constricting in several ways.

9.      At the time of the IPO, X Financial facilitated primarily two types of loans. The Company's Xiaoying Card Loan ("card loan"), which it describes as its "flagship product targeting prime borrowers," is a credit card balance transfer product. X Financial derived 36.7% of its revenues

3

in 2017 from card loans, making it the Company's largest product.  X Financial's Xiaoying Preferred Loan ("preferred loan") is a product marketed primarily to small- and medium-sized enterprises ("SMEs").  Preferred loans, the Company's second largest product at the time of the IPO, accounted for 22.6% of the Company's revenues in 2017.  X Financial's fees varied with the size of the loan, making larger preferred loans important to the Company's revenue.

10.     Delinquency rates, at least historically, were significantly higher for card loans than preferred loans.  For example, net default rates were 10.19% and 3.10% for card loans and preferred loans, respectively, in 2017.  However, given the typically larger size of preferred loans, even lower delinquency rates in preferred loans corresponded to significant losses.  X Financial has reported, for example, that, as of December 31, 2017, its card loans had approximately RMB2.7 billion in total undiscounted future payments, while its preferred loans had roughly RMB4.5 billion in total undiscounted future payments.

11.     Delinquencies result in losses for X Financial in different ways.  X Financial requires its borrowers to enter into a variety of insurance agreements for the unsecured card and preferred loans it facilitates.  A third-party company, ZhongAn, provided 94% of these insurance plans as of June 30, 2018.  When a borrower defaulted, ZhongAn reimbursed the investor, but had recourse to X Financial, subject to certain caps.  These penalties greatly impacted X Financial's bottom line—at some points leading X Financial to pay ZhongAn more than it collected from borrowers.

12.     Increasing defaults may also lead to ZhongAn increasing premiums to new borrowers, which makes X Financial's products less attractive to the Company's customers, thereby impacting the amount of borrowers who even apply to X Financial.

13.     The need to minimize losses and the risk of defaults were paramount to X Financial and its investors.  For this reason, X Financial claimed to provide services to "prime" borrowers, while

4

avoiding subprime debtors, with credit needs not fully met by traditional banks.   X Financial highlighted its ability to find underserved prime borrowers by using social and behavioral data taken from the Internet and mobile platforms such as social networking sites, as well as traditional indicators of credit-worthiness, and applying its proprietary technology to assess the risk of, and properly price loans to, borrowers.   It even consistently highlighted "proprietary technology" it used in its borrower screening process.

14.     The Registration Statement was used to sell to the investing public more than 11.7 million X Financial ADSs (including the exercise of the underwriters' overallotment option) at $9.50 per ADS.  Defendants generated more than $111 million in gross offering proceeds from their sale of X Financial ADSs in the IPO.

15.     However, the Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

16.     The Registration Statement painted an overly rosy picture of X Financial's business in spite of the tightening government restrictions, including making statements regarding how preferred loans were going to be part of the Company's "growth."   The numbers in the Registration Statement bolstered this false narrative.  For example, the total loan facilitation amount for card loans was, in the six months ending June 30, 2018, higher than it was for the entirety of 2017.  The number of card loans was also on the rise.  The Company had facilitated a total of 1,606,569 card loans in all of 2017, but it had hit 1,411,165 in the first six months of 2018.

17.     Investors were greatly encouraged by these numbers, especially because given the Chinese Government's limits on the amount borrowers could borrow, the number of borrowers was increasingly important.

18.     Except there was a problem –while X Financial publicly stressed the rigor of its control measures, the reality was that the Company significantly relaxed its screening procedures to boost its loan numbers in the twelve months prior to the IPO.  This undisclosed fact was already resulting in increased delinquency rates that Defendants knew would likely continue.

19.     As a result of the increased delinquency rates, X Financial had made several changes to its business *prior to the IPO* but had reported none of them in the Registration Statement.

20.     For example, at the time of the IPO, X Financial had already decided to: (i) limit the amount of card loans it was distributing; (ii) reduce the size of the card loans; and (iii) phase out the preferred loan business.  The Registration Statement made no mention of these facts.

21.     Indeed, while the Registration Statement noted poor July 2018 and August 2018 figures, it stated that things were already "recovering."

22.     In actuality, the Company's net revenue was on track to decline by 22% during the third quarter of 2018.  With the third quarter ending a mere eleven days after the IPO, Defendants undoubtably had internal figures that conveyed a very different picture of the Company than the optimistic one contained in the Registration Statement.

23.     On November 19, 2018, two months after the IPO, the Company released its earnings for the period ending September 30, 2018 (the "Q3 2018 Earnings").  The earnings contained bad news for the Company.  For example, as reported, the Company facilitated only about 806,000 loans, a decrease of 35% as compared to the same quarter in 2017 and 21% as compared to Q2 2018, while the amount of loans facilitated was RMB7,560 million, there was a 13% decline as compared to the same

period in the prior year and 32% decline as compared to the prior quarter.  Net revenue for the quarter was RMB829.5 million, a decline of 22% as compared to the same quarter in 2017, while net income was only RMB197.9, a decline of 34% from the prior quarter.  The Company reported that the delinquency rate for X Financial loans was 3.51% for loans past due 31 to 90 days, representing a greater than 40% sequential increase and a greater than 270% year-over-year increase.

24.     Defendants knew how dire these numbers would be prior to the IPO.  They knew delinquencies were on the rise and they were intentionally reducing loan sizes.  But in the "Recent Developments" section of the Registration Statement painted an optimistic picture indicating that the Company was already returning to growth.

25.     In the Q3 2018 Earnings, Defendants also provided disappointing financial guidance for the Company's fourth quarter.  The press release stated that X Financial only expected total loan facilitation in the range of RMB8,000 million to RMB8,500 million.  This slow growth during a historically strong season confirmed that negative origination and credit quality trends that predated the IPO were expected to continue.

26.     On November 19, 2018, X Financial held its first earnings call after the IPO to discuss its financial results (the "November 19 Call").  As executives explained on the call, the negative operational and financial results reported in the day's press release had been caused by market and other problems that had long preceded the IPO.  Defendant Tang, for example, blamed the "decline in loan facilitation" on "the lows we saw in July when the market turmoil was at a peak" and said that the "[n]umber-one driver" was "the lack of funding during the July and August time."  Speaking specifically about preferred loans, and contradicting statements in the Registration Statement, Defendant Tang told investors that demand for loans had dried up, prompting significant reductions in preferred loans "over the last three quarters" (*i.e.*, the last nine months).

27.     Defendants stated that sky-rocketing delinquency rates, would result in a change of policy moving forward.  The Company would be tightening its credit policy so less buyers would be approved, and it had already reduced the average loan size.

28.     However, Defendants also assured investors that the credit problems were behind them. For example, Defendant Tang stated the market turmoil that had led to the difficulties was "already over," the Company had "very sufficient funding" and growth was on the horizon.

29.     Defendants statements were misleading.  X Financial was still in trouble and, in fact, Defendants knew of the degree of the trouble even earlier than they admitted and had already made policy changes accordingly.

30.     In subsequent financial reports, X Financial shed further light on the problems that began before the IPO.  For example, the earnings report for the fourth quarter of 2018 ("Q4 2018 Earnings"), noted that delinquencies were still on the rise.  As reported, the delinquency rates for all outstanding loans that were past due for 31-90 days and 91–180 days as of December 31, 2018 were 3.54% and 5.28%, respectively, compared with 3.51% and 3.36%, respectively, as of September 30, 2018, and 1.47% and 1.35%, respectively, as of December 31, 2017.

31.     On a late night March 19, 2019 earnings call (the "March 19 Call") to discuss the Company's fourth quarter and fiscal year 2018 results, Defendant Cheng stated that X Financial's loan volume had been declining "since [the] middle of last year," which had caused declines in the Company's ticket size.  Cheng additionally admitted the Company had tightened its approval process *in the 2018 third quarter*, thereby reducing the number of approved borrowers and greatly impacting the Company's bottom line prior to the IPO in a way not disclosed in the Registration Statement.

32.     On March 19, 2019. X Financial stock closed at $6.47 per ADS, but the following day it closed at $6.15 per ADS.

33.     Then on May 21, 2019, during X Financial's earnings call to discuss the Company's first quarter 2019 results, Defendants finally came clean regarding its pre-IPO plans to discontinue preferred loans.  Defendant Tang admitted that X Financial was unlikely to achieve significant loan or revenue growth because its preferred loan business had failed "*over the last year*" and that the Company was shelving the entire business:

> [John Cai of Morgan Stanley:] *[D]o we see any potential to ramp up the growth,* in particular . . . the loan outstanding balance . . . ?
> [Tang:] . . . So *over the last couple of years*, preferred loan was one of our key product[s], and a lot of this served for the small and medium enterprises. And that segment over *the last year, the risk was higher than [we] expected. So we literally discontinued that product line*, except only serve [sic] for some of the higher-quality repeated borrower. So *that basically drives to our [sic] no growth in our loan balance*.

(Emphases added.)

34.     Over the next two trading days the Company's stock fell over 3%, from $5.70 per ADS to $5.52 per ADS.

35.     For an example of the contraction of X Financial's business one need look no further than the number of active individual users[1] of its services.  Far from growing its user base, X Financial's number of active individual investors was on the decline even before the IPO—a decline that continued after the Company became public, as shown by this chart based on Company earnings reports:

---

[1] According to X Financial's financial reports, this figure refers to individual investors who made at least one transaction during that period on the X Financial platform.

9



X Financial's year end 2019 earnings indicated the number of active individual investors was 136,205 2019, representing *a decrease of 48.9% from 266,581 in 2018*.

36.     X Financial's stock has seen a precipitous decline.  Thanks to decisions made prior to the IPO of which investors were unaware—including the decision to eliminate preferred loans and alter borrower screening requirements—earnings per share of the Company for both 2018 and 2019 were well below industry expectations, as depicted in this chart:



37.    As of December 9, 2019, the date the initial complaint was filed, X Financial's ADSs were trading at $1.90 per ADS, 80% lower than its IPO price of $9.50.

38.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of X Financial's share price, Lead Plaintiffs and members of each class have suffered significant losses and damages.

## JURISDICTION AND VENUE

39.    The claims asserted herein arise under Sections 11, 12(a) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77i(a) and 77o) and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

40.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the

11

acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.

41.     In connection with the acts alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange on which the ADSs trade.

## PARTIES

42.     Lead Plaintiffs Xiangdong Chen and Ke Zheng acquired X Financial ADSs at artificially inflated prices, as set forth in previously filed certifications incorporated by reference herein, pursuant and/or traceable to the Registration Statement for the Company's IPO and were damaged thereby.

43.     Defendant X Financial is a financial technology company incorporated in the Cayman Islands, and based in Shenzhen, China, that provides an online lending and borrowing marketplace. The Company conducted the IPO in New York and the ADSs sold in the IPO trade on the New York Stock Exchange ("NYSE"), under the ticker symbol "XYF."  Each X Financial ADS represents two Class A ordinary shares of the Company.  The Company maintains a dual voting class structure designed to concentrate control of the Company in the hands of its Chief Executive Officer ("CEO"), defendant Yue (a/k/a Justin) Tang, out of proportion to his economic stake in X Financial.  Class B ordinary shares, which were issued for the first time in the IPO and exclusively to Defendant Tang, each have twenty votes per share, as compared to Class A shares, which entitled their holders to only one vote per share.  Class B shares can be converted into Class A shares at the holder's election, but Class A shares cannot be converted into Class B shares.

44.     Defendant Tang, was X Financial's CEO and Chairman of the Board of Directors (the "Board") at the time of the IPO and all relevant times thereafter.  He is also the Company's founder.

Prior to the IPO, Defendant Tang owned more than 101 million X Financial ordinary shares, or approximately 36% of the Company's total outstanding shares.  As of the IPO, Defendant Tang's shares were converted into 97.6 million Class B shares and 3.8 million Class A shares, representing over 33% of the Company's outstanding shares and more than 90% of the Company's aggregate voting power.  According to the Registration Materials, Tang "will have the ability to control or exert significant influence over important corporate matters that require approval of shareholders which may deprive you of an opportunity to receive a premium for your ADSs and materially reduce the value of your investment."

45.     Defendant Jie (a/k/a Kevin) Zhang was X Financial's Chief Financial Officer at the time of the IPO and all relevant times thereafter.  He signed the Offering Materials for the IPO.

46.     Defendant Shaoyong (a/k/a Simon) Cheng was a director and the President of X Financial at the time of the IPO and all relevant times thereafter.  He signed the Offering Materials for the IPO.

47.     Defendant Ding (a/k/a Gardon) Gao was a director and Chief Technology Officer of X Financial at the time of the IPO and all relevant times thereafter.  He signed the Offering Materials for the IPO.

48.     Defendant Shengwen Rong was a director appointee of X Financial at the time of the IPO.  According to the Registration Statement he was to "serve as [X Financial's] independent director upon the effectiveness of the registration statement."  After the IPO, he became a member of the Board of Directors.

49.     Defendant Zheng Xue was a director appointee of X Financial at the time of the IPO. According to the Registration Statement he was to "serve as [X Financial's] independent director upon

the effectiveness of the registration statement."  After the IPO, he became a member of the Board of Directors.

50.     Defendant Longgen Zhang was a director appointee of X Financial at the time of the IPO.  According to the Registration Statement he was to "serve as [X Financial's] independent director upon the effectiveness of the registration statement."  After the IPO, he became a member of the Board of Directors.

51.      Defendants Richard Arthur, Assistant Secretary of Cogency Global Inc. ("Cogency Global"), and Colleen A. DeVries, Senior Vice President of Cogency Global, served as X Financial's Authorized U.S. Representatives in connection with the IPO and each signed an iteration of the Registration Statement.  Defendant Cogency Global is liable for the securities law violations by Defendants Arthur and DeVries in its capacity as their employer and as a control person under the Securities Act.

52.     Defendants Tang, Zhang and Cheng are referred to herein as the "Management Defendants."  The Management Defendants with Gao, Rong, Xue, Longgen Z., Arthur, and DeVries are referred to herein as the "Individual Defendants."  Each of the Individual Defendants, other than Rong, Xue, and Longgen Z. (who were named as director appointees in the Registration Statement), signed the Registration Statement.

53.     Defendants Morgan Stanley & Co. International plc and Morgan Stanley & Co. LLC (collectively, "Morgan Stanley") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of X Financial's Registration Statement.  The Offering Materials represented that Morgan Stanley & Co. International plc would offer the ADSs in the U.S. through Defendant Morgan Stanley & Co. LLC, its registered broker-dealer affiliate in the U.S.

54.     Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of X-Financial's Registration Statement.

55.     Deutsche Bank and Morgan Stanley & Co. International plc were joint book runners for the offering.

56.     China Everbright Securities (HK) Limited ("China Everbright") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of X-Financial's Registration Statement.

57.     China Merchants Securities (HK) Co., Ltd. ("China Merchants") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of X-Financial's Registration Statement.

58.     AMTD Global Markets Limited ("AMTD Global") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of X-Financial's Registration Statement.

59.     Morgan Stanley, Deutsche Bank, China Everbright, China Merchants and AMTD Global are collectively referred to herein as the "Underwriter Defendants."  The Underwriter Defendants, who sold millions of ADS in the IPO, received millions of dollars in fees and commissions for their work.  The underwriting discount and commissions represented approximately 7% of the IPO price.  The Registration Statement indicated that the Underwriter Defendants had advised X Financial that, after the IPO, they intended to make a market in the ADSs as permitted by applicable laws and regulations.  As listed in the Prospectus Supplement No. 1, dated September 20, 2018 (which superseded the chart in the initial registration statement), the Underwriter Defendants received 11 million ADSs for sale in total.  The Underwriter Defendants also demanded and received an agreement

from X Financial that X Financial would indemnify them "against certain liabilities, including liabilities under the Securities Act," according to the Registration Statement.

60.     According to the Registration Statement, certain of the underwriters were "expected to make offers and sales both inside and outside the United States through their respective selling agents. Any offers or sales in the United States will be conducted by broker-dealers registered with the SEC. Morgan Stanley & Co. International plc will offer the ADSs in the United States through its registered broker-dealer affiliate in the United States, Morgan Stanley & Co. LLC. China Everbright Securities (HK) Limited is not a broker-dealer registered with the SEC, and to the extent that China Everbright Securities (HK) Limited intends to make any offers or sales of ADSs in the United States or to any U.S. persons, it will do so only through one or more SEC-registered broker-dealer affiliates in compliance with the applicable securities laws and regulations."

61.     The Individual Defendants, Cogency Global and the Underwriter Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.     Background

#### 1.     P2P Lenders in China

62.     Defendant X Financial is a finance technology company based in Shenzhen, China. The Company operates a P2P platform that matches borrowers and lenders.

63.     From 2007 through 2015, the P2P lending industry enjoyed explosive growth in China. By 2015, there were reportedly 6,000 P2P lenders.  However, the industry was virtually unregulated by Chinese authorities, leading to massive fraud.

64.     X Financial was founded in 2014 in the midst of this boom.  According to the Company's own "Corporate Profile" on its website: "The Company's major loan products include Xiaoying Card Loan, primarily a credit card balance transfer product, and Xiaoying Preferred Loan, a

high-credit-limit unsecured loan product, both offering borrowers a combination of large credit line, and a long-term and attractive APR in China."

65.     The Company offers investment opportunities to investors in China through its wealth management platform, Xiaoying Wealth Management.

66.     The Company's primary source of revenue is charges for its loan facilitation services—it charges a fee, which is a percentage of the loan amount, for facilitating and processing loans between the two groups on its platform.  The Company also charges for other services it provides over the lifetime of the loan (*i.e.*, post-origination and guarantee services), but its primary revenue driver is fees for its loan facilitation services.  As such, the number of loans the Company facilitates, and the size of those loans, is essential to its bottom line.  According to the Registration Statement, in 2017, for example, the Company's service fee rate (annualized based on original amount of loan principal) of its major loan products ranged from 0.8% to 45.0%.  The service fees charged for loan facilitation services, post-origination services and guarantee services accounted for 85.8%, 2.8% and 2.7%, respectively, of X Financial's total net revenues.

67.     For a long time, X Financial and other P2P platforms seemed to have it made, with skyrocketing revenue.  Lenders were promised high interest rates for loans they made through platforms.

68.     But trouble was on the horizon.  Many P2P companies struggled to return money to investors and a large portion shut down without having done so.  The news was filled with people who reported losing their life savings thanks to a P2P lending platform.  There were even reportedly suicides because of these issues.  In 2016, statistics issued by the Chinese Banking Regulatory Commission showed that approximately 40% of these purported P2P lending platforms were in fact Ponzi schemes.

A graphic created by the Chinese-based news outlet TechNode showed the massive problems with P2P lenders:



**Most troubled P2P platforms are experiencing difficulties in returning capital to investors**

Types of troubled P2P platforms from 2016 to July 2018

Source: Home of Online Lending; Graphics by TechNode/Jiefei Liu

69.     In light of the problems with P2P lenders, the Chinese government stepped in and the industry went from being fairly unregulated to being subject to massive regulation.

70.     On August 17, 2016, the Chinese Banking Regulatory Commission, in conjunction with other regulators, issued: "Interim Measures for the Administration of the Business Activities of Online Lending Information Intermediary Institutions" (the "Interim Measures").[2]   The Interim Measures set many restrictions on P2P lenders, including disclosure requirements and funding limits.

71.     As specifically relevant to this case, the Interim Measures capped the amount individuals and businesses were allowed to borrow on a P2P platform.  Under the Interim Measures, an individual is permitted to raise a maximum fund of RBM200,000 per platform and an aggregate

---

[2] The Interim Measures are *available at* http://www.cbrc.gov.cn/govView_37D312933F1A4CECBC18F9A96293F450.html. An English translation is available from Chinalawinfo Co. Ltd., an online legal information service established by Peking University in association with the university's Legal Information Center, *available at*: http://www.lawinfochina.com/display.aspx?id=22668&lib=law&SearchKeyword=&SearchCKeyword=&EncodingName=big5.

amount of RBM1 million across all platforms.  A company is allowed to raise a maximum fund of RBM1 million per platform and an aggregate amount of RBM5 million across all platforms.  This marked a significant change for X Financial, who would regularly loan out RBM600,000 to some individuals.

72.     Originally, P2P lenders were supposed to comply with the Interim Measures within 12 months or shut down.  However, the People's Bank of China extended the deadline to June 2018.

73.     This was not the only regulation that impacted X Financial.  Prior to regulations issued in December 2017, the annualized interest rates for certain loans issued by X Financial exceeded 36%.  X Financial also was able to deduct certain fees from a loan principal in advance, including loan interest and service fees.  According to the Registration Statement, in order to comply with the 2017 regulations, X Financial "adjust[ed] the annualized fee rates of all new loans that [they] facilitated since December 7, 2017 not to exceed 36% and (ii) ceas[ed] deduction of any service fees from a loan principal in advance[.]"  This 36% figure is particularly relevant in light of the Registration Statement's disclosure that the Company's service fees might be deemed "fully or partially. . . as loan interest," meaning the combination could not exceed 36%.

74.     Additionally, in June 2018, relevant offices in Beijing, including the Beijing Leading Group for Special Rectification Work on Internet Finance Risk, issued documents that set out goals to both reduce the number of P2P companies and the business scale of those companies.

75.     These regulations put the P2P industry under significant strain.  But, while many other P2P lenders flailed and/or shuttered, X Financial seemingly continued to grow.  The Registration Statement laid out a compelling portrait of a Company on the rise.  For example, the loan facilitation amount for the six months ending June 30, 2018 indicated the 2018 numbers would be significantly higher than 2017 numbers:

19

|  | As of or for the Year Ended December 31, | | As of or for the Six Months Ended June 30, |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
| **Loans** | | | |
| Total loan facilitation amount (RMB in millions)[1] | 18,996 | 34,400 | 19,879 |
| Xiaoying Card Loan | 179 | 12,634 | 13,834 |
| Xiaoying Preferred Loan | 1,509 | 7,777 | 4,331 |
| Xiaoying Housing Loan | 5,840 | 4,244 | 164 |
| Loan facilitation services to other platforms | 1,804 | 5,464 | 1,318 |
| Others[2] | 9,663 | 4,281 | 232 |

76.     As shown in this chart, the loan facilitation amount for card loans for the first six months of 2018 was already higher than it was for the entirety of 2017.

77.     This growth came at a cost.  Confidential Witness #1 (CW1), who worked in credit risk control at X Financial, from June 2017 through October 2018, said the screening process for applicants became less rigorous if the Company wanted to distribute more loans.  According to CW1, this was the case from fall 2017 through the second quarter 2018 (the end of which coincided with the date of required compliance with the Interim Measures).  During this time, according to CW1, he was told by his manager to not be as detailed in his review and research of potential borrowers or as comprehensive in his factcheck of material provided to him.

78.     These numbers helped sell the Company to unsuspected investors.  However, it also led to borrowers defaulting, as discussed more fully *infra*.

### 2.     X Financial Markets Itself As More Attractive to Lenders

79.     X Financial claimed to benefit from something many other P2P lenders did not have: Insurance.  As stated on X Financial's website: "X Financial benefits from its strategic partnership with ZhongAn. The protection offered by ZhongAn's credit insurance on the Company's investment products significantly enhances investor confidence. The Company's risk management system is also strengthened by ZhongAn's rigorous risk control of insurance decision opinion. ZhongAn's credit assessment model is based on information from various databases, including PBOC CRC which is only

available to licensed financial institutions. The model serves as one of the inputs of the Company's comprehensive credit risk management system, along with other behaviour and credit information." According to an Oliver Wyman Report, less than 3% of similar consumer finance marketplaces in China offered such protection as of year end 2017.

80.    X Financial required parties to sign an insurance agreement as part of utilizing its services.

81.    Through X Financial's wealth management platform, Xiaoying Wealth Management, investors could lend with some confidence because of the insurance offered by ZhongAn.  Institutions could also fund loans through X Financial.  The detailed diagram of X Financial's business model, including its use of insurance, was present in the Registration Statement:



82.    While this meant the lender could feel safe using X Financial, this came at a cost to X Financial's bottom line.  According to an October 31, 2018 article published online on the China Money Network website, the company's average monthly return rate from its products, which was then 8.04%, was "relatively modest in comparison with its competitors" because part of its "profit margin

[was] transferred to ZhongAn."[3]  Delinquencies resulted in various payments to ZhongAn, as detailed *infra*.

### 3.    The Failure of Preferred Loans

83.    The Company relied on the success of its card loan and preferred loan products.  The Company describes card loans as "our flagship product targeting prime borrowers."  X Financial derived 36.7% of its revenues in 2017 from card loans, making it the Company's largest product.  X Financial offers its card loan product in amounts, or "ticket sizes," from RMB2,000 to RMB60,000.

84.    X Financial's preferred loan is a product marketed primarily to SMEs.  Preferred loans, which at the time of the IPO, were the Company's second largest product, accounted for 22.6% of the Company's revenues in 2017.  The Company offered its preferred loans at a variety of ticket sizes, typically depending on the type of investor, but, before June 2018, generally between RMB100,000 and RMB600,000, making preferred loans significantly larger than card loans.[4]

85.    Preferred loans were greatly impacted by the Interim Measures because of the significant cap it put on the Company's ability to lend.  Whereas previously the Company could lend RMB600,000 to an individual, after June 2018 it could only lend RMB200,000.

86.    CW1 performed background checks for borrowers applying for preferred loans and conducted in-person interviews with those borrowers.  However, he left the Company in October 2018 because, due to the contraction of the preferred loan business, preferred loans were no longer being administered in the office located in the Guangzhou region of China, where he worked.  He was told

---

[3] *See* Eudora Wang, *X Financial's Kevin Zhang is Long-Term Bullish for China's P2P Sector*, CHINA MONEY NETWORK, October 31, 2018, *available at* https://www.chinamoneynetwork.com/2018/10/31/x-financials-kevin-zhang-is-long-term-bullish-for-chinas-p2p-sector.

[4] Despite the differences in the loan products, at some point after the IPO in 2018, and thereafter, X Financial decided to combine the two units into a single business segment, called Xiaoying Credit Loan, and ceased breaking out operational results for each segment. This made it more difficult for investors to analyze the business unless executives spoke directly about the breakdown in an interview or earnings call.

*prior to his departure in October* that the Company was not going to be facilitating preferred loans any longer.

87.     CW1 noted that demand was way down for preferred loans because, as borrowers were allowed to take significantly less under the Interim Measures, the loans were not game changers for as many people.  In other words, if a person needed RMB400,000 for a busines remodel, they used to be able to receive that much through X Financial, but now they could only receive half as much, which would be inadequate to meet their requirements.

88.     X Financial and the Management Defendants were therefore, prior to the IPO, taking the first steps in eliminating the product line, because Defendants already knew it would be gone soon. However, X Financial hid this drastic contraction in a critical line of business from investors at the time of the September 2018 IPO.  For example, the Registration Statement stated that X Financial was "able to source a large number of borrowers for Xiaoying *Preferred Loan,* which *will drive the continued growth in our borrower base*."

89.     The Registration Statement also implied preferred loans were growing in other ways. For example, the Registration Statement stated how, while preferred loans typically had a fixed-term of 12 months, in the six months ended June 30, 2018, the Company had begun offering them with a term of three years.

90.     Based on information provided in the Registration Statement, and the data reported as of the end of the second quarter of 2018, the Company was on target to deliver over 12,300 more preferred loans than the prior year, almost *a 40% increase* in the amount of preferred loans.  While the Registration Statement did include data for July 31, 2018 and August 31, 2018, which indicated the

amount of preferred loans were waning, there was no direct explanation of why this was occurring, or any clear guidance that it would continue.[5]

91.     However, when X Financial reported earnings for the period ending September 30, 2018 (*only eleven days after the IPO*), on November 19, 2018, the Q3 2018 Earnings release noted for the first time:  "Xiaoying Preferred Loan was adversely impacted by sentiment across the industry[.]"

92.     The Q3 2018 Earnings also presented a dire picture of the loan facilitation amount. In the third quarter it was RMB7,560 million, representing a decrease of 13.1% from RMB 8,696 million in the same period of 2017, *and a decrease of 32.4% from RMB 11,186 million in the second quarter of 2018*.

93.     At the time of the IPO – which was only 11 days prior to end of this quarter – Defendants were undoubtedly aware that X Financial's numbers were going to continue to plummet. They were indeed aware that they had already chosen to discontinue the preferred loan product.

94.     On the November 19 Call to discuss the earnings, Defendant Tang told investors that demand for loans had dried up, prompting significant reductions in preferred loans "*over the last three quarters*" (*i.e.*, the last nine months), stating: "Then on the preferred loan, because of the operating environment for SME owners are very difficult these days, and our preferred loan did suffer a higher-than-expected loss than our earlier estimate. And as a result, actually, over the last three quarters, we have been consistently reduced our [sic] preferred loan business."  In other words, rather than growing, preferred loans were being intentionally phased out.

95.     As the executives explained, plummeting demand and high default rates had, in turn, forced the Company to make the "big [strategy change] to . . . scale down the preferred loan business." Scaling down preferred loans, meanwhile, had prompted "a change in product mix resulting from a

---

[5] "Preferred Loan" is mentioned in the charts in the "Recent Developments" section, but not in the explanatory paragraphs.

significant increase in the proportion of revenue generated by Xiaoying Card Loan." Yet this strategy decision was disclosed to investors in the Registration Statement.

### 4. The Rise of Delinquencies and X Financial's Undisclosed Tightening of its Approval Processes

96.     During this time, X Financial was experiencing a skyrocketing rate of delinquencies.

97.     X Financial marketed itself as a company able to target "prime borrowers" because of its screening process.  The Registration Statement contained multiple pages detailing the screening process for each of the two types of loans, which showed that the process for preferred loans was stricter.  In general, X Financial promoted its risk control system to assure investors:

> We utilize data-driven and technology-empowered credit analysis. Our proprietary risk control system, WinSAFE, builds risk profiles of our prospective borrowers upon data from reputable credit information providers employed by traditional financial institutions, augmented by a variety of social and behavioral data from internet and mobile platforms that are typically not utilized by traditional financial institutions. Leveraging data analysis and machine learning in analyzing a borrower's value, repayment capability and propensity, we have the capabilities to offer differentiated credit limits to borrowers based on individual credit assessment results. Our rigorous data-driven credit assessment methodology has helped us to achieve a strategic balance between borrower expansion and asset quality control.

98.     Nevertheless, there were certainly delinquencies.  In fact, despite the Registration Statement's emphasis on how X Financial was uniquely capable of targeting "prime borrowers," the Company's delinquency rates turned out to be higher than the delinquency rates at many peer companies.  For example, an August 2019 post on the website Home of Online Loans,[6] also known as WDZJ, reportedly listed delinquency rates of several companies for all outstanding loans as of December 31, 2018, only months after the X Financial IPO.  These rates were based on public filings.

---

[6] *Delinquency Rates Demystified for 13 Companies*, HOME OF ONLINE LOANS, Aug. 7, 2019, *available at* https://www.wdzj.com/zhuanlan/guancha/17-12432-1.html.

X Financial had the highest delinquency rates of peer companies, as shown in this chart which was translated and adapted from a chart that appeared in that article:

| Institution Name | M1 | M2 | M3 | M3-M6 | M6+ |
|---|---|---|---|---|---|
| Home Credit BV | -- | -- | -- | -- | 1.74% |
| 9F (Listed on NASDAQ) | 0.06% | 0.12% | 0.32% | 0.88% | -- |
| Quidian (Listed on NYSE) | -- | -- | -- | -- | -- |
| LexinFintech (Listed on NASDAQ) | 1.28% | 0.69% | 0.52% | 1.14% | -- |
| Weidai (Listed on NYSE) | 0.85% | 0.62% | 0.65% | -- | 2.45% |
| Niwodia (Listed on NASDAQ) | 1.35% | 2.53% | 2.37% | 5.46% | -- |
| Hexindai (Listed on NASDAQ) | 0.26% | 0.34% | 0.37% | -- | 0.63% |
| Yirendai (Listed on NYSE) | 1.00% | 1.80% | 1.70% | -- | -- |
| 360 Finance (Listed on NASDAQ) | -- | -- | -- | -- | 0.92% |
| X Financial (Listed on NYSE) | -- | 3.54% | | 5.28% | -- |
| 51 Credit Card (Listed on HKEx: 2051) | -- | -- | -- | -- | -- |
| V Credit (Listed on HKEx: 2003) | | 3.50% | | -- | 5.00% |
| PPDai (Listed on NYSE) | 0.92% | 1.63% | 1.41% | 4.23% | -- |

The "M" in the chart means month.  So, for X Financial, according to the Company's 2018 20-F Annual Report, outstanding loans that are past due for 31-90 days and 91–180 days, were 3.54% and 5.28%, respectively, as of December 31, 2018.  M2 and M3 represent two or three months past due, or 31-90 days past due.  M3-M6 is 91–180 days past due.

99.     Confidential Witness #2 (CW2), who worked in the debt collection department at X Financial from February 2018 through February 2019, said, despite what X Financial told the market,

the screening for Card Loans was lax, boiling down to almost anyone with a credit card being able to take out this type of loan.

100.    A search of online message boards and blog posts likewise indicates users found the application process for X Financial card loans virtually impossible to fail.  Here are a selection of comments from those sites:

- "Xiaoying Card Loan's record background check times means you can receive your loans in as few as two hours, beating 95% of the market's time. Once you've provided authentic identification information, your loans can very easily be accepted[.]"

- "Xiaoying Card Loan is known for its fast loan processing[.]"

- "Xiaoying Card Loan requirements do not include any related to identity or household registration; your loans will be approved whether you're legally registered or not[.]"[7]

101.    The insufficient screening process resulted in the high number of defaults.

102.    And avoiding delinquencies was essential to X Financial's survival.  Delinquency results in losses for X Financial in different ways.  ZhongAn provided 94% of the insurance plans X Financial required investors to enter into as of June 30, 2018.  When a borrower defaults, ZhongAn reimburses the investor, but has recourse to X Financial, subject to certain caps.  Specifically, the Registration Statement details the model for loans facilitated since September 2017 as follows:

> Under New ZhongAn Model (i) for Xiaoying Preferred Loan newly facilitated since September 2017, ZhongAn is fully liable for the borrower's credit risk; and for (ii) most Xiaoying Card Loan newly facilitated since September 2017, borrowers are required to enter into a guarantee agreement and an insurance agreement with us and ZhongAn, respectively, to pay the guarantee fee and insurance fee to the respective party at a pre-agreed rate. Upon borrower's default, ZhongAn reimburses the full loan principal and interest to the investor first, and has the right to recourse to both the borrower and us, but our obligation at any time is capped at a certain percentage of the principal at loan facilitation as pre-agreed with ZhongAn. Such cap is the lower of (1) total amount of guarantee fees

---

[7] These quotes are *available at*, in order, https://www.rong360.com/ask/view/e7u87ja35 (July 7, 2017), http://www.wanppt.com/wdgl/595.html (undated), and https://www.p2peye.com/thread-1953075-1-1.html (January 8, 2018).  Each one has been translated from the original Chinese.

contractually required to be collected from the borrowers for such loans facilitated during the current period on an aggregated basis, and (2) a certain percentage of the total principal of the loans facilitated stated in an annualized manner, as pre-agreed with ZhongAn, which will be negotiated prospectively at each quarter between the two parties based on the expected default rate.

103.    Because of the high rate of delinquencies, there were quarters when X Financial was required to pay ZhongAn more than it collected from borrowers.

104.    ZhongAn may also increase premiums to new borrowers to account for defaults, which makes X Financial's products less attractive to the Company's customers.  This in turn could influence the amount of loans distributed, though it might not be apparent to even the Company, as borrowers might simply not apply knowing of the high insurance premium rates.  On online consumer complaint boards in China, insurance requirements and their costs are a source of major complaints about X Financial.

105.    Delinquencies also impacted the fees X Financial collected.  While X Financial charged upfront fees for certain loans, for preferred loans it collected service fees on a monthly basis over the term of the loan.  Therefore, if a borrower defaulted, X Financial was also without at least a portion of its expected loan facilitation fees.

106.    The Registration Statement admitted delinquency rates were on the rise:  "In 2016, 2017 and for the six months ended June 30, 2018, the total loans we facilitated amounted to RMB18,996 million,  RMB34,400 million  and  RMB19,879 million,  respectively,  while  the delinquency rate by balance for outstanding loans that were 91 to 180 days past due was 0.38% as of December 31, 2016, 1.34% as of December 31, 2017 and 3.26% as of June 30, 2018."  But the Registration Statement did not explain to investors that this increase in delinquency was a growing trend that was continuing at the time of the IPO, nor did it disclose that X Financial was making policy changes because of the delinquency increases, such as tightening credit requirements and reducing loan size.

107.    According to the Registration Statement, delinquency rates, at least historically, were significantly higher for card loans than preferred loans.  For example, net default rates were 10.19% and 3.10% for card loans and preferred loans, respectively, in 2017.  However, given the typically larger size of preferred loans, even lower delinquency rates in preferred loans corresponded to significant losses.  X Financial has reported, for example, that, as of December 31, 2017, its card loans had approximately RMB2.7 billion in total undiscounted future payments, while its preferred loans had roughly RMB4.5 billion in total undiscounted future payments.

108.    While X Financial did not disclose this prior to the September 2018 IPO, X Financial would admit on the November 19 Call that delinquency rates for preferred loans were greatly exceeding the Company's internal expectations.  The rate of delinquency on card loans was also high.

109.    As a result, on the November 19 Call, the X Financial Defendants said, in light of this, they would "tighten [the] credit policy" and "reject more applications" as preventative measures.  But that change had in fact already occurred, unbeknownst to investors.

110.    The Q4 2018 Earnings showed delinquencies were still troubling X Financial. The delinquency rates for all outstanding loans that were past due for 31-90 days and 91–180 days as of December 31, 2018 were 3.54% and 5.28%, respectively, compared with 3.51% and 3.36%, respectively, as of September 30, 2018, and 1.47% and 1.35%, respectively, as of December 31, 2017. Yet, the Company did not adequately disclose in the Registration Statement that delinquencies were sharply on the rise.

111.    On the March 19 Call, X Financial discussed the Q4 2018 and year-end results. Participating in the March 19 Call on behalf of the Company were the Management Defendants and an investor relations representative; securities analysts on the call included representatives from Deutsche Bank and Morgan Stanley.

112.     On the March 19 Call, Defendant Cheng for the first time stated that the "approval rate has been decreasing *since middle of last year*."  While on the November 19 Call, the X Financial Defendants indicated they would be reducing approval rates as a preventative measure in the future, the Company now admitted that the conscious decision to reduce the rates was done prior to the IPO.

113.     The Registration Statement failed to indicate this – after all, it stated preferred loans would help grow the user base.

114.     On the March 19 Call, Defendant Zhang explained that this rise in delinquencies was the result of loans facilitated in June and July 2018, shortly before the IPO.  Those loans boosted figures for the IPO but now were creating significant problems for investors.  Defendant Zhang admitted:  "And we noted that the delinquency rate for the loan facilitated in June, July of 2018 actually increased a lot in Q4, and that's resulted in a significant compensation for ZhongAn and we need to reimburse ZhongAn and that gap."

115.     Defendant Cheng made the shocking admission that these delinquencies, "particularly for [the] preferred loan," resulted in the Company "*compensate[ing] ZhongAn more than [it] collected from the borrowers*."

116.     While the Company did not at this point report delinquencies separately for preferred and credit loans, Defendant Cheng admitted that the delinquency increases were "particularly for our preferred loan."

117.     Notably, giving more preferred loans in the first half of 2018 would have improved the financials prior to the IPO.  And CW1, who was part of the due diligence system at X Financial, said the interview process became less rigorous when the Company wanted to distribute more loans, as the Company did during this time.

118.     On April 25, 2019, X Financial filed its annual report for 2018 on Form 20-F.  The report contained a chart entitled "Delinquency Rate by Vintage of Xiaoying Preferred Loan," which illustrated the dramatic increase in delinquency rates for the preferred loans processed leading up to and during the IPO—including in first, second, and third quarters of 2018—and that such negative trends were accelerating, as reflected below (where the X access stands for number of months delinquent):[8]



119.     The annual report also showed an accelerating delinquency rate for card loans, as depicted in the following "Delinquency Rate by Vintage of Xiaoying Card Loan" chart[9]:

---

[8] The graph has been annotated for clarity.

[9] The graph has been annotated for clarity.



Although the difference in delinquency rate on loans distributed in recent quarters versus those distributed in early 2017 is less stark than it is for preferred loans, any acceleration in delinquencies for card loans was of concern given how much larger a role card loans had in X Financial's business.

120.    Defendants had access to current information at all relevant times and, at the time of the IPO, surely would have known how quickly delinquencies were accelerating in at least Q3 2018.  After all, Defendant Tang bragged on the November 19 Call that the Company "closely monitor[ed] the data" and was "able to manage [its] risk" quickly.  Yet even on the first post-IPO call, the Management Defendants tried to downplay the trouble the Company was in.

**5.    The Company's Conscious Reduction in Card Loan Size**

121.    While X Financial was consciously downsizing its preferred loans business in preparation for its cessation, and more loan applications were being rejected, X Financial had made one more policy change they did not disclose to investors in the Registration Statement: they decreased the size of card loans.

122.    Unlike preferred loans, the size of card loans were not particularly impacted by the Interim Measures because the loan size was already below the limit required by the government.  There

was no indication prior to the IPO that the average size of card loans was intentionally changing.  After all, it was important for X Financial to loan out as much money as it could because demand and fees were based on these factors.

123.    The Registration Statement included disappointing data for July 2018 and August 2018 but indicated that things were improving since August 2018.  For example, the Registration Statement assured investors:  "Since the beginning of August 2018, the amount of funding from individual investors on our platform has been recovering, and our business performance has started gradually improving[.]"

124.    However, the Q3 2018 Earnings indicated a tremendous reduction in loan size.  The loan facilitation amount of card loans in the third quarter of 2018—the period ending eleven days after the IPO—was RMB5,720 million, down 24.4% from RMB7,562 million in the second quarter of 2018.

125.    In his opening remarks on the November 19 Call, Defendant Tang stated the Company "***consciously reduced*** [its] average loan size because of [its] concern of external economic environment and credit environment" in the third quarter.  This was news to investors, as, while this decision was obviously made before the IPO, it could not be found in the Registration Statement.

126.    Tang stated:  "[I]f you look at the average loan size that we have on our credit card loan during the Q3, we cut it down by about 20% from our normal period."  Later in that call he stated the reduction might be closer to 25% down from the prior average.

127.    Both Defendants Tang and Cheng explained that this undisclosed, but purposeful, reduction was the result of a poor credit environment.  They did not explain why they had not mentioned this action in the Registration Statement.  And reassured investors that the Company had already rebounded, that the uncertainty was behind the Company.

33

128.     However, X Financial had not rebounded.  Its user base continued to deteriorate.  For example, the March 19 Earnings indicated the total users for Q4 2018 was even worse than it had been in Q3 2018.  Reportedly, the number of active individual investors in the fourth quarter of 2018 was 110,973, a decrease of 8.9% from 121,757 in the third quarter of 2018.

129.     Analysts recognized that X Financial had not recovered.  For example, an analyst report from Morgan Stanley issued March 19, 2019 stated: "***The 4Q18 results were weak, with a flattish loan balance, higher delinquency and declining take rates***. We see a weaker-than peer growth outlook, due to asset quality pressure and a likely change in product mix" (emphasis added).

130.     This reduction in the size of loans was also apparent in the Company's annual financials – despite the Registration Statement's implication that the Company was growing at the time of the IPO, the amount of loan facilitation in 2018 amounted to RMB36,913.  If the number for the period ending June 30, 2018, was doubled, the figure would have been RMB39.8 billion, and that would have been a low estimate considering Q4 is typically a strong season for lenders.

## 6.     X Financial Finally Admits the Full Truth to the Market

131.     On May 20, 2019, after the market closed, X Financial announced its first quarter 2019 earnings.  The loan facilitation amount – now a combination of preferred and card loans – was RMB7,932 million, down 3.7% from the first quarter of 2018.

132.     The Company also reported a lower average loan amount than it even had in fourth quarter 2018, which was after the conscious reduction of card loan size.  The reported average loan amount per transaction (calculated by dividing the total loan facilitation amount by the number of loans facilitated during the relevant period) in the first quarter of 2019 was RMB6,558, representing a decrease of 45.6% from RMB12,055 in the same period of 2018 and a decrease of 10.3% from RMB7,312 for the fourth quarter of 2018.

133.     On the related May 21, 2019 investor call, the Management Defendants stressed X Financial was continuing to grow and expand its reputation with higher value investors.  However, when pressed by John Cai of Morgan Stanley on whether the Company still saw growth in its future, Defendant Tang admitted growth would be difficult because of the discontinuation of the preferred loan product:

> [Cai:] *[D]o we see any potential to ramp up the growth,* in particular . . . the loan outstanding balance . . . ?
>
> [Tang:] . . . So *over the last couple of years*, preferred loan was one of our key product[s], and a lot of this served for the small and medium enterprises. And that segment over *the last year, the risk was higher than [we] expected. So we literally discontinued that product line*, except only serve [sic] for some of the higher-quality repeated borrower. So *that basically drives to our [sic] no growth in our loan balance*.

134.     Defendant Tang also admitted that the Company did not even want to predict volume growth:  "I don't want to give very aggressive expectations of the loan volume growth. . . I think we will see some growth, but I don't want to project aggressive growth in our loan volume or loan balance at this moment."  He said he did not want to predict loan growth because of the reduction in approval rate for card loans – which was down from fourth quarter 2018, despite the fact that Defendants had stated this reduction approval was due to the challenging economic environment the worst of which they previously indicated was over the prior year.

135.     By August 2019, X Financial would admit that they were distancing themselves from ZhongAn insurance, which now only facilitated about 50% of the loans from the Company.  While X Financial did not disclose the exact reasons they were looking to other insurance providers, surely the fact that the Company was consistently paying ZhongAn extraordinary amounts as a result of delinquencies was a factor.

136.     According to the Company's 2019 year-end earnings, X Financial only had 136,205 active individual investors use its platform in 2019, representing *a decrease of 48.9%* from 266,581 in

35

2018.  The earnings reports for each quarter since the Company went public show this began declining prior to the IPO, unbeknownst to investors.

137.    In both 2018 and 2019, X Financial fell short of analysts' earnings expectations by over 50%, according to a Bloomberg Terminal Best Estimate analysis.

**B.    Defendants Use Material Misstatements and Omissions in the Registration Statement to Sell X Financial ADSs to Public Investors**

138.    On August 28, 2018, X Financial filed a Form F-1 Registration Statement with the SEC for the Company's IPO. The Company filed amendments to the Form F-1 on September 10, 2018, September 12, 2018 and September 17, 2018. The Registration Statement, as amended, was signed by Defendant Tang on behalf of himself and acting as attorney-in-fact for Defendants Cheng, Gao and Zhang.  Defendant DeVries also signed on behalf of Cogency Global Inc.  On September 19, 2019, X Financial filed a prospectus with the SEC, which forms part of the Registration Statement. The following day, X Financial filed a supplement to the Prospectus, which also forms part of the Registration Statement.

139.    X Financial offered 11,000,000 American Depositary Shares representing 22,000,000 Class A Ordinary Shares.  X Financial priced its IPO at $9.50.  This implies a raise of $104.5 million not inclusive of a greenshoe offering of 1.65 million shares.

140.    The Registration Statement contained untrue statements of material facts and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.  Defendants chose to address certain topics in the Registration Statement and therefore were under a duty to tell the whole truth about those subjects.

141.    The Registration Statement urged investors to only consider it when deciding to purchase X Financial ADSs, not to consider external information:

> We have not authorized anyone to provide any information other than that
> contained in this prospectus or in any free writing prospectus prepared by or on

our behalf or to which we have referred you. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you.

142.   Therefore investors in the IPO were led to believe the information in the Registration Statement was complete and accurate.

### 1.   Material Misstatements and Omissions Regarding X Financial's Ability to Target Investors Able to Repay Loans and the Company's Increasing Delinquency Rates

143.   In light of the precarious environment that P2P lenders found themselves in, and because of the importance of a low rate of loan defaults to X Financial's business model, the Registration Statement stressed that X Financial targeted "prime borrowers."  The Registration Statement defined the "prime borrower" as "an individual having sound credit history, who has credit records with PBOC CRC and usually no late payment record of over 60 days in the previous six months."  X Financial claimed that in order to determine "whether a prospective borrower is a prime borrower, [they would] review his or her credit card transaction history, along with [their] sophisticated risk management review system."

144.   X Financial discussed its proprietary system, enabling it to easily perform credit analyses:

> We utilize data-driven and technology-empowered credit analysis. Our proprietary risk control system, WinSAFE, builds risk profiles of our prospective borrowers upon data from reputable credit information providers employed by traditional financial institutions, augmented by a variety of social and behavioral data from internet and mobile platforms that are typically not utilized by traditional financial institutions. Leveraging data analysis and machine learning in analyzing a borrower's value, repayment capability and propensity, we have the capabilities to offer differentiated credit limits to borrowers based on individual credit assessment results. Our rigorous data-driven credit assessment methodology has helped us to achieve a strategic balance between borrower expansion and asset quality control.

145.   The Registration Statement discussed at length the approval for card loans, depicted in the following included graphic:



146.    In particular, in the "Verification" section, X Financial reported for card loans it "***verif[ied] each applicant's information using multiple authentication technologies and internal and external databases***, including, among others, face scanning and OCR technology, the internal and industry blacklist provided by third-party database and the mobile activities of the applicant, to identify and screen for fraudulent applications."

147.    In the "Credit Assessment" section, X Financial again tried to assure investors by making the screening process seem extremely thorough so delinquencies would be rare:

> Once an applicant's information is input into our proprietary risk control system, WinSAFE, we will conduct credit assessment based on our database. We will also send the identity information of the applicant to ZhongAn and receive ZhongAn's credit opinion on insurance based on its credit analysis model. We will, in accordance with our own risk management strategies, embed such credit opinion on insurance into our risk management model for decisioning and assign each applicant a credit grade. ***Such credit grade is a comprehensive credit level reflecting our prediction of the applicant's likelihood of future delinquency, considering multiple factors, among others, the applicant's ability to fund repayment obligations. We continue to optimize our risk management model as we modify and identify more effective proxies to estimate an applicant's income level.***

148.    For the larger preferred loans, X Financial again sought to assure investors regarding its controls and procedures by detailing a multi-step loan approval process, as depicted in the following chart:



149.     Unlike applicants for card loans, the Registration Statement stated that applicants for preferred loans, "are recommended and filtered by [X Financial's] channel partners based on applicants' credit profile prior to making online applications through" the website.  They also must undergo "offline interviews" and "and reject any applicants with credit profile and fraud concern based on the interview."  These interviews are then used in the credit assessment process.

150.     The Registration Statement continually highlighted the strength of X Financial's credit assessment capabilities, citing, for example, the "***strong credit performance of the loans that we facilitate***, the accompanying insurance protection, ***and our proven risk management and credit assessment capabilities***."   The Registration Statement repeatedly emphasized the purportedly high credit quality of the Company's customers, describing X Financial as "a leading technology-driven personal finance company in China focused on serving China's underserved ***prime borrowers*** and mass affluent investors."   Similarly, the Registration Statement stated "*[w]e* ***strategically target the prime borrowers*** underserved by traditional financial institutions," and "[w]e believe ***we set a high standard of credit quality*** by defining our borrowers as prime borrowers, who we define as an individual having sound credit history, who has credit records with PBOC CRC and usually no late payment record of over 60 days in the previous six months."

151.     In particular, the Registration Statement highlighted the creditworthiness of the SME borrowers who used X Financial's preferred loans and had allegedly gone through the more comprehensive screening process detailed above.  For example, the Registration Statement reassured investors that X Financial's "[h]igh-credit-limit unsecured loans are generally borrowed by small

39

business owners whose credit worthiness can be verified."  The Registration Statement also included

the following chart, which showed a consistently low delinquency rate for its preferred loans through

the second quarter of 2018, which ended June 30, 2018:



152.    The Registration Statement tied the purported strengths of X Financial's risk

management to what it described as low delinquency rates in its card and preferred loans products.

Under the "Our Strengths" section, for example, the Registration Statement claimed that delinquency

rates for both of the Company's major products were low:

> ***We focus on serving the credit needs of prime borrowers with sound credit
> profile and history*** . . . . In 2017 and for the six months ended June 30, 2018, the
> APR of our Xiaoying Card Loan was 26.21% and 28.58%, respectively, while the
> ***credit losses as measured by delinquency rate for the outstanding loans that are
> 91-180 days past due was 1.64% as of December 31, 2017 and 3.62% as of June
> 30, 2018***, and the APR of our Xiaoying ***Preferred Loan*** was 16.89% and 17.70%,
> respectively, while the ***credit losses as measured by delinquency rate for the
> outstanding loans that are 91-180 days past due was 0.67% as of December 31,
> 2017 and 2.31% as of June 30, 2018***.

153.    The Registration Statement stressed how X Financial was "a leading" company

because of its ability to attract the best borrowers:

We believe that our ability to ***identify, attract and maintain a high-quality borrower*** base through online and offline channels has enabled us to achieve consistently low credit losses and funding costs for the loans we facilitate, which in turn, allows us to offer attractive lending rates and large credit line to our borrowers while maintaining a healthy and sustainable profit margin.

154.    The statements referenced in ¶¶ 143-153 were materially false and misleading when made because they omitted the following material information necessary to make them not misleading under the circumstances in which they were made:   (i) the revenue and loan facilitation growth provided in the Registration Statement leading up to the IPO was achieved by relaxed credit and due diligence standards, under which the Company had underwritten tens of millions of dollars' worth of poor quality loans that suffered from a disproportionately high risk of default as compared to the Company's earlier loan vintages; and (ii) the Company was suffering from accelerated delinquency rates from poor quality loans that it had underwritten in the first, second, and third quarters of 2018, which had caused the Company's delinquency rate to sharply rise.

### 2.    Material Misstatements and Omissions Regarding Preferred Loans

155.    The Registration Statement stressed the importance of preferred loans, which were important to "grow" the consumer population.  Specifically, the Registration Statement included the following assurances to investors:

> ***Xiaoying Preferred Loan is attractive to prime borrowers*** who are primarily small business owners. This product offers a combination of high credit limit, long term and attractive APR with no collateral. Supported by our broad network of channel partners to which we apply a unified lending standard and practice, ***we are able to source a large number of borrowers for Xiaoying Preferred Loan, which will drive the continued growth in our borrower base***.

156.    The Registration Statement conveyed a favorable increase in preferred loans for the six months ended June 30, 2018. Specifically, it stated that X Financial had facilitated 6,327 and 31,775 preferred loans in 2016 and 2017, respectively (RMB1,509 million and RMB7,777 million,

respectively), as compared to 22,040 preferred loans (RMB4,331 million) for the first six months of

2018.  There was no indication that upward momentum would change after June 30, 2018.

157.    The Registration Statement also stressed X Financial's growing customer base, which

it implied would continue after the IPO:

> Our revenues are dependent on our ability to acquire new borrowers and retain
> existing borrowers. The size of our borrower base directly affects the total amount
> of loans we facilitate and in turn the service fees that we collect. The number of
> active borrowers on our platform grew significantly, increasing from 208,920
> borrowers in 2016 to 2,249,183 borrowers in 2017, of which 207,983, or 99.6%,
> and 2,107,184, or 93.7%, were new borrowers, respectively. For the six months
> ended June 30, 2018, the number of active borrowers on our platform was
> 1,278,289, of which 933,470, or 73.0% were new borrowers. As a result, we have
> experienced significant growth in the amount of loans facilitated.

158.    The Registration Statement similarly described its card and preferred loans as, jointly,

the major products that would drive X Financial's "continued" growth.  Under a heading entitled "Our

Strategies," the Registration Statement declared that X Financial would "*[c]ontinue* to . . . *broaden our*

*product offerings* to cater to the evolving market demands" and "*[e]xpand user base and enhance*

*user acquisition*."  Notably, under the "[e]xpand user base" section, the Registration Statement

highlighted the growth in both card loans and preferred loans, stating that, "[a]s of June 30, 2018, we

had a total of . . . 12,464,562 cumulative registered users of Xiaoying Card Loan and Xiaoying

Preferred Loan" on its platform, which the Company "plan[ned] to further leverage . . . to cross-sell

products."

159.    The Registration Statement also highlighted X Financial's ability to upsell customers

as its user base expanded, stating, for example: "User referral has been primarily driving the *continued*

*growth* in our user base of both borrowers and investors . . . . [A]s our big data technology allows us to

accurately identify high quality borrowers, *we are able to offer large credit line products to such*

*individuals* . . . ."

160.     In addition, the Registration Statement claimed that the market for X Financial's loans was healthy and would support the Company's continued growth.  For example, the Registration Statement stated, in relevant part:

> The low levels of consumption and leverage ratio indicate ***considerable room for further expansion*** of the consumer finance market in China.
>
> * * *
>
> The credit card market in China is in the process of liberalization and is comparable to the United States in the 1980s when the ***market was expanding*** . . . .

161.     The statements referenced in ¶¶ 155-160 were materially false and misleading when made because they omitted the following material information necessary to make them not misleading under the circumstances in which they were made: (i) the Company's total loan facilitation amount was not growing, but rather was contracting; (ii) the number of investors actively using X Financial's platform was shrinking; (iii) demand from SMEs for the Company's preferred loans was plummeting; (iv) the Company's preferred loans had performed so poorly that it had begun drastically scaling back its preferred loans in the first quarter of 2018, several months before the IPO, and was in the process of phasing out such loans completely; (v) the Company had increased the strictness of its screening process, resulting in a decrease in customer base; (vi) demand for the Company's card loans was also plummeting; (vii) the revenue and loan facilitation growth provided in the Registration Statement leading up to the IPO was achieved by relaxed credit and due diligence standards, under which the Company had underwritten tens of millions of dollars' worth of poor quality loans that suffered from a disproportionately high risk of default as compared to the Company's earlier loan vintages; (viii) the Company's product mix had significantly deteriorated; and (ix) the Company's net revenue was on track to decline by 22% during the third quarter of 2018.

### 3.      Material Misstatements and Omissions Regarding Card Loans

162.    The Registration Statement also emphasized the importance of card loans to X Financial's revenue.  Not only were there more card loans than preferred loans, the interest rate was higher (though the amount of each loan considerably smaller).  The Registration Statement contained the following chart detailing this:

| Loan Product | Year Ended December 31, 2016 | Year Ended December 31, 2017 | Six Months Ended June 30, 2018 |
|---|---|---|---|
| Xiaoying Card Loan | 19.69% ~ 25.44% | 19.69% ~ 49.44% | 9.98% ~ 36.00% |
| Xiaoying Preferred Loan | 16.26% ~ 16.32% | 16.32% ~ 21.44% | 11.47% ~ 21.61% |
| Xiaoying Housing Loan | 5.39% ~ 18.00% | 5.98% ~ 20.31% | 10.56% ~ 15.30% |
| Loan facilitation services to other platforms[1] | 1.33% ~ 15.37% | 1.22% ~ 15.37% | 0.50% ~ 7.80% |

*Note:*(1) Different from APR used to express the total borrowing cost for our loan products, the figures set forth in the table represent the service fee range we charge borrowers referred from other platforms for loans successfully allocated to investors.

163.    The Registration Statement stated:  "Xiaoying Card Loan is the most profitable product facilitated on our platform due to its higher service fee rate compared to our other products. As *we plan to expand the business scale of Xiaoying Card Loan, we expect revenue contribution from Xiaoying Card Loan will continue to increase in the future and enhance our profitability*."

164.    The statements referenced in ¶¶ 162-163 were materially false and misleading when made because they omitted the following material information necessary to make them not misleading under the circumstances in which they were made: (i) the Company's total loan facilitation amount was not growing, but rather was contracting; (ii) the number of investors actively using X Financial's platform was shrinking; (iii) the Company had increased the strictness of its screening process,

resulting in a decrease in customer base; (iv) demand for the Company's card loans was also plummeting; (v) the company had consciously reduced the size of card loans no later than Q3 2018.

### 4. The Registration Statement Failed to Disclose Trends, Uncertainties and Risks Regarding X Financial's Products

165.    Moreover, the Registration Statement failed to disclose trends, uncertainties and risks regarding preferred and card loans.

166.    Part I of Form F-1, which X Financial filed with the SEC as part of the IPO process, is entitled "Information Required in Prospectus" and it governs the nature and content of information an issuer must disclose in connection with an offering.

167.    Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods."  Specifically, Item 5(D), entitled "Trend information," provides, in full, as follows:

> The company should identify the most significant recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. The company also should discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

168.    The scope of the information whose disclosure is required under this paragraph on trends, uncertainties and events is coextensive with that required under Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

169.    Accordingly, Item 303 of Regulation S-K imposed an affirmative obligation on X Financial to disclose information about known trends and uncertainties, including those involving the

Company's preferred loans and card loans.  Defendants violated Item 303.  For example, Defendants knew, but did not disclose, that (i) the rate of approval of card loans was on the decline because of a change of policy to constrict these loans; (ii) that the size of card loans had consciously been reduced because of market conditions that might continue; (iii) preferred loans were being discontinued; and (iv) delinquency rates were on the rise to such a degree they had begun significantly reducing the preferred loan business.

170.    Moreover, Item 303 required disclosure of these trends and uncertainties because they could cause X Financial's reported financial information in the Offering Materials not necessarily to be indicative of the Company's future operating results or financial condition.

171.    Similarly to Item 103, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe the risk."

172.    X Financial's failure to disclose internal data and decisions violated 17 C.F.R. § 229.105 because these adverse trends created significant risks that were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in X Financial ADSs speculative or risky.  Indeed, the risk factors that were provided in the Registration Statement were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose that the potential future adverse impacts described were already occurring.  For example, the Registration Statement purported to warn that "[a] change in our ability to attract or retain borrowers . . . *may potentially affect our revenue and profitability*" at a time when Defendants had already (i) scaled back their approval of loans in the face of significant declines in demand and rising delinquency rates; and (ii) decided to phase out its preferred loan program.

## ADDITIONAL ALLEGATIONS APPLICABLE ONLY TO EXCHANGE ACT CLAIMS

173.     Lead Plaintiffs make the additional allegations contained in ¶¶ 174-207 below with respect to their claims under Section 10(b) and 20(a) of the Exchange Act only.  Lead Plaintiffs disclaim any reliance upon these allegations or incorporation of these allegations in their Securities Act claims.

174.     Lead Plaintiffs, who purchased or otherwise acquired X Financial ADSs during the Exchange Act Class Period, bring these claims on behalf of the Exchange Act Class against X Financial and the Management Defendants only.

175.     X Financial and each of the Management Defendants are makers of the statements contained in the Registration Statement because X Financial is the Issuer of the statements and each of the Management Defendants signed his name to those statements, indicating that he was a maker thereof.

### A.      Additional Misrepresentations and Omissions

176.     In an attempt to buffer the impact of the crushing decrease in X Financial's business and the increase in delinquencies, the X Financial Defendants dribbled out the truth about the reality of their business in a series of partial disclosures, which painted an overly optimistic portrait of the Company's future.

177.     On October 31, 2018, the China Money Network website published an interview with Defendant Zhang.[10]  The interviewer noted that the number of active borrowers decreased "nearly 20% to about 170,000 in July."  Defendant Zhang blamed a "shortage of funding" in the industry and stated in August the Company had "already recovered."

---

[10] *See* Eudora Wang, *X Financial's Kevin Zhang is Long-Term Bullish for China's P2P Sector*, CHINA MONEY NETWORK, October 31, 2018, *available at* https://www.chinamoneynetwork.com/2018/10/31/x-financials-kevin-zhang-is-long-term-bullish-for-chinas-p2p-sector.

178.    The statements in ¶ 177 were materially false and misleading when made because Defendant Zhang omitted that (i) the Company had purposely scaled back the preferred loan business; and (ii) the Company's total loan facilitation was continuing to decrease.

179.    In the Q3 2018 Earnings, the Company reported that the delinquency rate for X Financial loans was 3.51% for loans past due 31 to 90 days, representing a greater than 40% sequential increase and a greater than 270% year-over-year increase.  This key metric indicated significant deterioration in the quality of the Company's loan portfolio.  In addition, X Financial reported significant reduction in loans facilitated in the quarter, reflecting a significant contraction in the Company's business.  As reported, the Company facilitated only about 806,000 loans, a decrease of 35% as compared to the same quarter in 2017 and 21% as compared to Q2 2018, while the amount of loans facilitated was RMB7,560 million, a 13% decline as compared to the same period in the prior year and 32% decline as compared to the prior quarter.  Active lending had also declined, from about 157,000 active lenders the previous quarter to only about 122,000 in the third quarter of 2018.  In addition, X Financial reported that net revenue for the quarter was RMB829.5 million, a decline of 22% as compared to the same quarter in 2017, while net income was only RMB197.9, a decline of 34% from the prior quarter, underlining the Company's inability to generate revenue in the face of the significant increases in delinquencies and the contraction of the business.  These rising delinquency rates and deterioration of loan profitability reflect the poor quality of loans that were issued prior to the IPO.

180.    Far from the rosy picture presented by the Registration Statement, the Q3 2018 Earnings press release also provided disappointing financial guidance for the Company's fourth quarter.  It stated that X Financial only expected total loan facilitation in the range of RMB8,000 million to RMB8,500 million.  This slow growth during a historically strong season confirmed that

negative origination and credit quality trends that predated the IPO were expected to continue.   The press release indicated that this increase resulted "primarily due to a challenging credit environment," because preferred loans were "adversely impacted by sentiment across the industry resulting from closing of a number of troubled online lending platforms during the third quarter of 2018."

181.    On the November 19 Call, X Financial held its first earnings call after the IPO to discuss its financial results.   Participating in the call on behalf of the Company were the Management Defendants, and an investor relations representative; securities analysts on the call included representatives from Deutsche Bank, Morgan Stanley and AMTD Group.

182.    On the November 19 Call, executives began to reveal the truth about X Financial's business, but sought to reassure investors by stressing supposed growth.

183.    In terms of the negative numbers, Defendant Tang primarily blamed the market, stating that the "decline in loan facilitation" was because of "the lows" the Company saw in July and August when "the market turmoil was at a peak."   He assured investors not to worry because that was "already over."

184.    In fact, Tang stressed the Company had a bright future: "We are very early in our growth curve and believe in the long term there is tremendous potential in this market."

185.    During the November 19 Call, analysts questioned X Financial's executives about the rapidly contracting preferred loans and rising delinquency rates.   In response, they conceded that low demand and "very high" delinquency rates for X Financial's preferred loans had produced a cascading effect that torpedoed the Company's overall financial results.   As these executives explained, plummeting demand and high default rates had, in turn, forced the Company to make the "big [strategy change] to . . . scale down the preferred loan business."   Scaling down preferred loans, meanwhile, had prompted "a change in product mix resulting from a significant increase in the proportion of revenue

generated by Xiaoying Card Loan." The pivot to depending on card loans had, in turn, caused a purposeful–though previously undisclosed--reduction in X Financial's "average loan ticket size by 20% to even 25%" and also caused further increases in the Company's overall delinquency rate, as card loans represented significantly higher risks.

186.     Cheng said the Company was making changes as a result of the delinquencies seen in Q3. He stated: "We'll adjust our credit policy, we'll tighten our credit policy, starting from Q3." In other words, according to Cheng, the numbers seen in Q3, numbers not seen in the Registration Statement but available to Defendants at the time the Registration Statement was issued, were so bad that moving forward the Company would be changing its policies.

187.     Notably, though the Registration Statement divided delinquency rates of card and preferred loans, X Financial stated it would no longer be providing investors with that information.

188.     Tang downplayed analyst concerns about the default figures, despite the fact that future defaults, even on those existing loans would impact the Company's bottom line:

> For the existing loan book, because our risks are fully provisioned and fully being sell to the customers covered by the insurance company, so you actually don't need to worry about the existing loan book that much. That's the reason I think we feel this is a better way to present our business, just on the combined basis.

189.     The statements in ¶¶ 179-188 were materially false and misleading when made because (i) the Company's total loan facilitation amount was not growing, but rather was contracting; (ii) the number of investors actively using X Financial's platform was shrinking; (iii) X Financial would later admit they had begun making these changes in the third quarter, meaning the changes existed before the IPO; (iv) delinquencies in the current loan book would impact X Financial's future financials; and (v) the Company was on target to have higher delinquency rates than other similar companies, thereby indicating delinquency rates were related to more than industry-wide problems.

190.    On the March 19 Call, X Financial had a call to discuss the Q4 and year end 2018 results.  Participating in the call on behalf of the Company were the Management Defendants, and an investor relations representative; securities analysts on the call included representatives from Deutsche Bank and Morgan Stanley.

191.    On the March 19 Call, Defendant Cheng for the first time admitted that the "approval rate has been decreasing since middle of last year," in other words, before the IPO.

192.    In response to an observation from Morgan Stanley analyst John Cai that card loans and "the ticket size of the overall loan facilitation" declined in the fourth quarter, Defendant Tang tried to spin it as a positive for the Company, noting it was because of the "risk management capability" of the Company and would actually "improve. . . loan performance."

193.    Defendant Tang assured investors that X Financial had "more than sufficient investor demand for [its] product."

194.    The statements in ¶¶ 190-193 were materially false and misleading when made because (i) the number of investors actively using X Financial's platform was shrinking; (ii) delinquencies in the current loan book would impact X Financial's future financials; and (iii) X Financial's deteriorating product mix would continue to harm it in the coming quarters.

**B.    Scienter**

195.    Additional aspects of the Management Defendants' conduct indicate that they either deliberately, recklessly or intentionally made the most significant misrepresentations and omissions contained in the Registration Statement and later statements:

    a.    The Management Defendants had access to adverse information pertaining to the Q3 of 2018 that they did not disclose to investors in the Registration Statement;

    b.    The Management Defendants consciously decreased loan size prior to the IPO;

    c.    The Management Defendants knew X Financial had tightened its screening process and therefore reduced approved borrowers prior to the IPO;

    d.      X Financial had begun to phase out preferred loans prior to the IPO;

    e.      The Management Defendants had access to information conveying skyrocketing delinquency rates; and

    f.      The Management Defendants loosened credit requirements in an effort to boost numbers prior to the IPO.

196.    The Management Defendants were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Exchange Act Class Period. The Management Defendants had access to and were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Management Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

197.    As senior officers and controlling persons of a publicly-held company whose ADSs were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Management Defendants each had a duty to promptly disseminate accurate and truthful information with respect to X Financial's operations and business, and to correct any previously issued statements that were materially misleading or untrue when made, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Management Defendants' wrongful conduct during the Exchange Act Class Period as described herein violated these specific requirements and obligations.

198.    For example, Defendant Tang was founder of X Financial and its CEO and Chairman of the Board at the time of the IPO and all relevant times thereafter. According to the Registration Materials, Tang had "the ability to control or exert significant influence over important corporate matters[.]" He spoke on every earnings call and issued a statement at the time of each release.

Defendant Cheng was the President of X Financial and a director of its Board at the time of the IPO and all relevant times thereafter.  Both of them were responsible for steering the company.  In their positions, they were responsible for decisions that led to the loosening of credit requirements to boost X Financial's financials for the IPO.  They each knew this upward trajectory would not continue, because, as they later admitted, they were responsible for decisions that led to the tightening of credit requirements for loans and the cessation of the preferred loan business.  However, at the time of the IPO, and thereafter, they continued to hide the full truth from investors.

199.    In making the statements complained of herein, the Management Defendants, who were senior officers and controlling persons of X Financial, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Management Defendants is attributable to X Financial.

**C.    Loss Causation**

200.    X Financial had an IPO price of $9.50 per ADS but suffered as the truth came out about the reality of its business.

201.    When X Financial reported its poor Q3 2018 Earnings, the stock increased because of Defendants' assurances that "market turmoil" was no longer "at a peak" and the lack of funding that hampered loan facilitation was "already over."

202.    However, when the Company admitted, *inter alia*, it had changed its policies well before the IPO and that its skyrocketing delinquencies resulted in it paying ZhongAn more than it received from borrowers, after market close on March 19, 2019, the stock plummeted.  On March 19 it closed at $6.47 per ADS, but the following day it closed at $6.15 per ADS, a drop of almost 5%.

203.    On May 21, 2019, X Financial finally admitted that it had discontinued the preferred loan business, the stock dropped from $5.70 to $5.52, amounting to a 3.16% decline.

53

204.     As of December 9, 2019, the date the initial complaint was filed, X Financial's ADSs were trading at $1.90 per ADS.

**D.     Presumption of Reliance**

205.     Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.     X Financial and the Management Defendants made public misrepresentations or failed to disclose material facts during the Exchange Act Class Period;

b.     the omissions and misrepresentations were material;

c.     X Financial ADSs are traded in an efficient market;

d.     the Company's shares were liquid and traded with moderate to heavy volume during the Exchange Act Class Period;

e.     the Company traded on the NYSE and was covered by multiple analysts;

f.     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

g.     Lead Plaintiffs and members of the Exchange Act Class purchased, acquired and/or sold X Financial ADSs between the time X Financial and the Management Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

206.     Based upon the foregoing, Lead Plaintiffs and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

207.     Alternatively, Lead Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as X Financial and the Management Defendants omitted material information in their statements during the Exchange Act Class Period in violation of a duty to disclose such information, as detailed herein.

## COUNT I

### (Violations of Section 11 of the Securities Act Against All Defendants)

208.     Lead Plaintiffs repeat and reallege allegations in Paragraphs 1-172 above.   The allegations contained in Paragraphs 173-207 are expressly excluded from this claim, which does not allege fraud, recklessness, or intentional misconduct.

209.      This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

210.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

211.     The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

212.     X Financial is the registrant for the IPO.  As the issuer of the shares, X Financial is strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

213.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

214.     By reason of the conduct alleged herein, each Defendant violated Section 11 of the Securities Act.  Additionally, Cogency Global is liable for violating Section 11 of the Securities Act under principles of agency and *respondeat superior* as the employer of Defendants Arthur and DeVries, who variously signed the Registration Statement.

215.     Lead Plaintiffs purchased X Financial ADSs pursuant and/or traceable to the Registration Statement for the IPO.

55

216.     Lead Plaintiffs and the Class have sustained damages.  The value of X Financial ADSs has declined substantially subsequent to and because of Defendants' violations.

217.      At the time of their purchases of X Financial ADSs, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiffs filed this complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiffs filed this complaint.

## COUNT II

### (Violations of Section 12(a)(2) of the Securities Act
### Against the Underwriter Defendants)

218.     Lead Plaintiffs repeat and reallege allegations in Paragraphs 1-172 and 208-217 above. The allegations contained in Paragraphs 173-207 are expressly excluded from this claim.  This claim is premised on the remedies available under Section 12 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

219.     This claim is asserted by Lead Plaintiffs against the Underwriter Defendants, on behalf of all persons who acquired shares of the Company's common stock pursuant to the September 19, 2018 IPO.

220.     By means of the Registration Statement, each of the Underwriter Defendants offered, promoted, and sold X Financial ADSs in the IPO, and therefore was liable under Section 12(a)(2) for the misrepresentations and omissions contained in the Registration Statement.

221.     Morgan Stanley and Deutsche Bank sold at least 97.5% of X Financial ADSs offered (excluding the overallotment).

222.     The Underwriter Defendants solicitated the purchase of X Financial ADSs, motivated by a desire to serve their own financial interests or those of the securities owner.   The Underwriter Defendants made significant commissions on these sales.    The underwriting discounts and commissions represented 7% if the IPO price.

223.     None of the Underwriter Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement, and identified in Paragraphs 138-172 above were true, were without omissions of material fact, and were not misleading.

224.     By reason of the conduct alleged herein, each of the Underwriter Defendants has violated Section 12(a)(2) of the Securities Act.

225.     Lead Plaintiffs and the Classes have sustained enormous damages because the value of their X Financial ADSs has declined precipitously.

226.     Lead Plaintiffs and the Classes hereby tender their shares to the Underwriter Defendants and demand rescission.

227.     At the time of their purchases, Lead Plaintiffs and the Classes were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action. The initial complaint was filed within three years of the time that the Underwriter Defendants first sold X Financial ADSs to the investing public.

## <u>COUNT III</u>

### <u>(Violations of § 15 of the Securities Act Against X Financial, Cogency and the Individual Defendants)</u>

228.     Lead Plaintiffs repeat and reallege allegations in Paragraphs 1-172 and 208-227 above. The allegations contained in Paragraphs 173-207 are expressly excluded from this claim.  This claim is

premised on the remedies available under Section 15 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

229.     This claim is brought against the Individual Defendants, Cogency and X Financial arising out of their control of the primary violations of the Securities Act alleged herein.

230.     X Financial controlled Cogency Global, Arthur, and DeVries, and caused them to sign the Registration Statement, assist in preparing the Registration Statement, plan the IPO, solicit potential ADS purchasers, and ultimately effectuate the IPO.   X Financial also exerted control over the Individual Defendants by virtue of the Individual Defendants' employment and/or roles and responsibilities at the Company as of, or in connection with, the IPO.

231.     Additionally, the Individual Defendants named herein each were control persons of X Financial and Cogency Global by virtue of their positions as directors and/or senior officers of X Financial and their ownership of X Financial shares.  These Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of X Financial.

232.     Furthermore, Cogency Global, by virtue of its status as the employer of Defendants Arthur and DeVries, was a control person of Arthur and DeVries and is responsible, under principles of agency and *respondeat superior*, for their primary violations of the Securities Act.  Cogency Global exercised control over Arthur and DeVries and caused them to sign the Registration Statement in connection with the IPO, as well as participate in the IPO in their capacity as X Financial's Authorized U.S. Representatives.

233.     By reason of the conduct alleged herein, the Defendants named herein each violated Section 15 of the Securities Act.

## COUNT IV

### (Violations of § 10(b) of the Exchange Act Against
### the Management Defendants and X Financial)

234. Lead Plaintiffs repeat and reallege allegations in Paragraphs 1-233 above.

235. During the Exchange Act Class Period, X Financial and the Management Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

236. X Financial and the Management Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Exchange Act Class Period.

237. Lead Plaintiffs and the Exchange Act Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for X Financial ADSs. Lead Plaintiffs and the Exchange Act Class would not have purchased X Financial ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by X Financial and the Management Defendants' misleading statements.

238. As a direct and proximate result of X Financial and the Management Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of X Financial ADSs during the Exchange Act Class Period.

## COUNT V

### (Violations of § 20(a) of the Exchange Act Against the Management Defendants)

239.    Lead Plaintiffs repeat and reallege allegations in Paragraphs 1-237 above.    The

Management Defendants acted as controlling persons of X Financial within the meaning of Section

20(a) of the Exchange Act. By virtue of their positions as officers and/or directors of X Financial,

and/or their ownership of X Financial securities, the Management Defendants had the power and

authority to, and did, cause X Financial to engage in the wrongful conduct alleged.

240.    As a direct and proximate result of the Management Defendants' wrongful conduct,

Lead Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with

their purchases of X Financial ADSs during the Exchange Act Class Period.

241.    By reason of such conduct, the Management Defendants are liable pursuant to Section

20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment as follows:

A.    Determining that the instant action may be maintained as a class action under

Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class

representatives;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other

members of the two classes against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including

interest thereon;

C.    Awarding Lead Plaintiffs and the other members of the Classes their reasonable

costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative members of the Classes to exclude themselves by requesting exclusion through noticed procedures.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated:  July 13, 2020

Respectfully submitted,

**POMERANTZ LLP**

_s/ Jeremy A. Lieberman_
Jeremy A. Lieberman
Cara David
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: cdavid@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

_**Attorneys for Lead Plaintiffs**_