**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| XIANGDONG CHEN, Individually and On Behalf of All Others Similarly Situated,<br><br>           Plaintiff,<br><br>           v.<br><br>X FINANCIAL, YUE TANG, JIE ZHANG, SHAOYONG CHENG, DING GAO, SHENGWEN RONG, ZHENG XUE, LONGGEN ZHANG, RICHARD ARTHUR, COLLEEN A. DEVRIES, COGENCY GLOBAL INC., MORGAN STANLEY & CO. INTERNATIONAL PLC, MORGAN STANLEY & CO. LLC, DEUTSCHE BANK SECURITIES INC., CHINA EVERBRIGHT SECURITIES (HK) LIMITED, CHINA MERCHANTS SECURITIES (HK) CO., LTD., and AMTD GLOBAL MARKETS LIMITED,<br><br>           Defendants. | Case No. 1:19-cv-06908<br><br><br><br><br><br>__ORAL ARGUMENT REQUESTED__ |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ................................................................................. 1

II.    FACTUAL STATEMENT ...................................................................................... 3

    A.     Company and Regulatory Background.................................................... 3

    B.     XF Begins to Transform its Business Prior to the IPO........................... 4

    C.     XF's Misleading IPO .............................................................................. 6

    D.     XF Slowly Reveals The Truth ................................................................ 6

III.   ARGUMENT......................................................................................................... 7

    A.     The Complaint States a Claim for Violations of the Securities Act ....... 7

        1.     Plaintiffs Face a Minimal Pleading Burden under the Securities Act ........ 7

        2.     The Securities Act Claims Do Not Sound in Fraud................................... 8

        3.     Defendants Made False and Misleading Statements in the Prospectus ...... 9

            a)     Defendants Made Misleading Statements about Preferred Loans  10

            b)     Defendants Misled Investors Regarding Their Ability to Target Prime Borrowers and Their Delinquency Rates ........................... 17

            c)     Defendants Made Misleading Statements About the Size and Growth of Card Loans ................................................................ 20

            d)     Defendants Failed to Disclose Trends and Risks.......................... 21

         4.     The Securities Act Claims are Timely...................................................... 22

    B.     The Complaint States a Claim for Violations of the Exchange Act ..................... 24

        1.     Defendants Knew or Recklessly Disregarded that the Registration Statement Contained Material Misrepresentations and Omissions .......... 25

        2.     Defendants Failed to Fully Disclose The Truth After the IPO ................. 28

    C.     Plaintiffs Adequately Allege Liability under Sections 15 and 20(a) .................... 29

IV.    CONCLUSION................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)................................................................................................14, 15

*Acticon AG v. China Ne. Petroleum Holdings Ltd.*,
615 F. App'x 44 (2d Cir. 2015) ...............................................................................................30

*In re Adient plc Sec. Litig.*,
No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ....................................16

*In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*,
144 F.R.D. 613 (E.D.N.Y. 1992).............................................................................................19

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010).....................................................................................23

*In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004).....................................................................................30

*In re Aphria, Inc. Sec. Litig.*,
No. 18-cv-11376 (GBD), 2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) .........................19, 20

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).......................................................................................................9

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019)......................................................................................14

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)......................................................................................25

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012)......................................................................................30

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002).....................................................................................................10

*In re Carter-Wallace, Inc., Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000).......................................................................................................25

*Chill v. Gen. Elec. Co.*,
101 F. 3d 263 (2d Cir. 1996).....................................................................................................25

ii

*In re CINAR Corp. Sec. Litig.*,
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ...........................................................................30

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)..............................................................................9

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006)............................................................................14

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
    No. 20-cv-2031 (JSR), 2020 WL 4547217 (S.D.N.Y. Aug. 06, 2020) ..................................11

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011)..........................................................................................22

*CompuDyne Corp. v. Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006)............................................................................29

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    MDL No. 12-2389, 2013 WL 11319408 (S.D.N.Y. Dec. 12, 2013) .......................................19

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017)........................................................................................22, 23

*Frazier v. VitalWorks, Inc.*,
    341 F. Supp. 2d 142 (D. Conn. 2004).............................................................................16

*GAMCO Invs., Inc. v. Vivendi Universal, S.A.*,
    838 F.3d 214 (2d Cir. 2016).........................................................................................25

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012).........................................................................27, 28

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................................11

*Hain Celestial Grp. Inc. Sec. Litig.*,
    2:16-cv-04581, 2020 WL 1676762 (E.D.N.Y. Apr. 6, 2020)...............................................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014)................................................................................................25

*Herman & Maclean v. Huddleston*,
    459 U.S. 375 (1983).................................................................................................7, 8

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011).........................................................................................8

*In re Idreamsky Tech. Ltd. Sec. Litig.*,
  236 F. Supp. 3d 824 (S.D.N.Y. 2017)..................................................................13

*Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*,
  620 F.3d 137 (2d Cir. 2010)..............................................................................13

*Jackson v. Halyard Health, Inc.*,
  16-cv-05093, 2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018)..................................27

*Kalnit v. Eichler*,
  264 F. 3d 131 (2d Cir. 2001).............................................................................26

*In re KeySpan Corp. Sec. Litig.*,
  No. 01 CV 5852 (ARR), 2003 WL 21981806 (E.D.N.Y. July 30, 2003)...............15

*Knollenberg v. Harmonic, Inc.*,
  152 Fed. Appx. 674 (9th Cir. 2005)......................................................................8

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011).....................................................................8, 20, 21

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019).....................................................................18

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006), rev'd on other grounds by *Makor Issues &
  Rights, Ltd. v. Tellabs, Inc.*, 551 U.S. 308 (2007)..................................................15

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)..................................................................30

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
  543 F.3d 150 (3d Cir. 2008)...............................................................................23

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010)...........................................................................................23

*Meyer v. JinkoSolar Holdings Co.*
  761 F.3d 245 (2d Cir. 2014)..........................................................................13, 28

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)...............................................................................11

*Newman v. Warnaco Grp., Inc.*,
  335 F.3d 187 (2d Cir. 2003)...............................................................................23

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006)..................................................................27

*Novak v. Kasaks,*
 216 F.3d 300 (2d Cir. 2000)......................................................................................11, 18, 26, 28

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC,*
 595 F.3d 86 (2d Cir. 2010)......................................................................................................10

*In re Orion Sec. Litig.,*
 No. 08 CIV. 1328 (RJS), 2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009)..................................8

*Oxford Asset Mgmt. v. Jaharis,*
 297 F.3d 1182 (11th Cir. 2002) ..............................................................................................21

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.,*
 681 F.3d 114 (2d Cir. 2012).....................................................................................................21

*Panther Partners Inc. v. Jianpu Tech., Inc.,*
 No. 18-cv-9848 (PGG), 2020 WL 5757628 (S.D.N.Y. Sep. 27, 2020).............................17, 21

*Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Tr. v. J.P. Morgan
 Acceptance Corp. I,*
 No. 08-cv-1713 (ERK) (WDW), 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) ......................30

*In re Ply Gem Holdings, Inc. Sec. Litig.,*
 135 F. Supp. 3d 145 (S.D.N.Y 2015)........................................................................................19

*In re Refco, Inc. Sec. Litig.,*
 503 F. Supp. 2d 611 (S.D.N.Y. 2007)........................................................................................8

*Ret. Ass'n v. comScore, Inc.,*
 268 F. Supp. 3d 526 (S.D.N.Y. 2017)....................................................................................9, 26

*Rothman v. Gregor,*
 220 F.3d 81 (2d Cir. 2000).......................................................................................................25

*Rudman v. CHC Grp. LTD.,*
 217 F. Supp. 3d 718 (S.D.N.Y. 2016).......................................................................................17

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,
 Inc.,*
 75 F.3d 801 (2d Cir. 1996)........................................................................................................16

*In re Scholastic Corp. Sec. Litig.,*
 252 F.3d 63 (2d Cir. 2001).......................................................................................................25

*Scott v. Gen. Motors Co.,*
 46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd,* 605 F. App'x 52 (2d Cir. 2015).....................12, 17

*SEC v. Johnston*,
No. 19-2264, 2021 WL 222037 (1st Cir. Jan. 22, 2021) ........................................................26

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)....................................................................................................13

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010)......................................................................................18

*Steinberg v. Ericsson LM Tel. Co.*,
07-cv-9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008).....................................................27

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)......................................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................................................7, 26, 27

*In re Veon Ltd. Sec. Litig.*,
15-cv-08672, 2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ..................................................27

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd,* 838 F.3d 223 (2d Cir. 2016) ............................13

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).................................................................................................9, 14

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)........................................................................................9

*In re WorldCom, Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004)......................................................................................13

*In re Xerox Corp. Sec. Litig.*,
165 F. Supp. 2d 208 (D. Conn. 2001)......................................................................................15

*Yi Xiang v. Inovalon Holdings, Inc.*,
268 F. Supp. 3d 515 (S.D.N.Y. 2017)......................................................................................22

**Statutes**

15 U.S.C. 77.........................................................................................................................8, 22

15 U.S.C. § 78u-4 .....................................................................................................................25

Private Securities Litigation Reform Act of 1995 ....................................................................25

Securities Act of 1933.......................................................................................................... *passim*

Securities Exchange Act of 1934................................................................................................3, 8, 9, 24

**Rules and Regulations**

17 C.F.R. § 229.105 ..............................................................................................................22

17 C.F.R. § 229.303 ..............................................................................................................21

**Other Authorities**

"Interim Measures for the Administration of the Business Activities of Online
Lending Information Intermediary Institutions" (the "Interim Measures") .........................4, 5

Interpretation: Commission Guidance Regarding Management's Discussion and
Analysis of Financial Condition and Results of Operations, Securities and
Exchange Commission Release Nos. 33-8350; 34-38960; FR-72 (Dec. 19,
2003), *available at* https://sec.gov/rules/interp/33-8350.htm#P18_1728...............................21

Lead Plaintiffs Xiangdong Chen and Ke Zheng ("Plaintiffs") hereby submit their opposition to the Motion to Dismiss (the "Motion") filed by X Financial ("XF" or the "Company"), Yue Tang, Shaoyong Cheng, Shengwen Rong, Zheng Xue, and Longgen Zhang (collectively, "Defendants").[1]

## I.     PRELIMINARY STATEMENT

This case is about one of many Chinese peer-to-peer ("P2P") lenders that misled the market about its financial prospects in light of increasing regulations in China. XF promoted itself as one of the only companies that was going to thrive despite Chinese regulations. However, prior to the Company's September 19, 2018 initial public offering ("IPO"), though undisclosed to investors at the time of the IPO, the Company was already making changes to its business model.

XF's business model depended on approving borrowers that were likely to repay investors. If these investors did not repay, XF was on the hook for the money. As Chinese regulations were beginning to put a crimp in the Company's business model by restricting the amount it could lend and the fees it could charge, XF needed to present investors positive data and optimistic statements. In the first half of 2018, Defendants loosened their approval standards so they could post large loan facilitation figures, which were presented as part of the Registration Statement. Then, shortly before the IPO, in light of increasing delinquencies, the Company decided to eliminate its second largest product line (preferred loans), reduce the amount of funds provided by its largest product line (card loans), and tighten its approval process.

---

[1] Citations to the Amended Class Action Complaint (ECF No. 22) (the "Complaint") are in the form of "¶__." Citations to the Memorandum of Law in Support of Motion to Dismiss Amended Complaint are in the form of "MTD."   Citations to Exhibits attached to the Declaration of Brian S. Weinstein in support of the Motion are in the form of "Weinstein Ex."

1

These decisions were not disclosed in the Registration Statement submitted in connection with the IPO. In the Registration Statement, XF stressed the Company's positive outlook. XF emphasized it had technology that identified services to "prime" borrowers, while avoiding subprime debtors, which would in theory lead to a higher repayment rate. The Registration Statement also stated that preferred loans would be a driver of growth.

In reality, at the time of the IPO, XF had already decided to: (i) limit the amount of card loans it was distributing; (ii) reduce the size of the card loans; and (iii) phase out the preferred loan business thanks to a sharp increase in delinquency rates.

The truth was disclosed only later, in a series of insufficient partial disclosures. Two months following the IPO, in November 2018, when the Company presented dismal figures, it reassured investors that the rough patch was behind them. It was only in 2019 that the full truth became known to the market.

The Complaint lays all of this out clearly, including quoting from witnesses supporting the allegations. The Motion relies on isolating or selectively ignoring key allegations of the Complaint. Reading the Motion one would believe the Complaint has no allegations regarding any of the changes occurring before the IPO, when, in fact, the Complaint alleges with specificity that these changes occurred in 3Q 2018—which ended a mere eleven days after the IPO. Defendants hide behind a "Recent Developments" section of the Registration Statement that presented declining financial figures for two months, but ignore Defendants' repeated reassurances that these figures were the fault of the macro financial environment that the Company was already allegedly recovering from. Additionally, the Motion makes several arguments simply inapplicable to statements at issue in this case.

2

Here, Defendants have strict liability for the statements in the Registration Statement under the Securities Act of 1933. They are also liable under Section 10(b) of the Securities Exchange Act of 1934 because they knew or recklessly disregarded the misleading nature of the statements in the Registration Statement and their post-IPO statements about these topics.

XF hit the market at $9.50 per ADS—buoyed by Defendants' misstatements in the Registration Statement that would later come to light. By the date the initial complaint was filed, XF's ADSs were trading at $1.90 per ADS, 80% lower than its IPO price.

The Motion should be denied in its entirety.

## II.   FACTUAL STATEMENT

This is a class action on behalf of all persons or entities who: (1) purchased or otherwise acquired XF ADSs pursuant and/or traceable to the Company's September 19, 2018 IPO seeking to pursue remedies under §§11, 12(a) and 15 the Securities Act of 1933 (the "Securities Act"); and (2) purchased or otherwise acquired XF ADSs during the period from September 19, 2018 through and including May 20, 2019, seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5.

### A.   **Company and Regulatory Background**

XF is a finance technology company based in Shenzhen, China that operates a P2P platform that matches borrowers and lenders. ¶62. The Company's primary source of revenue is charges for its loan facilitation services—it charges a fee, which is a percentage of the loan amount, for facilitating and processing loans between the two groups on its platform. ¶66.

The Company had two major sources of revenue – card loan and preferred loan products. ¶83. XF derived 36.7% of its revenues in 2017 from card loans, making it the Company's largest

product. *Id.* Preferred loans were, at the time of the IPO, the Company's second largest product, accounting for 22.6% of the Company's revenues in 2017. ¶84.

XF was one of many P2P platforms that flourished in China with very few regulations to cramp its usurious practices. ¶¶67-69. It promised investors high returns and charged high fees to its borrowers. *Id.* However, there was massive fraud in the industry and regulators stepped in to stem the tide of difficulties. ¶69.

In August 2016, the Chinese Banking Regulatory Commission, in conjunction with other regulators, issued: "Interim Measures for the Administration of the Business Activities of Online Lending Information Intermediary Institutions" (the "Interim Measures"), which had to be adhered to as of June 2018. ¶¶70-72. As relevant to this case, the Interim Measures capped the amount individuals and businesses that were allowed to borrow on a P2P platform. ¶71.

This was not the only regulation that impacted XF. Following regulations in December 2017, the company had to adjust the annualized fee rates of all new loans downward so it would not exceed 36%. ¶73. Additionally, in June 2018, relevant offices in Beijing, set out goals to reduce the number of P2P companies and the business scale of those companies. ¶74.

Yet, while many other P2P lenders flailed and/or shuttered, XF seemingly continued to grow. ¶75. The Registration Statement laid out a compelling portrait of a Company on the rise. *Id.* XF marketed itself as more attractive to investors because it was backed by insurance offered by a company named ZhongAn. ¶¶79-82.

## B.    XF Begins to Transform its Business Prior to the IPO

By the time XF went public on September 19, 2018, the Company had already begun transforming itself to fit into the new regulatory regime.

4

Preferred loans were greatly impacted by the Interim Measures because of the significant cap it put on the Company's ability to lend. ¶85. Whereas previously the Company could lend RMB600,000 to an individual, after June 2018 it could only lend RMB200,000. *Id.*

Right up until the implementation of the Interim Measures, Confidential Witness #1 (CW1), who worked in credit risk control at XF, stated he was told by his manager to be less detailed in his review of potential borrowers. ¶77. This helped increase XF's numbers prior to the IPO. ¶78. However, starting in June 2018, CW1 noted that demand fell substantially for preferred loans because the amount that could be borrowed was no longer a game-changer for people. ¶87. Prior to his departure in October 2018—*the month after the IPO*—he learned the Company was no longer going to be facilitating preferred loans. ¶86. Defendants would not admit they had discontinued this product until May 21, 2019, seven months later. ¶133.

There were additional problems with XF's bottom line. XF touted its ability to target prime borrowers, but witnesses actually cited the laxness of procedures in the first half of 2018. *E.g.*, ¶¶77, 97-99. This laxness led XF to have the highest delinquency rates of peer companies, despite it promoting its ability to appropriately assess risk of default. ¶98. When a borrower defaulted, a third-party insurer reimbursed the investor, but had recourse to XF, subject to certain caps. ¶102. These penalties greatly impacted XF's bottom line—sometimes leading XF to pay the third-party more than it collected from borrowers. ¶103.

One bright spot for XF in this regulatory world was that card loans, its largest product line and one essential to its balance sheet, was not particularly impacted by the Interim Measures because its loan size was already below the limit required by the government. ¶122. However, given the difficulties XF was having with repayment, they had to make changes. Prior to the IPO, though not disclosed to investors, the Company reduced the size of card loans and also

5

tightened its approval process. ¶¶124-130. The approval process changes had a tremendous impact on the Company's user base. ¶128.

### C.     XF's Misleading IPO

While XF was constricting behind-the-scenes, the Registration Statement created a rosy picture of the Company's prospects.

The Registration Statement stated how preferred loans were to be part of the Company's "growth," despite XF deciding to discontinue them prior to the IPO. ¶112. While the Company noted poor July 2018 and August 2018 figures in a "Recent Developments" section, it blamed these low figures on the macro environment solely and not any internal decisions. ¶¶24, 123. In fact the Registration Statement said that the Company was already "recovering" and "improving." ¶123. In reality, the Company's active users were on track to decline by 29% during the third quarter of 2018—which ended a mere eleven days after the IPO. ¶179.

The Registration Statement failed to mention that XF had already decided to: (i) limit the amount of card loans it was distributing; (ii) reduce the size of the card loans; and (iii) phase out the preferred loan business. ¶¶20, 79-130. These decisions would substantially impact the Company's bottom line, but were hidden from investors.

### D.     XF Slowly Reveals The Truth

On November 19, 2018, the Company released its earnings for the period ending September 30, 2018 (the "Q3 2018 Earnings"), a period that ended eleven days after the IPO. ¶23. The Q3 2018 Earnings provided bad news for the Company, including a 21% decrease in the numbers of loans facilitated quarter-to-quarter and a decrease of 32% in the value of those loans quarter-to-quarter. ¶179. But on an earnings call that day (the "November 19 Call"), Defendants primarily blamed market conditions, and did not disclose any pre-IPO changes. ¶26.

6

On the November 19 Call, the Company said moving forward, due to sky-rocketing delinquency rates, it would be tightening its credit policy so less borrowers would be approved, and it had consciously reduced the average loan size. ¶¶109, 185-186. However, Defendants also misleadingly assured investors that the credit problems were behind them and growth was on the horizon. ¶182-183, 201.

In subsequent financial reports, XF shed further light on the problems that began before the IPO. ¶¶176-194. For example, the earnings report for the fourth quarter of 2018 ("Q4 2018 Earnings"), noted that delinquencies were still on the rise. ¶110. Cheng also belatedly admitted the Company had tightened its approval process since the middle of 2018—prior to the IPO and before the Company previously said that move had taken place—thereby reducing the number of approved borrowers and impacting the Company's bottom line in a way not disclosed in the Registration Statement. ¶112. Defendants had previously stated that was going to happen from Q3 2018 on, as a preventative measure. ¶109-110. Then, on May 21, 2019, Defendants finally admitted their financial figures were also falling because the Company had discontinued preferred loans—a decision made prior to the IPO but not disclosed until that day. ¶¶131-134.

### III.   ARGUMENT

#### A.   The Complaint States a Claim for Violations of the Securities Act

##### 1.   Plaintiffs Face a Minimal Pleading Burden under the Securities Act

In ruling on a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007). Section 11 of the Securities Act places "a relatively minimal burden on a plaintiff." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983). Section 11 imposes liability if "any part" of a registration statement "contained an

7

untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading." 15 U.S.C. § 77k(a). To state a Section 11 claim, a plaintiff need only establish one of the following: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011). In contrast to Section 10(b) claims, "plaintiffs alleging violations of Sections 11 and 12(a)(2) [do] not need [to] plead scienter, reliance, or loss causation." *Id.* Because Section 11 has no scienter requirement, "[l]iability against the issuer of a security is *virtually absolute*, even for innocent misstatements." *Herman & MacLean*, 459 U.S. at 382.[2]

### 2.      The Securities Act Claims Do Not Sound in Fraud

Claims under § 11 are generally subject to the permissive notice pleading standards of Rule 8(a), unless the claims *necessarily* "sound in fraud." *See Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674, 684 (9th Cir. 2005) (finding that Rule 9(b) did not apply where "claims [were] not 'grounded in fraud' because Plaintiffs allege[d] a basis for Section 11 liability other than fraud; i.e., the omission of a material fact from the Registration Statement.").[3]

Defendants incorrectly contend that Plaintiffs' Securities Act claims are "predicated on fraud," requiring that the Complaint satisfy Rule 9(b)'s heightened pleading standard. MTD 11-12. Courts in this District have held that allegations "that a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud." *In re Orion Sec. Litig.*, 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009). Here,

---

[2] Unless otherwise noted, internal citations and quotations are omitted and emphasis is added.

[3] *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (finding careful division of Section 11 and Section 10(b) claims, such as the one present in the instant complaint, instructive).

Plaintiffs have alleged non-fraudulent bases for § 11 liability, including the simple fact that Defendants negligently signed a Registration Statement which contained untrue facts and material omissions. ¶¶15, 140, 208-214.

The Complaint expressly disclaims that its Securities Act claims are based in fraud. ¶¶208. The Complaint is also segregated into two parts, with distinct sections for the Exchange Act claims and the Securities Act claims. Notably, the Counts that set forth the Securities Act claims, expressly exclude the paragraphs related to the Exchange Act claims. ¶¶208, 218. *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (distinguishing *Rombach*, the case Defendants rely on here, when plaintiffs' Section 11 claims did not incorporate their 10(b) claims).[4]

Regardless, however, the Complaint meets even the higher pleading standard necessitated by Rule 9(b), as Plaintiffs "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

### 3. Defendants Made False and Misleading Statements in the Prospectus

XF's Registration Statement contained several material misrepresentations and material omissions for which Section 11 imposes liability. "'[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic.'" *In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 258 (2d Cir. 2016) (quoting *Meyer v. JinkoSolar Holdings Co.* 761 F.3d 245, 250 (2d Cir. 2014)).

---

[4] *See also City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 425 (S.D.N.Y. 2011) (finding Securities Act claims must only satisfy the Rule 8 pleading standards when the Complaint makes it "easy to distinguish between the two [theories], and the substance of the allegations keeps the distinction as clear as does the complaint's structure."); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011).

9

Once a party chooses to speak, it has a "duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). Moreover, the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). The Registration Statement included a number of statements which did not "accurately inform" investors, rendering the statements false and misleading. These statements centered on the Company's (i) planned elimination of preferred loans; (ii) failure to target prime borrowers leading to increased delinquency rates; and (iii) constriction of the size of its card loan business.

### a)  Defendants Made Misleading Statements about Preferred Loans

The Complaint alleges that Defendants had decided to cease providing preferred loans prior to the IPO and was already phasing out the product line. ¶¶86-95. Defendants not only spoke on the topic of preferred loans and failed to disclose the product's planned elimination, Defendants stated in the Registration Statement that these types of loans would drive "growth." ¶¶88, 155. The Motion spends six pages arguing that somehow Defendants' misstatements should be insulated from legal responsibility – each of these attempts must fail. MTD at 14-21.

*First*, Defendants argue that simply because the Registration Statement disclosed that card loans were an increasingly large portion of the Company's product mix, investors should have assumed preferred loans were being eliminated. MTD at 15. Yet the Registration Statement stated that the product mix had been changing since the launch of card loans in 2016. (Weinstein Ex. A at 27.) Defendants never explain how the change in product mix—which had been going on for years—should have suddenly alerted investors to the cessation of preferred loans.

*Second*, Defendants try to sidestep the Complaint's allegations that the decision to eliminate was pre-IPO by claiming it is based on "second-hand" information and hindsight

10

pleading. MTD at 17-18.[5] CW1's job was to perform background checks for borrowers applying for preferred loans and he left that job in October 2018—the month following the IPO. Prior to his departure he was told that the Company was not going to be facilitating preferred loans any longer, and they had already ceased being administered at the major office in which he worked. ¶86. Defendants appear to be arguing that at the time of the IPO, September 19, 2018, Defendants had every intention of growing the preferred loan business but a month later a "line-level employee," as Defendants call him, was eliminated from his job because of an abrupt change of plans. MTD 17-18. That argument strains credulity. Seemingly knowing that, Defendants attack the witness himself, arguing that he would not have been in the "position to know the facts attributed to [him]." MTD at 17, quoting. However, this knowledge directly impacted his job, and his departure from his job, so certainly he was in the position to know. Confidential witness allegations must be accepted as true when the source is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).[6] That is exactly the case here.

Defendants argue that a witness cannot be taken at his word if there are no corroborating facts to support his statement. MTD at 17. Even if that was true—and it is not[7]—there are

---

[5] Defendants argue that "Plaintiffs allege nothing to demonstrate. . . [and] no facts to suggest that XF had considered" the discontinuance of preferred loans at the time of the IPO (MTD at 16), thereby completely ignoring the allegations in the Complaint in a way impermissible at this stage in the litigation. *E.g.*, ¶¶83-88.

[6] The law in this circuit strongly favors crediting witness allegations when the descriptions of the witnesses "easily 'support the probability' that the unnamed prior employees would have the knowledge [attributed to them]." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 124 (2d Cir. 2013); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589–90 (S.D.N.Y. 2011) (witnesses credited when they were identified "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

[7] Defendants assert an almost impossible standard for confidential witnesses. MTD 17-18; 22-23. To the extent that some of CW's information is based on hearsay is of no matter. Courts "may properly take account of the alleged testimony. . . [of witnesses] even though some of his testimony is based on hearsay and indirect knowledge." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 2020 WL 4547217 (S.D.N.Y. Aug. 06, 2020).

multiple corroborating facts to support CW1's statements. CW1 stated that he was told that XF would no longer be distributing preferred loans and months later *XF admitted* that it had ceased offering the product line. There is no more concrete corroborating fact than XF's own admission.

*Third*, Defendants' argument that they had no obligation to present financial figures in a negative light is a red herring. MTD at 15.[8] Plaintiffs are not arguing that Defendants had a requirement to present historical financial data in a negative light. The Complaint clearly alleges Defendants' stated emphasis on how attractive preferred loans were to so-called "prime borrowers" and how the loan type would "drive [] continued growth" at a time when preferred loans were already being totally phased out was false and misleading. ¶¶155-161. While the Registration Statement presented historical data which showed the past couple of months had been difficult for the preferred loan balance sheet, Defendants not only reassured investors by stating that the product would lead to "growth," but also by telling the market that XF's "business performance has started gradually improving" since market turmoil in the few months prior to the IPO. ¶123. This at a time when Defendants were eliminating the product line. In other words, Plaintiffs are not alleging that Defendants should have disparaged themselves – the Complaint instead alleges that Defendants explicitly and overtly misled investors by making statements that flatly were untrue in light of current circumstances.[9]

After all, the fact that Defendants presented accurate historical data (if it was accurate), does not insulate them from liability. As the Second Circuit has repeatedly held: "The literal

---

[8] Similarly, Defendants' argument that accurate historical data cannot form the basis of a securities claim (MTD 19) is of no matter. Plaintiffs are not alleging that the historical data was false or misleading.

[9] The cases Defendants rely on are therefore distinguishable.  MTD at 15. Neither is about a case, such as this one, where Defendants made optimistic statements about a business they had already decided to shutter.  The holding in *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 397 (S.D.N.Y. 2014), *aff'd,* 605 F. App'x 52 (2d Cir. 2015), focused on the fact that General Motors had disclosed negative data but did not label it a "trend."  It did not center on false positive statements accompanying negative data.  Likewise in *Hain Celestial Grp. Inc. Sec. Litig.*, 2020 WL 1676762, at *13 (E.D.N.Y. Apr. 6, 2020) the court was faced with a wholly distinct issue – whether there was a legal requirement to disclose sales incentives which allegedly made figures unsustainable.

truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context. Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate*." Jinkosolar Holdings Co.*, 761 F.3d at 250–51. Here, Defendants made repeated representations about how strong a product preferred loans were, without admitting they were being phased out.

*Fourth*, these statements are not protected by the bespeaks caution doctrine. MTD at 19-20. "It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking." *Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (finding alleged false statement actionable as "an omission of present fact, to which bespeaks caution does not apply"). Here, Defendants omitted the present fact that preferred loans were already being phased out in preparation for total elimination. *E.g.*, ¶88 (Defendants "were therefore, prior to the IPO, taking the first steps in eliminating the product line"; ¶87 ("the Company was not going to be facilitating preferred loans any longer").) Therefore, these statements were "misleading about historical and present facts at the time they [were] made" and their "misleading nature [could] be verified at the time they [were] made." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011), *aff'd,* 838 F.3d 223 (2d Cir. 2016); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004) (misrepresentations that involve "present or historical facts cannot be cured by cautionary language").

Additionally, statements, even forward-looking statements, are not protected if Defendants know them to be misleading "in light of historical fact." *Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010); *see also In re Idreamsky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 831 (S.D.N.Y. 2017) ("generalized disclosures of potential risks" are insufficient because

13

"[i]f a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.'"). Here, Defendants knew that preferred loans would not contribute to "growth," as preferred loans were already being eliminated. *E.g.*, ¶¶85-95. Defendants refer to a series of statements such as a warning that "adverse economic conditions" could impact the Company as "robust cautionary language" (MTD at 20), but these generic, boilerplate warnings, did not "convey[] substantive information"—i.e., that the critical preferred loans were being eliminated from the Company's product line. *In re Vivendi, S.A. Sec. Litig.* 838 F.3d 223, 247 (2d Cir. 2016) ("kitchen-sink disclaimer, listing garden-variety business concerns that could affect any company's financial well-being, was not meaningful cautionary language.").[10]

*Fifth*, the statement that there was "considerable room for further expansion" in XF's business "was not framed like a statement of opinion." *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (noting a statement did not have "prefatory language like 'I believe' or 'In my estimation.'"). Even if it was an "opinion," as Defendants argue—though they do not cite a case on point establishing it as such (MTD at 20)[11]—it is still actionable. As the Second Circuit recently stated, a plaintiff may base its fraud allegations on a defendant's statement of opinion where it "contain[s] one or more embedded factual statements that can be

---

[10] Defendants reliance on *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 356-57 (S.D.N.Y. 2006) is puzzling because that case supports Plaintiffs' argument. In that case, defendants pointed to disclosures that "the challenges of 2001 were 'keenly felt,'" 2002 would be "another challenging year," "the uncertain outlook for the U.S. economy" would "constrain profit growth," and there was "work to be done.'" *Id.* at 361. The court held that "[s]uch general cautionary statements failed to apprise plaintiff of the relevant risk arising from defendants' substantial Tyco and WorldCom holdings, especially in light of the total mix of information available." *Id.* Here likewise the Defendants rely on generic cautionary language about "risks and challenges" and "[a]dverse economic conditions." MTD at 20. That is plainly not enough to invoke the bespeaks caution doctrine.
[11] The sole case Defendants' cite is *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 250 (S.D.N.Y. 2019), issued before the Second Circuit's holding in *Newlink*, 965 F.3d at 175. That case centers on characterizations of a market as "attractive" but notably the court held these comments "were not so inconsistent with the underlying facts as to support an inference that Sky did not actually believe the opinions, nor has Plaintiff shown that they were misleading." Here, Plaintiff pleads that there were omitted underlying facts.

14

proven false" or "implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted." *Newlink*, 965 F.3d at 175. While Defendants argue that "Plaintiffs allege nothing" to establish liability under this standard (MTD at 21), that is far from the truth. Plaintiffs allege that XF's business, particularly its preferred loan segment was contracting at the time of the IPO because of regulations the enforcement of which would, if anything, only increase. *E.g.*, ¶¶69-74, 85-95. Therefore, a statements that the "market was expanding" is actionable under either standard – it both contains a factual statement which can be proven false and omits material facts that the speaker knew at the time of the statement.

*Sixth*, Defendants pull two quotes out of context and state all the statements about preferred loans are "quintessential puffery," MTD at 18, when in fact none of them are. As alleged, Defendants misled investors by stating that the Company was "able to source a large number of borrowers for Xiaoying Preferred Loan, which will drive the continued growth in our borrower base." ¶155. This statement was false and misleading because, at the time it was made, preferred loans were declining and being phased out as a product line. Context matters when making a puffery determination. *See In re KeySpan Corp. Sec. Litig.*, 2003 WL 21981806, at *17 (E.D.N.Y. July 30, 2003) (finding optimistic statements were actionable where "defendants were in possession of yet failed to disclose facts inconsistent with their public statements"); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (not puffery where "defendants made specific statements, including but not limited to those characterized by the defendants as merely reflecting optimism, knowing they were contrary to the company's actual situation"). As the 7th Circuit has held, "we're still seeing that product continue to maintain its growth rate" is actionable when spoken on a specific product line. *Makor Issues & Rights, Ltd. v.*

15

*Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006), rev'd on other grounds by *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 551 U.S. 308 (2007). In this case, Defendants stated a specific product would contribute to growth when it was in fact being phased out.

The cases that Defendants rely on are easily distinguishable. MTD at 18. In *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, the Second Circuit ruled that statements that Philip Morris expected a product line "to perform well" did not give rise to a duty to disclose that the Company might "adopt[] [] an alternate marketing strategy that would hurt short-term earnings" and that a "reasonable investor" would not have believed "that the company had irrevocably committed itself to one particular strategy" based on the statement. 75 F.3d 801, 811 (2d Cir. 1996). Here, a reasonable investor would believe based on Defendants' concrete, clear and on point statements that preferred loans—the same loans that, unbeknownst to investors, were being eliminated—would drive growth. Likewise, *In re Adient plc Sec. Litig.*, if anything goes against Defendants' argument. In that case, a defendant commented that a certain line was on the upswing. *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *23 (S.D.N.Y. Apr. 2, 2020). The court held that statements were inactionable puffery when plaintiffs had not pled "contradict[ing] facts that [we]re known to a defendant." *Id.* Here, Plaintiffs have pled contradictory facts regarding the preferred loan business. ¶¶36, 85-95. The misguided nature of Defendants argument is heightened by their citation of *Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142, 153 (D. Conn. 2004). In that case, the court found statements such as a prediction that "2002 will be another very exciting year" and a statement that the company had "great software and service solutions" non-actionable. *Id.* However, the statements in the instant case are far from the generic hopeful assertions in *VitalWorks, Inc.*. Here, the statements specifically label a product being discontinued as one that will "source a large number of borrowers" and "drive the

16

continued growth" of the Company. Surely, that statement would influence an investor in a way this will be an "exciting year" would not.[12]

*Finally*, there can be no question that Defendants created a misleading impression with their statements about preferred loans, a business line on its way out. Recently a court in this circuit was faced with a case about a P2P lender who had not fully disclosed the oppressive regulatory framework in China and how the regulations would impact the company's business. The court held: "to correct the misleading impression created by Defendants' bullish statements concerning the financial services provider market, [the company] was obligated to describe the regulatory framework then in place - nascent though it may have been - and disclose the impact of that regulation on the market, including the fact that the financial services providers on whom it relied for a substantial portion of its revenue were not in compliance." *Panther Partners Inc. v. Jianpu Tech., Inc.*, 2020 WL 5757628, *13 (S.D.N.Y. Sep. 27, 2020). Here, while XF described the regulations, it made bullish statements about its business without disclosing the full impact the regulations were having on its business. That is actionable.

### b) Defendants Misled Investors Regarding Their Ability to Target Prime Borrowers and Their Delinquency Rates

The Complaint alleges that Defendants relaxed their assessment standards in the first half of 2018 to bolster numbers prior to the IPO and that these lax credit assessment standards would necessarily impact the Company in the future.[13] *E.g.*, ¶¶77, 97-99. It is not hindsight pleading to use delinquency rates posted after the IPO to establish these facts because a loan given to an

---

[12] Defendants other cases similarly do not help their cause. *See Rudman v. CHC Grp. LTD.*, 217 F. Supp. 3d 718, 728 (S.D.N.Y. 2016) (a statement about a "strong customer relationship" was held to be puffery when there was simply a temporary non-payment by that customer); *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 395 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015) (statements held as puffery when they did not allege misrepresentations as to already existing facts).

[13] Defendants claim that Plaintiffs' allegations contradict each other (MTD at 22), but that is based on an incorrect reading of the Complaint. The Complaint alleges that in the first half of 2018 Defendants loosened their credit standards to boost their financials, but began to tighten their standards just prior to the IPO. ¶¶77-78, 99-100, 112.

17

unqualified person in June 2018 would likely not be delinquent until after the IPO. *See Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476 (D. Del. 2019) (holding that it was not fraud by hindsight when the complaint pled defendants knew or recklessly disregarded information and red flags that led to the impact alleged).

Moreover, the Complaint quotes two witnesses discussing lax credit assessment standards and many user comments, including one stating that the screening "requirements do not include any related to identity or household registration; your loans will be approved whether you're legally registered or not." ¶¶77-78, 99-100. As alleged, and shown by increasing delinquency figures, this lax screening process led to a high rate of borrower default. ¶¶114-117, 202. These defaults greatly impacted XF's bottom line – there were months when it had to pay the insurer more than it took in. *Id*. Meanwhile, large chunks of the Registration Statement were dedicated to XF's rigorous screening process, which purportedly attracted only "prime borrowers" who could repay their loans. *E.g.*, ¶143 (borrowers were reviewed with a "sophisticated risk management review system"; ¶144 (the Company "Leverag[es] data analysis and machine learning in analyzing a borrower's value, repayment capability and propensity" and the "rigorous data-driven credit assessment methodology has helped us to achieve a strategic balance between borrower expansion and asset quality control.").

Defendants respond by attacking the witnesses as the recipients of "largely second-hand" knowledge. However, both witnesses were in positions to know about the matters to which they testified. *See Novak*, 216 F.3d at 314; *see also In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 555 n.5 (S.D.N.Y. 2010) (crediting CW allegations where they "were positioned, albeit at low levels" how a company implemented its policies). CW1, who worked in credit risk control at XF, was directly in a position to review loan applications. ¶144. CW2 was in debt collection and, in

18

that capacity, necessarily dealt with borrowers in default and reviewed files related to the borrowers and their initial approval. ¶144.[14]

These lax standards led to a tightening of credit assessment standards right before the IPO.[15] ¶¶112-114, 191. This was undisclosed to investors and dribbled out after the IPO. ¶¶176-192.[16]

Likewise, the Registration Statement did not explain to investors that the increase in delinquency rates it reported was a growing trend that was continuing at the time of the IPO, nor did it disclose that XF was making policy changes because of the delinquency increases, such as tightening credit requirements and reducing loan size. Coupled with the representation that the Company was already recovering from adverse economic conditions, Defendants' statements about delinquency rates were particularly false and misleading.

Defendants again try to hide behind a "puffery" defense, but "[e]ven assuming that the Defendants' statements included puffery or corporate optimism, when viewed in context, a reasonable investor could rely on their statements." *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, *9 (S.D.N.Y. Sept. 30, 2020). In *Aphria*, the court held that statements touting an asset

---

[14] Even if this was not the case—and it is—the information the witnesses provide is informative regardless. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 11319408, at *24 n.24 (S.D.N.Y. Dec. 12, 2013) (internal citation omitted) ("The fact that the [source of allegations] may or may not constitute 'hearsay' is similarly misplaced; allegations in a complaint are not tested against the rules of evidence."); *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 144 F.R.D. 613, 617 (E.D.N.Y. 1992) (hearsay sufficient basis on which to allege facts in a complaint).

[15] Defendants assert two statements by Defendant Cheng, which say the same thing, are clarifications of one another. MTD at 24. This assertion seems to represent a misapprehension of the Complaint and Defendant Cheng's statements. The Complaint alleges that the approval rate had begun declining prior to the IPO, since, to quote Defendant Cheng, the "middle of" 2018. ¶191. When Defendant Cheng said in November XF was changing its policy in light of the delinquencies seen in Q3 that statement was false and misleading. ¶¶186-189. The Company had already made that decision prior to the IPO. ¶191.

[16] Defendants cite one case, in a footnote, to argue that this disclosure was not material regardless because Plaintiffs do not allege the magnitude of the change in loan approval rates. MTD at 24 n.15. However, in the case cited, *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 151-154 (S.D.N.Y 2015), the court was presented with deciding materiality for a one-month decline in siding scales, which is far from the significant policy change regarding loan approval rate alleged in this Complaint. ¶¶121-128.

19

as "world class" and "established and successful" were actionable when the company was merely operational. *Id.* The court held: "Plainly, such facts, if known to a reasonable investor, would likely influence one's view of the Company's representations as to operations and conditions of these assets, the company's valuations of the same, and the decision as to whether to purchase or sell Aphria's securities." Similarly, here Defendants statements about its "high standard of credit quality" should be held actionable when, in fact, Defendants' procedures led it to have the highest delinquency rates of peer companies. ¶98.

### c) Defendants Made Misleading Statements About the Size and Growth of Card Loans

In order to defeat Plaintiffs' well-pled allegations regarding misrepresentations around card loans, Defendants again rely on the argument that the reporting of historical data should be enough to satisfy their disclosure obligations. MTD at 21. However, as explained above, that data was contradicted by Defendants' explanation that any low numbers were the result of macro economic conditions and the Company's fortunes were already improving. The Complaint alleges, with support from Defendants' own later statements, that the Company had consciously, prior to the start of the IPO reduced both the size of card loans and the approval rate. *E.g.*, ¶112, 122-125, 195. Yet the Registration Statement states Defendants' "*expect revenue contribution from Xiaoying Card Loan will continue to increase in the future*[.]" According to the Registration Statement, card loans were the Company's top product. ¶163. Therefore, statements about the product line were unquestionably material to investors.[17]

---

[17] A court must consider "both 'quantitative' and 'qualitative' factors in assessing an item's materiality. . . Where the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim is  even lower." *Litwin*, 634 F.3d at 717-18.

### d) Defendants Failed to Disclose Trends and Risks

Defendants' failures to disclose known, material trends also constitute material omissions in violation of the Company's duty of disclosure under item 303 of Regulation S-K. 17 C.F.R. § 229.303. Item 303 "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).[18]

As the Eleventh Circuit has explained, "Item 303(a)(3)(ii) essentially says to a registrant: If there has been an ***important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results***, explain this change in the prospectus. The obvious focus is on preventing the latest reported results from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects" *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir. 2002). Because Item 303 disclosures are mandatory, "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of [such] 'known trends or uncertainties.'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015).[19]

---

[18] The Instructions to Item 303 require the Company's discussion and analysis to "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." *Id.* The SEC instructs a Company's management to "identify and discuss key performance indicators, including non-financial performance indicators, that their management uses to manage the business and that would be material to investors." *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities and Exchange Commission Release Nos. 33-8350; 34-38960; FR-72 (Dec. 19, 2003), *available at* https://sec.gov/rules/interp/33-8350.htm#P18_1728.

[19] Defendants argue that Item 303 is not applicable to foreign companies. MTD at 26. However, courts in this circuit have found that, "[t]hough Item 303 does not apply to foreign corporations, the SEC has stated that its interpretations of Item 303 'apply to [Management Discussion & Analysis disclosures] drafted pursuant to Item 5 of Form 20-F,' which does apply to foreign corporations." *Jianpu Tech. Inc.*, 2020 WL 5757628 at *7 n.5 .

The IPO Prospectus failed to disclose several known, material trends in violation of Item 303. Specifically, the Prospectus failed to disclose that, by the time of the IPO, XF: (i) scaled back its approval of loans in the face of significant declines in demand and rising delinquency rates and (ii) decided to phase out its preferred loan program. ¶172.

Similar to Item 103, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe the risk." Here, the risks of XF's business were heightened for many reasons, including because of (i) its lax credit procedures in the first half of 2018 and (ii) the discontinuance of preferred loans.[20]

### 4.    The Securities Act Claims are Timely

Under Section 13 of the 1933 Act, a plaintiff's claims are timely if "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]" 15 U.S.C. 77m. "A securities-law violation is discovered when the plaintiff learns 'sufficient information about [the violation] to. . . plead it in a complaint' with enough 'detail and particularity to survive a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss.'" *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).[21] In order for the statute of limitations to begin to run, given

---

[20] Defendants state that Plaintiff "plead[s] no facts. . . showing that Defendants knew at the IPO that XF would "discontinue" preferred loans or reduce its loan approval rate." Defendants therefore disregard the allegations of the Complaint, which must be taken as true for purposes of the motion to dismiss. Plaintiffs plead that Defendants were in the process of eliminating preferred loans at the time of the IPO and that, based on Defendants' own statements, they had already reduced the Company's loan approval rate at the time of the IPO. *E.g.*, ¶¶86-88, 191.

[21] Defendants argue that this Court "need not resolve" which standard should be applied when judging when the statute of limitations should begin. MTD at 8. However, in addition to the Second Circuit stating the standard in *Nomura*, the "the weight of authority leans toward the courts which have applied the *Merck* statute of limitations standard to Securities Act cases[.]" *Yi Xiang v. Inovalon Holdings, Inc.*, 268 F. Supp. 3d 515, 522 (S.D.N.Y. 2017).

22

"the totality of the circumstances," *id.* at 120, the information provided must be "specific enough to provide an ordinary investor with indications of the *probability* (not just the *possibility*) of a violation." *Id.* (emphases in original; internal quotations omitted). "[A] reasonable plaintiff on inquiry notice would conduct further investigation, but the limitations period begins to run only when, in the course of that investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately." *Id.* This did not occur on November 19, 2018, as Defendants argue.[22] MTD at 7-11.

Far from being the full disclosure Defendants claim, the November 19 Call would not have put an investor on notice. Although the numbers disclosed reported a "decline in loan facilitation," Defendant Tang sought to reassure investors by stating "the lows we saw in July when the market turmoil was at a peak" and said that the "[n]umber-one driver" was "the lack of funding during the July and August time." ¶26. As the Supreme Court has stated: "reassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns." *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.,* 543 F.3d 150, 168 n.14 (3d Cir. 2008), aff'd *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).[23] That is the case here. In response to the information delivered on the November 19 Call, the stock price went up. This undermines Defendants' argument that Defendants' statements on this call provided notice to plaintiff. *See Newman v. Warnaco Grp., Inc.*, 335 F.3d 187 (2d Cir. 2003) (investors not on inquiry notice when, *inter alia*, there was no price decline

---

[22] Defendants also go outside the Complaint to reference analyst reports which they claim shed light on XF's financial situation and also trigger the statute of limitations.  MTD at 10-11.  However, one analyst taking a "cautious view" of the business and another expecting "modest" growth certainly did not give investors the facts they needed to bring a Securities Act claim.

[23] *See also In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010) (even under the "storm warnings" pleading requirement, "storm warnings" do not place investors on inquiry notice when accompanied by "'reliable words of comfort from management' such that an investor of ordinary intelligence would reasonably have relied on the statements to allay his or her concern.").

upon the filing of a 10-K). XF's stock price went down following the more complete May 19, 2019 disclosure. ¶203.

Additionally, Defendants' statements on the call hid the full truth from investors. Despite arguing otherwise, the Motion makes this clear with its pull quotes. MTD at 9-10. Defendants assert the following facts which make clear that plaintiffs could not have brought a claim based on the November 19 Call:

- Defendants assert that the truth about preferred loans was disclosed because, on the November 19 Call, Defendant Tang stated "over the last three quarters, [the Company had] consistently reduced [its] preferred loan business." MTD at 9; ¶94. While this disclosure did seemingly contradict the Registration Statement, which spoke about how that business line would be part of the Company's "growth," ¶88, it would not have provided even a storm warning to investors, who were assured that the market turmoil that led to this reduction was a thing of the past. ¶¶181-84. There was no disclosure that prior to the IPO Defendants had decided to *eliminate* preferred loans. *E.g.*, ¶¶88, 93, 133.

- Defendants implausibly state that Defendant Cheng telling investors that in the future the Company would "tighten our credit policy" should have put investors on notice. MTD at 9; ¶186. However, investors would have no indication from this that the Company had begun tightening its credit policy *prior to the IPO* (which Defendants admitted for the first time in March 2019), nor would they have any idea that credit standards had been loosened in the first half of 2018 to goose the Company's financials prior to the IPO, all of which is alleged in the Complaint. *E.g.,* ¶¶31, 77, 99, 112, 191. On the November 19 Call, Defendant Cheng said the Company would "reject more applications" *from Q3 onward* as a preventative measure. ¶109. It was not incumbent on Plaintiffs to seek out non-public information to contradict him.

- Defendants next argue that Defendant Tang's statement regarding a "conscious[] reduc[tion]" in loan size should have been sufficient to put plaintiffs on notice of their claim. MTD at 10; ¶125. However, the allegations in the Complaint, state that Defendants' stated this was because of a poor credit environment, from which the Company had already recovered. ¶127. This would not have signaled an overall change, but rather, at most, a temporary blip.

For the aforementioned reasons, Plaintiffs' Securities Act claims are timely.

**B.** **The Complaint States a Claim for Violations of the Exchange Act**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

24

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)). Here, Defendants only contest the first and second of these factors.

### 1. Defendants Knew or Recklessly Disregarded that the Registration Statement Contained Material Misrepresentations and Omissions

Under the PSLRA, to adequately plead scienter, a complaint must allege facts that, when viewed holistically, give rise to a strong inference that the defendant acted with "the required state of mind." 15 U.S.C. § 78u-4(b)(2). To plead scienter in a securities fraud claim, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud. *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (citation omitted). "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308, 311). Alternatively, a complaint adequately pleads a reckless omission if it alleges that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* at 308; *see also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 486 (S.D.N.Y. 2011) (quoting *Novak*, 216 F.3d at 311). "An egregious refusal to see the obvious" is a hallmark of recklessness. *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000) (quoting *Chill v. Gen. Elec. Co.*, 101 F. 3d 263, 269 (2d Cir. 1996)). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have

25

specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit v. Eichler*, 264 F. 3d 131, 142 (2d Cir. 2001) (citations omitted).

Courts assessing scienter must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original). Indeed, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (internal citation omitted).

As the First Circuit recently reinforced, "a defendant's publication of statements when that defendant knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *SEC v. Johnston*, 2021 WL 222037 at *7 (1st Cir. Jan. 22, 2021). That is precisely what is alleged here. Even if Defendants did not know what they were representing was false and/or misleading—and Plaintiffs do not concede that—Defendants "***should have known*** that they were misrepresenting material facts related to the corporation." *Novak,* 216 F.3d at 308 (vacating a dismissal). Indeed, allegations of scienter are reinforced where a defendant "'sp[eaks] extensively' about [an issue and knows it is] … 'a subject about which investors and analysts often inquire." *comScore*, 268 F. Supp. 3d at 552-53. Defendants repeatedly spoke about XF's different loan products and were often asked about their impact on the Company's financials. *E.g.*, ¶¶64, 94-95, 108-116, 133-134, 155, 158, 163, 185.

Each of the undisclosed facts involved XF's main lines of business and significant business decisions. For example, the highest levels of the Company were involved in decisions to (i) discontinue preferred loans, the Company's second largest product line; (ii) decrease or increase credit standards; and (iii) decrease loan ticket size. When analyzing "*all* of the facts

26

alleged, taken collectively" this becomes clear. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). Notably, the Individual Defendants embrace responsibility for these overarching corporate decisions by frequently using the word "we" to describe the moves taken. *E.g.*, ¶94 (Defendant Tang: "we have been consistently reduced our [sic] preferred loan business."); ¶114 (Defendant Zhang: "we noted that the delinquency rate for the loan facilitated in June, July of 2018 actually increased a lot in Q4"); ¶126 ("we cut [average loan size] down by about 20% from our normal period"); ¶133 (Defendant Tang: "we literally discontinued" preferred loans).

Additionally, "a later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006). Here Defendants' later statements were inconsistent with their earlier statements. For instance, on the November 19 Call, Defendant Cheng told the market that the Company would be tightening its application process from then on as "a preventative action." ¶191; Weinstein Ex. F at 5. Whereas on the March 19 Call, Defendant Cheng admitted that the Company's approval rate for loans had been declining since the middle of 2018, in other words, before the IPO and before his November 19 statement. ¶191.

Defendants argue that, in order to establish scienter, Plaintiffs needed to plead contemporaneous contrary information given to the Individual Defendants. MTD at 30. However, that misinterprets cases in this circuit.[24] *See In re Gen. Elec. Co. Sec. Litig.*, 857 F.

---

[24] None of the decisions Defendants rely on—which are all unpublished—are on point. *See Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *12-13 (S.D.N.Y. Dec. 10, 2008) (the court dismissed the case because it found no false and misleading statements pled, but also stated that plaintiffs had not sufficiently pled that defendants had information "inconsistent in any way with their public statements."); *Jackson v. Halyard Health, Inc.*, 2018 WL 1621539, at *8-9 (S.D.N.Y. Mar. 30, 2018) (which involved one product that was allegedly malfunctioning and the court found the Complaint failed to allege individual defendants "had access" to the relevant test results); *In re Veon Ltd. Sec. Litig.*, 15-cv-08672, 2018 WL 4168958, at *17-18 (S.D.N.Y. Aug. 30, 2018) (centering on a bribery scheme that certain executives, none of whom are covered in the opinion, implemented; the court focused on the fact that there were no allegations that defendants had contrary information).  Here, the pleadings make clear that the

27

Supp. 2d 367, 395-396 (S.D.N.Y. 2012). In *In re General Electric Company Security Litigation*, an individual defendant made statements about the financial health of a corporation that included detailed accounts of delinquency rates and borrow stats. The district court concluded that "[i]n order to speak so knowledgeably regarding the state of [the corporation]'s finances, [the speaker] must have educated himself regarding [the corporation's] financial health." *Id*. The court held an inference of scienter permissible from these comprehensive statements. *Id*. Here too Defendants spoke frequently about these topics, both in the Registration Statement and afterward. If Defendants did not know their statements were false, they, at a minimum, recklessly "failed to review or check information that they had a duty to monitor." *Novak*, 216 F.3d at 308.[25]

Additionally, individuals and entities that speak on material topics assume a duty to "tell the whole truth." *Jinkosolar Holdings Co., Ltd.*, 761 F.3d at 250. Defendants did not comply with that duty.

### 2.    Defendants Failed to Fully Disclose The Truth After the IPO

Rather than come clean with the public about XF's declining fortunes right after the IPO, Defendants continued to misrepresent the truth. Defendants argue that the statements made were true (MTD at 27-28), but, even if some were factually true, they were all misleading.

Defendants state that there is "nothing to suggest" that Defendant Zhang's October interview statement that the Company had "already recovered" was false. MTD at 27. But the Complaint clearly alleges that, by this time, the Company had purposely scaled back the preferred loan business and the Company's loan facilitation was continuing to decline. *E.g.*,

---

Individual Defendants, who spoke frequently on these topics, had access to financial figures, and knew of decisions, that made their public statements misleading. *E.g.*, ¶¶88, 93-95, 169, 195.

[25] Defendants argue that the Complaint does not plead scienter on behalf of the Individual Defendants because it only has "boilerplate assertions" regarding what Individual Defendants knew. MTD at 30. As detailed *supra*, this ignores much of the Complaint.

¶¶91-95, 178, 128-132. Defendants try to spin his statement as being *solely* about the funding shortage that occurred previously, but that is not clear from the context, which in fact was in response to a question about active borrowers. (Weinstein Ex. D at 4-5 ("Q: Statistics show that the number of active borrowers in XF has decreased by nearly 20% to about 170,000 in July. What are the main reasons for this?")[26] Given this context, Defendant Zhang's statement was materially false and misleading.

Similarly, statements by Defendant Tang and Cheng on the November 19 Call and Defendant Tang on the March 19 Call, omitted the full truth from investors because they failed to disclose material facts and were also accompanied by false reassurances. ¶¶182-194. Defendants argue that, on November 19, the Company "believed in good faith that better times lay ahead" based on positive Q4 loan facilitation figures.[27] MTD at 28. However, Defendants leave out that the claimed misstatements involve, *inter alia*, the size of XF's investor base (¶189), and that was on the decline in Q4 2018, irrespective of their purported "good faith" beliefs. (Weinstein Ex. E at 1.) Additionally, as discussed previously, any claims regarding delinquency rates are not hindsight pleading when Defendants' chose to let non-credit worthy applicants borrow money. *See supra* at 17-18.

C.      **Plaintiffs Adequately Allege Liability under Sections 15 and 20(a)**

"In the Second Circuit, the 'control person' provisions are broadly construed as they were meant to expand the scope of liability under the securities laws." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). "In order to establish a prima facie Section 15 claim,

---

[26] While Zhang spoke about the industry's shortage of funding, his "already recovered" statement comes directly after a statement about the decrease in the number borrowers. *See* Weinstein Ex. D at 4-5.

[27] Tellingly, Defendants go outside the Complaint to add a comment regarding how the risks were "covered by the insurance company." This statement, which does not counteract any of the alleged misstatements and is not part of Defendants' substantive argument regarding falsity, raises a factual matter inappropriate for resolution at this stage in the litigation and indicative of why full discovery is necessary in this action.

29

a plaintiff must show (1) control, and (2) an underlying violation of Section 11." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 772 (S.D.N.Y. 2012) (citing *In re Lehman Bros. Mortg.–Backed Sec. Litig.*, 650 F.3d 167 (2d Cir. 2011)).[28] The Complaint satisfies the necessary requirements for control person liability.

Defendants assert that Plaintiffs have not adequately alleged control person liability because they have not adequately alleged a primary violation of the Securities Act or Exchange Act. As demonstrated above, however, Plaintiffs have adequately alleged Section 11 and Section 10(b) claims. Therefore, the "primary violation" element is satisfied. *See In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 234 (S.D.N.Y. 2004).

Defendants do not assert that the Complaint fails to allege control other than on behalf of three of the Defendants, who were not directors at the time of the IPO but were by the time of the 10(b) misstatements. Generally, "[d]etermining an individual defendant's liability as a control person is a 'fact-intensive inquiry that . . . should not be resolved on a motion to dismiss.'" *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 587 (S.D.N.Y. 2016).

## IV.     CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety. If the Court dismisses the Complaint, Plaintiffs respectfully submit that the dismissal should be without prejudice.

---

[28] Similarly, the elements of control person liability pursuant to Section 20(a) are: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Acticon AG v. China Ne. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015).  Courts in this District typically do not require allegations of "culpable participation" for Section 15 claims, and in any event, Defendants do not challenge the sufficiency of the Complaint on "culpable participation" grounds. *E.g., Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*, 2012 WL 601448, at *21 (E.D.N.Y. Feb. 23, 2012); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 310 (E.D.N.Y. 2002) ("The Court … declines to require plaintiffs to allege culpable participation" on Section 15 claims).

Dated: February 5, 2021

POMERANTZ LLP

 /s/ Cara David
Jeremy A. Lieberman
Cara David
600 Third Ave., 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com
        cdavid@pomlaw.com

*Lead Counsel for Plaintiffs*

31