UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| XIANGDONG CHEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>X FINANCIAL, YUE TANG, JIE ZHANG, SHAOYONG CHENG, DING GAO, SHENGWEN RONG, ZHENG XUE, LONGGEN ZHANG, RICHARD ARTHUR, COLLEEN A. DEVRIES, COGENCY GLOBAL INC., MORGAN STANLEY & CO. INTERNATIONAL PLC, MORGAN STANLEY & CO. LLC, DEUTSCHE BANK SECURITIES INC., CHINA EVERBRIGHT SECURITIES (HK) LIMITED, CHINA MERCHANTS SECURITIES (HK) CO., LTD., AND AMTD GLOBAL MARKETS LIMITED,<br><br>Defendants. | No. 1:19-cv-06908-KAM-SJB<br><br>**ORAL ARGUMENT REQUESTED** |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE X FINANCIAL DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000

18/F, The Hong Kong Club Building
3A Chater Road
Hong Kong, SAR
China
Telephone: +852-2533-3300

*Attorneys for the X Financial Defendants*

Dated:  March 8, 2021

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

     I.      PLAINTIFFS' SECURITIES ACT CLAIMS ARE TIME-BARRED ....................... 2

     II.     THE AMENDED COMPLAINT FAILS TO PLEAD ACTIONABLE MISSTATEMENTS OR OMISSIONS ..................................................................... 3

     III.    THE EXCHANGE ACT CLAIMS ALSO FAIL FOR LACK OF SCIENTER ......... 9

CONCLUSION ............................................................................................................................. 10

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Aphria, Inc. Sec. Litig.*,
18-cv-11376, 2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020)........................................................7

*In re Barclays Bank PLC Sec. Litig.*,
09-cv-1989, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011),
*aff'd in relevant part*, *Freidus v. Barclays Bank PLC*, 734 F.3d 132 (2d Cir. 2013).................2

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015) .............................................................................................4

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) ...........................................................................................4

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ........................................................................................................10

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) ...........................................................................................2

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020) ...........................................................................................5

*Freidus v. Barclays Bank PLC*,
734 F.3d 132 (2d Cir. 2013) ..........................................................................................................2

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ..........................................................................................................3

*In re Gen. Elec. Co. Sec. Litig.*,
856 F. Supp. 2d 645 (S.D.N.Y. 2012) .........................................................................................10

*Ho v. Duoyuan Global Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012) ...........................................................................................4

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ............................................................................................................8

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010) ...........................................................................................6

*Long Miao v. Fanhua, Inc.*,
     442 F. Supp. 3d 774 (S.D.N.Y. 2020) ...................................................................................10

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
     26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) .........................2

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
     616 F. App'x 442 (2d Cir. 2015) ...........................................................................................3

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
     15 F. Supp. 3d 336 (S.D.N.Y. 2014) ......................................................................................2

*Newman v. Warnaco Grp., Inc.*,
     335 F.3d 187 (2d Cir. 2003) ...................................................................................................3

*In re Nokia Oyj Sec. Litig.*,
     423 F. Supp. 2d 364 (S.D.N.Y. 2006) ..................................................................................10

*Panther Partners, Inc. v. Jianpu Tech., Inc.*,
     18-cv-9848, 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) .....................................................5

*In re Pfizer, Inc. Sec. Litig.*,
     538 F. Supp. 2d 621 (S.D.N.Y. 2008) ....................................................................................6

*In re Philip Morris Int'l, Inc. Sec. Litig.*,
     437 F. Supp. 3d 329 (S.D.N.Y. 2020) ...............................................................................8, 10

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
     694 F. Supp. 2d 287 (S.D.N.Y. 2010) ....................................................................................7

*In re Proshares Tr. II Sec. Litig.*,
     19-cv-0886, 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020) ...........................................................8

*Rombach v. Chang*,
     355 F.3d 164 (2d Cir. 2004) ...................................................................................................3

*Shields v. Citytrust Bancorp, Inc.*,
     25 F.3d 1124 (2d Cir. 1994) .................................................................................................10

*Singh v. Schikan*,
     106 F. Supp. 3d 439 (S.D.N.Y. 2015) ....................................................................................8

*Woolgar v. Kingstone Cos., Inc.*,
     477 F. Supp. 3d 193 (S.D.N.Y. 2020) ....................................................................................6

*Yi Xiang v. Inovalon Holdings, Inc.*,
    268 F. Supp. 3d 515 (S.D.N.Y. 2017) ..................................................................................3

STATUTES & RULES

Fed. R. Civ. P. 9(b) ..................................................................................................................3

**PRELIMINARY STATEMENT**

Rather than address the legal deficiencies that require dismissal of Plaintiffs' claims, the Opposition attacks straw men, demonstrating precisely why the AC should be dismissed.[1]

The Opening Brief established that Plaintiffs' Securities Act claims are untimely because investors were on notice of the AC's central allegations no later than November 19, 2018, more than one year before Plaintiffs commenced this action.  Plaintiffs' only response is that management's supposed reassurances dissipated any "storm warnings" and that XF's November 19 Disclosures did not reveal everything included in the AC.  But "storm warnings" case law has no application here because the *very facts* supposedly omitted from the Offering Materials were disclosed.  And it is black-letter law in this Circuit that the statute of limitations is not tolled until the emergence of each and every allegation a plaintiff ultimately chooses to plead.

As to the merits, the Opposition's efforts to muddy the waters cannot mask the fundamental deficiencies of Plaintiffs' claims.  Plaintiffs *concede* that all data reported in the Offering Materials was accurate.  To state any claim at all, Plaintiffs need the Court, at a minimum, to accept one of three critical premises, namely that:

- CW1's repetition of one *unattributed* comment *after* the IPO establishes that XF "discontinued" the preferred loan product *before* the IPO (and elected to conceal that information from the market for more than eight months);

- two anecdotal characterizations of XF underwriting as "lax" by line-employee CWs reveal Company-wide abandonment of disclosed credit standards; or

- a statement made during Q&A with analysts that loan approval rates declined in the "second half" or "since the middle" of 2018 somehow contradicts prior disclosures stating the decline was "starting from Q3" 2018.

None of this approaches plausibility, much less particularity.  The AC should be dismissed.

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Defendants' opening memorandum of law, dated December 7, 2020 (the "Opening Brief" or "Br.").  References to the "Opposition" or "Op." are to Plaintiffs' memorandum of law in opposition, dated February 5, 2021.  Unless otherwise noted, citations herein omit any internal quotation marks, citations, emphases, and/or alterations.

## ARGUMENT

### I.   PLAINTIFFS' SECURITIES ACT CLAIMS ARE TIME-BARRED

The Opening Brief demonstrated that Plaintiffs' Securities Act claims are time-barred because the AC establishes that investors were on notice of the alleged omissions in the Offering Materials by November 19, 2018.  (Br. at 7-11.)  Plaintiffs' contention that supposed "reassur[ances]" during the November 19 Call "dissipat[ed]" any "storm warnings" and thus tolled the limitations period is meritless.  (Op. at 23.)  This is not a "storm warnings" case at all. The November 19 Disclosures provided "*the very information that [Plaintiffs] claim was not disclosed at the proper time.*"  *In re Barclays Bank PLC Sec. Litig.*, 09-cv-1989, 2011 WL 31548, at *7 (S.D.N.Y. Jan. 5, 2011) (emphasis added), *aff'd in relevant part*, *Freidus v. Barclays Bank PLC*, 734 F.3d 132 (2d Cir. 2013); *see also* (Br. at 9-10).  Any "[c]omforting words" simply "cannot counteract this kind of explicit information."  *Barclays*, 2011 WL 31548, at *7; *see also Freidus*, 734 F.3d at 138-39 ("reliable words of comfort from management" did not toll limitations period).  In any event, the "reassuring" statements here related to XF's condition and outlook *as of November 19, 2018*—not the IPO.  (Op. at 23; Ex. F. at 2.)  They thus "had no bearing" on the accuracy of the Offering Materials.  *Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 352-53 (S.D.N.Y. 2014); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014) ("reassuring statements" may toll limitations period "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern"), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

Plaintiffs' observation that the November 19 Disclosures did not precipitate an immediate stock price drop also cannot save their untimely claims.  (Op. at 23-24.)  "Loss causation is not an element" of a Securities Act claim and "need not be pleaded."  *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 424 (S.D.N.Y. 2011).  Accordingly, as one of

2

Plaintiffs' own authorities makes clear, a "decline in stock price is not necessarily required to put a plaintiff on notice" of a Securities Act claim.  *Yi Xiang v. Inovalon Holdings, Inc.*, 268 F. Supp. 3d 515, 524 (S.D.N.Y. 2017).  Plaintiffs' reliance on *Newman v. Warnaco Grp., Inc.*, an Exchange Act case, is therefore misplaced.  335 F.3d 187, 195 (2d Cir. 2003); (Op. at 23).[2]

Finally, Plaintiffs claim that the November 19 Disclosures could not have started the limitations period because they did not alert investors to *all* of the AC's allegations.  (Op. at 24.)  But the limitations period is not "tolled until a company's disclosures touch on every specific allegation that a plaintiff chooses to put in his complaint."  *Magnum Hunter*, 616 F. App'x at 447; (Br. at 8).  As shown, Plaintiffs had more than enough facts on any developments actually predating the IPO to assert their (meritless) claims on November 19, 2018.  (Br. at 8-10.)

**II.      THE AC FAILS TO PLEAD ACTIONABLE MISSTATEMENTS OR OMISSIONS**

Independently, the AC should be dismissed because it does not allege an actionable misstatement or omission.  As an initial matter, FRCP 9(b) applies to all of Plaintiffs' claims.  (Br. at 11-12.)  The Opposition confirms that Plaintiffs' Securities Act allegations are rife with "the wording and imputations" of "fraud," *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004), repeatedly arguing that the Offering Materials "misled the market," "created a rosy picture of [XF's] prospects," and kept important decisions "hidden from investors" (Op. at 1, 6).  Plaintiffs protest that the AC includes disclaimers of fraud, a reference to "negligen[ce]," and "distinct sections" for different claims.  (Op. at 8-9.)  But, as established in the Opening Brief (Br. at 12 & nn.7-8), these "formalisms" do not allow Plaintiffs to evade Rule 9(b), and courts "uniformly apply Rule 9(b) to complaints that separate allegations"—like the AC—"so long as the theories

---

[2] In any event, by December 7, 2018 (*still* more than a year before Plaintiffs brought suit), XF's stock price closed down nearly 11% since the November 19 Disclosures and more than 32% from the IPO price.  *See* https://finance.yahoo.com/quote/XYF (last visited Mar. 8, 2021); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) (authorizing "judicial notice of well-publicized stock prices" on a motion to dismiss).

of liability are the same under both statutes." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 401-02 (S.D.N.Y. 2020); *Ho v. Duoyuan Global Water Inc.*, 887 F. Supp. 2d 547, 567 (S.D.N.Y. 2012).  That is particularly so where, as here, Securities Act claims are "staked . . . upon the same factual allegations" as Exchange Act claims.  *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 742 (S.D.N.Y. 2015); (AC ¶¶ 138-207, 234).

  ***Statements Regarding Preferred Loans***.  The Offering Materials disclosed that, while overall business was showing some "gradual[] improv[ement],"[3] preferred loan facilitation had declined sharply prior to the IPO, the product's primary borrowers had been adversely affected by economic and regulatory developments, and XF expected to focus increasingly on card loans going forward.  (Br. at 14-21.)  The Opposition does not dispute this; indeed, Plaintiffs make clear they do not challenge *any* historical data in the Offering Materials.  (Op. at 12 n.8.)

  Plaintiffs' theory is thus reduced to the allegation that XF decided to *terminate* the preferred loan product before the IPO but did not disclose that until eight months after the IPO.  But, as the Opposition confirms, that is rank speculation based almost entirely on CW1.  (Op. at 10-12.)[4]  The only "facts" *actually attributed* to CW1 are that the preferred loan business was undergoing a "contraction" and would no longer be administered in the particular office where he worked, none of which suggests the entire product line was eliminated or contradicts any statement made in the Offering Materials.  (*See* AC ¶ 86.)  The remainder of the AC's allegation—that XF "was not going to be facilitating preferred loans any longer"—is attributed

---

[3] Plaintiffs suggest that XF misleadingly stated that the preferred loan business was "improving" or "grow[ing]." (Op. at 12.)  Not so: it disclosed that its *overall* "business performance ha[d] started gradually improving" along specific metrics (notably *not* including preferred loan facilitation) and that it expected preferred loans to help facilitate the "continued growth" of its *overall* "borrower base."  (Ex. A at 10, 169; AC ¶¶ 123, 155.)  Similarly, XF's identification of factors suggesting "room for further expansion" related to the *overall* "consumer finance market in China" and, as the AC observes, card loans were "not particularly impacted" by the market forces buffeting preferred loans.  (Ex. A at 5; AC ¶¶ 122, 160; Op. at 14-15.)

[4] While Plaintiffs contend their CWs were in positions to "know the facts attributed" to them (Op. at 10-12, 18-19), the Opposition fails to grapple with the case law requiring, at least, plausible *factual allegations* establishing the basis of any CW's purported knowledge.  The AC's failure to plead such facts is fatal.  (Br. at 17-18, 22-23.)

to a *different* and *entirely unidentified* source whose position (indeed, whose very employment by XF) is not alleged.  (*Id.*)  As Plaintiffs' own authority shows, such a statement cannot be credited at the pleading stage.  *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*, 477 F. Supp. 3d 123, 132 & n.1 (S.D.N.Y. 2020) (CW allegations lacking "description of the source of [the CW's] knowledge" or "rely[ing] solely exclusively on second-hand information" are insufficient); (Br. at 17-18).  Regardless, even *this* vague allegation dates to the month *after* the IPO, and thus cannot establish omissions in the Offering Materials.  (AC ¶ 86.)

The Opposition also claims that XF eventually "admitted" to a pre-IPO cessation of the preferred loan business.  (Op. at 7, 12.)  That is nonsense.  As explained in the Opening Brief, the only alleged "discontinuance" announcement occurred *eight months after* the IPO, did not actually announce the full elimination of the product, and provided no basis to infer that any discontinuance was contemplated or consummated pre-IPO.  (Br. at 16-17.)  Tellingly, Plaintiffs have no answer to the case law demonstrating the insufficiency of these allegations.  (*Id.*)

Plaintiffs' failure to allege any pre-IPO termination undermines all of the Opposition's remaining arguments on preferred loans.  Indeed, Plaintiffs' efforts to distinguish authorities showing that generically positive characterizations of the product are protected puffery, opinions, or forward-looking statements (Br. at 18-21) are based on the premise that XF decided to "*total[ly] eliminat[e]*" preferred loans before the IPO (*see* Op. at 12-16 & n.9 (emphasis added)).

Finally, *Panther Partners Inc. v. Jianpu Tech. Inc.* is inapposite.  (Op. at 17).  There, a Chinese fintech company failed "to describe the regulatory framework" and its "impact . . . on the market."  18-cv-9848, 2020 WL 5757628, at *11-13 (S.D.N.Y. Sept. 27, 2020).  Here, the Offering Materials devoted almost *30 pages* to China's emergent consumer finance regulations, including the "Interim Measures" identified in the AC.  (Br. at 14-15; Ex. A at 10-11, 24-27,

5

32-34, 38, 41-42, 184-201.)  Indeed, the *first* risk factor disclosed the Interim Measures' new loan "cap" and the regulations' adverse impact on the "self-employed business owners" who sought preferred loans (and, in turn, on XF itself).  (*Id.* at 24-27, 107, 112; AC ¶¶ 71-72, 85.)

     ***Statements Regarding Credit Assessment/Delinquency***.  Plaintiffs' charges of "relaxed" credit standards are based almost exclusively on the inscrutable statements of CW1 and CW2.  (Op. at 17-19.)  But those are precisely the sort of uncorroborated, conclusory anecdotes of unspecified "lax[ity]" (AC ¶¶ 77, 99-100, 117) that courts disregard as irrelevant to company-wide underwriting practices.  (Br. at 17-18, 22-23); *Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (disregarding "rank-and-file" CWs' allegations that "AMEX had lowered its lending criteria" and "issued credit to high risk individuals").  CW1, for example, alleges that XF's screening sometimes "became less rigorous" and that he was once told "to not be as detailed" or "as comprehensive."  (AC ¶ 77.)  These barebones allegations convey no concrete information (Br. at 22) and, if anything, are equally consistent with efforts to *avoid exceeding* disclosed standards as with any *downward deviation*.[5]

     Plaintiffs argue that XF's post-IPO delinquency results "establish" an undisclosed abandonment of credit standards.  (Op. at 17-18.)  But this speculation cannot state plausible claims absent *facts* showing that "lax" credit standards are anything other than "merely consistent with" XF's delinquency rates.  (Br. at 6.)  The Offering Materials and earnings calls *disclosed* spiking delinquency and warned it could worsen due to macroeconomic and industry factors.  (Br. at 3-4, 13-14, 23.)  Nothing even suggests this was incorrect, let alone fraudulent.[6]

---

[5] Plaintiffs also cite three "user comments" from "online message boards" and "blog posts."  (Op. at 18; AC ¶ 100.) These comments do not even support Plaintiffs' allegations and should be disregarded in all events.  (Br. at 23); *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 630-31 (S.D.N.Y. 2008) (disregarding "anonymous blog posts").

[6] Plaintiffs also cannot avoid dismissal by marshalling XF's descriptions of its credit policies and tools (Op. at 18; AC ¶¶ 143-48) without any well-pled allegations that XF actually deviated therefrom.  *See Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 231-32 (S.D.N.Y. 2020).  Plaintiffs make much, for example, of XF's references to

As for any pre-IPO "tightening," the Opposition confirms that this theory is based entirely on Defendant Cheng's March 19 Call remark that loan approval rates declined sometime in "the **second half of 2018**" (or "since the middle of last year," which, according to Plaintiffs, means "the same thing"). (Op. at 19 & n.15; Br. at 24 (emphasis added).) The AC pleads no basis for Plaintiffs' bald insistence that this remark *must* refer to the period "just prior" to the September 2018 IPO (Br. at 24)—an interpretation all the more strained by Plaintiffs' separate allegations that the same approval standards were relaxed through at least July 2018 (AC ¶ 114). Nor does the Opposition square Plaintiffs' assertion with their position that similar comments from the November 19 Call (that XF was tightening its credit policy "**starting from Q3**" **2018**) referred only to *post*-IPO developments. (Br. at 24 (emphasis added); Op. at 7, 19 & n.15, 24.) At best, Cheng's comments, taken together and in context, are temporally ambiguous, which does not give rise to plausible, let alone particularized, claims. *Cf. Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) ("declin[ing] to extrapolate a year-long fraudulent scheme from this isolated and imprecise remark on a conference call"). In any event, the AC alleges no facts about any pre-IPO approval *rate* declines to suggest they were material to XF's overall results. (Br. at 24 n.15.) Indeed, the Opposition can cite only irrelevant AC allegations about average loan *size*. (Op. at 19 n.16.)[7]

    ***Statements Regarding Card Loans***. Plaintiffs do not dispute that XF set out data accurately reflecting reductions in both average card loan size and total card loan facilitation in

---

"prime borrowers" but, crucially, nowhere allege that XF did not in fact target borrowers with the specifically defined "prime" criteria set out in the Offering Materials. (Ex. A at 14.)

[7] XF's generalized "'belie[fs]'" in its "'high standard of credit quality'" or ability to attract a "'high-quality borrower base'" cannot support claims because they are inactionable puffery and/or opinions. (Br. at 24-25.) Plaintiffs' one case to supposedly suggest otherwise stands only for the unremarkable proposition that even otherwise generic touting of a "world class" asset can be misleading if the speaker conceals that the asset is not even "operational." *In re Aphria, Inc. Sec. Litig.*, 18-cv-11376, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020) (Op. at 19-20). There is simply no analogy here, where XF affirmatively disclosed its increasing delinquency rates notwithstanding its stated beliefs in the overall quality of its credit function. (Br. at 13-14.)

the months preceding the IPO, plus the delinquency rates and macroeconomic challenges driving the former. (Br. at 13, 21-22 & n.13; Op. at 20.)  XF had no obligation to portray this data in a "pejorative light," "draw negative inferences," or use the particular "phrasing that [P]laintiffs would have wished." *Singh v. Schikan*, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015); (Br. at 15).

Plaintiffs suggest that all of this was somehow negated by XF's "explanation" that its "fortunes were already improving." (Op. at 20.)  But XF disclosed only that its "performance ha[d] *started gradually* improving," that any overall recovery "would take time," and that its full-year results could be "adversely affected" by challenges to date. (AC ¶ 123 (emphasis added); Ex. A at 9-10.)  Plaintiffs cite no authority to show that this sort of cautious optimism can render accurately reported results misleading.  In any event, there is no dispute that XF's card loan facilitation *was in fact modestly improving* during the IPO month. (Br. at 21 n.13.)

Plaintiffs also target XF's "expect[ation]" that "revenue contribution" from card loans would "continue to increase in the future." (Op. at 20.)  But the statement, read in context, refers to then-ongoing "*product mix*" developments that the AC nowhere alleges were false—i.e., XF was shifting its focus to card loans. (Ex. A at 101 (emphasis added); Br. at 9-11, 14-15.); *In re Philip Morris Int'l, Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 357 (S.D.N.Y. 2020) (defendant did not "misrepresent[t] the Company's priority simply because sales grew less rapidly than initially projected").  Regardless, it remains a protected, forward-looking statement. (Br. at 21-22.)[8]

***Post-IPO Statements***.  Plaintiffs remain unable to identify any actionable post-IPO statement. (Br. at 26-28; Op. at 28-29.)  The Opposition strains to transform Defendant Zhang's

---

[8] The Opposition also identifies no violation of Item 303 or 105. (Br. at 26.)  Plaintiffs argue only that XF was required to disclose its "discontinuance" of preferred loans, its "lax" pre-IPO credit standards, and its eventual move to "scale[] back" loan approval rates. (Op. at 22.)  The AC alleges no facts to show that any of this *actually even occurred* prior to the IPO—let alone that it was both "presently known to management" and "reasonably likely to be material." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-96 (2d Cir. 2016); *In re Proshares Tr. II Sec. Litig.*, 19-cv-08886, 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020); (Br. at 14-16, 26).

October 2018 statements into some sweeping misrepresentation of XF's overall health and outlook. But, as alleged (AC ¶ 177), Zhang simply noted that an industry-wide "shortage of funding" was a primary reason for the July 2018 decline in XF's overall loan facilitation and that the number of investors lending money had "recovered" as of August 2018—*none of which is alleged to be false*. (Ex. D at 4-5; Ex. A at 9-10.) Nor was it "misleading" for Zhang not to add that XF had "scaled back" preferred loans or seen its overall loan facilitation "continu[e] to decline" (Op. at 28) because the Offering Materials had already disclosed these developments. (Br. at 14-15, 20-21 & n.13.) And Plaintiffs' notion of a "continuing" decline is hindsight pleading (Br. at 14, 16), reliant on data from the end of Q4 2018 (which had just begun when Zhang made his comments) and from the *subsequent year*. (Op. at 28-29 (citing AC ¶¶ 128-32).)

As for the November 19 and March 19 Calls, the Opposition targets failure to disclose declines in XF's "investor base." (Op. at 29.) But XF undisputedly issued releases *on the same days* that included any investor base results "omitted" from the calls. (Br. at 28; AC ¶ 128; Ex. E at 1.) And the remaining investor base allegations, and reliance on *ex post facto* delinquency increases, are hindsight pleading yet again. (Br. at 14, 25, 28; Op. 29.) Despite suggesting that Defendants hid "red flags" sure to yield higher delinquency going forward (Op. at 17-18, 29), Plaintiffs cannot identify any concealed problem given the risk factors set out in the Offering Materials, the delinquency results reported there and in subsequent earnings disclosures, and the AC's failure to allege any credit standard "relaxation" as discussed above. (Br. at 4-5, 9, 13-14.)

## III.    THE EXCHANGE ACT CLAIMS ALSO FAIL FOR LACK OF SCIENTER

Plaintiffs do not deny—and therefore concede—their inability to identify specific reports or statements contradicting Defendants' public remarks; instead, they claim access to such information can be inferred. (Br. at 25-30; Op. at 27-28.) But in *General Electric*, the case upon which Plaintiffs' argument rests, the complaint "described a plethora of reports . . . to which [the

9

CFO's] remarks were directed," making it "highly implausible" that the CFO would be ignorant of "basic facts contained in these reports." *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 660 (S.D.N.Y. 2012) (on reconsideration) (also confirming that the "Second Circuit requires that such reports or statements *be identified*" when "a plaintiff alleges fraudulent intent based on access to contrary information") (emphasis added). Here, the AC does not plead *any* reports or statements, let alone a "plethora." There is thus no basis to infer scienter. (Br. at 29-30.)

Nor can Plaintiffs rely on the assertion that "decisions" to "discontinue preferred loans," "decrease or increase credit standards," and "decrease loan ticket size" involved XF's "highest levels." Op. at 26. "[I]t is practically hornbook law" that accusations "founded on nothing more than a defendant's corporate position are entitled to no weight." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 806 (S.D.N.Y. 2020); *Philip Morris*, 437 F. Supp. 3d at 360-61. In any event, these "decisions," to the extent they *ever* occurred, either were made after the statements at issue (preferred loan discontinuance, credit relaxation), or were disclosed in the Offering Documents, the November 19 Disclosures, or both (reductions in loan size, approval rates).

Plaintiffs are likewise incorrect that the Court could infer scienter from some purported tension between Cheng's statements on the November 19 Call (XF would tighten credit policies "starting from Q3" 2018) and March 19 Call (tightening occurred in "the second half" of 2018). (Ex. F at 5; Ex. G at 9; Op. at 27.) These remarks are not inconsistent, let alone "directly contradict[ory]." *In re Nokia Oyj Sec. Litig.*, 423 F. Supp. 2d 364, 404-06 (S.D.N.Y. 2006).[9]

## CONCLUSION

For the reasons set forth above, the AC should be dismissed with prejudice.

---

[9] Finally, to the extent that Plaintiffs attempt to allege scienter on the basis of "false reassurances" that XF's performance was improving (Op. at 2, 12, 20, 23, 29), the law is clear that "misguided optimism" supports no "inference of fraud" and post-statement "dimming of [a] company's prospects" may show, at most, that "defendants were wrong." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 187-88 & n.68 (2d Cir. 2014); *Nokia*, 423 F. Supp. 2d at 406.

Dated:   New York, New York
         March 8, 2021

Respectfully submitted,

DAVIS POLK & WARDWELL LLP


By:   /s/ *Brian S. Weinstein*

Brian S. Weinstein
Craig J. Bergman
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
brian.weinstein@davispolk.com
craig.bergman@davispolk.com

Jonathan K. Chang
18/F, The Hong Kong Club Building
3A Chater Road
Hong Kong, SAR
China
Telephone: +852-2533-3300
jonathan.chang@davispolk.com

*Attorneys for the X Financial Defendants*

11