# EXHIBIT A

No *Shepard's* Signal™
As of: August 16, 2021 10:29 PM Z

# *In re NIO Sec. Litig.*

United States District Court for the Eastern District of New York

August 12, 2021, Decided; August 12, 2021, Filed

19-CV-1424 (NGG) (JRC)

**Reporter**
2021 U.S. Dist. LEXIS 152311 *

IN RE NIO, INC. SECURITIES LITIGATION

## Core Terms

registration statement, investors, Plaintiffs', scienter, manufacturing, allegations, misleading, omissions, factory, construction project, motion to dismiss, violator, permits, pleaded, misrepresentation, particularity, Defendants', anonymous, causation, planning, manufacturing facility, strong inference, announced, culpable, website, environmental impact, material fact, Securities Act, Exchange Act, misstatements

**Counsel:** [*1] For Emily Chou, Xie Jian Feng, Movant: Matthew M Guiney, Wolf Haldenstein Adler Freeman & Herz, LLP, New York, NY USA.

For The Nio Investor Group, Movant: Jeffrey P. Campisi, LEAD ATTORNEY, Kaplan Fox & Kilsheimer LLP, New York, NY USA.

For Mark Murphy, Movant: Phillip Kim, The Rosen Law Firm, New York, NY USA.

For Gary Leung, Stephen Pandur, David Ge, Erik De La Cruz, Mario Castorena, Movants: Lawrence P. Eagel, Melissa Ann Fortunato, LEAD ATTORNEYS, Bragar Eagel & Squire, P.C., New York, NY USA; Shannon Lee Hopkins, Levi & Korsinsky, LLP, Stamford, CT USA.

For Mark Mundy, Movant: Laurence Matthew Rosen, The Rosen Law Firm, P.A., New York, NY USA; Phillip Kim, The Rosen Law Firm, New York, NY USA; Yu Shi, The Rosen Law Firm, P.A., New York, NY USA.

For BABULAL TARAPARA, Movant: Lesley Frank Portnoy, LEAD ATTORNEY, Glancy Prongay & Murray LLP, New York, NY USA.

For Bruce A. Bookbinder, Henri A. Malka, Raam Muthusamy, Movant: Jeremy Alan Lieberman, LEAD ATTORNEY, Pomerantz LLP, New York, NY USA.

For Jonathan Tan, Individually and on behalf of all others similarly situated, Plaintiff: Phillip Kim, The Rosen Law Firm, New York, NY USA.

For Eva Huang, Plaintiff: Laurence Matthew Rosen, The Rosen [*2] Law Firm, P.A., New York, NY USA.

For NIO Inc., Defendant: Scott D. Musoff, LEAD ATTORNEY, Michael Charles Griffin, Robert Alexander Fumerton, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, NY USA.

For Padmasree Warrior, Defendant: Robert Alexander Fumerton, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, NY USA.

For Bin Li, Lihong Qin, Tian Cheng, Xiang Li, Hai Wu, Yaqin Zhang, Defendants: Robert Alexander Fumerton, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, NY USA.

For Xiangping Zhong, Zhaohui Li, Defendants: Richard A. Rosen, LEAD ATTORNEY, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY USA.

For Morgan Stanley & Co. LLC, Goldman Sachs (ASIA) L.L.C., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, UBS Securities LLC, WR Securities, LLC, Defendants: Jed Mastren Schwartz, Milbank LLP, New York City, NY USA; Micaela Manley, Scott A. Edelman, Milbank LLP, New York, NY USA.

**Judges:** NICHOLAS G. GARAUFIS, United States District Judge.

**Opinion by:** NICHOLAS G. GARAUFIS

# Opinion

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, [*3] United States District Judge.

Lead plaintiff Mark Mundy and named plaintiff Eva Huang ("Plaintiffs") bring this putative class action on behalf of themselves and all purchasers of NIO Inc.'s ("NIO") American Depositary Shares ("shares") from its initial public offering ("IPO") on September 12, 2018 through March 5, 2019 ("the Class Period"). (Am. Compl. (Dkt. 67) ¶ 1.) Plaintiffs allege that NIO filed a false and misleading Registration Statement in connection with its IPO, for which Defendants are liable under *Sections 11* and *15 of the Securities Act of 1933* (the "Securities Act") and *Sections 10(b)* and *20(a) of the Securities Exchange Act of 1934* (the "Exchange Act"), as well as *Rule 10b-5* promulgated by the Securities and Exchange Commission ("SEC") pursuant to *Section 10(b)*. Defendants are NIO, certain of its senior executives and board members (the "Individual Defendants"), and the underwriters of NIO's IPO.[1] Defendants moved to dismiss the action pursuant to *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim. (*See* Defs.' Mot. to Dismiss (Dkt. 68); Defs.' Mem. in Supp. of Mot. to Dismiss ("Mot.") (Dkt. 69); Pls.' Opp. to Mot. to Dismiss ("Opp.") (Dkt. 71); Defs.' Reply (Dkt. 72).)[2] For the following reasons, Defendants' motion is DENIED.

## I. BACKGROUND [*4]

On a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in Plaintiffs' favor. *See N. Y. Pet Welfare Ass'n v. City of New York, 850 F.3d 79, 86 (2d Cir. 2017)*.

---

[1] The Individual Defendants are Bin Li, NIO's founder, Chief Executive Officer ("CEO"), and chairman of the company's board of directors; Louis Hsieh, NIO's former Chief Financial Officer ("CFO"); Lihong Qin, NIO's co-founder, president, and a director; Padmasree Warrior, NIO's former chief development officer, CEO of NIO's American subsidiary, NIO USA, and former director of the company; Tian Cheng, Xiang Li, Hai Wu, Yaqin Zhang, Xiangping Zhong, and Zhaohui Li, all six of whom were directors of NIO. (*Id.* ¶¶ 24-33.) The underwriter defendants are Morgan Stanley & Co. LLC; Goldman Sachs (Asia) L.L.C.; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Deutsche Bank Securities Inc.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; UBS Securities LLC; and WR Securities, LLC. (*Id.* ¶ 36-44.)

[2] Individual Defendants' Motion to Join the pending Motion to Dismiss (Dkt. 74) is GRANTED.

## A. Overview

NIO is a Chinese company founded in 2014 that develops electric vehicles ("EVs") and is often referred to as the "Tesla of China." (*Id.* ¶ 47.) Headquartered in Shanghai, NIO pitched itself as a "pioneer in China's premium [EV] market" that was higher quality than other domestic manufacturers and less expensive than foreign manufacturers. (*Id.* ¶¶ 23, 49.) Compared to American and European EV makers, like Tesla, Audi, and Mercedes-Benz, NIO sells its vehicles at lower prices because it manufactures them in China. (*Id.* ¶¶ 48, 50.) NIO's domestic production lowers manufacturing costs, allows it to capture EV subsidies from the Chinese government, and lets it avoid the import duties levied on foreign manufacturers. (*Id.* ¶¶ 3-4.)

But unlike its foreign competitors, NIO does not manufacture its own EVs. (*Id.* ¶ 5.) Instead, in May 2016, NIO partnered with Jianghuai Automobile Group Co. Ltd. ("JAC Motors"), a state-owned Chinese truck manufacturer. (*Id.* ¶¶ 5, 52.) Under their five-year agreement, JAC Motors would manufacture NIO's **[*5]** EVs and NIO would pay JAC Motors a per-vehicle fee, as well as cover any operating losses for the first 36 months of production. (*Id.* ¶ 52.)

## B. NIO's September 2018 Initial Public Offering

On September 11, 2018, NIO filed its final Registration Statement with the SEC in advance of its IPO and, on the following day, filed its Prospectus. (*Id.* ¶ 54.) On September 12, NIO's shares began trading on the New York Stock Exchange. (*Id.* ¶ 55.) NIO's IPO raised approximately $1.095 billion in net proceeds from the sale of 184 million shares at a price of $6.26 per share. (*Id.*)

In its Registration Statement, NIO warned of risks related to its current manufacturing agreement with JAC Motors, noting that its brand could be "adversely affected by perceptions about the quality of our partners' vehicles." (NIO Prospectus (Dkt. 70-1) at 16).[3] Equity

---

[3] Items 303 and 503 of SEC Rule S-K require that registration statements "focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." *17 C.F.R. §§ 229.303*; *229.503*. (Am. Compl. ¶¶ 94-99.)

research analysts also noted that risk, describing JAC Motors as "third tier," and described the "unusual business model" as a "source of concern for investors." (Am. Compl. ¶¶ 53, 57.)

NIO also announced in its Registration Statement that it was "developing [its] own manufacturing facility in Shanghai which [it] expect[ed] to be ready by the end of 2020." (NIO **[*6]** Prospectus at 32.) The Shanghai Facility site was approximately 15 miles from NIO's headquarters, an estimated 20-minute drive. (Am. Compl. ¶ 145.) Pursuant to an agreement with Shanghai municipal authorities, the government would construct the facility and NIO would lease it from them and outfit it into its own factory. (*Id.* ¶ 64 n.5.) NIO planned to pay $650 million to complete the facility, at least $276 million of which would come from the proceeds of the IPO. (*Id.* ¶¶ 63-64.)

NIO made several statements related to the Shanghai Facility in its Registration Statement, including:

> • ***"The construction and operation of our own manufacturing plant in Shanghai or other manufacturing facilities are subject to regulatory approvals and may be subject to delays, cost overruns or may not produce expected benefits***. We are developing our own manufacturing facility in Shanghai which we expect to be ready by the end of 2020. Such manufacturing facility is currently being constructed by relevant Shanghai authorities. As a result, such construction is largely outside of our control and could experience delays or other difficulties. We are also building phase two of our manufacturing facilities in Nanjing. **[*7]** Construction projects of this scale are subject to risks and will require significant capital. Any failure to complete these projects on schedule and within budget could adversely impact our financial condition, production capacity and results of operations. Under PRC law, construction projects are subject to broad and strict government supervision and approval procedures, including but not limited to project approvals and filings, construction land and project planning approvals, environment protection approvals, the pollution discharge permits, work safety approvals, fire protection approvals, and the completion of inspection and acceptance by relevant authorities. Some of the construction projects being carried out by us are undergoing necessary approval procedures as required by law. As a result, the relevant entities operating such construction

projects may be subject to administrative uncertainty construction projects in question within a specified time frame, fines or the suspension of use of such projects. Any of the foregoing could have a material adverse impact on our operations." (NIO Prospectus at 32.) (emphasis in original).)

> • "Construction has started on our own manufacturing **[*8]** facility in Shanghai." (*Id.* at 122.)

> • "Our own manufacturing facility in Shanghai is currently under construction by certain Shanghai government entities." (*Id.* at 137.)

### C. The March 2019 Announcement

Before markets opened on March 6, 2019, NIO released its financial results for the fourth quarter, as well as for the entirety of Fiscal Year 2018 on Form 6-K. (Am. Compl. ¶ 65.) NIO reported net losses of $1.4 billion, and a significant slowdown in EV deliveries. (*See* Mot. at 7.) NIO also announced that it was abandoning its plans for the Shanghai Facility and instead would continue to partner with JAC Motors to produce EVs. (Am. Compl. ¶ 65.) On a conference call with investors, NIO's CEO, Defendant Bin Li, cited a November 2018 Chinese government policy encouraging "cooperation between the car R&D companies like NIO with the existing manufacturing companies ... that means the cooperative mode between NIO and JAC is endorsed by the Chinese government." (*Id.* ¶ 67.)

Following the announcement, NIO's stock fell from its closing price of $10.16 on March 5, 2019 to $7.09 on March 7, 2019-a 30 percent drop. (*Id.* ¶ 146.) The South China Morning Post published an article on March 6, 2019 headlined **[*9]** "Chinese Electric Vehicle Make NIO Scraps Shanghai Factory Plan After Losses Double to US$1.4 Billion." (*Id.* ¶ 72.) A Deutsche Bank report published on March 19, 2019 also noted the news and stated that investors believed NIO abandoned the Shanghai Facility because it lacked sufficient cash due to dwindling car sales since January 2019. (*Id.* ¶ 71.) An industry website, insideevs.com, posted an article titled "NIO Terminates Plan for Shanghai Manufacturing Plant." (*Id.* ¶ 73.)

### D. Plaintiffs' Allegations

Plaintiffs allege that Defendants misrepresented the progress of construction on the Shanghai Facility and

failed to warn investors about risks to construction related to future cash flow and sales performance. (*Id.* ¶ 10.) Plaintiffs rely primarily on NIO's failure to obtain the necessary regulatory approvals, without which NIO could not have started construction, and accounts from three former employees who stated that construction had never begun on the Shanghai Facility, despite what NIO published in its Registration Statement. (*Id.* ¶ 10, 85-86.)

All construction projects in Shanghai, including government projects, require a construction planning permit from the municipal government, **[*10]** which posts all permits on its website within five days of issuance. (*Id.* ¶¶ 77-78.) Permits for projects issued after 2010 remain on the government website even if the projects are later suspended or terminated. (*Id.* ¶ 81.) According to Plaintiffs, construction on the Shanghai Facility could never have begun because the Shanghai Municipal Planning and Natural Resources Bureau website shows no construction planning permit was ever issued for NIO's Shanghai Facility. (*Id.* ¶ 80.) Because the website catalogs all permits, and no permit is available for NIO's project, Plaintiffs aver that NIO misrepresented the status of the Shanghai Facility by telling investors that it was "currently under construction" when it was not and could not have been under the applicable laws. (*Id.* ¶ 85.)

Plaintiffs also base their allegations on NIO's failure to obtain an environmental approval. (*Id.*) Chinese law requires a construction project to conduct and pass a multi-step environmental impact assessment before construction can begin. (*Id.* ¶ 82.) That process involves the preparation of an environmental impact assessment and report, a period of public comment and review and, ultimately, approval by the relevant **[*11]** authorities. (*Id.*) The Shanghai Environmental Impact Assessment for Construction Projects Publication Platform website lists projects in Shanghai which have successfully completed the environmental review process. (*Id.* ¶ 83.) NIO satisfied the first step of the process with an environmental impact assessment completed by Shanghai Huanke Environmental Assessment Consulting Co., Ltd. in May 2018, but the project was never listed as approved on the website. (*Id.* ¶ 84.) Plaintiffs cite the lack of environmental approval to support their allegation that construction never began on the Shanghai Facility. (*Id.* ¶ 85.)

Plaintiffs also rely on accounts from three former NIO employees, ("FE1", "FE2", and "FE3",) to allege that construction on the Shanghai Facility never began. (*Id.*

¶¶ 86-91.)

FE1 was a Purchasing Manager at NIO from May 2018 until August 2020. (*Id.* ¶ 87.) As a Purchasing Manager, FE1 was responsible for overseeing site selection, design, and installation of new factories, as well as negotiating contracts with factory suppliers. (*Id.* ¶¶ 87-88.) FE1 was directly involved with the Shanghai Facility and stated that construction had not begun when the project was terminated in the latter **[*12]** half of 2018. (*Id.* ¶ 89.)

FE2 worked in a senior sales position for NIO in Shanghai from March 2018 until October 2019. (*Id.* ¶¶ 74.) According to FE2, construction never started on the factory, which was still in the initial planning stages when it was abandoned. (*Id.* ¶ 90.) FE2 also told Plaintiffs that the "main reason" for scrapping the project was "cash shortage difficulties." (*Id.* ¶ 74.)

FE3 was a car design engineer for NIO in Shanghai from April 2018 until May 2020 and also reported that NIO performed an environmental impact assessment but canceled the Shanghai Facility before construction could begin. (*Id.* ¶ 91.)

### E. Procedural History

Between March and May 2019, multiple plaintiffs filed putative class actions against NIO in the Eastern District of New York and in the Northern District of California. (*See* Mar. 3, 2020 Mem. & Order (Dkt. 44) at 4-5.) The cases were transferred to this district where the court consolidated them, appointing Mark Mundy as lead plaintiff and The Rosen Law Firm as class counsel. (*Id.* at 11-12.)

### II. LEGAL STANDARD

### A. *Rule 12(b)(6)*

To survive a motion to dismiss under *Rule 12(b) (6)*, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief **[*13]** that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*).[4] In considering

---

[4] When quoting cases, unless otherwise noted, all citations

the sufficiency of the operative complaint, the court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiffs favor." *Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)*. However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal, 556 U.S. at 678*.

## B. Pleading Standard

Plaintiffs' claims under the Exchange Act must satisfy the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)* and the *Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)*. *See Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012)*. For those claims, Plaintiffs "must state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. To satisfy *Rule 9(b)*, the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz, 690 F.3d at 108*. Further, to satisfy the PSLRA, Plaintiffs must "specify each misleading statement; . . . set forth the facts on which a belief that a statement is misleading was formed; and ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*

Defendants contend that **[*14]** Plaintiffs' Securities Act claims are also subject to the heightened pleading standards of *Rule 9(b)* because they "are based on the same securities fraud allegations pled under the Exchange Act." (Mot. at 10.) "Fraud is not an element or a requisite to a [Securities Act] claim" and "a plaintiff need allege no more than negligence to proceed under" that provision. *Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)*. However, where a *Section 11* claim is "premised on allegations of fraud," plaintiffs must adhere to the heightened pleading standards under *Rule 9(b)* and plead their allegations with particularity. *See id.* ("We hold that the heightened pleading standard of *Rule 9(b)* applies to *Section 11* and *Section 12(a)(2)* claims insofar as the claims are premised on allegations of fraud.").

In practice, courts rely on four factors to determine whether *Section 11* claims sound in fraud: whether "(1) the complaint contains merely a blanket disclaimer that the plaintiffs do not allege fraud for the purposes of the Securities Act claims; (2) the allegations themselves include classic fraud language; (3) the complaint does not show any basis for the claims that is non-fraudulent; and (4) the plaintiffs do not separate the factual allegations supporting the fraud claims and negligence claims, but rather require the **[*15]** courts to parse the complaints." *In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 392 (E.D.N.Y. 2013)* (citing *Rombach, 355 F.3d at 171-72*). The court will also consider whether the "gravamen of the complaint is plainly fraud," or whether alternative bases of liability exist. *Rombach, 355 F.3d at 172*.

Here, the court finds that Plaintiffs' Securities Act claims are not subject to the heightened pleading standards under *Rule 9(b)* because they sound in negligence, not in fraud. Plaintiffs' claims under *Section 11 of the Securities Act* and under *Section 10(b) of the Exchange Act* are analytically distinct, even if overlapping conduct forms the basis for both. Plaintiffs do not simply rely on a blanket disclaimer to cordon off their claims into fraud and negligence; they plead each allegation separately. With respect to the *Section 11* claim, Plaintiffs base their allegations on Defendants' failure to make "a reasonable investigation" or possess reasonable grounds for the facts presented to investors in the Registration Statement. (Am. Compl. ¶ 128.) In contrast, Plaintiffs' Exchange Act claims rest on alternative grounds—alleged in a separate, Exchange Act-specific portion of the Amended Complaint—that "[t]he Individual Defendants were, at the very least, reckless in telling investors that construction of the Shanghai Facility was underway if they **[*16]** did not verify that construction had actually commenced." (*Id.* ¶ 143.) The court finds that Plaintiffs' *Section 11* and *Section 10(b)* claims are separate because alternative grounds of liability, requiring different proof, are distinctly asserted. *See, e.g. In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 631-32 (S.D.N.Y. 2007)* ("[T]he mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent ... . *Rombach* necessarily requires a case-by-case analysis of particular pleadings to determine whether the gravamen of the complaint is plainly fraud.").

Accordingly, Plaintiffs' Securities Act claims are not subject to *Rule 9(b)*'s heightened pleadings standards for fraud.

and quotation marks are omitted, and all alterations are adopted.

## III. DISCUSSION

### A. Overview

Plaintiffs assert claims against all Defendants under *Section 11 of the Securities Act* and against NIO and the Individual Defendants under *Section 10(b) of the Exchange Act* and *Rule 10b-5*. (Am. Compl. ¶¶ 123-132; 153-162.) In addition, Plaintiffs allege "control person" liability against the Individual Defendants under *Section 15 of the Securities Act* and *Section 20(a) of the Exchange Act*. (*Id.* ¶¶ 133-138; 163-168.) Defendants move to dismiss all of Plaintiffs' claims.

### B. Primary liability

1. *Section 11 of the Securities Act*

Plaintiffs assert *Section 11* claims against all Defendants. (Am. **[*17]** Compl. ¶ 24.) *Section 11* imposes liability for material misstatements or omissions in registration statements. *See* *15 U.S.C. § 77k(a)*. "To state a claim under *section 11*, a plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under *section 11*; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358-59 (2d Cir. 2010)* (quoting *15 U.S.C. § 77k(a)*).

Plaintiffs allege, and Defendants do not dispute, that they purchased NIO's shares in satisfaction of the first element, and that the named Defendants consist of the company itself, its officers and directors, and its underwriters, in satisfaction of the second element. (Am. Compl. ¶¶ 2, 23-46.) The crux of Defendants' motion lies in the third prong: whether the registration statement "contained an untrue statement of a material fact or omitted to state a material fact" that rendered it misleading to investors. *15 U.S.C. § 77k(a)*.

A *Section 11* claim requires (1) a misrepresentation or omission concerning (2) a **[*18]** material fact. A misrepresentation is an "untrue statement," and an omission is a missing statement "required to be stated

... or necessary to make the statements [in the registrationstatement] not misleading." *15 U.S.C. § 77k(a)*. "The test for whether a statement is materially misleading ... is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach, 355 F.3d at 172 n. 7*. Plaintiffs assert two theories of liability under *Section 11*: (1) that Defendants misrepresented the progress of construction on the Shanghai Facility; and (2) that Defendants omitted warnings that the construction depended on sufficient cash flow and meeting sales expectations. (Am. Compl. ¶ 10.)

Defendants move to dismiss Plaintiffs' *Section 11* claims on the grounds that Plaintiffs "fail to allege any material misrepresentation about the status of construction of the Shanghai Facility." (Mot. at 2.) Defendants argue (1) that construction permits and environmental approvals were not necessary for construction to have begun, (2) that the anonymous employees' testimony should not be credited because Plaintiffs have not alleged sufficient facts to establish the foundation for the former employees' knowledge, and, (3) **[*19]** that even if there were a misrepresentation, Plaintiffs have failed to show that it was material to investors. (Mot. at 11-17.) For the following reasons, the court finds that Plaintiffs have adequately pleaded a *Section 11* claim.[5]

*a. Lack of Permits and Approvals*

First, Defendants argue that the absence of construction permits and environmental approvals on which Plaintiffs rely is meaningless because such authorizations were "neither [] sufficient nor [] necessary" for construction to begin. (Mot. at 13.) The court disagrees. On a motion to dismiss the court accepts all factual allegations in the complaint as true. *See* *N.Y. Pet Welfare Ass'n, 850 F.3d at 86*. Plaintiffs allege that certain regulatory approvals were required for construction to begin, that NIO failed to obtain those approvals, and that, therefore, construction on the Shanghai Facility never began and NIO misled investors when it stated that the Shanghai Facility was "currently under construction." (Am. Compl. ¶¶ 62, 85.) To support those factual allegations,

---

[5] Because the court finds that Plaintiffs' *Section 11* claims may proceed because they have adequately pleaded material misrepresentations with respect to the Shanghai Facility, the court need not consider whether Plaintiffs' allegations that Defendants omitted warnings about specific risks could independently form the basis of such a claim.

Plaintiffs point to various other construction projects, including government projects, that obtained permits and note that the government websites cataloging those approvals maintain a record for all permits, **[*20]** including for projects that are suspended or canceled. (*Id.* ¶¶ 81, 83.) Defendants do not controvert Plaintiffs' clear assertion that "[i]t is illegal to begin construction work in Shanghai without the necessary construction planning permit from the Shanghai Municipal Planning and Natural Resources Bureau." (*Id.* ¶ 77.) Instead, Defendants aver that NIO was engaged in a long permitting process with multiple steps, that it had yet to obtain final approval, and that nothing in the Registration Statement stated otherwise. (Mot. at 14.) At bottom, the two sides present competing theories to be developed as the case continues, but at this stage, Plaintiffs have met their initial pleading burden.

### b. Anonymous Employee Accounts

Next, Defendants argue that the anonymous former NIO employees on whom Plaintiffs rely lack the requisite knowledge for their claims that construction on the Shanghai Facility had never started. (*Id.* at 12.) The court disagrees and finds that Plaintiffs have alleged sufficient facts from which the court may infer that the former employees would have knowledge of the status of construction on the Shanghai Facility.

As a general matter, "if personal sources must be identified, **[*21]** there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)*. Following *Novak*, district courts in the Second Circuit generally credit anonymous witnesses in two situations. *See, e.g., Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011)*. In one situation, courts will credit confidential sources whose "positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Id.* Alternatively, where "independent adequately pled factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened." *Id.*

Plaintiffs rely on three anonymous former employees: FE1, FE2, and FE3. FE1, who told Plaintiffs that construction on the Shanghai Facility never began, was a Purchasing Manager whose job duties included selecting factory sites and negotiating with factory suppliers. (Am. Compl. ¶¶ 187-89.) As a Purchasing Manager in charge of factory development, FE1 would have been a position to know the status of construction on the **[*22]** Shanghai Facility. The court, therefore, finds that Plaintiffs have alleged sufficient facts "to indicate a high likelihood" that FE1 had knowledge of the status of construction.

The two other anonymous sources—FE2 and FE3—are described as employees in a "senior sales position" and a "car design engineer" respectively. (Am. Compl. ¶¶ 74, 91.) FE2 told Plaintiffs that construction had never started on the Shanghai Facility. (*Id.* ¶ 90.) FE3 confirmed, also noting that NIO had completed the first step in the environmental impact approval process by preparing a report. (*Id.* ¶ 91.) Both employees were based in Shanghai. (*Id.* ¶¶ 74, 91.) FE2's and FE3's positions may not be described with enough detail to suggest how each would have known particular details about construction on the Shanghai Facility. However, their accounts are supported by FE1's accounts, by the absence of regulatory approvals necessary for construction to begin, and, in FE3's case, by Defendants' admission that an environmental impact assessment was conducted. As a result, the court disagrees with Defendants' contention that Plaintiffs failed to plead sufficient facts on which the anonymous witnesses' allegations were **[*23]** based, and finds that those accounts, along with the lack of permits and approvals, form an adequate basis for a claim under *Section 11*.

### c. Materiality

Finally, Defendants argue that Plaintiffs have failed to "allege facts showing the status of construction was material information." (Mot. at 15.) Materiality is satisfied when a plaintiff alleges "a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000)*. A district court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 717 (2d Cir. 2011)*.

The court finds that Plaintiffs have satisfactorily alleged materiality. According to Plaintiffs, the Shanghai Facility would require upwards of 25 percent of IPO proceeds

and reduce NIO's reliance on JAC Motors, an allegedly "third tier" manufacturer. (Am. Compl. ¶¶ 5, 63.) The new facility was intended to shift NIO out of a partnership that analysts viewed as a "source of concern for investors" and eliminate certain production risks that the company had identified. (*Id.* **[\*24]** ¶¶ 57-58.) The news about the facility was featured prominently in industry press, along with NIO's other announcements about weak financials and lagging demand for EVs. (*Id.* ¶¶ 71-73.) Those details are sufficient for Plaintiffs to show that a "reasonable investor would have considered" details about the Shanghai Facility important when making investment decisions. *Ganino, 228 F.3d at 161*. Therefore, the court disagrees with Defendants and finds that Plaintiffs have adequately alleged materiality.

2. *Section 10(b) of the Exchange Act* and *Rule 10b-5*

Plaintiffs also bring claims under *Section 10(b) of the Exchange Act* and *Rule 10b-5* against NIO and the Individual Defendants. (Am. Compl. ¶ 154.) *Section 10(b)* makes it unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. § 78j(b)*. *Rule 10b-5* "more specifically delineates what constitutes a manipulative or deceptive device or contrivance," *Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999)*, and prohibits "mak[ing] any untrue statement of a material fact or ... omit[ting] to state a material fact necessary in order to make the states made ... not misleading." *17 C.F.R. § 240.10b-5(b)*.

*Section 10(b) of the Exchange Act* resembles *Section 11 of the Securities Act* in that they both provide causes of action **[\*25]** for material misstatements and omissions, but plaintiffs proceeding under *Section 10(b)* bear a heavier burden. To survive a motion to dismiss for claims under *Section 10(b)*, plaintiffs must "plausibly allege: (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Singh v. Cigna Corp., 918 F.3d 57, 62 (2d Cir. 2019)*. Defendants contend that Plaintiffs have (1) failed to allege a material misrepresentation or omission, (2) failed to plead scienter, and (3) failed to plead loss causation. (Mot. at 2-4.) The court considers each of those arguments in turn.

*a. Material Misrepresentations and Omissions*

Plaintiffs base their *Section 10(b)* and *Rule 10b-5* claims on the same alleged misrepresentations and omissions as their *Section 11* claims. "The test for whether a statement is materially misleading" is the same under *Section 10(b)* and *Section 11*. *Rombach, 355 F.3d at 172 n. 7*. Because the court finds that Plaintiffs adequately pled that Defendants made materially misleading statements with respect to the *Section 11* claims, the same analysis holds for the *Section 10(b)* claims.

As discussed above, actions under the Exchange Act are subject to additional requirements at the pleading stage under *Federal Rule of Civil Procedure 9(b)* and the PSLRA. *See Fed. R. Civ. P. 9(b)*; *15 U.S.C. § 78u-4(b)(1)*. Under *Rule 9(b)* **[\*26]** , plaintiffs must plead fraud with particularity. The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007)*. Plaintiffs have met each of those requirements. They identified several specific statements, named NIO and those who signed its offering documents as speaker, pinpointed the source of these statements as NIO's September 2018 Registration Statement, and explained that these statements were fraudulent because they misrepresented the status of the Shanghai Facility. (Am. Compl. ¶¶ 60-62.)

In addition to *Rule 9(b)*, the PSLRA imposes an additional pleading requirement: "whenever plaintiffs allege, on information and belief, that defendants made material misstatements or omissions, the complaint must 'state with particularity all facts on which that belief is formed.'" *Novak, 216 F.3d at 312 (2d Cir. 2000)* (quoting *15 U.S.C. § 78u-4(b) (1)*). The Second Circuit has held that plaintiffs who rely on anonymous sources, as Plaintiffs do here, do not necessarily need to identify these sources by name, especially when plaintiffs rely on separate additional facts. *Novak, 216 F.3d at 314*. As discussed above, Plaintiffs **[\*27]** rely on three anonymous sources whose testimony is corroborated independently and by each other. Therefore, Plaintiffs have pleaded the factual basis with particularity.

*b. Scienter*

Defendants argue that Plaintiffs' Exchange Act claims should be dismissed because they failed to sufficiently plead scienter. (Mot. at 21-22.) Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud" and is necessary to assert a violation of *section 10(b) of the Exchange Act* and *Rule 10b-5*. *Ernst & Ernst v. Hochfelder, 425 U.S.185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)*. Under the PSLRA, plaintiffs bringing such actions are required to "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. *15 U.S.C. § 78u-4(b)(2)*. Although the PSLRA is silent on what amounts to a "strong inference," the Supreme Court has clarified that it is an inference which is "more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makar Issues & Rts., Ltd., 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*. Defendants contend that Plaintiffs failed to articulate a strong inference of scienter under the PSLRA. (Mot. at 21-22.)

The court must determine "(1) whether the Complaint alleged facts sufficient to create a strong inference of scienter, and (2) whether an inference **[*28]** of scienter is at least as compelling as any opposing inference of nonfraudulent and nonreckless intent." *S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 111 (2d Cir. 2009)*. On the first prong, plaintiffs can show scienter either by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, 493 F.3d at 99*.

Plaintiffs plead scienter based on alleged conscious misbehavior or recklessness, claiming that Defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." (Opp. at 17.) Plaintiffs note that the Shanghai Facility was NIO's first and only manufacturing facility; it was approximately a 20-minute drive from NIO headquarters; its construction was a business imperative that would have allowed the company to shift away from its partnership with JAC Motors; and the company planned to dedicate 25 percent of the IPO proceeds to its construction. (Opp. at 18; Am. Compl. ¶¶ 139-45.) In addition, Plaintiffs assert that the Registration Statement shows that Defendants were aware of the regulatory approvals required to begin construction. **[*29]** (Am. Compl. ¶

144.) Given those facts, Plaintiffs argue that "[i]t is not credible that NIO's senior executives were unaware of the status of the Shanghai Facility's construction" and that "[i]f the Individual Defendants failed to verify the construction status before telling investors that construction was underway, then they were reckless." (Opp. at 18.)

Defendants contend that Plaintiffs have inadequately alleged scienter through recklessness because they did not "*specifically identify* the reports or statements that are contradictory to the statements made." (Mot. at 22 (quoting *Glaser, 772 F. Supp. 2d at 578*) (emphasis in original).) That language originates from the Second Circuit's decision in *Novak, 216 F.3d at 309*, and refers to situations where "the public statements [of corporate officials] are consistent with reasonably available data" at the time they were made. For that proposition, the *Novak* court cited to *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801 (2d Cir. 1996)*. In *San Leandro*, plaintiffs argued that Philip Morris concealed the true rate at which sales of Marlboro cigarettes were declining because the company later revealed that sales were falling at 8.3 percent, "significantly higher than the previously announced rate of 2.5 percent." *Id. at 812*. The court held that plaintiffs' "unsupported **[*30]** general claim of the existence of confidential company sales reports that revealed the larger sales decline" was insufficient to adequately allege that Philip Morris's public statements were false or misleading. *Id.* The circumstances in this case are substantially different. The *San Leandro* plaintiffs argued that poor sales figures implied that Philip Morris must have known that sales were declining more than three weeks before those figures were announced. In contrast, the question here is whether a significant construction project had begun at all. Put simply, whether a factory is "currently under construction" is far clearer cut than sales data which is prone to fluctuation and differing interpretations. A company's representations about the strength of demand for a product might fairly be construed as "consistent with reasonably available data," but a company's representations about whether a factory is currently under construction cannot be. Therefore, Plaintiffs' allegations that Defendants represented that the Shanghai Facility was under construction when it was not are enough to plead recklessness.

Plaintiffs must also show that the "strong inference of scienter" is "cogent **[*31]** and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, 551 U.S. at 314*. Defendants suggest that the more

"cogent" and "compelling" explanation is that "Defendants sincerely believed construction was underway" because the project was primarily in the hands of the Shanghai government. (Mot. at 24.) But considering the totality of the facts Plaintiffs have asserted—namely the importance and cost of the factory to NIO's business, the close proximity of the project to NIO's offices, Defendants' awareness of the required regulatory approvals, and their substantial role in preparing the factory along with the Shanghai government—the court finds that Plaintiffs have pleaded recklessness as the foundation of a strong inference of scienter which is sufficiently compelling.

c. *Loss Causation*

Finally, Defendants argue that Plaintiffs have failed to adequately plead loss causation. (Mot. at 24.) Loss causation requires a plaintiff to show that an alleged misstatement, "when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005)*. Pleading loss causation "is not meant to impose a great burden on plaintiffs." *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG, No. 11-cv-4209 (KBF), 2013 U.S. Dist. LEXIS 43774, 2013 WL 1223844, at *12 (S.D.N.Y. Mar. 27, 2013)* (citing *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*). The Supreme Court has held that an artificially inflated stock price **[\*32]** at the time of purchase is insufficient to show loss causation. *Dura Pharms., 544 U.S. at 346*. Instead, plaintiffs must establish that the stock price fell following later corrective disclosures. *Id. at 345-47*. Although plaintiffs "need not demonstrate on a motion to dismiss that the corrective disclosure" was the singular cause of the loss, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 233 (2d Cir. 2014)*, the complaint must still "allege facts that support an inference that defendants' misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud," *In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010)* (quoting *Lentell, 396 F.3d at 175*).

Plaintiffs allege that "NIO's announcement on March 6, 2019 that it had terminated construction of the Shanghai Facility shocked the market" and caused the price of its shares to drop by 30 percent from $10.16 per share on March 5 to $7.09 on March 7. (Am. Compl. ¶ 146.) Plaintiffs have also alleged that the Shanghai Facility would have eliminated a partnership which some analysts viewed as a "source of concern for investors," and have pointed to various media and equity research commentary to establish that the Facility was a development of significance to industry professionals. (*Id.* ¶¶ 57, 70-72.) **[\*33]** Pleading loss causation "does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative casual explanations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC, 797 F.3d 160, 189 (2d Cir. 2015)*. If that were the case, defendants could escape liability for fraud merely through clever timing of information disclosures. Even though NIO released financial results that could have impacted the stock price at the same time as the news about the Shanghai Facility, Plaintiffs' allegations are sufficient here. *See Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 161-62 (2d Cir. 2012)* (holding that even where non-fraudulent developments may be responsible "for a portion of the collapse" in a company's stock price, "these facts, if established, hardly foreclose the reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself."). Accordingly, Plaintiffs have satisfactorily pleaded loss causation.

## C. Control Person Liability

In addition to their claims under *Section 11* and *Section 10(b)*, Plaintiffs allege violations of *Section 15 of the Securities Act* and *Section 20(a) of the Exchange Act* against the Individual Defendants in their capacities as "control persons" of NIO. (Am. Compl. ¶¶ 134, 166.) For both claims, Plaintiffs must show (1) a primary violation of the relevant statute, and (2) **[\*34]** control of the primary violator by the defendants. *See In re Lehman Bros. Mortgage-Backed Secs. Litig., 650 F.3d 167, 185 (2d Cir. 2011)*. "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996)* (quoting *17 C.F.R. § 240.12b-2*). Defendants move to dismiss the control person claims on three separate grounds. (Mot. at 25.)

First, Defendants argue that the control person claims should be dismissed because Plaintiffs have failed to plead a primary violation under either the Securities Act or the Exchange Act, which is necessary to sustain a control person liability claim. (*Id.*) For the reasons stated above, Plaintiffs have sufficiently pleaded both.

Second, Defendants argue that it is improper for Plaintiffs to plead both primary and control person liability for the same underlying conduct by the same defendants and therefore the claims are redundant. (*Id.*) Although some case law from district courts in this circuit arguably supports that theory, at this stage the court declines to dismiss the claims for that reason, especially given that the Federal Rules of Civil Procedure permit parties **[*35]** to plead claims in the alternative. *Compare Kalnit v. Eichler, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999)* (stating, in dicta, that directors alleged to have made misrepresentations "would be primary violators rather than control persons") *with In re Van der Moolen Holding N.V. Secs. Litig., 405 F. Supp. 2d 388, 412-13 (S.D.N.Y. 2005)* (permitting claims under *Sections 10(b)* and *20(a)* to proceed, despite *Kalnit*, because "it is conceivable that one defendant ultimately might be found to be a primary violator while another defendant might be found to be a control person" and because the Federal Rules of Civil Procedure permit claims in the alternative); *see also In re Alstom SA, 406 F. Supp. 2d 433, 486, 506 (S.D.N.Y. 2005)* (sustaining both *Sections 10(b)* and *20(a)* allegations against some defendants as alternative theories of liability).

Third, Defendants argue that Plaintiffs have failed to plead the requisite elements for either of the control person liability claims, which the court now considers. (Mot. at 25.)

1. *Section 15 of the Securities Act*

Plaintiffs allege that the Individual Defendants are liable under *Section 15 of the Securities Act* for the misstatements in NIO's Registration Statement. (Am. Compl. ¶¶ 134-136.) *Section 15* attaches liability to "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under *sections [11* or *12 of the Securities Act*]." *15 U.S.C. § 77o(a)*. As discussed, Plaintiffs have sufficiently pleaded a primary violation **[*36]** of *Section 11*. The remaining question is whether they have also established in their pleadings that the Individuals Defendants exercised "control over the primary violator." *Id.*

Plaintiffs have adequately alleged that the Individual Defendants had control over NIO because all of them signed NI O's Registration Statement. (Am. Compl. ¶ 35.) *See Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I, No. 08-cv-1713 (ERK) (WDW), 2012 U.S. Dist. LEXIS 24106, 2012 WL 601448, at *20 (E.D.N.Y. Feb. 23, 2012)* (collecting cases) ("It is well settled law that officers and directors of the primary violator who signed the registration statements containing alleged violations fulfill the control prong [of *Section 15*]."). The Individual Defendants were all either officers or directors of NIO, and each reviewed and signed NIO's Registration Statement. (Am. Compl. ¶¶ 24-35.) Therefore, Plaintiffs have sufficiently pleaded a *Section 15* violation.

Defendants argue that Plaintiffs have failed to plead a third element of *Section 15* liability altogether because the Amended Complaint fails to establish that Defendants "culpably participated in the alleged violations." (Mot. at 25.) It is an open question whether *Section 15* claims also require "culpable participation" in addition to the "control" **[*37]** element. *See In re Lehman Bros., 650 F.3d at 186*; *Plumbers' & Pipefitters' Loc. No. 562, 2012 U.S. Dist. LEXIS 24106, 2012 WL 601448, at *20*. District courts in this circuit are divided on that question, with many of them holding that culpable participation is not required for *Section 15* claims. *See, e.g., In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012)* ("'While the Second Circuit has yet to address the question of whether a plaintiff bringing a *Section 15* claim must allege 'culpable participation,' a majority of judges in this District ... have held such an allegation is not required.'"); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450 F. Supp. 3d 379, 427 n.4 (S.D.N.Y. 2020)*. This court agrees and holds that Plaintiffs need not allege culpable participation for a *Section 15* claim.

2. *Section 20 of the Exchange Act*

Plaintiffs also assert control personal liability against the Individual Defendants pursuant to *Section 20(a) of the Exchange Act*. (Am. Compl. ¶ 164.) *Section 20(a) of the Exchange Act* is substantively similar to *Section 15 of the Securities Act* in that it provides "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter" shall be liable to the same extent as the controlled person for the underlying violation. *15 U.S.C. § 78t(a)*. But unlike *Section 15 of the Securities Act*, *Section 20(a) of the Exchange Act* provides a defense for parties who "acted in good faith and did not directly or indirectly induce the act or acts constituting" the primary violation. *Id.*

*Section 20(a) of the Exchange Act* shares **[*38]** its first two elements—a primary violation and control over the primary violator—with *Section 15 of the Securities Act*. *See In re Lehman Bros., 650 F.3d at 185. Section 20*

plaintiffs must also plead culpable participation. *See id. at 186*. Courts have described culpable participation as "similar to the scienter requirement of *Section 10(b)*" in that "plaintiffs must 'plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 661 (S.D.N.Y. 2007)*. At the very least, culpable participation "requires 'something more than negligence.'" *In re Alstom SA, 406 F. Supp. 2d at 490*. As discussed in the section on scienter, viewing the evidence in the most favorable light for Plaintiffs, they have adequately alleged that NIO and its senior executives and directors—the Individual Defendants— knew or should have known of the status of the Shanghai Facility when they signed the Registration Statement. Accordingly, Plaintiffs have met their burden to plead liability under *Section 20(a)*.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (Dkt. 68) is DENIED.

SO ORDERED.

Dated: Brooklyn, New York

August 12, 2021

/s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS

United States District **[*39]** Judge

---

**End of Document**