UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
XIANGDONG CHEN, Individually and
On Behalf of All Others Similarly Situated,

                      Plaintiff,

*v.*

X FINANCIAL, YUE TANG, JIE ZHANG,
SHAOYONG CHENG, DING GAO,
SHENGWEN RONG, ZHENG XUE,
LONGGEN ZHANG, RICHARD ARTHUR,
COLLEEN A. DEVRIES, COGENCY
GLOBAL INC., MORGAN STANLEY &
CO. INTERNATIONAL PLC, MORGAN
STANLEY & CO. LLC, DEUTSCHE BANK
SECURITIES INC., CHINA EVERBRIGHT
SECURITIES (HK) LIMITED, CHINA
MERCHANTS SECURITIES (HK) CO., LTD., and
AMTD GLOBAL MARKETS LIMITED,

                      Defendants.
----------------------------------------------------------------X

**REPORT &
RECOMMENDATION**
19-CV-6908-KAM-SJB

**BULSARA, United States Magistrate Judge:**

      This is a securities class action brought by investors who purchased or otherwise

acquired American Depositary Shares ("ADSs") in X Financial's ("XF") September 19,

2018 Initial Public Offering ("IPO"). XF is a financial technology company based in

Shenzhen, China, engaged in the business of peer-to-peer online lending. Plaintiffs

allege that XF's IPO prospectus and registration statement contained false or misleading

statements or omissions in violation of sections 11, 12(a)(2), and 15 the Securities Act of

1933 ("Securities Act"). *See* 15 U.S.C. §§ 77k, 77l(a)(2), 77o(a). Plaintiffs allege that XF

and the other defendants misrepresented three aspects of its business: the elimination

of its preferred loan product line, its ability to maintain low delinquency rates and

attract prime borrowers, and policy changes that decreased the size of its card loans and the total loans facilitated by the company.[1]  Plaintiffs also allege that XF made false or misleading statements or omissions on earnings calls and in press interviews after the IPO, in violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.  *See* 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5.

Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.[2]

For the reasons stated below, it is respectfully recommended that Defendants' motion to dismiss be granted in full, with leave to replead denied in part and granted in part.  The Court finds that the Securities Act claims are untimely, as Plaintiffs have failed to bring their claims within the one-year statute of limitations.  The Court therefore recommends these claims be dismissed with prejudice.  The Court also finds that Plaintiffs have failed to adequately plead claims under the Exchange Act since they have failed to allege scienter.  The Court therefore recommends these Exchange Act claims be dismissed, but with leave to replead.

---

[1] The Court uses these three categories based on Plaintiffs' categorization of their claims in their briefing and at oral argument, which unfortunately varied over time. (*See* Am. Class Action Compl. for Violations of the Federal Securities Laws dated July 13, 2020 ("AC"), Dkt. No. 22; Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Am. Compl. dated Feb. 5, 2021 ("Opp'n"), Dkt. No. 71; Tr. of Oral Arg. dated Oct. 6, 2021 *Chen v. X Financial, et al.*, 19-cv-6908 ("Tr.") at 63: 21–25).

[2] Notice of the X. Financial Defs.' Mot. to Dismiss the Am. Compl. dated Dec. 7, 2020 ("Notice of Mot."), Dkt. No. 70.

## <u>ALLEGATIONS AND PROCEDURAL HISTORY</u>

The following facts are drawn from the Amended Complaint ("Complaint") and are accepted as true for purposes of this motion to dismiss.[3]

XF is a financial technology company based in Shenzhen, China, that operates a peer-to-peer lending platform that matches borrowers and lenders.[4]  XF's founder and Chief Executive Officer (CEO) is Yue (Justin) Tang ("Tang").[5]  Tang was also Chairman of the Board at the time of the IPO.[6]  XF generates revenue primarily by collecting fees for facilitating loans.[7]  "In other words, if [XF] connects a borrower with a lender, it receives a percentage commission on the amount of that loan."[8]  This collection of facilitation fees generates the largest of its revenue streams.[9]  "As such, the number of loans the Company facilitates, and the size of those loans, is essential to its bottom line."[10]

XF's two primary products are the Xiaoying Card Loan ("card loan") and Xiaoying Preferred Loan ("preferred loan").[11]  The card loan product—XF's "flagship"—is

---

[3] AC.

[4] AC ¶ 2.

[5] *Id.* ¶¶ 43–44.

[6] *Id.* ¶ 44.

[7] *Id.* ¶¶ 2, 66.

[8] *Id.* ¶ 2.

[9] *Id.*

[10] *Id.* ¶ 66.

[11] *Id.* ¶¶ 9, 64.

targeted to "prime borrowers,"[12] with approximately 37% percent of its 2017 revenue

deriving from this product.[13] The preferred loan product is marketed mainly to small-

and medium-sized businesses, and accounted for approximately 23% of XF's revenue in

2017.[14] XF "claimed to provide services to 'prime' borrowers, while avoiding subprime

debtors."[15] Plaintiffs allege that XF's focus on prime borrowers and its description of the

rigor of its applicant screening procedures signaled to investors that "delinquencies

would be rare."[16]

Beginning in 2016, Chinese authorities began to implement rules and regulations

governing the peer-to-peer lending industry, including, for example, caps on how much

companies like XF could lend to borrowers.[17] The regulations were enacted, according

to Plaintiffs, because statistics showed that up to 40% of peer-to-peer platforms were

Ponzi schemes.[18] Although the regulations and revelations led many such platforms to

close, XF gave indications that the company was continuing to grow.[19] XF "touted" a

positive future outlook based on a claimed ability to attract higher quality investors and

---

[12] *Id.* ¶ 83.

[13] *Id.* ¶ 9.

[14] *Id.*

[15] *Id.* ¶ 13; *see also id.* ¶ 143 (describing prime borrowers).

[16] *Id.* ¶ 147.

[17] *Id.* ¶¶ 4, 85.

[18] *Id.* ¶ 4.

[19] *Id.* ¶¶ 6, 71–76.

"tough quality control."[20]  But, according to Plaintiffs, these rosy assessments were misleading, and the company repeated these false statements in its SEC filings and other public disclosures.

XF filed a Form F-1 registration statement on August 28, 2018,[21] which went through several amendments.[22]  XF's amended registration statement was declared effective on September 18, 2018; XF filed a prospectus, (together with the Form F-1, the "Registration Statement"), for its IPO the following day.[23]  The Complaint alleges that there were three categories of false statements in the Registration Statement.[24]

*First*, the Complaint alleges that the Registration Statement suggested that the preferred loan business was going to grow, but in fact the company had decided—prior to the IPO—that preferred loans would be phased out.[25]  For instance, the Registration Statement claimed that XF was "able to source a large number of borrowers" for preferred loans, and those borrowers "will drive the continued growth" in the company's "borrower base."[26]  XF also reported data in the Registration Statement indicating that it

---

[20] *Id.* ¶ 6; *e.g.*, ¶ 75 ("The Registration Statement laid out a compelling portrait of a Company on the rise.  For example, the loan facilitation amount for the six months ending June 30, 2018 indicated the 2018 numbers would be significantly higher than 2017 numbers[.]").

[21] *Id.* ¶ 7.

[22] *Id.*

[23] *Id.*

[24] *Id.* ¶ 20.

[25] *Id.* ¶¶ 16, 20.

[26] *Id.* ¶ 155 (emphasis omitted); *see also id.* ¶ 158.

would be delivering nearly 40% more preferred loans in 2019 than in 2018.[27]  The Complaint alleges that these statements and suggestions about growth were false.  That is because XF had made the decision, prior to the IPO, to eliminate the preferred loan product.[28]

As evidence for this allegation, the Complaint cites to a November 19, 2018 earnings call (the "November 19 Call").  During that call, Plaintiffs allege that Tang "told investors that demand for loans had dried up, prompting significant reductions in preferred loans 'over the last three quarters' (*i.e.* the last nine months)."[29]  Tang said that "actually, over the last three quarters, we have been consistently reduc[ing] . . . preferred loan business."[30]  This statement reflects the fact, according to Plaintiffs, that "rather than growing, preferred loans were being intentionally phased out."[31]  This was confirmed in a May 21, 2019 earnings call, when Tang—in discussing the preferred loan business—stated that "over the last year, the risk was higher than [we] expected.  So we literally discontinued that product line, except . . . for some of the higher-quality repeated borrower.  So that basically drives . . . no growth in our loan balance."[32]

---

[27] *Id.* ¶ 90.

[28] *Id.* ¶¶ 88, 93 ("At the time of the IPO . . . Defendants were undoubtedly aware that [XF's] numbers were going to continue to plummet.  They were indeed aware that they had already chosen to discontinue the preferred loan product.").

[29] *Id.* ¶ 94 (emphasis omitted).

[30] *Id.*

[31] *Id.*

[32] *Id.* ¶¶ 33 (emphasis removed; first alteration in original), 133.

Confidential Witness #1 ("CW1") conducted background checks for preferred loan applicants.[33] He left the company in October 2018 because "preferred loans were no longer being administered in the office located in the Guangzhou region of China, where he worked."[34] "He was told prior to his departure in October that the company was not going to be facilitating preferred loans any longer."[35]

*Second*, Plaintiffs allege that the Registration Statement misled investors about XF's ability to maintain low delinquency rates and attract the prime borrowers who were the company's focus. According to Plaintiffs, XF publicly stressed the "rigor[]" of the processes used to screen potential borrowers,[36] but had—in the 12 months prior to the IPO—decided to relax those procedures.[37] CW1 "said the screening process for applications became less rigorous if the Company wanted to distribute more loans."[38] According to CW1, this was the case from "fall 2017 through the second quarter 2018[.]"[39] The witness was told by his manager "to not be as detailed in his review and research of potential borrowers or as comprehensive in his factcheck[.]"[40] Confidential Witness #2 ("CW2") worked in the "debt collection department" at XF from February

---

[33] *Id.* ¶ 86.

[34] *Id.*

[35] *Id.* (emphasis omitted).

[36] *E.g.*, *id.* ¶ 97.

[37] *Id.* ¶ 18.

[38] *Id.* ¶ 77.

[39] *Id.*

[40] *Id.*

2018 through February 2019, and said that "the screening for Card Loans was lax, boiling down to almost anyone with a credit card being able to take out this type of loan."[41]  The apparent laxity in the screening process was reflected in various comments made on online message boards.[42]  This relaxation, with its concomitant increase in less credit-worthy borrowers, led to an increase in delinquency rates prior to the IPO; however, the company falsely suggested in the Registration Statement that those rates were recovering.[43]  "The Registration Statement admitted delinquency rates were on the rise . . . . [b]ut . . . did not explain to investors that this increase in delinquency was a growing trend that was continuing at the time of the IPO[.]"[44]

*Third*, in response to this rise in delinquencies, XF allegedly made two policy changes—to decrease the size of its card loans and to reject more loan applicants—prior to the IPO that it failed to or falsely described in the Registration Statement.[45]  The effect of these changes also led to a decrease in the company's total loan facilitation.[46]  These policy changes stood in stark contrast to what was disclosed in the Registration Statement.  For instance, the Registration Statement indicated that card loan contributions to company revenue would increase: "we plan to expand the business

---

[41] *Id.* ¶ 99.

[42] *Id.* ¶ 100.

[43] *Id.* ¶¶ 21–24.

[44] *Id.* ¶ 106; *see also id.* ¶¶ 123–24.

[45] *Id.* ¶¶ 19–20, 106, 109.

[46] *Id.* ¶¶ 25–26, 92, 124.

scale of Xiaoying Card Loan, [and] we expect revenue contribution from Xiaoying Card Loan will continue to increase in the future and enhance our profitability."[47]

After the IPO, according to Plaintiffs, the effect of the policy changes was obvious and it became clear that the changes were made prior to the IPO. In the November 2019 earnings release, the company disclosed a decrease of 35% in the number of loans in the third quarter, as compared to the same period in 2017. Net revenue was down 22% and net income was down 34%. The disclosed delinquency rate for its loans reflected more than a 270% year-over-year increase.[48] Though it announced during the November 2019 call that XF would tighten its "'credit policy'" and "'reject more applications,'" Plaintiffs claim these changes had already taken place before the IPO.[49]

During the March 19, 2019 earnings call, Cheng stated that XF's "loan volume" had been declining "since [the] middle of last year," *i.e.*, prior to the IPO.[50] Cheng also admitted that XF "had tightened its approval process" in the third quarter of 2018, "reducing the number of approved borrowers and greatly impacting the Company's bottom line to the IPO in a way not disclosed in the Registration Statement."[51] Plaintiffs allege that this was an admission that the decision to tighten the approval process was made prior to the IPO.[52]

---

[47] *Id.* ¶ 163 (emphasis removed).

[48] *Id.* ¶ 23.

[49] *Id.* ¶ 109; *see also id.* ¶¶ 125, 164.

[50] *Id.* ¶¶ 31, 112 (emphasis omitted).

[51] *Id.* ¶ 31.

[52] *Id.* ¶ 112.

On December 9, 2019, Plaintiff Xiangdong Chen filed the first complaint against all defendants.[53] On May 13, 2020, the Court appointed X Financial Investor Group (comprised of Xiangdong Chen and Ke Zheng, both of whom purchased XF ADSs during the IPO) as Lead Plaintiff and Pomerantz LLP as Lead Class Counsel. *Xiangdong Chen v. X Fin.*, No. 19-CV-6908, 2020 WL 2478643, at *1 (E.D.N.Y. May 13, 2020). On July 13, 2020, Plaintiffs filed their Amended Complaint. The Amended Complaint includes claims under (i) section 11 of the Securities Act against all defendants: XF, XF executives and/or directors (the "Individual Defendants"),[54] the IPO underwriters or underwriter representatives (the "Underwriter Defendants"),[55] and XF's U.S. representative for the IPO (the "Cogency Defendants");[56] (ii) section 12 of the Securities Act against the

---

[53] Class Action Compl. for Violations of the Federal Securities Laws dated Dec 9, 2019 ("First Compl."), Dkt. No. 1.

[54] The Individual Defendants are Yue (Justin) Tang, Jie (Kevin) Zhang (Chief Financial Officer at XF), and Shaoyong (Simon) Cheng (President at XF), Ding (Gardon) Gao (director and Chief Technology Officer at XF), Shengwen Rong (director appointee at XF), Zheng Xue (director appointee at XF), Longgen Zhang (director appointee at XF), Richard Arthur (Assistant Secretary of Cogency Global Inc. ("Cogency Global")), and Colleen A. DeVries (Senior Vice President of Cogency Global). (AC ¶¶ 43–52). Collectively, Tang, Zhang, and Cheng are referred to as the "Management Defendants." (*Id.* ¶ 52). Service upon Defendants Ding Gao and Jie Zhang was tolled pending the Court's ruling on Defendants' Motion to Dismiss. (Order dated Sept. 27, 2020).

[55] The Underwriter Defendants are Morgan Stanley & Co. International plc ("MSPLC") and Morgan Stanley & Co. LLC (collectively, "Morgan Stanley"), Deutsche Bank Securities Inc. ("Deutsche Bank"), China Everbright Securities (HK) Limited ("China Everbright"), China Merchants Securities (HK) Co., Ltd. ("China Merchants"), and AMTD Global Markets Limited ("AMTD Global"). (AC ¶¶ 53–59). Service upon the Foreign Underwriter Defendants—MSPLC, Everbright, and China Merchants—was tolled pending the Court's ruling on Defendants' Motion to Dismiss. (Order dated Aug. 19, 2020). Morgan Stanley and Deutsche Bank are collectively the "Domestic Underwriter Defendants."

[56] The Cogency Defendants are Cogency Global, Richard Arthur and Colleen A. DeVries.

Underwriter Defendants; (iii) section 15 of the Securities Act against XF, the Individual

Defendants, and Cogency Global; (iii) section 10(b) of the Exchange Act against XF and

the Management Defendants; and (iv) section 20(a) of the Exchange Act against the

Management Defendants.[57]

On December 7, 2021, X Financial, Yue Tang, Shaoyong Cheng, Shengwen Rong,

Zheng Xue, and Longgen Zhang (the "X Financial Defendants") served a Motion to

Dismiss the Amended Complaint.[58]  On February 5, 2021, Plaintiffs served their

Opposition.[59]  The Domestic Underwriter Defendants and Cogency Defendants filed

Notices of Joinder to the Motion to Dismiss, joining in full the arguments made by the

other parties.  The X Financial Defendants served a Reply on March 8, 2021.[60]

## **DISCUSSION**

## I.    **Legal Standard**

For a 12(b)(6) motion, the Court must "accept as true all of the factual allegations

set out in plaintiff[s'] complaint."  *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)

(quotations omitted).  The Court then draws "inferences from those allegations in the

light most favorable to plaintiff[s], and construe[s] the complaint liberally."  *Id.*

---

[57] *Id*. ¶¶ 208–41.

[58] Notice of Mot.; *see also* Mem. of Law in Supp. of the X Financial Defs.' Mot. to Dismiss the Am. Compl. dated Dec. 7, 2021 ("Mot. to Dismiss"), attached as Ex. 1 to Notice of Mot., Dkt. No. 70-1.  Individual Defendants Ding Gao and Jie Zhang Foreign Underwriter Defendants MSPLC, Everbright, and China Merchants were not served, however, they have stipulated with Plaintiffs that the Court's Order on Defendants' Motion to Dismiss will apply equally to them.  (*See* Order dated Aug. 19, 2020 and Order dated Sept. 27, 2020).

[59] Opp'n.

[60] Reply Mem. of Law in Further Supp. of the X Financial Defs.' Mot. to Dismiss the Am. Compl. dated Mar. 8, 2021 ("Reply"), Dkt. No. 74.

(quotations omitted).  Once the facts are construed in the light most favorable to the plaintiffs, to avoid dismissal there must be sufficient facts that allege a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quotations omitted).  "[A] district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.  Of course, it may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

 "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  A complaint must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (quotations omitted) (alteration in original).  In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; Fed. R. Civ. P. 8(a)(2).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted).  The determination whether a plaintiff has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Escamilla v. Young Shing Trading Co.*, No. 17-CV-652, 2018 WL 1521858, at *2 (E.D.N.Y. Jan. 8, 2018) (same), *report and recommendation adopted*, 2018 WL 1033249 (Feb. 23, 2018).

The pleading standard is more rigorous for claims sounding in fraud. Such claims must satisfy the requirements of Rule 9(b) and, where applicable, the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 15 U.S.C. § 78u-4(b). That is, for Exchange Act 10b-5 claims, and Securities Act claims "premised on allegations of fraud," *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir. 2004), plaintiffs must state "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Indeed, "fraud is not an element or a requisite to a claim under [Securities Act] Section 11 or Section 12(a)(2); at the same time, claims under those sections may be—and often are—predicated on fraud," and must satisfy Rule 9(b). *Rombach*, 355 F.3d at 171; *see also In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 243 (S.D.N.Y. 2020) ("[W]hile a plaintiff need allege no more than negligence to proceed under Section 11 . . ., claims that do rely upon averments of fraud are subject to the test of Rule 9(b).") (quoting *Rombach*, 355 F.3d at 171).

The PSLRA requires that a plaintiff alleging that a defendant either "made an untrue statement of a material fact" or "omitted to state a material fact necessary" to make the statements made not misleading must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2). "Although [m]alice, intent, knowledge, and other conditions of a

person's mind may be alleged generally, the relaxation of the particularity requirement

for conditions of mind must not be mistaken for a license to base claims of fraud on

speculation and conclusory allegations[.]" *Weight Watchers*, 504 F. Supp. 3d at 242

(internal citations and quotations omitted). This requirement "is cast in terms of the

conduct alleged, and is not limited to allegations styled or denominated as fraud or

expressed in terms of the constituent elements of a fraud cause of action." *Rombach*,

355 F.3d at 171.

Ultimately, "to satisfy Rule 9(b) and PSLRA pleading requirements, [a] securities

fraud complaint based on misstatements must (1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when

the statements were made, and (4) explain why the statements were fraudulent." *In re

MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 303 (S.D.N.Y. 2013) (internal

citations and quotations omitted); *see also ATSI*, 493 F.3d at 99 (same).

## II.     Securities Act Claims

### A.     Section 11 Claim

> To establish a prima facie claim under Section 11, "the plaintiff must allege
> that: (1) she purchased a registered security, either directly from the issuer
> or in the aftermarket following the offering; (2) the defendant participated
> in the offering in a manner sufficient to give rise to liability under section
> 11; and (3) the registration statement contained an untrue statement of a
> material fact or omitted to state a material fact required to be stated therein
> or necessary to make the statements therein not misleading."

*Weight Watchers*, 504 F. Supp. 3d at 243 (quoting *In re Morgan Stanley Info. Fund

Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (additional quotations omitted)).[61]

Plaintiffs bring a section 11 claim against all defendants.

---

[61] Though defendants contend that the Securities Act claims here sound in fraud, and are therefore subject to Rule 9(b), a proposition that Plaintiffs dispute, the Court

A section 11 claim must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]" 15 U.S.C. § 77m. This limitations period, thus, begins either (a) upon the actual discovery of an untrue statement or (b) when "reasonable diligence" would have discovered the statement or omission.

The "actual discovery" of the untrue statement occurs when the defendant provides "precisely the information" that it should have disclosed earlier. *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013) (quotations omitted). In this way, "[c]laims under section 11 are barred if brought more than one year after actual or constructive notice of the claim." *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011).

But in addition, the failure to exercise "reasonable diligence" causes the limitations period to begin running. As such, "the statute of limitations for Securities Act claims is not somehow tolled until the appearance of disclosures that perfectly match the allegations that a plaintiff chooses to include in its complaint." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015). The meaning of "reasonable diligence" is best understood by reference to the term in the context of similar provisions in the Exchange Act.

An Exchange Act section 10(b) limitations period begins to run, "after the discovery of the facts constituting the violation," *see* 28 U.S.C. § 1658(b)(2), a phrase that does not include the term "reasonable diligence." Nonetheless, it was accepted for

---

does not reach the issue. Even if not subject to Rule 9(b), the Securities Act claims do not survive the statute of limitations bar.

many decades that the period began to run not only when a plaintiff discovered the factual basis for a claim, "but also when a hypothetical reasonably diligent plaintiff would have discovered them." *Merck & Co. v. Reynolds*, 559 U.S. 633, 646–47 (2010). Courts understood "reasonable diligence" as "inquiry notice," meaning the limitations period began when information "would lead a reasonable investor *to investigate* the possibility of fraud." *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173–74 (2d Cir. 2011) (emphasis added). "If at that point, the plaintiff fail[ed] to initiate such an investigation, . . . the statute of limitations . . . start[ed] running on the day the plaintiff should have begun investigating." *Id.* In *Merck*, the Supreme Court rejected the "inquiry notice" framework and the idea that the limitations period was tethered to the commencement of an investigation. It held, instead, that "the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation, including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." 559 U.S. at 653 (quotations omitted). That is, "the limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *City of Pontiac*, 637 F.3d at 174. And in *City of Pontiac*, the Second Circuit held that "the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id.* at 175.

*Merck* and *City of Pontiac*, as noted, interpret "reasonable diligence" in the Exchange Act. Though the Second Circuit has not resolved whether the *pre-Merck* "inquiry notice" standard for "reasonable diligence" still applies to Securities Act claims, district courts have applied *Merck* in that context. That is, those courts have concluded that the statute of limitations begins not when a reasonably diligent plaintiff should have begun investigating the false statements in a registration statement, but when he discovers the facts that are the basis of the claim, and can plead those claims with particularity. *Magnum Hunter*, 616 F. App'x at 447 ("We have never considered whether *Merck* abrogates this circuit's existing 'inquiry notice' rule in favor of the discovery rule in Securities Act claims, an issue that divides the district courts in this circuit.); *Freidus*, 734 F.3d at 138 n.2 (2d Cir. 2013) (noting "inquiry notice" application to Securities Act is unresolved by Circuit); *e.g.*, *Horowitz v. Sunlands Tech. Grp.*, No. 19-CV-3744, 2021 WL 1224517, at *2 (E.D.N.Y. Mar. 31, 2021); *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 240 (E.D.N.Y. 2019); *Rudman v. CHC Grp. LTD.*, 217 F. Supp. 3d 718, 724 (S.D.N.Y. 2016); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 762 (S.D.N.Y. 2012).

Here the statute of limitations issue is relatively straightforward. Many, if not all, of the section 11 allegations are based upon disclosures made during the November 19, 2018 earnings call. They are disclosures of "precisely the information" that Plaintiffs allege XF should have disclosed in the Registration Statement. And to the extent that there is not total overlap between the disclosures and a complete and truthful disclosure, the November 19, 2018 statements were sufficient to give reasonably diligent plaintiffs the facts necessary to plead a section 11 claim. In other words, Plaintiffs had

until November 19, 2019 to file their section 11 claims, but they waited until December 9, 2019 to do so.

Plaintiffs' first set of alleged misstatements alleges that XF had—prior to the IPO—decided to eliminate the preferred loan business. *Supra*, at 5–6. They allege in that Defendants "were indeed aware that they had already chosen to discontinue the preferred loan product." (AC ¶ 93). As evidence in support, Plaintiffs—in the next paragraph—cite to the November 19 Call, where Tang told investors that the company had been consistently reducing the preferred loan business. (*Id*. ¶ 94). And Plaintiffs allege that this statement was an admission that the preferred loan business had been eliminated: "In other words, rather than growing, *preferred loans were being intentionally phased out*." (*Id*. (emphasis added)). In other words, according to Plaintiffs' own allegations, everyone knew as of November 19, 2018 that XF had eliminated the preferred loan product.

At oral argument, confronted with this disclosure of corrective facts made more than one year before the Complaint's filing, Plaintiffs' counsel engaged in unpersuasive semantics. Counsel argued that during the November 19 Call XF only disclosed that preferred loans were being "phased out," not that they had been eliminated.[62] The Court is at a loss to discern the difference between elimination and "phasing out" of a program—both lead to the end of the product offering. If the distinction is one of timing, the Complaint does not rely on that difference. The Complaint alleges that the

---

[62] Tr. at 26:10–13 ("[T]he falsity of the statements to the extent that it omits that the company had discontinued the preferred line only comes to light in May of 2019."); *Id*. at 27:12–14 ("That's the claim that's alleged, that they discontinued it, and it was a failure to disclose a discontinuance of that.").

elimination of the loans occurred through a "phasing out" of the program. (*See* AC ¶ 20 ("For example, at the time of the IPO, [XF] had already decided to . . . *phase out* the preferred loan business.") (emphasis added)). In other words, the Complaint is based entirely on the idea that XF failed to inform investors that preferred loans had already been phased out. And that is exactly what Tang told them on November 19th. So counsel's argument that Tang failed to tell investors the program had been eliminated is not what the Complaint alleges. The Complaint does not allege that XF decided to immediately eliminate the preferred loan business, *i.e.*, turn off the program and call in all the loans immediately on a date certain.[63] Indeed, the terms "phasing out" and "elimination" of the preferred loans are used interchangeably by Plaintiffs in the Complaint and their briefs. (Opp'n at 10 ("The Complaint alleges that Defendant has decided to cease providing preferred loans prior to the IPO and was already phasing out the product line."); AC ¶ 88 (XF was "prior to the IPO, taking the first steps in eliminating the product line, because Defendants already knew it would be gone soon")).

The claims based on the second set of alleged misstatements—concerning delinquency rates—is likewise barred because of the November 19 Call. Plaintiffs allege that the Registration Statement—by focusing on the rigor of XF's application process— hid the rise in delinquency rates that was occurring pre-IPO. (AC ¶ 106 ("The Registration Statement admitted delinquency rates were on the rise . . . But the

---

[63] To the extent the Complaint is read that way, on the November 19 Call, Tang also said that "to understand [XF's] business going forward," investors "should just focus on card loan[s]," a statement that could only be interpreted as meaning that the loans had been eliminated. (Tr. of X Financial Third-Quarter 2018 Earnings Conference Call dated Nov. 19, 2018 ("Nov. 19 Call Tr."), attached as Ex. F to Decl. of Brian S. Weinstein in Supp. of the X Financial Defs.' Mot. to Dismiss the Am. Compl. ("Weinstein Decl."), Dkt. No. 70-2 at 5–7; Tr. at 11:1–10).

Registration Statement did not explain to investors that this increase was a growing trend that was continuing at the time of the IPO[.]")). *Supra*, at 7–8. The Complaint states, however, that XF disclosed the true state of the delinquency rates during the November 19 Call. (AC ¶ 108 ("While X Financial did not disclose *this* prior to the September 2018 IPO, X Financial would admit on the November 19 Call that delinquency rates were greatly exceeding the Company's internal expectations.") (emphasis added)). During the call, XF stated that it "saw [an] increase in delinquency," and that preferred loans had "a higher delinquency in Q3 than before[.]" (Nov. 19 Call Tr. at 5). And there is nothing in the Complaint alleging there was additional information about delinquencies disclosed *after* the November 19 Call. In other words, whatever was necessary to alert Plaintiffs about false statements concerning delinquency rates must have been said during the November 19 Call, because that is all the claim is based on.

The third set of allegations—that XF, in response to rising delinquencies, made policy changes that decreased the size of card loans and thus the total loans facilitated by the company—runs into the same problem. *Supra*, at 8. During the November 19 Call, Tang said that during the third quarter (a period that was both before and after the September 18, 2018 IPO), XF "consciously reduced [its] average loan size because of [its] concern of external economic environment and credit environment. . . . by about 20%[.]" (Nov. 19 Call Tr. at 2–3; Tr. at 13:1–12). Plaintiffs argue that the November 19 Call only disclosed these policy changes as measures XF intended to take in the future, (Opp'n at 19), but again, their Complaint undermines their argument. The Tang statement about an already "reduced" loan size is quoted in the Complaint, where Plaintiffs point out that this disclosure headlined Tang's remarks: "In his opening

remarks on the November 19 Call, Defendant Tang stated that the Company '***consciously reduced*** [its] average loan size[.]" (AC ¶ 125 (emphasis in original)). Indeed, Plaintiffs go on to characterize these remarks as an unexpected but noteworthy departure from the Registration Statement: "This was news to investors, as, while the decision was obviously made before the *IPO*, it could not be found in the Registration Statement." (*Id.* (emphasis added)). As such an "obvious" disclosure about past, pre-IPO changes, Plaintiffs had in hand the information to plead claims alleging the Registration Statement's suggestion of card loan growth was false under section 11. Having now waited more than a year before filing suit, these claims are now time-barred. And again, as with the other alleged false statements, by relying on the November 19 earnings release, Plaintiffs have demonstrated they had more than a year's notice of a false statement, and pled themselves out of court.[64]

Plaintiffs' arguments to the contrary are entirely without merit. Plaintiffs contend that the November 19 Call statements only previewed the problems in the Registration Statement, but did not reveal or disclose the full extent of the falsity. (Opp'n at 23–24). With respect to the first set of false statements—those about elimination of the preferred loan product—this is demonstrably false. The disclosure could not have been clearer that the product was being "phased out" and "eliminated." *Supra*, at 19.

---

[64] Plaintiffs also allege that Defendants' failure to disclose known, material trends and risks amounts to a violation of item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, and item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105. Since the trends relate to delinquency rates and the size of loans, they are simply subsets of the other section 11 claims which are time-barred and therefore, the more specific Regulation S-K-based claims are also time-barred. *Rudman*, 217 F. Supp. 3d at 730 (dismissing item 303 claims on same grounds as section 11 claims).

With respect to the second and third set of statements—those related to delinquency rates and the size of card loans—even if the November 19 earnings release did not disclose or correct every facet of the Registration Statement that was false, a reasonably diligent plaintiff could have brought a claim based on the statements that were made. And this is true under either standard for "reasonable diligence." For the delinquency rates, under a pre-*Merck* "inquiry notice" standard, having been alerted in November to the fact that delinquencies were on the rise and that the size of card loans was decreasing, a reasonable investor would have begun his investigation then to determine when those trends began. *See, e.g., Freidus*, 734 F.3d at 139 ("Barclays's unscheduled Update, which disclosed the company's significant exposures to a deteriorating credit market whose fragility had recently been widely and publicly exposed, was sufficient for Lead Plaintiffs to have discovered the alleged untruths and omissions."); *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 367 (S.D.N.Y. 2012) ("Plaintiff need not have notice of *all* the misconduct it alleges in the Complaint to trigger inquiry notice.") (emphasis added).

Alternatively, under the *Merck* standard, which rejects "inquiry notice," the limitations period begins when a diligent plaintiff can state a cause of action. And for either the delinquency rate or the card loan size, Plaintiffs' briefs do not explain how either the November 19 statements were insufficient to state a section 11 claim or how subsequent disclosures in March turned an unviable claim into an actionable one. At best, the March disclosures gave a level of precision—*i.e.*, a more exact timeframe— when the later delinquency rates and loan sizes began moving in a negative direction. (*E.g.*, AC ¶ 30 ("In subsequent financial reports, X Financial shed *further* light on problems that began before the IPO.") (emphasis added) (discussing delinquency

rates)).  Subsequently discovering additional detail about a claim does not delay the running of a limitations period.  *See, e.g.*, *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 199 (S.D.N.Y. 2020) (finding Securities Act claims time-barred where defendant disclosed "dire need of capital," rejecting plaintiffs' argument that limitations period only began to run after a subsequent announcement that allowed plaintiffs to "piece together enough information to deduce" that company was experiencing "severe liquidity and debt crisis") (quotations omitted); *Rudman*, 217 F. Supp. 3d at 725 (finding claims time-barred, where "[a]lthough CHC did not provide a customer-level breakdown of revenue lost due to the EC225 suspension, the Registration Statement provided more than enough information for an investor to conclude that a substantial loss in revenue on EC225 contracts in Brazil implicated Petrobras.").

Moreover, Plaintiffs contend that the November 19 Call was so remarkable because it disclosed results for the third quarter of 2018, a quarter that ended on the heels of the IPO.  And they use that fact to contend that XF knew at the time of the IPO and Registration Statement that the alleged statements were false.  (AC ¶ 26 ("On November 19 . . . . executives explained on the call [that] the negative operational and financial results reported in the day's press release had been caused by market and other problems that had long preceded the IPO."); *id.* ¶ 91 ("[W]hen X Financial reported earnings . . . on November 19, 2018, [it] noted for the first time: 'Xiaoying Preferred Loan was adversely impacted[.]'"); *id.* ¶ 93 ("At the time of the IPO – which was only 11 days prior to the end of this quarter – Defendants were undoubtedly aware that X Financial's numbers were going to continue to plummet.")).  Having alleged that statements made in November 2018 about the past necessarily were about pre-IPO actions and trends—and thereby made the Registration Statement full of alleged

falsies—it is impossible for Plaintiffs to claim that they could only have brought a false statement action based on more granular information received subsequently in March 2019.

Plaintiffs then argue that XF provided reassurances that negated any notice when it simultaneously told investors on November 19 that "the credit problems were behind them." (Opp'n at 23; *see also* AC ¶ 28). Whatever reassurance that Tang provided during the call, Plaintiffs do not identify anything that directly addresses the three categories of false statements they base their claim upon. At best, they identify general puffery made by Tang about the Company's ability to rebound financially moving forward. (*E.g.*, AC ¶ 28 ("growth was on the horizon"); *id.* ¶ 182 ("executives . . . sought to reassure investors by stressing supposed growth.")). *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) ("The 'reassuring' statements by management were mere expressions of hope, devoid of any specific steps taken to avoid under-reserving in the future. In these circumstances, the claimed reassurances are unavailing."). And none of the cases Plaintiffs cite suggest that such generic reassurances preclude the triggering of the limitations period when there is the "perfect match" between the disclosed statement and false statement, as there is here. *E.g., Freidus*, 734 F.3d at 139 ("We think that, in spite of statements regarding the bank's risk management practices and other generic assurances, Barclays's unscheduled Update, which disclosed the company's significant exposures to a deteriorating credit market whose fragility had recently been widely and publicly exposed, was sufficient for Lead Plaintiffs to have discovered the alleged untruths and omissions.").[65]

---

[65] Defendants argue that none of the statements in the Registration Statement are in fact false. Given the fully dispositive nature of the statute of limitations defense, it is

## B.    Section 12(a)(2) Claim

Plaintiffs also bring a claim against the Underwriter Defendants, alleging

liability under section 12(a)(2) of the Securities Act.  Section 12(a)(2) gives rise to

liability where

> (1) the defendant is a "statutory seller"; (2) the sale was effectuated "by
> means of a prospectus or oral communication"; and (3) the prospectus or
> oral communication "include[d] an untrue statement of a material fact or
> omit[ted] to state a material fact necessary in order to make the statements,
> in the light of the circumstances under which they were made, not
> misleading."

*In re Morgan Stanley*, 592 F.3d at 359 (quoting 12 U.S.C. § 77l(a)(2)).  As with section

11, section 12(a)(2) creates liability if a prospectus or registration statement contains "(1)

a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure

obligation; and (3) an omission of information that is necessary to prevent existing

disclosures from being misleading."  *Id.* at 360.  Like claims brought under section 11,

section 12(a)(2) claims are subject to a one-year statute of limitations.  *See* 15 U.S.C. §

77m.  This claim against the Underwriter Defendants is untimely for the same reasons

the section 11 claim is untimely.  *See*, *e.g.*, *Lighthouse Fin. Grp. v. Royal Bank of

Scotland Grp., PLC*, 902 F. Supp. 2d 329, 348 (S.D.N.Y. 2012) ("As Plaintiffs did not

meet their burden to properly allege compliance with the statute of limitations, their

[section 11, 12(a)(2), and 15 of the] '33 Act claims should be dismissed on these grounds

---

unnecessary to reach these arguments.  Nonetheless, it is very difficult to accept
Defendants' arguments about falsity in their entirety.  The Registration Statement
plainly touts the preferred loan business as a core part of XF's business, and a few short
weeks after its issuance, the company announced that it had already begun phasing out
the program.  The timing alone creates an inference of falsity.  But resolving the
question is academic.

alone."), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015).

### C. Section 15 Claim

Plaintiffs also bring a claim against the Individual Defendants, Cogency Global, and XF, alleging liability under section 15 of the Securities Act.  An individual or entity may be liable under section 15 where that individual or entity "control[s] any person liable under sections 11 or 12."  *In re Morgan Stanley*, 592 F.3d at 358 (quotations omitted) (citing 15 U.S.C. § 77o).  "Section 15 liability is derivative of liability under Sections 11 and 12[.]"  *In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 183 (S.D.N.Y. 2012).  Because section 15 claims are derivative, the one-year statute of limitations also applies.  *See In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 522 (S.D.N.Y. 2005) (*citing Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 n.1 (2d Cir. 1993)).  Thus, like Plaintiffs' sections 11 and 12(a)(2) claims, Plaintiffs' section 15 claim is untimely.  *See*, *e.g.*, *Cross v. 21st Century Holding Co.*, 00-CV-4333, 2001 WL 34808272, at *6 (S.D.N.Y. Aug. 6, 2001) ("A necessary element of a cause of action under section 15 is a primary violation of the Securities Act of 1933, such as a violation of section 11. 15 U.S.C. § 77o.  Because the Court has dismissed plaintiffs' section 11 claim as untimely, plaintiffs' section 15 claim necessarily fails. Accordingly, the second cause of action is dismissed.").

## III. Exchange Act

### A. Section 10(b) Claim

Plaintiffs have also asserted a claim under section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against XF and the Management Defendants.  *See*

15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  To state a claim under section 10(b) or Rule 10b-5, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *see also Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–342 (2005).  Plaintiffs must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[.]'"  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (quoting PSLRA).  "The requisite state of mind in a Rule 10b-5 action is "an intent to deceive, manipulate or defraud," *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quotations omitted), otherwise known as scienter.

Plaintiffs can successfully plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* (quotations omitted).  However, "[w]here motive is not apparent, . . . the strength of the circumstantial allegations [of conscious misbehavior or reckless behavior] must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quotations omitted).  As an example, the necessary strong inference of scienter "may arise" where the pleadings sufficiently show that defendants

> (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor[.]

*Novak*, 216 F.3d at 311 (internal citations omitted).  But ultimately, "[t]o qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—

it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

Plaintiffs' fraud theory is that the Management Defendants' failure to disclose the decisions to decrease loan sizes, phase out preferred loans, and implement policy changes—purportedly prior to the IPO—demonstrates scienter since these were decisions that involved executives at the highest level of the company. (AC ¶ 195(b), (d), (f); *see also* AC ¶ 198 (Defendants Tang and Cheng "were responsible for decisions that led to the tightening of credit requirements for loans and the cessation of the preferred loan business.")). Plaintiffs do not base their scienter allegations on a motive and opportunity to commit fraud; they instead argue that the Management Defendants demonstrated conscious misbehavior or recklessness since—given their access to company information—they should have known their public statements were false and failed to correct those public statements.[66]

Plaintiffs' failure to identify contemporaneous reports contrary to the Management Defendants' public statements, and their receipt by those defendants, is fatal to the Exchange Act claims. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309; *see also Johnson v. Siemens AG*, No. 09-CV-5310, 2011 WL 1304267, at *15 (E.D.N.Y. Mar. 31, 2011) ("To establish an inference of scienter, lead plaintiff must do more than allege that the individual defendants or other [] officers had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions, their general responsibility for

---

[66] Opp'n at 25–26.

monitoring [company] activities, and their access to inside information."). Or, Plaintiffs must "provide specific instances in which Defendants received information that was contrary to their public declarations." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (collecting cases). "[A]ccusations [of knowledge or access] founded on nothing more than a defendant's corporate position are entitled to no weight." *Fogel v. Wal-Mart de México SAB de CV*, No. 13-CIV-2282, 2017 WL 751155, at *16 (S.D.N.Y. Feb. 27, 2017) (quotations omitted), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (generalized allegations that a Defendant knew, or should have known, that a fact was being misrepresented "based on their senior positions in the company" or "by holding themselves out as knowledgeable" are insufficient to establish scienter).

The Complaint suggests that the Management Defendants had "access to adverse information" in public filings and documents. (AC ¶ 195(a), (e)). Although several paragraphs include attempts to detail this access, all are vague and conclusory, and do not connect the contradictory information to Management. Regarding preferred loans, Plaintiffs rely on CW1—a line-level employee who worked in a single office that stopped facilitating preferred loans, who heard from another unnamed person at an unknown time that XF would stop facilitating preferred loans at *another* unknown time, and who had no relationship to Management Defendants—to suggest those Defendants had knowledge of a company-wide decision. (AC ¶¶ 86–88). And regarding "loosened" credit requirements and policy changes, Plaintiffs rely on imprecise allegations by CW1 and CW2—line-level employees with no relationship to the Management Defendants

and no apparent insight into company-wide processes, and whose allegations are limited to a few paragraphs—as well as unattributed comments on blogs and online message boards. (AC ¶¶ 77, 99–100). At best, the pleading that Defendants *should have known* about contrary information is limited to the fact that they "spoke frequently" about XF's financial health, delinquency rates, and loan statistics. (Opp'n at 26, 28). But this is not sufficient to raise the necessary inference of scienter.[67] *See, e.g., Plumbers & Steamfitters Loc. 773*, 694 F. Supp. 2d at 300 (allegation that Defendant "received contradictory information because he 'was ultimately in charge of all [business activities]' is too general [to conclude Defendant] had actionable data alerting him to the falsity of his statements.").[68]

---

[67] Plaintiffs' reliance on case law suggesting that "employing a holistic analysis, surely an inference of knowledge may be appropriate, even if not determinative, where it would be 'absurd to suggest that management was without knowledge of the matter[.]'" *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012), does not save their claims. (Opp'n at 25–28). This principle does not permit Plaintiffs to rest on allegations lacking any specificity when making an argument of scienter based on access to allegedly contradictory information. Indeed, in the case Plaintiffs cite, the operative complaint outlined the internal reporting structures that keep management apprised of an involved in the corporate actions relevant to the claim in more detail than is done here—and the court still found that portion of the complaint lacking. *Gen. Elec.*, 857 F. Supp. 2d 367, 382–83, 395–96 ("The flaw in plaintiff's allegations of internal reporting is that they are very vague when describing what specific data about the loan portfolio was passed on to GE Corporate. In order to survive motion to dismiss, plaintiff must allege that Sherin knew or recklessly disregarded the fact that GE had made many loans to subprime consumer borrowers and companies with junk-level bond ratings.").

[68] Plaintiffs also attempt to establish scienter by arguing that Management Defendants knew that XF "had tightened its screening process" and reduced approved borrowers prior to the IPO, yet said that the changes took place later. (AC ¶ 195(c)). But Plaintiffs have failed to identify any contradictory statements that permit an inference of scienter. In November 2018, Cheng suggested that the tightening of the screening process began "starting from Q3." (Nov. 19 Call Tr. at 5; AC ¶¶ 27, 109). Later, in March 2019, Cheng stated that the decrease in approval rates for card loans began in the "middle of" 2018, or, the "second half of 2018[.]" (AC ¶¶ 112, 191; Tr. of XF Fourth Quarter 2018 Earnings Conference Call, attached as Ex. G to Weinstein Decl. at 9). The timing of precisely when this shift occurred is ambiguous, but these allegations are not

Plaintiffs argue that the Management Defendants' statements are attributable to XF for purposes of alleging scienter. But Plaintiffs have failed to adequately plead scienter with respect to the Management Defendants. Accordingly, Plaintiffs have also failed to plead with adequate specificity scienter with respect to XF. And the Exchange Act claim must be dismissed against all Defendants.

### B. Exchange Act: Section 20(a) Claim

Plaintiffs also allege control person liability against the Management Defendants under section 20(a) of the Exchange Act. *See* 15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108. As explained *supra*, Plaintiffs have not pled any viable primary violation of the Exchange Act. Accordingly, the Court recommends that Plaintiffs' section 20(a) claim be dismissed. *E.g., id.* ("ATSI fails to allege any primary violation; thus, it cannot establish control person liability.").

### IV. Leave to Replead

The Court may deny leave to replead where amending claims "would be futile[.]" *Alcatel*, 382 F. Supp. 2d at 535 (quoting *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). "[I]t would be futile for Plaintiffs to replead those claims that the

---

contradictory, nor necessarily inconsistent. The third quarter of 2018 ended at the beginning of September, and began in July, which is arguably consistent with the "middle of" or "second half of" the year. The natural, and strong, competing inference from any mismatch between the timing asserted in these statements is not of fraud, but the use of imprecise language in an attempt to be forthcoming. *See In re Alkermes Pub. Ltd. Co. Sec. Litig.*, No. 21-801-cv, 2021 WL --- (2d. Cir. Dec. 7, 2021) (affirming dismissal for lack of scienter where inference of scienter was not stronger than nonfraudulent inference).

Court dismisses as time-barred[.]" *Id.*; *see also NECA-IBEW Pension Tr. Fund v. Lewis*, 607 F. App'x 79, 81 (2d Cir. 2015). The Court finds Plaintiffs' section 11, section 12(a)(2), and section 15 claims to be untimely. Accordingly, those claims should be dismissed with prejudice.

Rule 15(a)(2) provides that leave to amend be "freely give[n]" in the absence of "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies . . . undue prejudice . . . [or] futility[.]" *Foman v. Davis*, 371 U.S. 178, 182, (1962). Since the Court recommends that Plaintiffs' section 10(b) and section 20(a) claims be dismissed for failure to allege scienter, and the factors that counsel against amendment have not been established, Plaintiffs should be granted leave to replead those claims. *See, e.g.*, *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 248 (S.D.N.Y. 2004) (denying leave to replead certain claims under section 11, section 12(a)(2), and section 14(a), but granting leave to replead claims that were dismissed for failure to adequately plead scienter).

## CONCLUSION

For the reasons stated above, the Court respectfully recommends that Defendants' motion to dismiss be granted as noted.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a

waiver of any further judicial review of the magistrate [judge's] decision.") (quotation omitted).

SO ORDERED.

*/s/ Sanket J. Bulsara*  December 9, 2021
_____
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York