**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| XIANGDONG CHEN, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>X FINANCIAL, YUE TANG, JIE ZHANG, SHAOYONG CHENG, DING GAO, SHENGWEN RONG, ZHENG XUE, LONGGEN ZHANG, RICHARD ARTHUR, COLLEEN A. DEVRIES, COGENCY GLOBAL INC., MORGAN STANLEY & CO. INTERNATIONAL PLC, MORGAN STANLEY & CO. LLC, DEUTSCHE BANK SECURITIES INC., CHINA EVERBRIGHT SECURITIES (HK) LIMITED, CHINA MERCHANTS SECURITIES (HK) CO., LTD., and AMTD GLOBAL MARKETS LIMITED,<br><br>        Defendants. | Case No. 1:19-cv-06908<br><br>Hon. Kiyo A. Matsumoto |

**LEAD PLAINTIFFS' OBJECTION TO THE REPORT AND RECOMMENDATION**
**REGARDING DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   FACTUAL STATEMENT ....................................................................................... 2

      A.    Company and Regulatory Background ....................................................... 3

      B.    XF Begins to Transform its Business Prior to the IPO ............................. 4

      C.    XF's Misleading IPO ................................................................................ 5

      D.    XF Slowly Reveals The Truth ................................................................... 6

III.  STANDARD OF REVIEW ..................................................................................... 7

IV.   ARGUMENT .......................................................................................................... 9

      A.    Plaintiffs' Claims for Violations of the Securities Act are Timely ........... 9

            1.    Misstatements and Omissions Regarding Prime Borrowers and
                  Delinquency Rates ......................................................................... 11

            2.    Misstatements and Omissions Regarding Preferred Loans ........... 12

            3.    Misstatements and Omissions Regarding Card Loans ................... 14

      B.    Plaintiffs Have Sufficiently Pled Scienter .............................................. 15

      C.    The Recommendation Should Have Granted Leave to Amend the Securities Act
            Claims ..................................................................................................... 19

V.    CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................7

*Bos. Ret. Sys. v. Alexion Pharm., Inc.*,
No. 3:16-cv-2127(AWT), 2021 WL 3675180 (D. Conn. Aug. 21, 2021) ...............................19

*Chill v. Gen. Elec. Co.*,
101 F. 3d 263 (2d Cir. 1996)..............................................................................16

*Christine Asia Co. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) ...........................................................................17

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020).................................................................19

*Doubleline Capital LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)................................................................15

*Edrei v. Maguire*,
892 F.3d 525 (2d Cir. 2018)................................................................................17

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)...............................................................................9, 13

*Freeman v. HSBC Holdings PLC*,
413 F. Supp. 3d 67 (E.D.N.Y. 2019) ..................................................................7

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)............................................................................8, 15

*Gorman v. Consol. Edison Corp.*,
488 F.3d 586 (2d Cir. 2007)...............................................................................19

*Halberg v. United Behavioral Health*,
408 F. Supp. 3d 118 (E.D.N.Y. 2019) ................................................................7

*Herman & Maclean v. Huddleston*,
459 U.S. 375 (1983)..............................................................................................8

*Horowitz v. Sunlands Tech. Grp.*,
   No. 19-CV-3744 (FB) (SMG), 2021 WL 1224517 (E.D.N.Y. Mar. 31, 2021)......................10

*Hutchison v. Deutsche Bank Sec. Inc.*,
   647 F.3d 479 (2d Cir. 2011)..........................................................................................8

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010).........................................................................10

*In re Ashanti Goldfields Sec. Litig.*,
   184 F. Supp. 2d 247 (E.D.N.Y. 2002) .......................................................................17

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011).........................................................................16

*In re Campbell soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ...........................................................................17

*In re Carter-Wallace, Inc., Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000)..........................................................................................16

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
   543 F.3d 150 (3d Cir. 2008).......................................................................................10

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)..........................................................................8

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)..........................................................................................16

*In re Supercom Inc. Sec. Litig.*,
   No. 15 CIV. 9650 (PGG), 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018)...............18

*Kalnit v. Eichler*,
   264 F. 3d 131 (2d Cir. 2001)......................................................................................16

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) ..............................................................................8

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*,
   318 F.3d 148 (2d Cir. 2003).......................................................................................15

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011).........................................................................................8

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010)....................................................................................................10

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999)......................................................................15, 16

*NECA IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2014), *cert. denied*, 568 U.S. 1228 (2013)...............................8

*Newman v. Warnaco Grp., Inc.*,
   335 F.3d 187 (2d Cir. 2003)...........................................................................................11

*Novak v Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...........................................................................................17

*Ret. Sys. of Gov't of V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)...........................................................................................16

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).............................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...........................................................................................7, 8, 18

*Thea v. Kleinhandler*,
   807 F.3d 492 (2d Cir. 2015)...........................................................................................19

**Statutes**

15 U.S.C. §77i(a) ..............................................................................................1, 2, 8, 9

15 U.S.C. §77k.................................................................................................2, 8, 9, 15

15 U.S.C. §77m..........................................................................................................9

15 U.S.C. §77o.................................................................................................2, 9, 15

15 U.S.C. §78j(b).............................................................................................2, 8, 19

15 U.S.C. §78t(a) ................................................................................................2, 19

28 U.S.C. §636(b)(1)(C) ....................................................................................................7

17 C.R.F. § 240.10b-5........................................................................................................2

Private Securities Litigation Reform Act.........................................................................8

**Rules**

Fed. R. Civ. P. 9(b) ..........................................................................................................8

Fed. R. Civ. P. 12(b)(6)...............................................................................................7, 17

Fed. R. Civ. P. 72.............................................................................................................1, 7

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, Lead Plaintiffs Xiangdong Chen and Ke Zheng ("Plaintiffs") hereby respectfully object to the Report and Recommendation ("Recommendation") of the Honorable Sanket J. Bulsara, U.S. Magistrate Judge, regarding Defendants' Motion to Dismiss ("Motion") this securities class action.[1] (ECF No. 94.) In the Recommendation, Judge Bulsara determined that Plaintiffs' claims under the Securities Act of 1933 were time barred and should be dismissed with prejudice[2] and that Plaintiffs' claims under the Securities Exchange Act of 1934 should be dismissed with leave to replead. For the reasons below, Plaintiffs respectfully object to the Recommendation.

## I.      PRELIMINARY STATEMENT

This case is about one of many Chinese peer-to-peer ("P2P") lenders that misled the market about its financial prospects in light of increasing regulations in China. X Financial ("XF" or the "Company") promoted itself as one of the only companies that was going to thrive despite Chinese regulations. However, prior to the Company's September 19, 2018 initial public offering ("IPO"), though undisclosed to investors at the time of the IPO, the Company was already making changes to its business model.

XF's business model depended on approving borrowers that were likely to repay investors. If these borrowers did not repay, XF was on the hook for the money. As Chinese regulations were beginning to put a crimp in the Company's business model by restricting the amount it could lend and the fees it could charge, XF needed to present investors positive data and optimistic statements. In the first half of 2018, Defendants loosened their approval standards so they could post large

---

[1] Citations to the Amended Class Action Complaint (ECF No. 22) (the "Complaint") are in the form of "¶__." All capitalized terms not otherwise defined have the meaning they were assigned in the Complaint.

[2] The Recommendation adjudicates the Section 12 claim originally pled, but that claim was voluntarily dismissed previously. (ECF No. 64.)

loan facilitation figures, which were presented as part of the Registration Statement.  Then, shortly before the IPO, in light of increasing delinquencies, the Company decided to eliminate its second largest product line (preferred loans), reduce the amount of funds provided by its largest product line (card loans), and tighten its approval process.  None of this was disclosed in the Registration Statement, which instead promoted the Company as one that targeted "prime" borrowers, thus reducing delinquencies, and had a growing preferred loans business.

The Recommendation does not find the statements in the Registration Statement were accurate disclosures, as the public is entitled to under the securities laws.  In fact, the Recommendation states: "it is very difficult to accept Defendants' arguments about falsity in their entirety.  The Registration Statement plainly touts the preferred loan business as a core part of XF's business, and a few short weeks after its issuance, the company announced that it had already begun phasing out the program.  The timing alone creates an inference of falsity." (Recommendation at 24-25 n.65.)  Rather, the Recommendation finds that the Securities Act claims are time barred and the Exchange Act claims are insufficient for failure to sufficiently allege scienter. Respectfully, Plaintiffs disagree with these findings and argue that the allegations in the Complaint are sufficient and timely.

## II.     FACTUAL STATEMENT

This is a class action on behalf of all persons or entities who: (1) purchased or otherwise acquired XF ADSs pursuant and/or traceable to the Company's September 19, 2018 IPO seeking to pursue remedies under §§11, 12(a) and 15 the Securities Act of 1933 (the "Securities Act"); and (2) purchased or otherwise acquired XF ADSs during the period from September 19, 2018 through and including May 20, 2019, seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5.

2

### A.      Company and Regulatory Background

XF is a finance technology company based in Shenzhen, China that operates a P2P platform that matches borrowers and lenders.  (¶62.)  The Company's primary source of revenue is charges for its loan facilitation services—it charges a fee, which is a percentage of the loan amount, for facilitating and processing loans between the two groups on its platform.  (¶66.)

The Company had two major sources of revenue – card loan and preferred loan products.  (¶83.)  XF derived 36.7% of its revenues in 2017 from card loans, making it the Company's largest product.  (*Id.*)  Preferred loans were, at the time of the IPO, the Company's second largest product, accounting for 22.6% of the Company's revenues in 2017.  (¶84.)

XF was one of many P2P platforms that flourished in China with very few regulations to cramp its usurious practices.  (¶¶67-69.)  It promised investors high returns and charged high fees to its borrowers.  (*Id.*)  However, there was massive fraud in the industry and regulators stepped in to stem the tide of difficulties.  (¶69.)

In August 2016, the Chinese Banking Regulatory Commission, in conjunction with other regulators, issued: "Interim Measures for the Administration of the Business Activities of Online Lending Information Intermediary Institutions" (the "Interim Measures"), which had to be adhered to as of June 2018.  (¶¶70-72.)  As relevant to this case, the Interim Measures capped the amount that individuals and businesses were allowed to borrow on a P2P platform.  (¶71.)

This was not the only regulation that impacted XF.  Following regulations in December 2017, the company had to adjust the annualized fee rates of all new loans downward so it would not exceed 36%.  (¶73.)  Additionally, in June 2018, relevant offices in Beijing, set out goals to reduce the number of P2P companies and the business scale of those companies.  (¶74.)

Yet, while many other P2P lenders flailed and/or shuttered, XF seemingly continued to grow.  (¶75.)  The Registration Statement laid out a compelling portrait of a Company on the rise.

3

(*Id*.)  XF marketed itself as more attractive to investors because it was backed by insurance offered by a company named ZhongAn.  (¶¶79-82.)

### B.      XF Begins to Transform its Business Prior to the IPO

By the time XF went public on September 19, 2018, the Company had already begun transforming itself to fit into the new regulatory regime.

Preferred loans were greatly impacted by the Interim Measures because of the significant cap it put on the Company's ability to lend.  (¶85.)  Whereas previously the Company could lend RMB600,000 to an individual, after June 2018 it could only lend RMB200,000.  (*Id*.)

Right up until the implementation of the Interim Measures, Confidential Witness #1 (CW1), who worked in credit risk control at XF, stated he was told by his manager to be less detailed in his review of potential borrowers.  (¶77.)  This helped increase XF's numbers prior to the IPO.  (¶78.)  However, starting in June 2018, CW1 noted that demand fell substantially for preferred loans because the amount that could be borrowed was no longer a game-changer for people. (¶87.)  Prior to his departure in October 2018—*the month after the IPO*—he learned the Company was no longer going to be facilitating preferred loans.  (¶86.)  Defendants would not admit they had discontinued this product until May 21, 2019, seven months later.  (¶133.)

There were additional problems with XF's bottom line. XF touted its ability to target prime borrowers, but witnesses actually cited the laxness of procedures in the first half of 2018.  (*E.g.*, ¶¶77, 97-99.)  This laxness led XF to have the highest delinquency rates of peer companies, despite it promoting its ability to appropriately assess risk of default.  (¶98.)  When a borrower defaulted, a third-party insurer reimbursed the investor, but had recourse to XF, subject to certain caps.  (¶102.)  These penalties greatly impacted XF's bottom line—sometimes leading XF to pay the third-party more than it collected from borrowers.  (¶103.)

4

One bright spot for XF in this regulatory world was that card loans, its largest product line and one essential to its balance sheet, was not particularly impacted by the Interim Measures because its loan size was already below the limit required by the government. (¶122.)  However, given the difficulties XF was having with repayment, they had to make changes.  Prior to the IPO, though not disclosed to investors, the Company reduced the size of card loans and also tightened its approval process.  (¶¶124-130.)  The approval process changes had a tremendous impact on the Company's user base.  (¶128.)

### C.    XF's Misleading IPO

While XF was constricting behind-the-scenes, the Registration Statement created a rosy picture of the Company's prospects.

The Registration Statement stated how preferred loans were to be part of the Company's "growth," despite XF deciding to discontinue them prior to the IPO.  (¶112.)  While the Company noted poor July 2018 and August 2018 figures in a "Recent Developments" section, it blamed these low figures on the macro environment solely and not any internal decisions.  (¶¶24, 123.)  In fact, the Registration Statement said that the Company was already "recovering" and "improving."  (¶123.)  In reality, the Company's active users were on track to decline by 29% during the third quarter of 2018—which ended a mere eleven days after the IPO.  (¶179.)

The Registration Statement failed to mention that XF had already decided to: (i) limit the amount of card loans it was distributing; (ii) reduce the size of the card loans; and (iii) phase out the preferred loan business.  (¶¶20, 79-130.)  These decisions would substantially impact the Company's bottom line, but were hidden from investors.  The Registration Statement also repeatedly emphasized the Company's credit procedures and its ability to target "prime" borrowers, the type who would not default.  (¶¶9, 13, 97; 143-153.)

5

**D.      XF Slowly Reveals The Truth**

On November 19, 2018, the Company released its earnings for the period ending September 30, 2018 (the "Q3 2018 Earnings"), a period that ended eleven days after the IPO. (¶23.)  The Q3 2018 Earnings provided bad news for the Company, including a 21% decrease in the numbers of loans facilitated quarter-to-quarter and a decrease of 32% in the value of those loans quarter-to-quarter.  (¶179.)  But, on an earnings call that day (the "November 19 Call"), Defendants primarily blamed market conditions.  (¶26.)

On the November 19 Call, the Company said moving forward, due to sky-rocketing delinquency rates, it would be tightening its credit policy so less borrowers would be approved, and it had already consciously reduced the average loan size.  (¶¶109, 185-186.)  However, Defendants also misleadingly assured investors that the credit problems were behind them and growth was on the horizon.  (¶182-183, 201.)  The stock price increased on these reassurances, despite the Company's poor financial results.  (¶201.)

In subsequent financial reports, XF shed further light on the problems that began before the IPO.  (¶¶176-194.)  For example, the earnings report for the fourth quarter of 2018 ("Q4 2018 Earnings"), noted that delinquencies were still on the rise, with loans issued just prior to the IPO particularly burdensome.  (¶¶110, 114.)  Cheng also belatedly admitted the Company had tightened its approval process since the middle of 2018—prior to the IPO and before the Company previously said that move had taken place—thereby reducing the number of approved borrowers and impacting the Company's bottom line in a way not disclosed in the Registration Statement. (¶112.)  Defendants had previously stated that was going to happen from Q3 2018 on, as a preventative measure.  (¶109-110.)  Then, on May 21, 2019, Defendants finally admitted their financial figures were also falling because the Company had discontinued preferred loans—a decision made prior to the IPO but not disclosed until that day.  (¶¶131-134.)

6

The initial complaint in this action was filed on December 9, 2019.  (ECF No. 1.)

### III.        STANDARD OF REVIEW

Pursuant to Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. §636(b)(1)(C), this Court reviews *de novo* the portions of the Recommendation to which a party objects.  *See, e.g., Halberg v. United Behavioral Health*, 408 F. Supp. 3d 118, 130 (E.D.N.Y. 2019) ("When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected.").  In so doing, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  The Court "may also receive further evidence or recommit the matter to the magistrate judge with instructions."  *Id.*  An objection that "asserts that the magistrate judge committed legal error in failing to adopt a previously presented argument" generally warrants de novo review.  *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 76 (E.D.N.Y. 2019) (citing *Moss v. Calvin*, 845 F.3d 516, 519 n.2 (2d Cir. 2017)).

To withstand a motion to dismiss, a plaintiff's allegations need only be "plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Additionally, a court is not free to dismiss based on its "disbelief of a complaint's factual allegations."  *Twombly*, 550 U.S. at 555-56.  Rather, courts must engage in "comparative

assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true." *Tellabs*, 551 U.S. at 326-27. Courts must also draw "all reasonable inferences in the plaintiffs' favor." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

Section 11 of the Securities Act places "a relatively minimal burden on a plaintiff." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983). Section 11 imposes liability if "any part" of a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading." 15 U.S.C. § 77k(a). To state a Section 11 claim, a plaintiff need only establish one of the following: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011). "Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims which—unless they are premised on allegations of fraud—need not satisfy the heightened particularity requirements of Rule 9(b)." *NECA IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 57 (2d Cir. 2014) (collecting cases) (emphasis added), *cert. denied*, 568 U.S. 1228 (2013). "Nor do the heightened pleading standards of the Private Securities Litigation Reform Act apply to such non fraud claims." *Id.* (citing 15 U.S.C. § 78u 4(b)(1)–(2)).[3] Here, Plaintiffs have alleged non-fraudulent bases for § 11 liability, including the simple fact that Defendants negligently signed a Registration Statement which contained

---

[3] *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (finding careful division of Section 11 and Section 10(b) claims, such as the one present in the instant complaint, instructive); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005) (finding that Rule 9(b) did not apply where Section 11 "claims [were] not 'grounded in fraud' because Plaintiffs allege[d] a basis for Section 11 liability other than fraud; i.e., the omission of a material fact from the Registration Statement.")..

untrue facts and material omissions.  (¶¶15, 140, 208-214.)  The Recommendation did not reach the issue of pleading standard.  (Recommendation at 14 n.61.)

## IV.      ARGUMENT

### A.      Plaintiffs' Claims for Violations of the Securities Act are Timely[4]

Under Section 13 of the 1933 Act, a plaintiff's claims are timely if "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]"  15 U.S.C. § 77m.  "A securities-law violation is discovered when the plaintiff learns 'sufficient information about [the violation] to. . . plead it in a complaint' with enough 'detail and particularity to survive a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss.'"  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).  In order for the statute of limitations to begin to run, given "the totality of the circumstances," *id.* at 120, the information provided must be "specific enough to provide an ordinary investor with indications of the *probability* (not just the *possibility*) of a violation."  *Id.*  (emphases in original; internal quotations omitted).  "[A] reasonable plaintiff on inquiry notice would conduct further investigation, but the limitations period begins to run only when, in the course of that investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately."  *Id.*  It is Defendants' burden to establish that "a reasonable investor . . . would have conducted a fulsome investigation and uncovered information sufficient to make out a plausible claim" by the relevant date.  *Id.* at 122.  "Determining when a claim accrues often requires a fact-intensive inquiry, and so a motion to

---

[4] In this Objection, Plaintiffs are only addressing the aspects of the claims the Recommendation based its decision on. If the Court would like further briefing on any other aspect of the case, Plaintiffs will happily oblige.

dismiss will only be granted where uncontroverted evidence irrefutably demonstrates that the plaintiff discovered or should have discovered facts sufficient to adequately plead a claim." *Horowitz v. Sunlands Tech. Grp.*, No. 19-CV-3744 (FB) (SMG), 2021 WL 1224517, at *2 (E.D.N.Y. Mar. 31, 2021) (*quoting Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 641 (S.D.N.Y. 2017) (internal quotations omitted)).    Additionally, as the Supreme Court has reinforced: "reassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns."  *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.,* 543 F.3d 150, 168 n.14 (3d Cir. 2008), aff'd *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).[5]

Plaintiffs allege three categories of material misstatements and omissions within the Registration Statement: (i) material misstatements and omissions regarding XF's ability to target investors able to repay loans and the Company's increasing delinquency rates; (ii) material misstatements and omissions regarding Preferred Loans; and (iii) material misstatements and omissions regarding Card Loans.  (¶¶138-172.)  While recognizing limited disclosures occurred on November 19, 2018, the Complaint makes clear why those disclosures were not enough for a reasonably diligent investor to have pled a securities claim that day with regard to any of these categories of misstatements.

As a preliminary matter not addressed in the Recommendation but plainly alleged in the Complaint (¶201) and squarely addressed in Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint (ECF No. 71 at 23), after the November 19, 2018 disclosures,

---

[5] *See also In re Ambac Fin. Grp., Inc. Sec. Litig*., 693 F. Supp. 2d 241 (S.D.N.Y. 2010) (even under the "storm warnings" pleading requirement, "storm warnings" do not place investors on inquiry notice when accompanied by "'reliable words of comfort from management' such that an investor of ordinary intelligence would reasonably have relied on the statements to allay his or her concern.").

the XF stock price went up.  A stock increase supports a finding that an investor is ***not on notice*** of a possible claim. *See Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 195 (2d Cir. 2003).  This is but one reason the Recommendation is incorrect.

> **1.    Misstatements and Omissions Regarding Prime Borrowers and Delinquency Rates**

The Complaint clearly states that while the Registration Statement admitted delinquencies were on the rise, it "did not explain to investors that this increase in delinquency was a growing trend that was continuing at the time of the IPO, nor did it disclose that X Financial was making policy changes because of the delinquency increases[.]"  (¶106.)  The Complaint then goes on to state: "X Financial would admit on the November 19 Call that delinquency rates for preferred loans were greatly exceeding the Company's internal expectations.  The rate of delinquency on card loans was also high."  (¶108.)  The Recommendation with regard to delinquency rates is based solely on these two paragraphs.  (Recommendation at 19-20.)  The Recommendation erred on this front in two ways.

***First***, the Recommendation asserts "there is nothing in the Complaint alleging there was additional information about delinquencies disclosed after the November 19 Call." (Recommendation at 20.)  However, that this finding is incorrect, as the Complaint does indeed reference additional disclosures about delinquencies.  The Complaint discusses the shocking delinquency rates disclosed on March 19, 2019, as part of the Company's Q4 2018 Earnings, and April 25, 2019, as part of the Company's annual report for 2018.  (¶¶30, 110, 118-119.)  Also, the Recommendation ignores the key disclosure about delinquencies that occurred on the March 19 Call.  On the March 19 Call, Defendant Zhang explained that this rise in delinquencies was ***the result of loans facilitated in June and July 2018, shortly before the IPO***.  (¶114.)  Therefore, while the Registration Statement stressed X Financial's ability to target borrowers who could repay

11

loans, on March 19, 2019, the Company finally admitted that right before the IPO, they were distributing loans to people who did not have the ability to repay their obligations. Defendant Cheng further made the shocking admission that these delinquencies, "particularly for [the] preferred loan," resulted in the Company "*compensat[ing] ZhongAn more than [it] collected from the borrowers*." (¶115.)

*Second,* the Recommendation calls Defendants' assurances on November 19 "generic" (Recommendation at 23), but they were anything but. When analysts were concerned about the default figures and how they might impact the Company going forward, Tang specifically and pointedly dismissed these concerns by stating: "For the existing loan book, because our risks are fully provisioned and fully being sell to the customers covered by the insurance company, so you actually don't need to worry about the existing loan book that much." (¶118.) It was not until March 19 that the Company revealed that delinquencies on the existing book were plaguing the Company to such an extent that the Company was paying out more in insurance than it was collecting from borrowers. (¶115.)

### 2.    Misstatements and Omissions Regarding Preferred Loans

The Complaint admits, as it must have in order to be transparent with the Court, that "[o]n the November 19 Call to discuss the earnings, Defendant Tang told investors that demand for loans had dried up, prompting significant reductions in preferred loans '*over the last three quarters*' (*i.e.*, the last nine months), stating: "'Then on the preferred loan, because of the operating environment for SME owners are very difficult these days, and our preferred loan did suffer a higher than-expected loss than our earlier estimate. And as a result, actually, over the last three quarters, we have been consistently reduced our [sic] preferred loan business.'" (¶94.) That did not alert the market that preferred loans were being eliminated. A reduction in a product line does not indicate a prior decision to eliminate the product line.

12

During oral argument, and in the Recommendation, the explanatory line that follows the quote in the Complaint was highlighted.  That line, written by counsel, states: "In other words, rather than growing, preferred loans were being intentionally phased out."   (¶94; *see also* Recommendation at 6; Tr. 31-33.)  As explained at oral argument, that explanatory statement in the Complaint was drafted by Plaintiffs' counsel with the benefit of hindsight.  (Tr. 31-33.)

The Recommendation accuses Plaintiffs of engaging in "semantics" by debating the words "phase out" versus "elimination."  (Recommendation at 18.)  But that obscures the point – the fact is the Complaint clearly alleges that, while XF had already decided to stop offering preferred loans at the time of the IPO, all that was disclosed on November 19 is that XF "had consistently reduced [their] preferred loan business."  (¶94.)  That was the sole relevant November 19 disclosure.[6]  It was not until May 21, 2019 that the Company disclosed it had "discontinued that product line." (¶113.[7])  Plaintiffs clearly assert in the Complaint that the decision to discontinue the product line was made prior to the IPO, but undisclosed.  (¶¶86, 155-161.)  A reduction does not signal to investors a discontinuance.  *See Nomura*, 873 F.3d at 120 ("Generalized knowledge that

---

[6] The Court references another disclosure – one outside the Complaint – in which Defendant Tang stated that "to understand [XF's] business going forward," investors should just focus on card loans." (Recommendation at 19 n.63 (*citing* ECF No. 70-2 at 5-7, a transcript of the November 19 Call attached to the Declaration of Brian S. Weinstein in Support of Defendants' Motion to Dismiss).)  While the Court finds this statement "could only be interpreted as meaning that the loans had been eliminated," this is not the only reasonable inference in the context of the quote.  That quote was given in answer to a question about delinquency rates no longer being reported separately for each type of loan. (¶84 n.4.)  In that same answer, Defendant Tang stated "if you look at the newly facilitated loan, our card loan is a dominant part of our business. . . That's the reason I think we feel this is a better way to present our business, just on the combined basis." ECF No. 70-2 at 7.  Defendant Tang stating the Company was presenting preferred loans and card loans on a "combined basis" meant that both type of loans were being offered and were simply being presented to the investing public as one unit as to not highlight any imbalance between the two types of loans.  It did not indicate elimination of preferred loans.

[7] While, as of May 2019, the Company reported the product was still given to certain repeat borrowers, later corporate filings state it ceased being offered completely later in 2019.

originators issued some defective loans alone would not cause a reasonable investor to believe necessarily that his or her particular" investments "were backed by such loans" absent disclosure "Defendants' loan-selection processes were also defective."). The revelation of a reduction in a product line would not put a reasonably diligent plaintiff on notice of an elimination of that product line. This is especially so when the "market turmoil" blamed for the reduction was supposedly behind the Company. (¶¶26, 177, 183, 201.)

### 3. Misstatements and Omissions Regarding Card Loans

The Recommendation lumps multiple types of statements about card loans together in a way the Complaint does not. (*Compare* Recommendation at 20-21 *with* ¶¶109, 125-127.) The Complaint does state that on the November 19 Call, XF alerted the public that it had previously "***consciously reduced*** [its] average loan size." (¶125.) But the Complaint also states that on the November 19 Call, XF stated it would "tighten [the] credit policy" and "reject more applications" as preventative measures. (¶109.) These things are not, contrary to what the Recommendation seems to conclude, the same. The former is about the amount of credit the Company would loan to an individual borrower (*i.e.*, the Company's average *per capita* liability per loan); the latter is about the number of applications the Company would approve overall. Nothing in the November 19 Call informed investors that prior to the IPO the Company was already rejecting more potential borrowers.

***Second,*** again here the Defendants' assurances were not "generic." (Recommendation at 23.) Both Defendants Tang and Cheng explained that even the decision to reduce the loan size was the result of a poor credit environment. (¶127.) And the Company reassured investors that the company had already rebounded and "market turmoil" was no longer "at its peak." (¶¶127, 183.) Tang stressed the Company had a bright future: "We are very early in our growth curve and believe in the long term there is tremendous potential in this market." (¶184.) This was more than

14

puffery – these statements prevented the stock from dropping despite negative financial results. (¶201.)  This case is clearly distinguishable from *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148 (2d Cir. 2003) ("*LC Capital*").  (Recommendation at 24.)  Unlike this case, *LC Capital* centered on an insurance company that was frequently taking large reserve charges.  318 F.3d at 150.  The *LC Capital* Court found that the recurring nature of the problem "indicate[ed] the likelihood of either a fundamental defect in the company's reserve methodology or the company's refusal to face reality" and therefore plaintiffs should not have been reassured by vague statements that the problem was behind the Company.  *Id.* at 156.  Here, Plaintiffs had little reason to not believe X Financial.  There was a well-publicized market problem in China in the summer of 2018.  When X Financial blamed the "market turmoil" for its issues, a reasonably diligent investor would not have had sufficient reason to doubt the Company.  *See Doubleline Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 438 (S.D.N.Y. 2018) (discussing how denials of problems can "allay[] a reasonable investor's concerns"); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999) ("[C]ourts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements").

Accordingly, Plaintiffs respectfully object to the Recommendation's conclusion that Plaintiffs have not adequately alleged timely claims under the Securities Act.[8]

### B.    Plaintiffs Have Sufficiently Pled Scienter

The Recommendation too easily accepts Defendants' framing and fails to draw "all reasonable inferences in the plaintiffs' favor."  *Ganino*, 228 F.3d at 161.  To plead scienter in a

---

[8] The Recommendation held that that Plaintiffs' Section 15 claims were untimely for the same reasons as their Section 11 claims.  (Recommendation at 26.)  Plaintiffs respectfully object to that finding for the reasons detailed with regard to Section 11.  The same objection applies with regard to the findings in the Recommendation about Plaintiffs' allegations regarding Defendants' violations of Item 303 and Item 105.  (Recommendation at 21 n.64.)

securities fraud claim, a complaint may *either* (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud. *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (citation omitted). "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak v. Kasaks*, 216 F.3d 300, 308, 311 (2d Cir. 2000)). Alternatively, a complaint adequately pleads a reckless omission if it alleges that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* at 308; *see also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 486 (S.D.N.Y. 2011) (quoting *Novak*, 216 F.3d at 311). "An egregious refusal to see the obvious" is a hallmark of recklessness. *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000) (quoting *Chill v. Gen. Elec. Co.*, 101 F. 3d 263, 269 (2d Cir. 1996)). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit v. Eichler*, 264 F. 3d 131, 142 (2d Cir. 2001) (citations omitted).

Recklessness exists if one "knew facts or had access to information suggesting that their public statements were not accurate." *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). The Recommendation opines that to meet this standard Plaintiffs have to allege (and thus, to have the capacity to know about) a specific report that went to management. (Recommendation at 28-30.) But that standard, before discovery, places too high a burden on Plaintiffs. Here, "it is virtually inconceivable" that defendants would not have known the

16

information.  *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (reversing a lower court's dismissal of a complaint and finding, for scienter purposes, an important threat to the company necessarily would have been communicated to senior level management).

The Court refers to the Complaint's confidential witnesses as "line level employees," just as Defendants had in their Motion to Dismiss.  Specifically, with regard to scienter and preferred loans, the Recommendation states that Plaintiffs rely only on "a line-level employee who worked in a single office that stopped facilitating preferred loans, who heard from another unnamed person at an unknown time that XF would stop facilitating preferred loans at another unknown time, and who had no relationship to Management Defendants."  (Recommendation at 29.) [9]  Preferred loans were the Company's second largest product and their discontinuance was credited as the reason the Company's loan balance (a key metric) was not growing.  (¶¶9, 33.)  Surely the most plausible inference is that the decision to stop facilitating preferred loans at a major location was made by – or should have at least been known by – top executives.  Especially when those executives were frequently speaking about preferred loans.  *See In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 270 (E.D.N.Y. 2002) (defendant's public statements regarding a company's investments

---

[9] By accepting Defendants' characterization of Plaintiffs' confidential witnesses in deciding a Rule 12(b)(6) motion to dismiss, the Recommendation appears to have reversed the *Twombly/Iqbal* presumption, having accepted Defendants' characterizations as true, while not accepting Plaintiffs' well-pleaded allegations as true.  *See Edrei v. Maguire*, 892 F.3d 525, 537 (2d Cir. 2018) (on a motion to dismiss, the Court "must accept as true" the "plaintiffs' account" of the facts).

The specificity of the Complaint's allegations "strongly suggests that Plaintiffs, without the benefit of discovery, have adequately investigated and substantiated their allegations and, as a result, have allayed the PSLRA's concerns about frivolous and abusive fraud suits."  *In re Campbell soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 595-96 (D.N.J. 2001).  *See also Novak*, 216 F.3d at 314 ("Imposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them.").

demonstrate personal knowledge of investments). In fact, when talking about preferred loans, Defendant Tang – the Company's founder, CEO and Chairman of the Board of Directors – embraced decisions about preferred loans as full Company decisions by using the term "we" when referencing them. *E.g.*, ¶94 (Defendant Tang: "we have been consistently reduced our [sic] preferred loan business."); ¶133 (Defendant Tang: "we literally discontinued" preferred loans).

Likewise, the Recommendation twice mentions Defendant Tang's statement that the Company "***consciously reduced*** [its] average loan size[.]" (Recommendation at 20-21).[10] This was not a decision by a line level employee. The reasonable inference is that Tang knew of this "conscious reduc[tion]," which he and other executives even explained the reasoning behind. (¶¶125-17, 133.)

When "assess[ing] all the allegations holistically," *Tellabs*, 551 U.S. at 310, it is clear Plaintiffs have adequately alleged scienter. This is supported by the importance of these matters to the Company. "Under the core operations theory, a court may infer 'that a company and its senior executives have knowledge of information concerning the core operations of a business,' such as 'events affecting a significant source of income.'" *In re Supercom Inc. Sec. Litig.*, No. 15 CIV. 9650 (PGG), 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018) (*quoting In re Express Scripts Holding Co. Sec. Litig.*, No. 16 CIV. 3338 (ER), 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017)). There is no question that card loans and preferred loans (the Company's number one and number two offerings at this time) were part of the core operations of the Company. Likewise, nothing could have been more important to X Financial than the Company's skyrocketing delinquency rates, which were at this point causing the Company to pay more to an insurer than it

---

[10] The Court highlighted this quote to show that information about loan size was public as of November 2019, which does not impact Plaintiffs' 10(b) claim.

collected from borrowers.  The importance of these matters "enhances the strong inference of scienter" already pled.  *Bos. Ret. Sys. v. Alexion Pharm., Inc.*, No. 3:16-cv-2127(AWT), 2021 WL 3675180, at \*23 (D. Conn. Aug. 21, 2021); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 423-424 (S.D.N.Y. 2020).

Therefore, Plaintiffs respectfully object to the Recommendation's holding regarding scienter.[11]

## C.   The Recommendation Should Have Granted Leave to Amend the Securities Act Claims

Alternatively, Plaintiffs also respectfully suggest that in its exercise of discretion, the Court should have granted leave to amend on all claims, not solely Plaintiffs' Exchange Act claims. Leave to amend "should be freely granted when justice so requires." *Thea v. Kleinhandler*, 807 F.3d 492, 496 (2d Cir. 2015) (internal quotation marks and citations omitted).  "Where the denial of leave to amend is based on the resolution of legal questions," as here, then "'a reviewing court conducts a *de novo* review.'"  *Id.* (quoting *Hutchison*, 647 F.3d at 490).  *See also Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007) (reviewing *de novo* district court's denial of motions for leave to amend as futile, as such a finding is a legal determination).  Although Magistrate Judge Bulsara correctly recognized that certain courts have not granted leave to amend based on futility when claims were dismissed on statute of limitations grounds (Recommendation at 32), this case is distinguishable.

---

[11] The Recommendation held that since the Court found that Plaintiffs had not sufficiently alleged scienter under Section 10(b) of the Exchange Act, Plaintiffs did not adequately allege a primary violation upon which to base their claims under Section 20(a) of the Exchange Act. (Recommendation at 31.)  Because Plaintiffs contend that the Court incorrectly held that Plaintiffs did not adequately allege scienter under Section 10(b), Plaintiffs respectfully assert that the Court's ruling with respect to Plaintiffs' Section 20(a) claim was also incorrect.

19

In this case, the Court found that the Securities Act claims were untimely because of partial disclosures less than thirteen months before the initial complaint was filed. (*See supra* at A.) In conjunction with that finding, the Recommendation criticized the pleading itself. (*See, e.g.,* Recommendation at 18-19 ("The Court is at a loss to discern the difference between elimination and 'phasing out' of a program—both lead to the end of the product offering. If the distinction is one of timing, the Complaint does not rely on that difference. . . the terms 'phasing out' and 'elimination' of the preferred loans are used interchangeably by Plaintiffs in the Complaint and their briefs."); 20 ("their Complaint undermines their argument"); 23-24 (discussing that the Complaint allegedly relies on the November 19 disclosures to enhance falsity allegations).) As detailed *supra* at A, Plaintiffs respectfully disagree with the Court's criticisms, however the Court's assertion of them indicates that a new pleading may ameliorate some of the Court's concerns and increase the clarity of the allegations.

Consequently, Plaintiffs believe it would not be futile to amend the Complaint in its entirety, if the Court believes any amendment is necessary.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully object to Magistrate Judge Bulsara's Recommendation.

Dated: December 23, 2021

**POMERANTZ LLP**

*/s/ Cara David* ____
Jeremy A. Lieberman
Cara David
600 Third Ave., 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com
      cdavid@pomlaw.com

20

*Lead Counsel for Lead Plaintiffs*

**HAO LAW FIRM**

Junbo Hao
Beijing Hao Junbo Law Firm
Rom 3-401 No.2 Building
No.1 Shuangliubei Street
Beijing, PR China 100024
Telephone: 0086 137 18052 888
Email: jhao@haolaw.cn

*Additional Attorneys for Lead Plaintiffs*

21