UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

XIANGDONG CHEN, Individually and
On Behalf of All Others Similarly Situated,

             Plaintiff,

             v.

X FINANCIAL, YUE TANG, JIE ZHANG,
SHAOYONG CHENG, DING GAO,
SHENGWEN RONG, ZHENG XUE,
LONGGEN ZHANG, RICHARD ARTHUR,
COLLEEN A. DEVRIES, COGENCY
GLOBAL INC., MORGAN STANLEY & CO.
INTERNATIONAL PLC, MORGAN
STANLEY & CO. LLC, DEUTSCHE BANK
SECURITIES INC., CHINA EVERBRIGHT
SECURITIES (HK) LIMITED, CHINA
MERCHANTS SECURITIES (HK) CO.,
LTD., AND AMTD GLOBAL MARKETS
LIMITED,

             Defendants.

No. 1:19-cv-06908-KAM-SJB

---

## X FINANCIAL DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO THE REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO DISMISS

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000

18/F, The Hong Kong Club Building
3A Chater Road
Hong Kong, SAR
China
Telephone: +852-2533-3300

*Attorneys for the X Financial Defendants*

Dated:  January 6, 2022

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ..................................................................................................................2

STANDARD OF REVIEW ...................................................................................................8

ARGUMENT........................................................................................................................9

I.      THE R&R CORRECTLY DETERMINED THAT PLAINTIFFS'
        SECURITIES ACT CLAIMS ARE TIME-BARRED ...............................................9

II.     MJ BULSARA WAS CORRECT IN DISMISSING THE EXCHANGE ACT
        CLAIMS FOR LACK OF SCIENTER .....................................................................18

III.    DENIAL OF LEAVE TO AMEND PLAINTIFFS' SECURITIES ACT
        CLAIMS WAS PROPER .......................................................................................23

CONCLUSION...................................................................................................................24

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Amorosa v. AOL Time Warner, Inc.*,
  409 F. App'x 412 (2d Cir. 2011) ................................................................................9, 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................................... 9

*In re Barclays Bank PLC Sec. Litig.*,
  09-cv-1989, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011),
  *aff'd in relevant part sub nom.*, *Freidus v. Barclays Bank PLC*,
  734 F.3d 132 (2d Cir. 2013) .........................................................................................17

*Behrendsen v. Yangtze River Port & Logistics, Ltd.*,
  19-cv-00024, 2021 WL 2646353 (E.D.N.Y. June 28, 2021) ..........................................22

*CDS Bus. Servs., Inc. v. H.M.C., Inc.*,
  19-cv-5759, 2021 WL 4458884 (E.D.N.Y. Sept. 28, 2021).............................................8

*Christine Asia Co. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ....................................................................................19

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) ...........................................................................13

*Cortina v. Anavex Life Scis. Corp.*,
  15-cv-10162, 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016).............................................22

*In re Coty Inc. Sec. Litig.*,
  14-cv-919, 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ..............................................14

*de la Fuente v. DCI Telecomms., Inc.*,
  206 F.R.D. 369 (S.D.N.Y. 2002).....................................................................................23

*Dodds v. Cigna Sec., Inc.*,
  12 F.3d 346 (2d Cir. 1993) .............................................................................................14

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JPMorgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ...........................................................................................18

*Emerson v. Mut. Fund Series Tr.*,
  393 F. Supp. 3d 220 (E.D.N.Y. 2019) ...........................................................10, 14, 16, 17

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017) ...........................................................................................10

*Fogel v. Wal-Mart de México SAB de CV*,
   13-cv-2282, 2017 WL 751155 (S.D.N.Y. Feb. 27, 2017),
   *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018)......................................19

*Francisco v. Abengoa, S.A.*,
   481 F. Supp. 3d 179 (S.D.N.Y. 2020) .....................................................................13, 17

*Francisco v. Abengoa, S.A.*,
   15-cv-6279, 2021 WL 4136899 (S.D.N.Y. Sept. 10, 2021)...........................................19

*Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018) ...........................................................................11

*Freidus v. Barclays Bank PLC*,
   734 F.3d 132 (2d Cir. 2013) ..............................................................................9, 10, 17

*Freidus v. ING Groep N.V.*,
   736 F. Supp. 2d 816 (S.D.N.Y. 2010),
   *aff'd in pertinent part*, 601 F. App'x 59 (2d Cir. 2015) ................................................13

*Friedman v. Endo Int'l PLC*,
   16-cv-3912, 2018 WL 446189 (S.D.N.Y. Jan. 16, 2018)...............................................18

*Gagnon v. Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019) ...........................................................................11

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ..........................................................................................14

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   643 F. Supp. 2d 562 (S.D.N.Y. 2009) .......................................................................3, 13

*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020)..............................................................................3

*Isaac v. City of N.Y.*,
   16-cv-4729, 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018).........................................8, 9

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
   14-cv-9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017)................................................21

*Lachman v. Revlon, Inc.*,
  487 F. Supp. 3d 111 (E.D.N.Y. 2020) ........................................................................20

*LC Cap. Partners, L.P. v. Frontier Ins. Grp.*,
  318 F.3d 148 (2d Cir. 2003) ................................................................................11, 17

*Lin v. Interactive Brokers Grp., Inc.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008) ......................................................................14

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ......................................................................................3

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020) ......................................................................19

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  616 F. App'x 442 (2d Cir. 2015) .........................................................................10, 13

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) ...................10, 15, 16

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021) ................................................................21, 22

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  851 F. Supp. 2d 512 (S.D.N.Y. 2012) ......................................................................21

*Midwest Operating Eng'rs Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*,
  21-801-cv, 2021 WL 5782079 (2d Cir. Dec. 7, 2021) (Summary Order)....................22

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014) .................................................................10, 13, 15

*Moss v. Colvin*,
  845 F.3d 516 (2d Cir. 2017) ......................................................................................8

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ....................................................................................13

*NECA-IBEW Pension Tr. Fund v. Lewis*,
  607 F. App'x 79 (2d Cir. 2015) ................................................................................23

*Newman v. Warnaco Grp., Inc.*,
  335 F.3d 187 (2d Cir. 2003) ....................................................................................13

*Nkansah v. U.S.*,
 18-cv-10230, 2021 WL 5493214 (S.D.N.Y. Nov. 23, 2021) ..........................................8

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
 423 F. Supp. 2d 364 (S.D.N.Y. 2006) ...................................................................20

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) ...........................................................................7, 19

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
 874 F. Supp. 2d 341 (S.D.N.Y. 2012) ...............................................................10, 16

*In re ProShares Tr. II Sec. Litig.*,
 839 F. App'x 649 (2d Cir. 2021) .........................................................................15

*Pub. Emps. Ret. Sys. v. Merrill Lynch & Co.*,
 714 F. Supp. 2d 475 (S.D.N.Y. 2010) .....................................................................9

*In re PXRE Grp., Ltd. Sec. Litig.*,
 600 F. Supp. 2d 510 (S.D.N.Y. 2009)....................................................................22

*Rudman v. CHC Grp. Ltd.*,
 217 F. Supp. 3d 718 (S.D.N.Y. 2016) ...................................................................11

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
 645 F. App'x 72 (2d Cir. 2016) ...........................................................................18

*Staehr v. Hartford Fin. Servs. Grp.*,
 547 F.3d 406 (2d Cir. 2008) ...........................................................................13, 16

*Stratte-Mcclure v. Morgan Stanley*,
 776 F.3d 94 (2d Cir. 2015) ...............................................................................18

*In re Synchrony Fin. Sec. Litig.*,
 450 F. Supp. 3d 127 (D. Conn. 2020),
 *rev'd in part on other grounds*, 988 F.3d 157 (2d Cir. 2021) .......................................10

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
 531 F.3d 190 (2d Cir. 2008) ...........................................................................18, 19

*TechnoMarine SA v. Giftports, Inc.*,
 758 F.3d 493 (2d Cir. 2014) ..............................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ......................................................................................18

*Tyler v. Liz Claiborne, Inc.*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011) ...............................................................................22

*Wilbush v. Ambac Fin. Grp., Inc.*,
   271 F. Supp. 3d 473 (S.D.N.Y. 2017) ...........................................................................21, 22

*Woolgar v. Kingstone Cos., Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020) ...............................................................................14

*Yi Xiang v. Inovalon Holdings, Inc.*,
   268 F. Supp. 3d 515 (S.D.N.Y. 2017) ...............................................................................13

*Youngers v. Virtus Inv. Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016) ...........................................................................10, 13

## STATUTES & RULES

15 U.S.C. § 77m.......................................................................................................................9, 14

28 U.S.C. § 636(b)(1) ....................................................................................................................8

Fed. R. Civ. P. 9(b) ......................................................................................................................18

Fed. R. Civ. P. 12(b)(6)..................................................................................................................9

Fed. R. Civ. P. 72(b)(3)..................................................................................................................8

Defendants X Financial ("XF" or the "Company"), Yue Tang, Shaoyong Cheng, Shengwen Rong, Zheng Xue, and Longgen Zhang (collectively, the "XF Defendants") respectfully submit this memorandum of law in response to Lead Plaintiffs Xiangdong Chen's and Ke Zheng's ("Plaintiffs") objections (Dkt. No. 97) ("Objections" or "Obj.") to the Report & Recommendation of United States Magistrate Judge Sanket J. Bulsara ("MJ Bulsara"), dated December 9, 2021 (Dkt. No. 94) ("R&R"), which recommended dismissal of this action in full.

## PRELIMINARY STATEMENT

This is a securities action arising out of XF's September 2018 initial public offering of American depositary shares ("ADS") in the United States (the "IPO"). On December 9, 2021, MJ Bulsara issued the R&R, recommending that all of Plaintiffs' claims be dismissed. In a thorough and well-reasoned 33-page decision, MJ Bulsara concluded that Plaintiffs' claims under the Securities Act of 1933 ("Securities Act") are barred by the applicable one-year statute of limitations and that their claims under the Securities Exchange Act of 1934 ("Exchange Act"). fail for lack of fraudulent scienter. Those conclusions were and are correct. Plaintiffs' Objections to the R&R should be overruled.

Regarding the Securities Act claims, MJ Bulsara concluded that application of the statute of limitations is "relatively straightforward." As explained in the R&R, "[m]any, if not all," of the Securities Act allegations are based upon disclosures made in XF's November 19, 2018 quarterly earnings call. Therefore, by Plaintiffs' own admission, that earnings call provided "precisely the information" that Plaintiffs allege XF should have disclosed in the Offering Materials. Plaintiffs were therefore required to file suit within one year after that earnings call. But Plaintiffs missed that deadline and their Securities Act claims are therefore untimely. Plaintiffs object that "reassurances" from management tolled the limitations period, that the disclosures were accompanied by a stock price uptick, and that the November 2018 disclosures

did not reveal each and every detail that would eventually make its way into their pleading.  But, as MJ Bulsara correctly found, the purportedly reassuring statements were "generic" corporate optimism, substantively irrelevant to the alleged omissions, or both.  And the law is clear in this Circuit that neither a stock price drop nor the disclosure of every fact a plaintiff ultimately chooses to plead is required to trigger the limitations period for Section 11 claims.

As for scienter, MJ Bulsara applied binding, well-settled law in holding that Plaintiffs' failure to "'specifically identify'" contemporaneous reports or statements contradicting Defendants' statements when made is "fatal" to their Exchange Act claims.  Plaintiffs complain that is "too high a burden" for them to carry and urge this Court to read the requirement out of the binding Second Circuit case law.  But the pleading standard for the Exchange Act is not lowered for weak claims.  Instead, having chosen to allege fraud, Plaintiffs must plead their claims with particularity; the grab-bag of legally impermissible or illogical inferences that Plaintiffs offer as an alternative are insufficient and were properly rejected in the R&R.  This Court should recognize what MJ Bulsara rightly did: Plaintiffs' claims are meritless and should be dismissed.

## **BACKGROUND**

XF serves China's emerging online consumer finance sector.  Among other things, it facilitates loan transactions by operating an online platform that matches borrowers with individual or institutional lenders.  (Amended Complaint (Dkt. No. 22) ("AC") ¶¶ 2-3, 43, 62-66.)  XF offers a suite of financing products, including a high-credit-limit unsecured personal loan product ("preferred loans") and a credit card balance transfer product ("card loans").  (*Id.* ¶¶ 9, 64.)

XF completed its IPO in September 2018, and its ADS trade on the New York Stock Exchange.  (*Id.* ¶¶ 1, 7, 43.)  In connection with the IPO, XF filed a prospectus with the

2

Securities and Exchange Commission ("SEC") on Form 424B that formed part of its registration statement (collectively, the "Offering Materials").  (*Id.*)

The Offering Materials contained robust disclosures advising prospective investors of information they should consider before purchasing ADS, including years' worth of operating data and financial results, developments in the Chinese economic and regulatory environments, significant business strategy decisions to date, and 57 pages of risk factors potentially bearing on the Company's future performance.  (*See, e.g.*, Ex. A at 1-13, 19-81, 94-145.[1])  Pertinent here, the Offering Materials disclosed that adverse economic and regulatory developments had disrupted XF's industry, sowing uncertainty in the market, precipitating declines in XF's user base and loan facilitation rates, and "negatively affect[ing]" the Company's third-quarter 2018 performance (with the slowdown likely to persist through at least "the full year ending December 31, 2018").  (*See, e.g.*, *id.* at 7-10, 24-28, 31-32, 35-37, 101, 107, 151-52.)  The Offering Materials further cautioned that XF had long seen (and could continue to see) delinquency rates rising across its product lines, with a pronounced trend in the preferred loan space where the Company's primary target borrowers (small business owners) were experiencing a liquidity crunch exacerbated by recent regulatory activity that threatened their "financial condition" and "repayment capability."  (*Id.* at 8-10, 24-27, 35-37, 54, 101, 103-04, 112, 123.)  Under the circumstances, the Company warned, "we may . . . impose more stringent borrower qualifications to ensure the quality of the loans we facilitate," a move that potentially could "negatively affect" XF's overall facilitation volume.  (*Id.* at 31, 35-37.)  The Offering Materials

---

[1] Citations to "Ex. __" are to the exhibits to the Declaration of Brian S. Weinstein in Support of the XF Defendants' Motion to Dismiss the AC, served on December 7, 2020 and filed on March 8, 2021.  (*See* Dkt. Nos. 70-2-70-10.) The Court may consider the Offering Materials both as documents integral to, and incorporated by reference into, the AC and as judicially noticeable SEC filings.  *See, e.g., Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382-84 (S.D.N.Y. 2020); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 707 (2d Cir. 2011); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 568 (S.D.N.Y. 2009).  Unless otherwise noted, case citations herein omit internal quotation marks, citations, emphases, and/or alterations.

also advised that XF had been altering its product mix to promote card loans and expected its revenue would increasingly be driven, on a proportional basis, by that product (and, thus, necessarily less so by other products, including preferred loans).  (*Id.* at 26-27, 101, 103-04, 109, 118-19.)  Finally, the Offering Materials set out operating data reflecting a recent and substantial drop-off in preferred loan (and overall) facilitation and average card loan transaction size.  (*Id.* at 7-10, 22.)

Despite these disclosures, Plaintiffs allege that it was not until November 19, 2018, when XF reported its third-quarter financial results, that the Company "began to reveal the truth" regarding these very subjects.  (AC ¶¶ 26-27, 91-95, 108-09, 125, 181-82.)  The alleged "reveal," however, consisted of nothing more than information that had already been disclosed in the Offering Materials or matters arising *after* the IPO.  Specifically, XF advised investors that it had been adversely affected by challenging market conditions and rising delinquencies (including among preferred loans), had been "scal[ing] down" and "consistently reduc[ing]" its preferred loan line to focus on card loans while also "reduc[ing]" its average card loan size in response, and would "tighten [its] credit policy" and "reject more applications" for loans "starting from Q3" as "prevention action" in "anticipat[ion]" of a "more difficult economic environment" in at least Q4.  (Ex. F at 5-6.)  It further made clear the card loan product was now the "dominant part of [XF's] business," with preferred loans comprising less than 10% of all newly facilitated loans, and that "to understand [the Company's] business going forward," analysts and investors "should just focus on card loan[s]."  (*Id.* at 6-7.)

Four months later, on a March 19, 2019 earnings call, XF executives confirmed that Q4 2018 had indeed presented a "difficult macroeconomic environment" continuing from the prior quarter, with the "delinquency situation . . . worsen[ing] for the whole industry" and XF's own

4

delinquency rates "increas[ing] a lot . . . in Q4" relative to Q3, "particularly for [the] preferred loan[s]." (Ex. G at 3-7; AC ¶¶ 114-15, 190-94.) Consistent with the November 2018 disclosures, XF confirmed that it had "reduc[ed] average loan size" and "lowered the ticket size for card loan[s]" "starting from Q3" and had "decreased [its] approval rate" for loan applications starting sometime in the "second half of 2018." (Ex. G at 5, 8-9; *see also* AC ¶¶ 31, 111-12, 190-91.) Finally, XF reminded investors that its preferred loan line continued to be subject to "product[] mix-driven change" favoring card loans, had "slowed down" with the target "SME sector" having been "hard last year," and was "very small" in its remaining form. (Ex. G at 7.) The AC again alleges that these statements somehow revealed material issues predating the IPO that were omitted from the Offering Materials. (AC ¶¶ 31, 111-12, 114-15, 190-94.)

During a subsequent earnings call on May 21, 2019, XF announced that, due to persistent delinquencies and higher-than-expected losses, it had now "discontinued" the preferred loan product line other than to "serve . . . higher-quality repeat[] borrowers." (*Id.* ¶¶ 33, 133-34, 203; Ex. H at 6.) Plaintiffs allege that this announcement—made *eight months after* the IPO—reflects a *pre-IPO* decision to the "eliminate" the product line in its entirety. (AC ¶¶ 33, 36.)

In addition to the Offering Materials, Plaintiffs' Exchange Act claims target post-IPO statements supposedly made by Defendants Tang (XF's CEO and Chairman), Cheng (President and director), and Jie Zhang (CFO) that, purportedly, were fraudulently "bright" and "reassur[ing]." (AC ¶¶ 44-46, 176-207.) According to the AC, the statements highlighted XF's growth potential while "hid[ing]" adverse developments discussed above and generally failing to predict that certain of the Company's operating results would worsen going forward. (*Id.*)

This action was commenced on December 9, 2019. (Dkt. No. 1.) The AC, filed July 13, 2020, asserts claims under (i) Section 11 of the Securities Act against XF, several XF executives

5

and/or directors (the "Individual Defendants"), the IPO underwriters or underwriter representatives (the "Underwriter Defendants"), and XF's U.S. representative for the IPO (along with certain of its employees) (the "Cogency Defendants"); (ii) Section 15 of the Securities Act against XF, the Individual Defendants, and the Cogency Defendants; (iii) Section 10(b) of the Exchange Act against XF and several Individual Defendants; and (iv) Section 20(a) of the Exchange Act against the same set of Individual Defendants.  (AC ¶¶ 208-17, 228-41.)[2]

The XF Defendants (subsequently joined by certain of the Underwriter Defendants and Cogency Defendants) filed a motion to dismiss the AC in full, arguing principally that (i) Plaintiffs' Securities Act claims were time-barred by the applicable one-year statute of limitations, (ii) the AC failed to plead any actionable misstatement or omission, and (iii) Plaintiffs' Exchange Act claims failed for lack of fraudulent scienter.  That motion was fully briefed as of March 8, 2021.  (*See* Dkt. Nos. 70-77.)

The following day, this Court referred Defendants' motion to MJ Bulsara.  (Minute Entry & Order of March 9, 2021.)  On October 6, 2021, MJ Bulsara presided over nearly three hours of oral argument, concluding with an invitation to the parties to submit supplemental briefing on any issue(s) of their choosing—an opportunity the parties jointly declined.  (Minute Entry & Order of October 6, 2021; Dkt. No. 92; R&R Decl. Ex. 1 (oral argument transcript)[3].)

The 33-page R&R followed on December 9, 2021.  (Dkt. No. 94.)  MJ Bulsara recommended dismissal with prejudice of Plaintiffs' Securities Act claims, deeming them untimely under a "relatively straightforward" application of the one-year statute of limitations.

---

[2] Defendants Ding Gao, Jie Zhang, Morgan Stanley & Co. International plc, China Everbright Securities (HK) Limited, and China Merchants Securities (HK) Co., Ltd have neither been served nor appeared in this action. Plaintiffs' time to serve them is tolled until resolution of the motion at bar.  (Dkt. Nos. 61, 67; Minute Order dated September 27, 2020.)

[3] "R&R Decl." refers to the Declaration of Brian S. Weinstein in Support of the XF Defendants' Opposition to Plaintiffs' Objections to the R&R, which is being filed concurrently herewith.

6

(R&R at 2, 17-26.)  In particular, MJ Bulsara concluded that, by the AC's own admission, the November 19, 2018 earnings disclosures provided "'precisely the information' that Plaintiffs allege XF should have disclosed in the [Offering Materials]." (*Id.* at 17 (citation omitted).) "[T]o the extent there [was] not *total* overlap," the R&R further reasoned, the limitations period "'is not somehow tolled until the appearance of disclosures that perfectly match the allegations that a plaintiff chooses to include in its complaint.'" (*Id.* at 15, 17 (emphasis added) (citation omitted).)  And the November disclosures were "sufficient to give reasonably diligent plaintiffs the facts necessary to plead a [S]ection 11 claim" by "November 19, 2019." (*Id.* at 17-18 (citation omitted); *see also id.* at 18, 21 (rejecting Plaintiffs' arguments in opposition as "entirely without merit," "demonstrably false," and amounting to "unpersuasive semantics").)

As for the Exchange Act claims, MJ Bulsara recommended dismissal without prejudice based on Plaintiffs' failure to plead facts giving rise to a strong inference of fraudulent scienter. (R&R at 28-31 & nn.67-68.)  MJ Bulsara principally determined that Plaintiffs' sole "fraud theory"—that Individual Defendants Tang, Zhang, and Cheng had access to information purportedly contradicting their or the Company's public statements—was unsupported by allegations "'specifically identify[ing] the reports or statement containing this information,'" a "fatal" deficiency under controlling Second Circuit authority.  (*Id.* at 28 (quoting, *inter alia*, *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).)  In so doing, MJ Bulsara recognized that mere "accusations of knowledge or access founded on nothing more than a defendant's corporate position are entitled to no weight." (*Id.* at 29 (internal citations, quotation marks, and alterations omitted).)  He also found that all of Plaintiffs' attempts to provide the requisite supporting detail were impermissibly "vague and conclusory," "imprecise," "unattributed," and failed to "connect" the supposedly "contradictory" information to any Individual Defendant.  (*Id.* at 29-30

7

(internal citations, quotation marks, and alterations omitted).)

Because the R&R recommended dismissal on timeliness and scienter grounds, MJ Bulsara expressly declined to reach any of the XF Defendants' alternative arguments—including the AC's failure to identify an actionable misstatement or omission—deeming them "academic." (*Id.* at 24-25 n.65.) Plaintiffs filed their Objections to the R&R on December 23, 2021.

## **STANDARD OF REVIEW**

District courts are empowered to "accept, reject, or modify" a magistrate judge's recommended disposition of a motion to dismiss. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1). Any portion of the report and recommendation that is the subject of a timely and specific objection must be reviewed *de novo*. *CDS Bus. Servs., Inc. v. H.M.C., Inc.*, 19-cv-5759, 2021 WL 4458884, at *1 (E.D.N.Y. Sept. 28, 2021); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). But "general objections or objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke *de novo* review" and warrant "review[] only for clear error." *CDS*, 2021 WL 4458884, at *1. "A clear error review is also appropriate where a party merely restates . . . the same arguments that party originally made." *Id.*; *see also Nkansah v. U.S.*, 18-cv-10230, 2021 WL 5493214, at *1-2 (S.D.N.Y. Nov. 23, 2021) (objections merely "reiterate[d] the same argument already presented to—and thoroughly considered by—[the magistrate judge]" and would "not prompt *de novo* review"); *Isaac v. City of New York*, 16-cv-4729, 2018 WL 4583481, at *2 (E.D.N.Y. Sept. 24, 2018) (Matsumoto, J.) (same).[4]
"Additionally, a district court generally will not consider new arguments . . . raised for the first

---

[4] *But see Moss v. Colvin*, 845 F.3d 516, 519 n.2 (2d Cir. 2017) (noting "skeptic[ism] that clear error review would be appropriate in this instance, where arguably the only way for Moss to raise arguments on that point was to reiterate them" but declining to "resolve which standard of review applies" because plaintiff's argument failed either way).

8

time in objections to a magistrate judge's report and recommendation that could have been raised" earlier. *Isaac*, 2018 WL 4583481 at *2.

Whether the R&R is reviewed *de novo* or for clear error, Plaintiffs' Objections are meritless and should be overruled. Dismissal of Plaintiffs' claims was and is plainly warranted.

## ARGUMENT

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[F]acts that are merely consistent with a defendant's liability" do not suffice. *Id.* Nor do "[t]hreadbare recitals of the elements of a cause of action" or "legal conclusion[s] couched as . . . factual allegation[s]." *Id.*

## I.      THE R&R CORRECTLY DETERMINED THAT PLAINTIFFS' SECURITIES ACT CLAIMS ARE TIME-BARRED

Claims under Sections 11 and 15 of the Securities Act are subject to a one-year statute of limitations that begins to run upon "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m; *see also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479 n.3 (S.D.N.Y. 2010); (R&R at 15-17). A corrective disclosure that provides the very information supposedly misstated or omitted places the plaintiff on notice of its claims and triggers the limitations period, regardless of whether a "constructive" or "inquiry" notice standard is applied. *See Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138-39 & n.2 (2d Cir. 2013) ("corrective disclosure" revealed the "alleged untruths and omissions" more than a year before suit, making notice standard irrelevant); *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir.

9

2011) ("The corrective disclosure date is the same as the constructive notice date for purposes of limitations."); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 300-02 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) ("either standard" is "satisf[ied]" where the very information on which claims are based is disclosed); (R&R at 15, 18, 22).[5] The limitations period is also triggered by media or analyst reports publicizing the information at issue. *See, e.g.*, *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016); *Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 351-53 (S.D.N.Y. 2014).

Importantly, and as explained in the R&R, the triggering disclosures need not "perfectly match," *Magnum Hunter*, 26 F. Supp. 3d at 302, or even "touch on," every "specific allegation that a plaintiff chooses to put in his complaint," *Magnum Hunter*, 616 F. App'x at 447, so long as they "relate directly to the misrepresentations and omissions that are alleged." *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 240 (E.D.N.Y. 2019); (R&R at 15); *see also In re Synchrony Fin. Sec. Litig.*, 450 F. Supp. 3d 127, 160-61 (D. Conn. 2020) ("first partial corrective disclosure" when "truth began to partially emerge" triggered limitations period), *rev'd in part on other grounds*, 988 F.3d 157 (2d Cir. 2021). Thus, the question is whether the disclosures provided "a 'constellation of facts' sufficient" to "put reasonable investors on notice" of their claims. *Magnum Hunter*, 26 F. Supp. 3d at 301 (quoting *Freidus*, 734 F.3d at 139). While it is true that "a statute of limitations defense in a securities case sometimes turns on disputed facts, the 'facts on the face of the complaint and related documents' are sufficiently conclusive in 'a

---

[5] Therefore, as MJ Bulsara concluded (R&R at 15-18, 22), the Court need not resolve whether the constructive notice standard or the arguably more permissive inquiry notice standard applies to Plaintiffs' claims. *See, e.g., Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 364 (S.D.N.Y. 2012) (noting "conflicting law" among New York federal courts); *see also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119-20 & n.37 (2d Cir. 2017) ("assum[ing]" without deciding that the constructive notice standard applies to Securities Act claims).

vast number of cases' to permit resolution on a motion to dismiss." *Rudman v. CHC Grp. Ltd.*, 217 F. Supp. 3d 718, 723 (S.D.N.Y. 2016) (quoting *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003)).

This litigation was commenced on **December 9, 2019**.  Plaintiffs' own allegations make clear, however, that they were on notice of the factual bases for their claims more than a year earlier—by **November 19, 2018** at the absolute latest.  On that date, XF released its Q3 2018 financial results (the "November 19 Release") and conducted a corresponding earnings call (the "November 19 Call") (together, the "November 19 Disclosures").  (AC ¶¶ 23, 26.)  As MJ Bulsara correctly determined (R&R at 17-21), the AC itself points to the November 19 Disclosures as the primary "corrective" disclosures in support of each of Plaintiffs' claims:

- **Rising Delinquency Rates and Changing Credit Standards**.  The AC alleges that the Offering Materials failed to disclose rising delinquency rates, which required XF to "tighte[n] credit requirements."  (AC ¶ 106; *see also id.* ¶¶ 24, 108, 154, 161, 169, 172.)

  o  According to Plaintiffs, XF "admit[ted] on the November 19 Call that delinquency rates for preferred loans were greatly exceeding the Company's internal expectations" and that, on the same call, XF said it "would 'tighten [the] credit policy' and 'reject more applications' as preventative measures."  (AC ¶¶ 108-09; Ex. F at 5-6.)[6]

  o  The November 19 Disclosures also provided data showing rising rates across delinquency buckets both quarter over quarter and year over year. (Ex. E at 1; Ex. F at 5.)

  o  As MJ Bulsara therefore recognized, "whatever was necessary to alert Plaintiffs about false statements concerning delinquency rates" was "said during the November 19 Call."  (R&R at 19-20.)

- **Scale-Down of the Preferred Loan Business**.  Plaintiffs allege that the Offering Materials "hid . . . from investors" that market demand for XF's preferred loans was declining and that, prior to the IPO, XF was "taking the first steps in

---

[6] The Court may take judicial notice of "transcripts of . . . investor calls and presentations referenced in the [AC]" in order to "show what was said to investors."  *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 764 (S.D.N.Y. 2019); *see also Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018).

eliminating the [preferred loan] product line." (AC ¶ 88; *see also id.* ¶¶ 16, 20, 26, 86, 94, 95, 155-161, 169, 172.)

  o According to the AC, during the November 19 Call, XF "told investors that demand for loans had dried up, prompting significant reductions in preferred loans '*over the last three quarters*' (*i.e.*, the last nine months)" and that investors learned during that Call that, "rather than growing, preferred loans were being intentionally phased out." (AC ¶ 94 (emphasis in original).)

  o The November 19 Disclosures specifically reported that XF had been "consistently reduc[ing]" and "scal[ing] down" its preferred loan business in response to rising delinquency rates and falling demand, particularly among small business owners. (Ex. F at 2, 5-6; *see also* Ex. E at 2; AC ¶ 95.) Indeed, "to understand [XF's] business going forward," XF told investors that they "should just focus on card loan[s]." (Ex. F at 7.)

  o MJ Bulsara thus concluded that, by Plaintiffs' own allegations, "disclosure of corrective facts" regarding the preferred loan business was "made more than one year before the Complaint's filing." (R&R at 18-19.)

• **<u>Reduction in Card Loan Transaction Size</u>**. The AC alleges that the Offering Materials failed to disclose that XF had begun to reduce the average loan size of its card loans as of Q3 2018. (AC ¶¶ 20, 27, 122, 124-27, 164, 169.)

  o According to the AC, during the November 19 Call, XF "stated that [it] '*consciously reduced* [its] average loan size'" because of concerns over the "'economic environment and credit environment' in the third quarter" and "cut . . . down" its average card loan size in particular by "20%" to "25%." (AC ¶¶ 125-26 (emphasis in original); *see also* Ex. F at 2-3, 6.)

  o As MJ Bulsara concluded, this "'obvious'" disclosure means that Plaintiff "had in hand" all information necessary to plead their claims. (R&R at 20-21.)

In sum, the AC admits that the November 19 Disclosures placed investors on notice of the supposed violations of which Plaintiffs now complain. Therefore, as MJ Bulsara concluded, "the statute of limitations issue is relatively straightforward." (R&R at 17-18 ("[m]any, if not all, of the [S]ection 11 allegation are based upon disclosures made during the November 19, 2018 earnings call").) Because the November 19 Disclosures were made more than one year before

this action was commenced, Plaintiffs' Securities Act claims are untimely.  *See, e.g.*, *Magnum Hunter*, 616 F. App'x at 447; *Amorosa*, 409 F. App'x at 416; *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 199-202 (S.D.N.Y. 2020); (R&R at 21 ("by relying on the November 19 [Disclosures], Plaintiffs have demonstrated they had more than a year's notice of a false statement")).[7]

Plaintiffs' Objections to the R&R's timeliness determinations are without merit.  (Obj. at 10-15.)  Plaintiffs first contend that the absence of an immediate stock price drop following the November 19 Disclosures means investors were not on notice of possible claims.  (Obj. at 10-11.)  The law is clear, however, that "stock price movements" are "not necessary" to put plaintiffs on notice of potential Section 11 violations.  *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 829 (S.D.N.Y. 2010), *aff'd in pertinent part*, 601 F. App'x 59 (2d Cir. 2015); *see also Yi Xiang v. Inovalon Holdings, Inc.*, 268 F. Supp. 3d 515, 524 (S.D.N.Y. 2017) ("decline in stock price is not necessarily required to put a plaintiff on notice" of a Securities Act claim).  That is because, unlike with Exchange Act claims, a plaintiff "need not plead damages," *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 164 (2d Cir. 2012), or "loss causation" in order to allege a *prima facie* Section 11 claim, *City of Roseville Emps.' Ret. Sys. v. EnergySolutions*, 814 F. Supp. 2d 395, 424 (S.D.N.Y. 2011); *Giant Interactive*, 643 F. Supp. 2d at 571-72.[8]  And, accordingly, the statutory text makes clear that the limitations period runs from

---

[7] Though MJ Bulsara recommended dismissal on the basis of the November 19 Disclosures alone, the "constellation of facts" available to Plaintiffs as of November 19, 2018 notably did not end with XF's own statements.  Just weeks after the IPO—and more than a month *before* the November 19 Disclosures—Morgan Stanley and Deutsche Bank published analyst reports on XF describing many of the purportedly misrepresented issues on which Plaintiffs' claims are based, including the struggles of and move away from XF's preferred loan business.  (Exs. B-C); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (courts may judicially notice media reports for the fact of their publication when analyzing timeliness); *Youngers*, 195 F. Supp. 3d at 520-21 (dismissing securities claims as untimely in light of press coverage); *Monroe Cty.*, 15 F. Supp. 3d at 351-53 (same).

[8] Plaintiffs' sole authority, *Newman v. Warnaco Grp., Inc.*, an Exchange Act case, is therefore inapposite.  335 F.3d 187, 195 (2d Cir. 2003); (Obj. at 11.)

the actual or constructive "discovery *of the untrue statement or the omission*" itself, rather than from any concomitant price decline.  15 U.S.C. § 77m (emphasis added).  Applying that text, the Second Circuit has concluded that even prospectus disclosures themselves can trigger the limitations period at the time of a plaintiff's original investment.  *See Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 351 (2d Cir. 1993); *see also Emerson*, 393 F. Supp. 3d at 240-41.  In any event, by December 7, 2018—*still* more than a year before Plaintiffs here brought suit—XF's ADS price closed at $6.40, down nearly 11% since the November 19 Disclosures (prior close: $7.18) and more than 32% from the IPO price ($9.50).[9]

Plaintiffs next argue that MJ Bulsara ignored that the November 19 Disclosures did not include XF's delinquency results for periods *post-dating* the IPO, including the then-in-progress Q4 2018 and, even more perplexingly, the opening quarters of the *following year*.  (Obj. at 11-12.)  But all of this information—disclosed in due course on subsequent earnings calls—would lend no support to a claim that the Offering Materials were misleading when issued, rendering it irrelevant.  *See, e.g.*, *In re Coty Inc. Sec. Litig.*, 14-cv-919, 2016 WL 1271065, at *8 (S.D.N.Y. Mar. 29, 2016) ("post-IPO financial results cannot be used" to support Section 11 claims).  That is because securities plaintiffs must "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008); *see also Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 225-26 (S.D.N.Y. 2020) ("allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did" constitute impermissible "hindsight" pleading).

---

[9] *See X Financial (XYF)*, Yahoo! Finance, https://finance.yahoo.com/quote/XYF (last visited Jan. 6, 2022); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) (authorizing "judicial notice of well-publicized stock prices").  XF has since changed the ratio of its ADS from one ADS representing two Class A ordinary shares to one ADS representing six Class A ordinary shares—effectively a one-for-three reverse split—altering historical ADS prices as publicly reported.

In any event, and as discussed above, the limitations period "is not somehow tolled until the appearance of disclosures that perfectly match the allegations that a plaintiff chooses to include in its complaint." *Magnum Hunter*, 26 F. Supp. 3d at 302; (*see also* R&R at 15, 22 (collecting cases)). The November 19 Disclosures clearly alerted investors "that delinquencies were on the rise" and "'greatly exceeding the Company's internal expectations.'" (R&R at 20, 22.)[10] No further information was required to put Plaintiffs on notice of their claims.

Plaintiffs are likewise incorrect that Defendant Tang's supposed "assurances" during the November 19 Call about XF's delinquency risk provisioning and insurance coverage could somehow have negated this notice. (Obj. at 12.) The cited statements related to XF's condition and outlook *as of November 19, 2018* and thus "had no bearing" on the accuracy of the Offering Materials issued two months earlier. *Monroe Cty.*, 15 F. Supp. 3d at 352-53; *see also Magnum Hunter*, 26 F. Supp. 3d at 302 ("reassuring statements" may toll limitations period "*only* if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern") (emphasis in original). As MJ Bulsara thus rightly determined, "Plaintiffs do not identify anything" among Tang's statements "that directly addresses the three categories of false statement they base their claim upon." (R&R at 24.)

Nor did MJ Bulsara err in recommending dismissal of Plaintiffs' claims regarding preferred loans as untimely. MJ Bulsara correctly observed that the AC itself expressly alleges that the November 19 Disclosures made clear to investors that "rather than growing, preferred loans were being intentionally phased out." (AC ¶¶ 93-94; R&R at 18.) Plaintiffs argue that the November 19 Disclosures advised investors only of a "reduction," rather than "discontinuance,"

---

[10] This accorded with myriad Offering Material disclosures warning of rising delinquency rates and the possibility of additional spikes going forward. (*See, e.g.*, Ex. A at 8-10, 24-27, 31, 35-37, 54, 101, 103-07, 112, 123); *see also In re ProShares Tr. II Sec. Litig.*, 839 F. App'x 649, 651 (2d Cir. 2021) (registration statement "adequately warned investors of the risks alleged in the complaint").

15

of the product line.  (Obj. at 12-13.)  In rejecting this argument as "unpersuasive semantics," MJ

Bulsara explained that "[t]he Court is at a loss to discern the difference between elimination and

'phasing out' of a program—both lead to the end of the product offering."  (R&R at 18; *see also*

*id.* at 19 ("Indeed, the terms 'phasing out' and 'elimination' of the preferred loans are used

interchangeably by Plaintiffs in the Complaint and their briefs."))[11]  That conclusion is correct.

The gravamen of the AC is unmistakably that the Offering Materials misled investors by

"impl[ying] that preferred loans were growing" and poised to be a primary driver of XF's future

business.  (AC ¶¶ 16, 88-89.)  The November 19 Disclosures made clear (i) that the line was

being "consistently reduce[d]" and "scale[d] down" in response to rising delinquency and

declining demand, (ii) that it now accounted for less than 10% of XF's newly facilitated loans,

and (iii) that investors accordingly "should just focus on card loan[s]" to "understand [XF's]

business going forward."  (AC ¶¶ 26, 91-95; Ex. F at 2, 5-7.)  As MJ Bulsara correctly

concluded, nothing more was required to trigger the statute of limitations.  *Cf. Bank of Am.*

*Corp.*, 874 F. Supp. 2d at 364, 367-68 (triggering disclosures need only "relate directly to the

misrepresentations and omissions" alleged) (quoting *Staehr*, 547 F.3d at 427); *Emerson*, 393 F.

Supp. 3d at 240; *Magnum Hunter*, 26 F. Supp. 3d at 302.

   MJ Bulsara also correctly concluded that the AC "undermines" Plaintiffs' arguments

regarding the card loan-based portion of the Section 11 claim.  (R&R at 20-21.)  As explained in

the R&R, the AC itself characterizes the November 19 Disclosures regarding XF "'consciously

---

[11] For this reason, MJ Bulsara correctly rejected Plaintiffs' contention that there was a substantive difference between the November 19 Disclosures that XF was "phasing out" the preferred loan product and the May 2019 earnings call during which Plaintiffs allege XF disclosed that it was "discontinuing" the product.  (R&R at 18-19.) Additionally, Plaintiffs have pled no *facts* establishing that XF made any pre-IPO decision to abandon the preferred loan line in its entirety.  Even the May 2019 earnings call remarks that Plaintiffs contend are the "real" corrective disclosure for statute of limitations purposes (Obj. at 13-14 & n.7) disclosed only that XF had chosen at an unspecified time to "'discontinue[]'" preferred loan offerings for most borrowers while retaining them for "'higher-quality, repeated borrowers'" (R&R at 6; AC ¶ 133; Ex. H at 6).  And, as MJ Bulsara rightly concluded, Plaintiffs' confidential-witness ("CW") allegations on this point are "vague and conclusory" and say nothing about any pre-IPO "company-wide decision" to remove preferred loans entirely from XF's product suite.  (R&R at 29-30.)

reduc[ing] [its] average loan size'" as detailing pre-IPO changes in policy; therefore, "Plaintiffs had in hand the information to plead claims alleging the [Offering Materials'] suggestion of card loan growth was false under [S]ection 11." (*Id.* (second alternation in original).)  Plaintiffs therefore are incorrect in suggesting that the R&R failed to account for the AC's allegations of pre-IPO credit policy "tighten[ing]." (Obj. at 14-15.)  They likewise miss the mark in complaining that the R&R's timeliness analysis did not independently address allegations that XF was secretly "'reject[ing] more [loan] applications'" (in addition to reducing average card loan sizes) before the IPO. (*Id.* at 14.)  MJ Bulsara simply concluded, correctly, that AC fails to plead facts showing any such pre-IPO approval rate adjustments in the first place.  (*See* R&R at 30-31 n.68 (explaining that the March 2019 earnings call remarks on which Plaintiffs exclusively rely are "ambiguous" and "imprecise" as to timing and thus "not contradictory, nor necessarily inconsistent with" prior disclosures).)  Nor, as Plaintiffs contend, did MJ Bulsara err in rejecting any suggestion that management's optimism "about the Company's ability to rebound financially moving forward" could have tolled the limitations period.  (R&R at 24; Obj. at 14-15.)  As the R&R correctly determined, the remarks identified in the AC are "generic reassurances" regarding the Company's overall financial and operational health and outlook.  (R&R at 24.)  They simply "cannot counteract" the "explicit" disclosure[12] of the information purportedly omitted at offering: here, that XF had "consciously reduced" its average card loan size given the "challenging credit environment."  (Ex. F at 2, 6).

---

[12] *In re Barclays Bank PLC Sec. Litig.*, 09-cv-1989, 2011 WL 31548, at *7 (S.D.N.Y. Jan. 5, 2011), *aff'd in relevant part sub nom.*, *Freidus*, 734 F.3d at 138-39 ("reliable words of comfort from management" did not toll limitations period); *see also LC Cap.*, 318 F.3d at 155-56; *Francisco*, 481 F. Supp. 3d at 201-02; *Emerson*, 393 F. Supp. 3d at 241.

## II.     MJ BULSARA WAS CORRECT IN DISMISSING THE EXCHANGE ACT CLAIMS FOR LACK OF SCIENTER

Plaintiffs' Objections to MJ Bulsara's recommendation to dismiss the Exchange Act fraud claims for failure to allege scienter are equally unavailing.  Under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), "a plaintiff must state with particularity facts giving rise to a strong inference that the defendant acted with scienter."  *Special Situations Fund III QP, L.P., v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 F. App'x 72, 74 (2d Cir. 2016).  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  To survive dismissal, the inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 314; (R&R at 27-28).  Where a complaint fails to allege scienter as to any employee of a corporate defendant, it necessarily fails to do so against the employer as well.  *Friedman v. Endo Int'l PLC*, 16-cv-3912, 2018 WL 446189, at *4 (S.D.N.Y. Jan. 16, 2018); *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

At the pleading stage, scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JPMorgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Plaintiffs here do not attempt to establish any cognizable "motive" to defraud on the part of any XF employee.  *See id.* (requiring allegations that a defendant "benefited in some concrete or personal way from the purported fraud").  As such, Plaintiffs must allege "correspondingly greater" circumstantial evidence of conscious misbehavior or recklessness.  *Id.* at 198-99.  This requires allegations showing "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Stratte-*

18

*McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).

Plaintiffs attempt to carry this burden by suggesting that Defendants Tang, Cheng, and Zhang had information that contradicted Offering Material disclosures and their own post-IPO public statements.  (AC ¶¶ 195-198.)  To plead scienter on that basis, however, plaintiffs "must specifically identify" contemporaneous "reports or statements" containing the "contrary facts" that the individual speakers were provided and disregarded.  *Novak*, 216 F.3d at 308-09; *Dynex*, 531 F.3d at 196.  Generalized allegations of access to such materials based on individuals' senior positions within a company are legally insufficient.  *See, e.g.*, *Fogel v. Wal-Mart de México SAB de CV*, 13-cv-2282, 2017 WL 751155, at *16 (S.D.N.Y. Feb. 27, 2017) ("[C]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight."), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018); *Francisco v. Abengoa, S.A.*, 15-cv-6279, 2021 WL 4136899, at *25 (S.D.N.Y. Sep. 10, 2021) (even identifying supposedly fraudulent decisions that "could be made only by senior managers," thus "requiring that information about the fraud be shared with them," is "not enough" to allege scienter ).  As MJ Bulsara correctly concluded, Plaintiffs' failure to identify any such reports or statements "is fatal."  (R&R at 28-30 & n.67 (collecting cases).)

Plaintiffs object that MJ Bulsara's application of this binding Second Circuit requirement imposed "too high a burden" and ask the Court simply to infer Individual Defendants' access to contradictory information.  (Obj. at 16-17.)  But their sole supposed authority—*Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017)—involved particularized allegations of a "secret meeting," attended by high-level company officers and senior managers, "at which [a] Chinese regulator threatened [the] company" in advance of its "imminent IPO" with "huge" potential ramifications.  *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 806 (S.D.N.Y. 2020)

19

(concluding that *Christine Asia* is "not to the contrary" of authority forbidding inferences of scienter based on "the mere fact of defendants' high-level positions").

Plaintiffs are likewise incorrect that scienter may be inferred solely from corporate executives "frequently speaking" about the underlying subject matter implicated in the alleged fraud. (*See* Obj. at 17.) As MJ Bulsara rightly recognized in rejecting this very contention, fraudulent intent may be not be ascribed to individuals simply because they "'hold[] themselves out as knowledgeable'" about a particular corporate issue. (R&R at 29-30 (quoting *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006)) (also explaining that "pleading that Defendants *should have known* about contrary information" because they "'spoke frequently'" about relevant topics is "not sufficient") (emphasis in original)); *see also Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 137-38 (S.D.N.Y. 2020) (not enough that executives "led the planning and implementation" of relevant projects or were involved in "weekly meetings" and "conversations" about subjects of supposed fraud).

Nothing about the AC's CW allegations or about XF's post-IPO disclosures purportedly "discontinu[ing]" preferred loans supports an inference of scienter either. (Obj. at 17-18). MJ Bulsara correctly recognized that the former comprise "vague and conclusory" reports by "line-level" employees that fail to "connect" any "contradictory information to Management" as is required in this Circuit. (R&R at 29-30.)[13] For example, MJ Bulsara observed that CW1 was a "line-level employee who worked in a single office that stopped facilitating preferred loans, who heard from another unnamed person at an unknown time that XF would stop facilitating preferred loans at *another* unknown time, and who had no relationship to the Management

---

[13] Plaintiffs chide MJ Bulsara for characterizing CW1 and CW2 as "line-level employees," but the AC itself ascribes nothing to these individuals beyond line responsibilities. (*See, e.g.*, AC ¶¶ 77, 86, 99 (CW1 performed "background checks" and "interviews" of potential borrowers while CW2 "worked in the debt collection department").)

Defendants." (*Id.* at 29 emphasis in original)).  Such confidential witnesses are simply not in a position—and therefore insufficient as a matter of law—to allege changes about high-level decisions of a company.  *See Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 780-81 (S.D.N.Y. 2021); *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 497 (S.D.N.Y. 2017).  And as for the earnings-call disclosures on preferred loans, *post*-offering announcements of business or product-line decisions do not in and of themselves establish fraudulent, *pre*-offering knowledge or intent on the part of corporate executives.  *See, e.g.*, *In re Jumei Int'l Holding Ltd. Sec. Litig.*, 14-cv-9826, 2017 WL 95176, at *4-5 (S.D.N.Y. Jan. 10, 2017) (asking "Court to assume knowledge and fraudulent intent on August 18, 2014 simply because Jumei began its exit from third-party marketplace several weeks later" was "classic fraud-by-hindsight pleading").

If anything, the progression of XF's disclosures on preferred loans (and other topics targeted in the AC) undermines any inference of fraud.  As discussed above, the Offering Materials warned that the product line faced significant headwinds and provided *undisputedly accurate* data clearly showing that preferred loan facilitation was declining in the months preceding the IPO.  *See supra* pp. 3-4.  Two months later, the November 19 Disclosures expressly advised that XF was "scal[ing] down" and "consistently reduc[ing]" the preferred loan business to "just focus" on card loans.  *Supra* pp. 4, 11-12.  That XF would provide all of this information while trying to defraud the market as to the state of its preferred loan business is simply illogical.  *See, e.g.*, *Jumei*, 2017 WL 95176, at *5 (no scienter where issuer "consistently disclosed the risk" associated with eventually discontinued business line); *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 530 (S.D.N.Y. 2012) (making "some disclosures," even if allegedly "less robust than they could have been," undermines an

inference of scienter given "the substantially higher bar").  Indeed, the AC's "strongest inferences are nonfraudulent"—that XF was endeavoring to keep investors apprised as its struggles in the preferred loan space unfolded.  *Cf. Midwest Operating Eng'r Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, 21-801-cv, 2021 WL 5782079, at \*4-5 (2d Cir. Dec. 7, 2021) (Summary Order).

Along similar lines, Defendant Tang's disclosure during the November 19 Call that XF had "consciously" lowered its average card loan size does not suggest fraudulent intent either. (Obj. at 18.)  To support an inference of scienter, information in the hands of corporate officials must be "contradictory" of the supposedly fraudulent statements and "non-public" in nature.  *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536, 544 (S.D.N.Y. 2009); *Wilbush*, 271 F. Supp. 3d at 496-97.  And, here, the Offering Materials themselves disclosed data showing that average card loan size (calculated as total loan facilitation amount divided by total number of loans facilitated) had declined substantially in the run-up to the IPO.  (Ex. A at 8, 22-23.)

Finally, Plaintiffs' reliance on the so-called "core operations" doctrine is misplaced. (Obj. at 18-19.)  There is "considerable doubt" whether that doctrine "survived the enactment of the PSLRA, and many courts have held that it is no longer valid."  *Cortina v. Anavex Life Scis. Corp.*, 15-cv-10162, 2016 WL 7480415, at \*7 (S.D.N.Y. Dec. 29, 2016); *Maloney*, 518 F. Supp. 3d at 781-82.  At best, it now may only "bolster[] the strength of the inference of scienter when plaintiff has *already* adequately alleged facts indicating that defendants might have known their statements were false."  *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (emphasis added).  The doctrine "cannot establish scienter independently."  *Behrendsen v. Yangtze River Port & Logistics Ltd.*, 19-cv-00024, 2021 WL 2646353, at \*12 (E.D.N.Y. June 28, 2021); (*see also* R&R at 30 n.67 (refusing to infer scienter based purely on importance of subject

matters to XF)).  Because Plaintiffs have otherwise failed to establish an inference of scienter as discussed above and in the R&R, the core operations doctrine cannot resuscitate their fraud claims.[14]

### III.   DENIAL OF LEAVE TO AMEND PLAINTIFFS' SECURITIES ACT CLAIMS WAS PROPER

MJ Bulsara also did not err in denying Plaintiffs leave to replead their Securities Act claims.  (R&R at 31-32; Obj. at 19-20.)  For one thing, Plaintiffs have already amended their complaint once as of right and declined at least one opportunity to do so again following a pre-motion conference before the Court.  (Dkt. No. 68.)  More importantly, and as the R&R correctly observed, courts routinely deem leave to amend futile where, as here, the complaint's "own allegations demonstrate that a reasonably diligent plaintiff would have had sufficient information to plead the asserted Securities Act violations . . . more than one year prior to the filing of Plaintiffs' initial complaint."  *NECA-IBEW Pension Tr. Fund v. Lewis*, 607 F. App'x 79, 81 (2d Cir. 2015); *de la Fuente v. DCI Telecomm., Inc.*, 206 F.R.D. 369, 387 (S.D.N.Y. 2002) (because securities claims were "barred by the statute of limitations, any attempt to amend would be futile.").  Plaintiffs cryptically posit that "a new pleading may ameliorate some of the Court's concerns" about the AC "and increase the clarity of the allegations."  (Obj. at 19-20.)  But they identify "no additional facts or legal theories" that could somehow render their Securities Act claims timely.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint.")

---

[14] MJ Bulsara was also correct in recommending dismissal of Plaintiffs' derivative control-person claims, as well as any claims based on purported violations of Items 303 or 105.  (R&R at 21 n.64, 26, 3; Obj. at 15 n.8, 19 n.11.)

## CONCLUSION

For the reasons set forth above, Plaintiffs' Objections to the R&R should be overruled.

Dated:  New York, New York  
        January 6, 2022

Respectfully submitted,

DAVIS POLK & WARDWELL LLP


By:  */s/ Brian S. Weinstein*

Brian S. Weinstein  
Craig J. Bergman  
Jonathan L. Goldsmith  
450 Lexington Avenue  
New York, New York 10017  
Telephone: (212) 450-4000  
brian.weinstein@davispolk.com  
craig.bergman@davispolk.com  
jonathan.goldsmith@davispolk.com

Jonathan K. Chang  
18/F, The Hong Kong Club Building  
3A Chater Road  
Hong Kong, SAR  
China  
Telephone: +852-2533-3300  
jonathan.chang@davispolk.com

*Attorneys for the X Financial Defendants*

24