# Exhibit 1

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -   X

XIANGDONG CHEN,                    :
                                        19-CV-6908(KAM)(SJB)
          Plaintiff,              :

            -against-            :        United States Courthouse
                                         Brooklyn, New York
X FINANCIAL, et al.,             :
                                         October 6, 2021
          Defendants.            :        2:00 o'clock p.m.

- - - - - - - - - - - - - -   X


TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE.


APPEARANCES:

For Plaintiff:              POMERANTZ LLP
                           600 Third Avenue
                           New York, New York  10016

                           BY: JEREMY A. LIEBERMAN, ESQ.
                               CARA J. DAVID, ESQ.


For Deft. X Financial:     DAVIS POLK & WARDWELL
                           450 Lexington Avenue
                           New York, NY 10017

                           BY: BRIAN S. WEINSTEIN, ESQ.
                               JONATHAN L. GOLDSMITH, ESQ.
                               ZULKAR KHAN, ESQ.


For Defts. Cogency Global,
R. Arthur and C. DeVries:  K&L Gates LLP
                           599 Lexington Avenue
                           New York, NY 10022

                           BY:  JOANNA A. DIAKOS, ESQ.


CMH        OCR        RMR        CRR        FCRR

2

APPEARANCES:   (Continued)

For Defts. Morgan Stanley and
Deutsche Bank Securities:        LATHAM & WATKINS LLP
                                 555 Eleventh Street, NW
                                 Suite 1000
                                 Washington, DC  20004

                                 BY:  SUSAN ENGEL, ESQ.


For Deft. AMTD Global
Markets Limited:                 LOEB & LOEB LLP
                                 345 Park Avenue
                                 New York, New York  10154

                                 BY:  JOHN A. PISKORA, ESQ.


Court Reporter:                  Charleane M. Heading
                                 225 Cadman Plaza East
                                 Brooklyn, New York
                                 (718) 613-2643

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.



                    *     *     *     *     *


         THE CLERK:  We are here for oral argument, case

number 19-CV-6908, Chen versus X Financial, et al.

         Counsel, please state your appearances on the record

starting with plaintiffs.

         MR. LIEBERMAN:  Good afternoon, Your Honor.  Jeremy

Lieberman, Pomerantz LLP, on behalf of plaintiffs.

         MS. DAVID:  Good afternoon, Your Honor.  Cara David

from Pomerantz LLP on behalf of plaintiffs.

3

THE COURT:  Good afternoon.

MR. WEINSTEIN:  Good afternoon, Your Honor.  Brian Weinstein from Davis Polk for the X Financial defendants and with me are my colleagues Zulkar Khan and Jonathan Goldsmith.

THE COURT:  Good afternoon.

MS. ENGEL:  Good afternoon, Your Honor.  Susan Engel from Latham & Watkins.  I'm appearing on behalf of Morgan Stanley & Co. LLC and Deutsche Bank Securities.

THE COURT:  Good afternoon.

MS. DIAKOS:  And good afternoon, Your Honor.  Joanna Diakos of K&L Gates on behalf of Cogency Global, Colleen DeVries and Richard Arthur.

THE COURT:  Good afternoon.

MR. PISKORA:  Good afternoon, Your Honor.  John Piskora, Loeb & Loeb, for the AMTD defendants.

THE COURT:  Good afternoon.

Okay.  So it's a real pleasure seeing lawyers in court in a civil case which I haven't done in a long time.  It may not be a pleasure for all of you after the oral argument.  You can just keep those opinions to yourselves.  I say that in jest, of course.

So I'm happy to defer to the parties if they've discussed a particular sequence of topics in which they want to deal with oral argument.  On the other hand, if you haven't or would simply like to defer to what I'm interested in and

4

then talk about what you're interested in afterwards, there is a sequence of various topics that I would like the parties to address and rather than having, say, the defendants talk for 45 minutes and then have the plaintiffs, you know, wait all that time, I would be inclined to have, you know, defendants speak on one topic and then have the plaintiffs respond so there's at least some contemporaneous meaning of the issues. That tends to be more helpful to me than, say, a Court of Appeals or similar style where maybe we have shorter argument but it's one side on all issues.

What do you each think?

MR. LIEBERMAN:  Your Honor, on behalf of plaintiffs, we think it's a great idea and we're happy to go along.

MR. WEINSTEIN:  That's fine with me as well, Your Honor.

THE COURT:  Okay.  So let me just tell you what I thought the topics are that I'd like to broach with each of you and, obviously, if there's some set of opening remarks or anything like that on either side, we're happy to hear you on that.

So I would like to discuss first the statute of limitations, then the statements about preferred loans, then the statements about assessment standards and delinquency rates, then the statements around the growth of the card loans and then finally, I think, you know, I'll just say there's

CMH        OCR        RMR        CRR        FCRR

5

these post IPO statements and the failure to disclose trends and other issues.

So I would propose that, you know, Mr. Weinstein you would go first on your opening and if you don't have any, you don't have to, and then statute of limitations and then I'll hear from plaintiffs.  Does that work for you?

MR. WEINSTEIN:  It does, Your Honor.

THE COURT:  And you're free -- a couple of things. You can use the podium if you'd like.  You're welcome to stand where you are.  Also, I recognize it is not the most comfortable thing to be wearing a mask all the time but I'm not going to get in trouble with the Chief so neither are you, but if you need a break because you'd like some water or need to step outside, anyone, just raise your hand and I'll be happy to obviously accommodate that because I know it's hard to talk for several hours straight or just sit in a mask for several hours straight which is what this may end up being.

MR. WEINSTEIN:  Thank you, Your Honor.  I will use the podium.

THE COURT:  Okay.  Great.

MR. WEINSTEIN:  Good afternoon, again, Your Honor. Brian Weinstein from Davis Polk for the X Financial defendants.  I will take the opportunity just to say a few words by way of introduction before addressing the statute of limitations issues.

CMH        OCR        RMR        CRR        FCRR

6

As the Court is aware, this case involves the September 2018 IPO of X Financial.  X Financial is a fin-tech company in China that matches borrowers and lenders and two of its products are at issue here, card loans which are essentially balance transfer products, as well as preferred loans which are unsecured loans made generally to small business owners.  As the Court is aware, the plaintiff has brought claims under both the '33 Act and the '34 Act.

Before addressing the statute of limitations issues, I do think it is important just to mention a few things by way of context here.

As the Court is aware, part of the backdrop for this case are certain regulations that were promulgated by Chinese regulators to clamp down on this industry within China, the online consumer finance industry, because it was learned that there were many fraudulent Ponzi schemes within this industry.

I just think it's important to state right up front that there's no allegation whatsoever nor could there be that X Financial was such a company, nor is there any allegation that X Financial failed to disclose these regulations. Indeed, there's no allegation that X Financial misstated any historical financial results on the various issues that are in play here.  In fact, the plaintiffs concede in their briefs that they are not alleging that any historical results were inaccurately stated and that includes the results for the two

7

months immediately preceding the IPO which were particularly difficult months given developments in the market and uncertainty regarding these newly instituted regulations.

So turning now, Your Honor, to the statute of limitations issue, as the Court is aware, the issue here is whether plaintiffs could have discovered their claims more than a year before the complaint was filed.  For the reasons I'll get to later, we don't think there was any claim to discover at any point in time because we don't believe that there were any material statements or omissions, but the basic gist of the complaint, the three issues that are essentially the thrust of plaintiff's complaint, the underlying facts relating to those three issues are all disclosed on a November 19, 2018 investor call by X Financial over a year before the complaint was filed.

THE COURT:  So on that, right, I thought I noticed what was somewhat of a subtle shift in the standards to be applied here which is your opening brief cites to cases about corrective disclosures and that in reply, you seem to say, well, look, our point is it was simply disclosed, we weren't correcting anything.  Does it matter?  Is it your position that the underlying basis or constellation effects were simply disclosed?

MR. WEINSTEIN:  I don't think it matters, Your Honor, in the sense that the relevant question is whether

8

the facts that they were on notice of at least a year before the complaint was brought, you know, establishes a sufficient constellation of facts that the gist of the complaint would have been known to them.

We don't believe there were any misstatements or omissions, material misstatements or omissions in the offering materials, but to the extent there could be any doubt about that on these three issues, once they knew what they learned on November 19, 2018, they had a year from that point in time to file a lawsuit and I'll explain what I mean with respect to each of these issues, but that's essentially the gist of our argument.

THE COURT:  And just to stay on the standard point, you say in reply that this is not a storm warnings case. Right?  That is not a situation where we're saying, look, there were sufficient red flags in the registration statement or in the November 18th call to give people a duty to investigate.  In other words, it's not even, it's not even an inquiry notice kind of concept.

So if it's not a storm warnings situation, what is it?  Is it just that we simply stated the facts that are the predicate for the alleged Section 11 violations, plain and simple?

MR. WEINSTEIN:  I think it may become clear when I discuss each of the issues, Your Honor, because, again, the

CMH        OCR        RMR        CRR        FCRR

9

point is it's not as if we're saying that there was a misstatement, that they should have known that at the time. We don't believe there was a misstatement or omission to begin with.

THE COURT:  And we know that that's always the delta dealing with statute of limitations, that you have to concede that, assume that there is a violation.

MR. WEINSTEIN:  And that may be some of what's behind your question or maybe it looked like we were unclear what the standard was because in order to prove the statute of limitations, you have to seem to be implying that there was some kind of storm warning or problem.  We don't think there was a problem with the disclosures.

So, for example, with the preferred loan issue, Your Honor, the offering materials disclosed the data that was showing that the preferred loan business was way down, but they claim that there was some decision to completely shut down the line prior to the September 2018 IPO and as I'll get to later when we address the issue of whether there was actually a material misstatement or omission, they haven't alleged any cognizable fact that that's the case.  In fact, it wasn't the case.  The company did not decide to shut down that line.

THE COURT:  And that's certainly a question I'll have for you at some point and for the plaintiffs.

10

MR. WEINSTEIN:  Right.

THE COURT:  But just to stick on the November 18th call on that issue --

MR. WEINSTEIN:  Right.

THE COURT:  -- what, and I have Exhibit F in front of me and E, you know, is there a statement or statements --

MR. WEINSTEIN:  Yes.

THE COURT:  -- in that, I think your brief cites to pages 5 and 6 generally, that you would point to as saying, look, you know -- of course, you're reserving your argument that there's nothing, there's no false misstatement -- but what would you point to in that call that says the preferred, whatever there needed to be on preferred loans, there was enough to figure out that there was a claim at the time this statement was made?

MR. WEINSTEIN:  Yes.  So the statements, we think, it couldn't really be any clearer, Your Honor.  They say we scaled down the business of preferred loans.  They say -- and it's hard to imagine anything clearer than this that says, this is on page 6, the middle of the page.  So in the future, if you look at our core business, really it's online loan facilitation -- I'm sorry.  I'm in the wrong spot.  They say: To understand our business going forward, you should just focus on card loans.

It's hard to imagine anything clearer than that,

CMH        OCR        RMR        CRR        FCRR

11

that a company could say to make it clear that an investor trying to assess this business should not be focusing at all on preferred loans.  They said the business was being scaled down and to understand the business going forward, you should just focus on card loans.

So we would suggest that's certainly enough to put plaintiffs on notice that if they believe that the offering materials presented too rosy a picture of the preferred loan business, that they had a year from that point in time to bring a lawsuit and the plaintiffs failed to do that.

THE COURT:  And I understand it's your position that we don't actually -- is it your position or I should just confirm that no one actually ever says, because it may not be true in fact, that the preferred loan business shut down.

MR. WEINSTEIN:  Certainly not before the IPO. Nobody said that because it would not have been true if they had said that.

THE COURT:  But we're in the post IPO world, right, on November 18th?

MR. WEINSTEIN:  Right.

THE COURT:  Is it also your position that there was no statement or statements, whether it's November 18th or March of the following year, that says, you know, we are shutting down the preferred loan business?

MR. WEINSTEIN:  So what they say in 2019 well after

12

the IPO, and it's a little, the statement is a little ambiguous as to timing, they talk about problems that the line has had over the prior year and then it said so we literally discontinued the line expect with respect to some high quality repeat borrowers.  Basically, it's a way of saying we've really scaled back this product.  That's precisely what they are saying in November of 2018, more than a year ahead of time, they said, We've scaled down the line, if you want to understand our business, just look at the card loans.

And, again, I realize this is a motion to dismiss. I'm not asking the Court to make statements of fact.  They haven't alleged that the line was completely shut down prior to the IPO because they couldn't allege it because it's not true.

THE COURT:  I understand.  And you would say, and, obviously, I'll hear from plaintiff on this, but there's no daylight between the statement, We basically scaled down the business of preferred loans, and what it said in March of the next year.

MR. WEINSTEIN:  That's correct.  I mean, again, it's hard to imagine a statement any clearer than to understand our business going forward, you should just focus on card loans. They're basically saying to investors, Don't worry about the preferred line, that's basically being scaled down.

THE COURT:  Okay.

CMH        OCR        RMR        CRR        FCRR

13

MR. WEINSTEIN: You know, the second statement which forms a basis of their complaint is the argument that the company had consciously reduced card loan size and, again, that was, that was directly disclosed on the November call. They say, we consciously reduced ticket size by 20 percent to 25 percent.

In fact, it's the statement from the November call that's the very basis for their allegation. They don't have any other basis relating, to allege the declining card loan size other than the November 2018 statement themselves and so, obviously, it couldn't be any clearer that that put them on notice of that claim.

THE COURT: And what do you understand the card loan size allegation to be about, the total, you know, dollar amount of all of the loans or a per person average which is what I think at the point of the brief you allude to or the number of loans that are, you know, given out?

MR. WEINSTEIN: Well, so there's no -- as I said earlier, there's no allegation by the plaintiff that the historical numbers that were reported by the company about the total number of loans, the total volume of loans was misstated. So their allegation can't be about that.

What their allegation is, it's clear to me as I understand it and would have to be, is that it's the actual size on average of any, of each given loan, like, on average.

14

And, again, their whole basis for alleging that is this very transcript and so they had a year from that point in time if they thought that gave them a claim to file suit and they failed to do that.

THE COURT:  And is there anything, because I think part of what the plaintiff said is for each of these items, and we just went through preferred.  Right?  Look, the November statement was a partial incomplete disclosure and it was clarified by March and only in March were we put on notice of the, of a claim that the IPO registration statement was false.  Is there any, is there a statement in 2018 March that goes to this issue of card loans that --

MR. WEINSTEIN:  I don't believe there's any later disclosure that they used to claim that the size of the card loans was not sufficiently disclosed in November 2018.

THE COURT:  Okay.

MR. WEINSTEIN:  They also in their complaint alleged things about an increase in delinquency rates and they tried what we consider a time barred pleading, but they tried to use that to suggest that there was a loosening of credit standards in the early part of 2018 and as I'll get to when we address the substance of whether there's material misstatements or omissions, we don't believe that they've adequately pled it, but to the extent that they're trying to rely on delinquency, increasing delinquencies to argue that there was some

15

statement or omission about credit standards, again, this November 18th call described what those delinquency rates were just like the offering materials described what the delinquency rates were and there's no allegation that that data that was reported was incorrect.

So, again, if plaintiffs concluded, based on the newest delinquency that were given to the market in November, that somehow the offering materials painted too rosy of a picture with respect to delinquencies and credit standards, again, they had a year from that point in time to bring a lawsuit and failed to do so.

THE COURT:  And what statement would you point to in the November --

MR. WEINSTEIN:  Again, they report all of the delinquency data.  Again, we don't -- in a sense, I'm guessing because I don't know how this, how the delinquency data and the offering materials or the November, all could support a claim, but all of the delinquency materials, all of the delinquency figures in November that they somehow suggest in hindsight support a claim as of September were disclosed. They basically updated the delinquency figure.

THE COURT:  I just want to make sure that I understand a couple of statements in, I think it's page -- there's a paragraph that begins, On the preferred loans, actually we do have a higher delinquency in Q3.  And then we

CMH       OCR       RMR       CRR       FCRR

16

have, that paragraph ends with, So we do see a high increase of default.

So that's both a contribution for the delinquency increase in the third quarter alone.  Is that the same delinquency loan rates that we have been talking about?

MR. WEINSTEIN:  I mean, that's certainly one of the types of disclosures I'm referring to.  There may have been others as well but, again, these are the very things that the plaintiffs are relying on to say, oh, you painted too rosy of a picture about this company in 2018, in September 2018, in the IPO materials, which we don't think is true.

THE COURT:  And I get that and you keep saying that but the frustrating part about that, right, is that, you know, assume for a moment that their allegations are correct.

MR. WEINSTEIN:  Correct.

THE COURT:  Right?  For the purposes of the statute of limitations.  If I'm going to find that their claim is barred by the statute of limitations, I need to point to some statement or set of statements that either they assume or you believe would key them off to their, perhaps, as according to you, meritless claim.

MR. WEINSTEIN:  Yes.

THE COURT:  And I just wanted to confirm what you thought those were.

MR. WEINSTEIN:  Yes, I understand that, Your Honor,

CMH      OCR      RMR      CRR      FCRR

17

and it is, it's exactly the disclosures you just read.  My only point is there might have been some others.  I don't recall every word.

THE COURT:  Understood.

Unless you have anything more on these points, I have a couple of assorted other questions on the statute of limitations.

MR. WEINSTEIN:  Sure.

THE COURT:  One is what's your -- as a legal matter, how does the concept of what the plaintiffs cite to, reassurance, into the framework.  Right?  They say, look, if at the time you key us off to or on to an alleged violation, you simultaneously reassure us, right, that all is going to work out and all is fine or you do things to downplay your disclosure, right, the statute of limitations is not triggered or maybe it's tolled even depending on what cases you look at.  Right?  Does that reassurance concept apply in a non-storm warnings case?

In other words, I read, that sort of tracks the, and this may be a question either side may not know off the top of my head because I realize both sides are citing a lot of cases, but it seems to me if you characterize reassurance, cases either follow the storm warnings area or they apply both to the storm warnings area and to where you simply say I've simply disclosed it, right, because storm warnings is I have

18

some red flags for you, whereas, the other one is I'd actually said what, I put you on notice, not inquiry notice, I put you on notice.

Do you have a view as to where reassurance fits?  I hope that question makes sense.

MR. WEINSTEIN:  If I understand Your Honor, I think this is not a storm warnings case as we argued because the actual facts that they're relying on to make their case were disclosed and, in fact, here, there are no relevant reassurances with respect to these items.  They told him if you want to look at our business, only look at card loans, don't look at preferred loans, so there was not some reassurance about that.

THE COURT:  And I certainly will ask them whether they, what they point to as reassurance, but I want to simply know, you know, can I do a reassurance entirely, even if the position is not, it's not red flags, it's not go figure it out --

MR. WEINSTEIN:  Yes.

THE COURT:  -- but reset it.

MR. WEINSTEIN:  Yes, that is our position, Your Honor.

Just to be clear, the statement about reassurance is that they've mainly focused on in their briefing is a statement that the company had already recovered from the

CMH        OCR        RMR        CRR        FCRR

19

funding shortage which saw real lows in July and August and that was true.

That's not to say everything is perfectly fine and we're totally, you know, going gangbusters in our business. There was a very specific point about a funding shortage in July and that had recovered and that was a true statement.

THE COURT:  In other words, the reassurance does not marry with these three categories that we've just gone through?

MR. WEINSTEIN:  That's correct, Your Honor, and it was true.

THE COURT:  Okay.

And when you say that, is that because most of these reassurance cases, when you read them, talk about the reassurance being a false reassurance or false sense of security and that's why or, in other words, how does the fact that that's true cling to this at all?

MR. WEINSTEIN:  Because it's sort of a second level of argument, Your Honor.

THE COURT:  Not a false statement on which you can bring a claim?

MR. WEINSTEIN:  It's not a false statement on which you can bring a claim.  It doesn't undo the statute of limitations argument.  It doesn't line up with these three different disclosures.

20

THE COURT:  Okay.

My last question on this area, and I know what the instinct is to say, I can tell, so I'd like, not that you aren't being thoughtful but to give a, you know, perhaps go against your better instincts here or your initial instincts, is this a with -- is the statute of limitations resolution, is that a with or without prejudice disposition?

The reason I say it, normal, you could say, oh, they couldn't possibly state a claim, it's with prejudice, we don't have to go through the multiple rounds of briefings that go with a securities class action, but if the point is their theory of the case is, well, look, there were false reassurances or certain things were disclosed or not disclosed we can imagine it being a without prejudice dismissal.

Do you have any view?  Do you have anything that sheds light on this?

MR. WEINSTEIN:  I think I'll stick with my original instinct, Your Honor.  Whether it's right or wrong, I don't believe that it should be without prejudice because I don't see how they could replead what they've pled that would change the back and forth on this issue that we've already had, given what was said on the November 2018 call which is what they relied on in their complaint and it just says what it says.

It says, We're scaling down our preferred, you know, loan business; if you want to understand our business, just

CMH      OCR      RMR      CRR      FCRR

21

look at the card loans.  So what else could they plead?  It says we've consciously reduced card loans by 20 to 25 percent and that's the basis, that's the very basis of their claim. So what else could they plead?

THE COURT:  In other words, it would be with prejudice if only for the fact you believe that any amended pleading would be futile?

MR. WEINSTEIN:  That's certainly true, Your Honor. I don't know if there's a different legal issue you're pointing to that I may not have --

THE COURT:  No.  I'm just saying normally.

MR. WEINSTEIN:  Right.

THE COURT:  The Circuit says in these kinds of cases, you give the plaintiff at least one, oftentimes two bites of the apple.  And particularly, you know, it's often in the 10(b)(5) context more than the Section 11 context in the ability to plead scienter.

MR. WEINSTEIN:  Right.

THE COURT:  There's an absence of some fact.  So I was just wondering to get out under a potential statute of limitations bar, which I think normally we think of with a prejudice dismissal, sort of, without even getting into -- and I guess futility is implicit in that because it's, like, you can't, the claim, you know, accrued on X date, the statute of limitations is longer after you're looking at the after

22

effects and why, but we're in a situation here that's somewhat -- so it could be futility as the basis of that and people just don't say it but here we have kind of an odd, and I was just wondering whether there were cases which spoke to this or that you had any view as to it.

My sense is, I'll certainly hear from plaintiff, is that statute of limitations feels like a with-prejudice dismissal if only because it implies futility because you cannot, you know, relate your claim back in some way is the question.

While I have you, one question.  I realize this is not the list of topics but there's some back and forth about whether 9(b) applies in pleading fraud with particularity.

Now, what does that get you in a sense, right, because I'm assuming if you lost on that argument, right, you're not suddenly going to say, well, they've now said everything that could state a cause, you know, a non-fraud claim and, you know, the rest of our arguments fall away, but in other words, you know, what purpose does the argument have?

Normally we say, look, 9(b) means have you to say the who, what, when, where and why it's fraudulent, right?  In other words, why is it said with -- why can you draw an inference of fraud?  What is the purpose of the 9(b) argument.

If it falls away or I don't decide it or I decided against you, what implications does it have for the remainder

23

of the argument?

MR. WEINSTEIN:  Right.  That's a very good question, Your Honor, and I'd answer it in two ways.

First, before I directly answer it is to say that was not going to be a big part of my argument today because even though I think it's one of the legal issues that the Court needs to wrestle with, even if you accept that the lower standard applies, we don't believe that the complaint comes close to being sufficient to allege a claim, but I do believe that if 9(b) does apply, it makes the case even stronger that their confidential witness allegations which we believe are far too thin and vague to pass muster under the governing case law, that it's all the more clear that they can't do so if 9(b) applies.

THE COURT:  Okay.  Thank you.

Anything else on statute of limitations before I let plaintiffs go?

MR. WEINSTEIN:  That's all I have, Your Honor. Thank you.

THE COURT:  All right.  Thank you.

MR. LIEBERMAN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. LIEBERMAN:  So, Your Honor, to break it down really on the statute of limitations discussions, two categories, one is a preferred loan and then there's just a

CMH      OCR      RMR      CRR      FCRR

24

general overall, you know, loan and assessment and credit risk practices which impact, you know, loan amount to loan value.

So when it comes to preferred loans, it's -- we allege clearly --

THE COURT:  So let me ask you that.  What category are we alighting in that or are you subsuming, right?

The defendants say, look, we understand there to be three broad categories:  You know, the preferred loan business, then the card business and then there's, you know, the second category which I guess we would call the delinquency rate and credit standards, et cetera.

Are you alighting that third category the card business?

MR. LIEBERMAN:  I would say when it comes to the corrected disclosures regarding the card business, there very much are overall disclosures that just generally deal with the loan book and credit assessment generally.  So you can -- it's going to be -- particularly from a statute of limitations, we're looking at a statement that, oh, look, we've tightened credit standards and, therefore, loan volume has decreased, that's going to affect card loans and that also militates regarding the assessment standards and the credit risk because they had, you know, because there were lacks in their credit standards, they would have to tighten it and that impact the volumes for both preferred and for card loans.  So that's

CMH      OCR      RMR      CRR      FCRR

25

the -- I wouldn't call it, alighting is, you know --

THE COURT: So, in other words, if there are statements either sufficient to -- because I thought the delinquency rate and credit standards, you're saying that those arguments are simply pass-throughs to how you get to the card loan volume allegations?

MR. LIEBERMAN: I wouldn't say there's a test. I think for analyzing, there's two -- in our view, when it comes to post-November correct disclosures, post-November relations, it's largely hitting those -- it's largely hitting preferred loans and then there's the statement regarding, generally, the declining loan volume because of increased credit standards and that's affecting both the amount of card loans and just loans generally and then, obviously, it impacts the credit assessment as well.

So that's, that's the only point I'm making as far as, as two categories with respect to the statute of limitations issue.

THE COURT: Okay.

MR. LIEBERMAN: So focusing on the preferred loans, the only time that the company admits, and we state, we allege clearly in its admission that they discontinued the preferred loans is on March -- is the May 2019 statement where they say unambiguously that they discontinued that, that line and they say we would be literally discontinuing the line. I don't

26

know how to --

THE COURT:  But that's not the standard even under the cases you cite.  Right?

The cases you cite say, look, it has to be a probability of a violation, not a possibility.  It doesn't require the actual, you know, statement of the truth to come out as triggering the statute of limitations.  Right?  In other words -- right?  So it's whether, whether it's the constellation test or even your probability test, right?

MR. LIEBERMAN:  Well, what it is is -- whether it's constellation or probability, the falsity of the statements to the extent that it omits that the company had discontinued the preferred line only comes to light in May of 2019.  So that, so that discontinuance, that simple allegation from CW1 and from, ultimately, from the company's disclosure in May of 2019 that it's discontinued, literally discontinued, the only time that comes to light, you will find at no other time earlier is in May to 19.

THE COURT:  I understand that but under, the whole point of the probability of the constellation standard, right, is to look at not when the literal truth comes out -- you said, you used the word "literal," right -- but, rather, the statements that they allege, in other words, that the defendants allege, is that sufficient to put someone on notice inquiry or directly on notice of the claim?  And they say the

27

question is not to look at the March statement but to look at the November statement and say does it, whether it's the probability or the constellation test, does it satisfy that.

They point to the statement we basically scaled down the business of preferred loans.  I thought you were going to begin by telling me why that statement is not sufficient which is I think the way you apply the test, not looking at, oh, this is when the truth came out.

MR. LIEBERMAN:  Well, I think it depends on how you characterize a claim.  If you're characterizing a claim as a failure to disclose the discontinuance of the preferred loans, that is only becoming revealed to the market.  That's the claim that's alleged, that they discontinued it, and it was a failure to disclose a discontinuance of that.

THE COURT:  But --

MR. LIEBERMAN:  That's the omission.  That's the precise omission.

THE COURT:  But that only alighted with the statute of limitations standard in that characterization, right, because it means the statute of limitations only begins to run when the exact claim that you have alleged arises and that's not true in Section 11 context even under your cases.  Right?

It is the probability test or the constellation of factors test.  It's not when did the -- it's not like a tort, when did the thing happen, right?  It is when I get enough

28

facts or when somebody put us on notice of something such that we could have brought a lawsuit. It's not --

MR. LIEBERMAN: We would say, Your Honor, we would say that in November of 2019, when the company says we scaled back over the last three quarters, that simply doesn't tell you -- that tells you some notion that there was some decrease in the preferred loans. It doesn't tell you how much. It's one level. "Scale back" can have a very wide spectrum of meanings. It could mean scale back by 95 percent. It could mean scale back by 98 percent. It could mean scale back by 93 percent.

THE COURT: Let's be clear. It's not scaled back. It's scaled down.

MR. LIEBERMAN: Scaled down or scaled back, duly corrected, Your Honor, but whether it's scaling down or scaling back, that's a very hard --

THE COURT: Fair enough.

If I accept that premise, right?

MR. LIEBERMAN: Yes.

THE COURT: What is the statement in Exhibit G or, I don't know if you have, that's the defendants' exhibit number, but if you have a different one, that's the March 2018 call transcript. What's the statement in there that you point to that says that's when they told us? If you claim that's when they shut that aspect of the business down, what's the

29

statement there that says that?

MR. LIEBERMAN:  Sure.  It's alleged in paragraph 33 of the amended complaint and it says that over the last year, the risk was higher than we expected so we literally discontinued that product line.  That statement.

THE COURT:  Okay.  I understand.  Go ahead.

MR. LIEBERMAN:  And to address what my adversary said earlier, he said, well, what we really put for statute of limitations purposes for preferred loans would have said going forward, you should only, you should not consider preferred loans as part of business.  That's going forward as of November of 2018, not going forward as of the time of the IPO. That was how my adversary led this, that the statement that put investors on notice was a statement going forward as of November when the statement was made as of November 2018, you should not considered preferred loans as part of that.

THE COURT:  I mean, maybe there's a different statement you're referring to, but when the statement is, And from that perspective, we basically scaled down, that's talking about the past tense, right?  I mean, I don't understand the argument with respect to that sentence.

MR. LIEBERMAN:  Okay.  Because it's telling you prospectively, that's not going to be part of the business, that's not telling you what's known to the market at the time of the IPO.

30

THE COURT: Okay. So if I look at the statement you've identified in paragraph 33, is it, what's the basis to infer that that's a statement about pre-IPO activity?

MR. LIEBERMAN: It's holistic with the allegation of CW1.

THE COURT: I don't know what that means.

The statement in March of 2019, either the statement of March of 2019 says that literally it was discontinued at the time of the IPO or doesn't, isn't that what you were seeing?

MR. LIEBERMAN: Well, it's telling you, it's telling you the definition. Now we know, now we know on May 21, 2019, now we understand what "scaled back" means. Now it's understood to the market what "scaled back" means. As we said, it's a spectrum. It could have meant a number of things. Now we understand finally in context what "scaled back" means. It means discontinued.

THE COURT: So I have to read this in conjunction with the CW1 allegation that you believe says it was discontinued sometime prior to September 18th of 2019.

MR. LIEBERMAN: You would read --

THE COURT: 2018, excuse me.

MR. LIEBERMAN: You would read this allegation in conjunction with that allegation and you would read this statement in conjunction with the November 2018 statement

CMH        OCR        RMR        CRR        FCRR

31

which says we scaled it back.  Now we understand what "scaled back" means.  For the first time, we understand what "scaled back" means.  It means it's cut off, discontinued, terminated, and that's the first time we're alerted to that.

"Scaled back" is an amorphous term -- "scaled down," excuse me, is an amorphous term which doesn't have meaning and "discontinued," it's very clear now what "discontinued" means.  So we do look at it in conjunction with the prior statement of November 2018 and we look at it in conjunction with the CW1 allegations that, indeed, by October 2018 when he left which is just a few weeks before the IPO, that that was, it was discontinued and they had ceased processing preferred loans in the Guangzhou region which is the main center.

THE COURT:  I appreciate, I understand your argument now.

If you look at paragraph 94 of the complaint, okay, the complaint here itself characterizes the November 19th call with respect to the preferred loans.  It says, In other words, rather than growing preferred loans, they were being intentionally phased out; that's the inference you draw from the November 19th call?

MR. LIEBERMAN:  And we draw that in the context of the May 20, 2019.

THE COURT:  That's not what the complaint says.  Come on.

CMH       OCR       RMR       CRR       FCRR

32

MR. LIEBERMAN: That's not what the complaint says, but that's the basis for our allegations in the context now --

THE COURT: Are you saying that the statement in the complaint, the last sentence of that paragraph, In other words, rather than growing preferred loans, they were intentionally being phased out, is not a characterization of the three sentences that come before it?

MR. LIEBERMAN: Your Honor, I would say fervently it's a characterization based upon the ultimate statement made in 2019 as well as the CW1 allegation.

THE COURT: That begs for belief, frankly. The last time I checked, in other words, you're summarizing what immediately precedes it, right, and you're characterizing May 2019.

I thought what you were going to say is that the phasing out is not the same thing as elimination, but you're taking a different position which is, No, actually, I shouldn't read what you've written here but, instead, I should read it in some other way that's referred to in the confidential witness statements that are not mentioned in this paragraph.

MR. LIEBERMAN: But, Your Honor, that's what I said earlier and that's certainly, we certainly allege -- we certainly, you know, assert that as well, that when you say phased out, intentionally phased out, which is plaintiff's

33

characterization.  Defendants can't say, Well, there's a statute of limitations defense here because plaintiff's characterize these words in paragraph 94 which somehow alerted investors to the fact that it was being discontinued.  These are characterizations.  Words speak for themselves.

THE COURT:  All that means is plaintiffs plead themselves out of court all the time.  That's the nature of what a statute of limitations defense asserts, right?  I get that and I understand your argument and the distinction between, you know, scaled down and eliminate, but this is your statement saying it was -- this is not even -- you know, this says significant reductions, they were being phased out which reads eliminate, not reduce.  That's your, those are your words.

MR. LIEBERMAN:  Phased out does not mean eliminating, does not mean has been eliminated.  It means gradually being eliminated.  On a gradual basis, it means being eliminated.  That's what "phased out" means.  There's a difference between "phased out" and "eliminated."

THE COURT:  And particularly on a motion to dismiss --

MR. LIEBERMAN:  And he said, "literally discontinued."  "Literally discontinued" has an essential difference in meaning than "phased out."

THE COURT:  Okay.  I understand that, right, but I'm

34

trying to understand your own statement.

I mean, "intentionally phased out," it's in the past tense and you bolded "over the last three years." In other words, you're using this statement on November 18th to talk about what has happened, I assume, because it follows paragraph 93 which says, They were indeed aware they had already chosen to discontinue the preferred loan product. Then you say this: Meaning over the last three years, they had eliminated the product. Right? That's why this paragraph follows the one before it.

MR. LIEBERMAN: Right, but that doesn't -- that doesn't change the essential -- we're never saying anywhere in the complaint that by saying phased out, they are alerting the market the market has been eliminated. Nowhere do we say that in paragraph 93 or 94.

THE COURT: I don't know what "phased out" -- I understand the difference between "scaling back" or "scaling down" and "eliminate." I don't know what the difference is between "phasing out" and "eliminate."

MR. LIEBERMAN: And literally discontinuing? I think it's one is phases, this is a product that may not be in our future, maybe we'll phase it out over five years, and one is literally discontinue, we're done, we're not selling the product anymore, and that's what CW1 alleges.

THE COURT: I will tell you your statement strains

CMH      OCR      RMR      CRR      FCRR

35

credulity but go ahead.

MR. LIEBERMAN:  Your Honor, we would say, first of all, there's an essential difference between "phase out" and "literally discontinue."

THE COURT:  And that's because I proffered that argument, not because that's what you led with, right?

I said I thought you were going to say that. Instead, you start to say this is a characterization of something, it's not a characterization of something that came before it.

MR. LIEBERMAN:  Your Honor, we would say both.  We would say both.  And there's nothing -- clearly, we've alleged already in the previous 93 paragraphs that witnesses had affirmed that the product was actually discontinued.  That had been already alleged and what we are saying is that the basic theory of the case is that the company did discontinue, literally discontinued the preferred loans before the IPO and they, but they started to dribble it out to the market in the way that the market can slowly adjust to it.

THE COURT:  I understand the point and we should move to the next subtopic which is your second category but, you know, I understand the theory you have, but I have to look at the pleading as characterized, and what it actually says, not the sort of, you know, the theory that is captured in, either in the briefs or oral argument.

CMH      OCR      RMR      CRR      FCRR

36

MR. LIEBERMAN: Okay. And then we would still say if you look at the literal words that we said is that preferred loans were being intentionally phased out, that has a different meaning than literally discontinued even if you look at those words.

THE COURT: Okay.

MR. LIEBERMAN: And so, and so with respect to the loan, loans and loan volume, generally, the first time that the market learns that the loan volume had been declining -- excuse me -- that the approval rate had been declining since the middle of 2018 was in Cheng's March 19, 2019 statement. There was no time beforehand that the company had said that their approval rate had been declining.

THE COURT: Are you drawing a distinction between approval rate and delinquency rate?

MR. LIEBERMAN: No, no, no, no.

THE COURT: Because approval rate is the -- it's from the lender's perspective, right, these are the number of loans we're approving. Delinquency rate is basically the rates of default or failure to non pay, as I understood it, and that policy affects the amount of money that comes in on a revenue basis.

MR. LIEBERMAN: Right. So I'm not speaking about delinquency rates. I'm speaking about approval rate. And it's going to significantly affect loan volumes and earnings

37

from loan volumes, et cetera, and that approval rate and impacts, our allegation is, that the, with respect to the fact that lending standards were lax in the run-up to the IPO and then, all of a sudden, tightened at or right after the IPO and all that, you don't have any statement talking about a declining approval rate.

THE COURT:  Where in your brief do you distinguish approval rates?  Because I'm just looking -- you can look at the table of contents of your brief.

MR. LIEBERMAN:  Right.

THE COURT:  Section 2(a)(3).  Which one of the A, B, C and D is that?  That's how I understood you were characterizing, because, frankly, there's a little bit of ships passing in the night which happens, right, about which claims, what are the claims that are being acted upon which is fine.  Right?  I just want to understand because I had understood your A through D and as you, when I began, I didn't have approval rates as one of my categories.

MR. LIEBERMAN:  Your Honor, there, there is no point in the brief where we specifically say approval rate, there is no point in the brief where we say that.  The general --

THE COURT:  Okay.  So you're now making an argument you didn't make in the briefs about why a class of claims is now timely.

In other words, we're talking still the statute of

38

limitations and I was understanding the categories A through D because I have to look at it in kind of almost on a per allegation basis. So this is a new argument about a class of, a new class of claims and why those are timely?

MR. LIEBERMAN: No. They're statements regarding the company's revenues, their growth, and the prospective growth, their credit standards, et cetera.

THE COURT: Now you've melded six different categories. Okay? I want to focus on what you said which was you're alleging that there's a category of allegations related to approval rates, the lenders approving of loans which is what I understood that to be, and I'm trying to figure out what -- we'll get to delinquency rates and the trends in the business. Those I see in the briefs and those I understand.

So if you are going to go with approval rates, I want to understand what that is and why that's not in the briefing. If it's not in the briefing, you know, I simply ask what are the allegations in the complaint that relate to that.

MR. LIEBERMAN: Your Honor, we would say, when you're talking about the approval rate and our growth, and, again, Your Honor may not be satisfied with the answer, but when we're speaking about the growth of a certain product line and you're speaking about your credit assessments and you're learning for the first time that that's being -- we don't, I don't have a section discussing approval rights and briefing.

CMH     OCR     RMR     CRR     FCRR

39

THE COURT:  Okay.  That's the question I asked and that's the answer to my question.

MR. LIEBERMAN:  If that's the answer to your question, that's the answer to your question.

THE COURT:  Okay.  And so if you're now raising allegations about approval rates, not whether that's okay or not, but to the extent you're doing that, what are the allegations in the complaint that deal with approval rates so I can figure out whether they're timely or not.

MR. LIEBERMAN:  So on page 20 --

THE COURT:  Okay.  Go ahead.

MR. LIEBERMAN:  On page 20 of the brief, we talk about how the complaint -- it's subsection C.

THE COURT:  So this is the card loans --

MR. LIEBERMAN:  Yes.

THE COURT:  -- which is what -- do you remember when we began this conversation, I asked about card loans and you said they're subsumed in this other category?

MR. LIEBERMAN:  And that's correct, Your Honor, it is subsumed.  We state:  The complaint alleges, with support from the defendants' own later statements, that the company is consciously prior to the start of the IPO reduced both the size of card loans and the approval rate.

So that's addressed squarely in the brief.  What we're saying is that that was not known to the market, that

CMH        OCR        RMR        CRR        FCRR

40

allegation, and the truth of that allegation is never known to the market until March 19, 2019.

THE COURT:  Look at paragraph 109 of your complaint.

MR. LIEBERMAN:  Okay.

THE COURT:  If we're talking about approval rates, you say:  As a result of the November 19th call, the defendant X Financial said in light of this, they would ... reject more applications.

MR. LIEBERMAN:  Yes.

THE COURT:  So they say that on November 19th.

MR. LIEBERMAN:  Before the IPO, yes.  They say it after the IPO but they don't say that they did that during, before the IPO.

THE COURT:  But that's not the question.  The question is you filed the lawsuit more than a year after November 19th.  That's the question.  Not whether -- it's not -- this is not a 10(b)(5) claim based on the accuracy of the statements made on November 19th.  That's not what this case is.  That's a different case.  The case is is it a Section 11 claim based on the September -- there are 10(b)(5) claims but you haven't, unless I've misread the complaint, argued that there's a fraudulent misstatement made on November 19th because of some omission.  Right?

MR. LIEBERMAN:  Correct.  Absolutely.  Absolutely. And so on November 19th, they say in the future, we're going

41

to reject more applications, but what they haven't disclosed to the market is that they've already started to reject more applications prior to the IPO by defendants' submission.

THE COURT:  I see.  So you're saying that this is a statement about the future and it would give you no indication that it had occurred in the past?

MR. LIEBERMAN:  That's correct.  That's correct, that's the allegation.  And I -- again, we've had a lot of back and forth to Your Honor's frustration regarding how this is being sliced and died amongst the various allegations and, again, we do contend that it does talk about when you're speaking about risk assessments and you're talking about credit risk and you're discussing these issues and you're talking about how you're focusing on prime borrowers and you're discussing the growth in your loan business and you're not saying that you're tightening credit, you're rejecting more applications, that is impacting those statements.  I note that apparently is frustrating Your Honor but --

THE COURT:  Well, it only frustrates me if, you know, we're being general and not specific because speaking in generalities is not how the law requires me to analyze the question, right?  And the frustration about approval rates is I asked you at the outset what are the categories and then I asked you where it's in your brief and, but it is what it is.

Just so I understand, I think we've been over this

42

part, 109 is you're saying that's a statement about the future and, therefore, it doesn't tee you off to what's occurred pre-IPO.

MR. LIEBERMAN:  No way, just like any statement regarding -- just like the statement that in the future, you should only look in November, you should only look at a preferred business does cue you in as to what circumstances --

THE COURT:  Okay.  So what in the March tells you this occurs before the IPO?

MR. LIEBERMAN:  Sure.  Well, on page 30, paragraph 112, it says:  Defendant Cheng for the first time stated that the approval rate has been decreasing since the middle of last year.

THE COURT:  So this turns on the meaning of the word "middle"?

MR. LIEBERMAN:  Sure.  We have to, in a pleading, we have to take the words literally.

THE COURT:  No, that's actually not right.  We have to accept the allegations as they're said.

I'm trying -- so what about their argument that the word "middle" needs to be understood in the context of what he's, what is said later in the conference?

MR. LIEBERMAN:  Well, that's a very vague statement. We should look at something said later on, later on about what "middle" might mean.  Nothing about saying that the approval

43

rate has been decreasing since the middle of last year means anything other than at the mid point of last year, which is well before September 19, 2018, well before the middle, they started to, they had started to decrease approval rates.

THE COURT:  Okay.  And what's your view on with or without prejudice?

MR. LIEBERMAN:  Certainly, we would, you know, with the benefit of the Court's ruling on a motion to dismiss, we would be, we would like the opportunity to, if the Court, with benefit of that guidance, to supplement the allegations in order to show precisely how the market did not learn of the allegations that we've alleged.

THE COURT:  Okay.  All right.  Anything else on statute of limitations?

MR. LIEBERMAN:  No, Your Honor.  We've, you know, we've -- again, we made our points.

I think preferred loans, there is no understanding to the market.  In our, it's in our allegations that it's being literally discontinued, it's terminated, until May of 2019 and when it comes to, that approval rates are declining which, in our view, touches upon so many statements and touches upon the growth of the company and prospective growth of the company which is a lending business and if you're a lending business and you haven't disclosed that your approval rate had been declined prior to the IPO, that's going to tell

44

you that you're not going to be able to issue as many loans, you're not going to be able to make the same type of revenues and the business is not going to be growing the way the company consistently said it was going to grow in the IPO.

THE COURT:  And that's the second sentence of 112, that's what you're referring to there?

MR. LIEBERMAN:  Yes.

THE COURT:  Thank you.

MR. LIEBERMAN:  Thank you, Your Honor.

THE COURT:  Okay.  Let's talk about the preferred loan statements themselves unless you want to quickly say anything about statute of limitations.

MR. WEINSTEIN:  What I would propose, Your Honor, if it's okay, there are three sets of arguments under the '33 Act, the preferred loans, the credit standard and the card loans.

THE COURT:  Yes.

MR. WEINSTEIN:  If it's okay with Your Honor, I propose to address those three together.

THE COURT:  Great.

MR. WEINSTEIN:  And I may make a comment or two referring back to the statute of limitation points in the context of that.

THE COURT:  Okay.  Great.

MR. WEINSTEIN:  So on preferred loans, Your Honor,

45

it boils down to their allegation that the company had made a decision to discontinue the line completely before the IPO and there are no cognizable facts that they pled that would suggest that, again, as I've said, they haven't pled that because they couldn't plead that because it's simply not true.

THE COURT:  And what about this "discontinued" statement from March?

MR. WEINSTEIN:  So that statement in March 2019 said we talked about problems over the prior year and said we literally discontinued except for certain high quality repeat buyers which, to me, is another way of saying we really scaled back this business.  It doesn't say when it happened.  Their only allegation that it happened prior to the IPO is based on one confidential witness.

THE COURT:  And so -- okay.  In other words, the statement about "discontinued" is not intentional with any statement in the registration statement because you would say, number one, it's not a full discontinuance?

MR. WEINSTEIN:  And it's ambiguous as to timing. The line was not discontinued prior to September 2018 and their only, and their only allegation that it was, it's not even their confidential witness who's alleged to have said it. It's somebody who apparently told the confidential witness who the plaintiffs lawyers have not even spoken to.  It was completely unidentified by position, it's completely

46

unidentified what his basis was for believing that, all that the confidential witness is alleged to have said, and it's entirely insufficient as to the case law.

THE COURT:  And so, I mean, in your briefs, you spend some time saying, look, there are all of these statements about, in the disclosures about the total mix --

MR. WEINSTEIN:  Yes.

THE COURT:  -- changing, right?  But none of -- I don't read, although I'm happy to be disabused of this notion, any of the statements you identify as the mix of information as saying what's said in March or said, or, in other words, the high end, you know, the phasing out except for high end or what's even said in November and that really, the defense, in addition to what we just went over, rises and falls not on what was disclosed but the confidential witnesses, what weight, if any, to give to them.  Is that fair?

MR. WEINSTEIN:  I think that is fair in the following respect, Your Honor.  The main reason why the complaint fails is that, one, it's untimely and, two, they just haven't alleged cognizable facts that affect their claims.

The affirmative disclosures that were made in the offering materials we think are important in various respects for certain arguments, but I agree with you that the main reason why this case should be dismissed is that they just

47

haven't pled sufficient cognizable facts and their own allegations, as Your Honor has pointed out, I think, plead them out of court on the statute of limitations basis.

THE COURT:  Okay.  One other question on this preferred loan and the confidential witness and I know that you are going to that.

MR. WEINSTEIN:  Yes.

THE COURT:  I mean, the Novak or Novak case in the Second Circuit which, you know, they relied on, right, as well as Judge Engelmayer's case, I mean, they seem to allude to the fact, look, it's sort of like the difference between weight versus admissibility, right, which is to say that I'm to take the confidential witness for what it is.  In other words, it's a statement that I can, you know, look at and accept and I should accept but, you know, that's different and I don't think that their case is on this point but I'm happy to have you tell me which ones those are about the weight issue which is, you know, on a motion to dismiss, can I say, look, yes, this is a confidential witness, this is what he said, but that just doesn't mean a lot.

MR. WEINSTEIN:  Right.  So, Your Honor, it depends on the particular allegations that are made in the complaint about the confidential witness.

So, certainly, it's true that you can rely on confidential witnesses under the right circumstances and

48

certainly there have been some cases that have found that the allegations regarding that confidential witness were sufficient to survive a motion to dismiss.  There are a lot of cases that find that it's not sufficient and we think that the allegations here align much better with those cases.

The reasons are, as I started to mention earlier, the only person who's alleged to have said that the line was discontinued is not even the confidential witness.  He says he was told by somebody else that the line was being discontinued.  We don't even know who that person was, what position they held, what their basis was for saying that, what they actually said.  The case law is very clear that that type of allegation is not sufficient.

The confidential witness himself, all that he said is that he worked in credit risk control for about a year, year and a half, and that he had to leave because of the one location where he was working out of, which is one of eleven different locations in the company, was no longer facilitating preferred loans as of October of 2018.

THE COURT:  Well, that was going to be my next question.

We're talking about paragraph 86 in the complaint and the confidential witness says preferred loans were no longer being administered in the office located in the Guangzhou region of China where he Worked.

CMH      OCR      RMR      CRR      FCRR

49

MR. WEINSTEIN:  Right.

THE COURT:  Is there something in the registration statement that says, you know, how many offices there are?

MR. WEINSTEIN:  Yes.

THE COURT:  Or that helps put --

MR. WEINSTEIN:  Yes, Your Honor.  Page 169 of the offering materials, the registration statement, it's the bottom paragraph.

THE COURT:  Okay.

MR. WEINSTEIN:  Let me know when you're there.

THE COURT:  Yes.

MR. WEINSTEIN:  It says:  As of June 30, 2018, we facilitated the preferred loans in approximately eleven cities in China.

THE COURT:  I see.

MR. WEINSTEIN:  Okay.  I'd also note, Your Honor, that we're not relying entirely on this, obviously, but he says he had to leave in October of 2018 because they were no longer facilitating preferred loans.  That's actually after the IPO which was in September which is a point.

The more important point is he is not in a position and doesn't even purport to claim that he knows anything about a company-wide decision to discontinue the line.  That's not what he said happened.  He didn't have a basis to know that.  It's actually counterfactual and he says somebody told him

CMH     OCR     RMR     CRR     FCRR

50

that but doesn't tell us who that was or what their position was or what their basis was.

THE COURT: And when you say it's counterfactual, that's because of what we started with, that, in fact, there was no limitation?

MR. WEINSTEIN: Certainly not before the IPO.

THE COURT: Okay.

MR. WEINSTEIN: And, again, the only thing they're relying on is the statement that, you know, in May of 2019 about the line being discontinued but, again, the statement doesn't say that was done before the IPO and it doesn't even say it was discontinued altogether. It says it was literally discontinued except for certain high quality repeat buyers.

So there's just no cognizable actual --

THE COURT: And I realize we may not have it, but the complaint doesn't have a page citation for that. Do you have a page citation?

MR. WEINSTEIN: For this statement in the --

THE COURT: In Exhibit G.

MR. WEINSTEIN: Yes. I'll find it.

THE COURT: It's okay. I don't -- because I think if plaintiffs have it, that would be great too and I can certainly come back to it. Sorry.

MR. WEINSTEIN: Okay. So in terms -- I should say, Your Honor, pivoting for a second, on the substance there,

CMH     OCR     RMR     CRR     FCRR

51

they focus on one statement in the offering materials that referred to preferred loans in the context of growing the customer base.

THE COURT:  Okay.

MR. WEINSTEIN:  And that one sentence can't possibly render the offering materials materially misleading because, again, the data that was presented showed the preferred loan line being drastically down and the fact that there was a decline in preferred loans which was disclosed doesn't mean that it couldn't contribute to growth.

Really, plaintiffs' argument depends on the notion that the company had already decided to shut down the line as of September 2018 and as I described, there's just no facts that were pled that would support that.  And, again, if there could be any doubt on any of that in terms of the merits of misrepresentation, you come back to the statute of limitations.

So if somehow they allege that the September 2018 offering materials were not sufficiently forthcoming about the future prospects of the preferred line, there couldn't be any doubt as of November 2018 and, again, not only do they say it was being scaled down, they said literally, to investors, if you want to understand our business going forward, you should just look at the card loans.  That's them saying that to investors, saying don't really think about our preferred line,

52

that's on its way out.  So it's hard to get any clearer than that in terms of starting the statute of limitations clock.

So if I can turn to the second set of arguments that they make which is that the company failed to disclose that they had relaxed credit standards in the first half of 2018 and then they allege that there was this tightening between the end of July and the middle of September, so during a very specific six-week period, again they have no cognizable facts that would support that theory nor do they have any facts that they pled describing what the nature or scope of this supposed loosening of credit standards was that would allow a conclusion to be reached that it was material or that would tie you to any statement in the offering materials that would be rendered misleading.

Again, they're relying entirely on confidential witnesses and three blog posts.  And, again, going back to what I said earlier, sometimes confidential witnesses can be enough and sometimes they're not enough and this is clearly a case where the allegations are just far too thin to allege a securities claim.

THE COURT:  And so you're not saying that the registration statement says anything about loosening or tightening of assessment standards as a means of saying this is not a false statement because it was said before.

MR. WEINSTEIN:  That's correct.  It's just they

53

don't have any evidence that it happened and no evidence that if anything like that happened, that it was material because there's just nothing pled other than some very vague anecdotal comments from two confidential witnesses, one of whom, the confidential witness we've been discussing said that the screening process became less rigorous.  That's it.  No details, descriptions.  What does that mean?  He said he was told by some unidentified manager not to be as detailed in his diligence.  We don't know who that manager was.  Plaintiff's lawyer hasn't spoken to that manager.  We don't know, you know, what the context was.  No specific facts are provided.

This confidential witness doesn't even purport to allege that there was some company-wide change in policy.  He doesn't say, My manager told me there was a new policy here so here's what you have to do differently than what you did before.  It's just completely anecdotal.  It's one employee and it's insufficient to allege a securities claim.

Then there is a second confidential witness who for purposes of this point was not even in the relevant department and he was not screening borrowers, he was in the debt collection department, and the sum total of allegations was that the standards were lax but no details whatsoever about what that means, how it changed, anything.

Again, under the, under the case law, it's just far too thin to suggest that there was some company-wide change of

54

policy and, of course, these three anonymous blog posts out of thousands upon thousands upon thousands of borrowers that made reference to how quickly and easily they could get credit, which, incidentally, is not different than the facts disclosed in the offering materials that one of the things X Financial prided itself on as a technology company was that its technology allowed them to make credit decisions very quickly. That was kind of for card loans, the way the business model worked, but three anonymous blog posters say nothing about the company-wide change in policy, about how credit assessments were made.  Obviously, that cannot possibly sustain a securities claim.

To the extent that they tried to rely on the fact that the delinquency numbers rose after the IPO, and tried to infer from that, that there was some change in policy, that's obviously classic hindsight pleading which doesn't suffice to plead a claim.

Then with respect to this notion of credit standards then tightening over the six weeks before the IPO, you know, that whole issue is really only relevant, frankly, if they can establish that credit standards were loosened during the six months beforehand because, which they haven't done.  In other words, what they're really saying is you loosen your credit standards and then you realize you had a problem on your hands so you had to quickly tighten it, but they haven't established

55

or pled any facts showing that the company actually loosened its standards.

They also haven't pled anything cognizable that the company then tightened its standard in that period of time. There's a statement as we were talking about, Your Honor was just talking about with plaintiff's counsel in the March 19th call that approval rates had declined sometime in the middle of 2018. Your Honor said are you really, does this claim really come down to whether or not the middle means July or September? In fact, there's an even, I think more far-fetched when you look at the whole transcript because he later modifies what he says and says we tightened approval rates sometime in the second half of 2018. So he doesn't -- it's not -- when in the second half. There's nothing that puts it before the IPO. And, again, even if it was before the IPO, which hasn't been adequately alleged, how can a tightening of approval standards be a material issue unless you can also establish they were previously loosened which they hadn't done nor had they pled any facts to suggest that this tightening of credit standards, you know, whenever it happened was somehow an ongoing material change to the company's business rather than, you know, the type of adjustments that a company makes with any given quarter as a matter of risk control.

The suggestion seems to be, you know, if they were tightening credit standards, maybe that's going to lower the

56

number of loans they can facilitate, but if you look at when the company announced their results for Q4, on that same call, March 19th, they reported that far from, you know, the loan facilitation contracting as a result of tightening credit standards, that actually total loan facilitation had increased by 25 percent in Q4.

So, I just don't think there's any conceivable material claim relating to the tightening.

THE COURT:  I just want to ask about materiality. You know, I don't see that as something raised in the brief front and center and maybe it's somewhere and I've missed it but, you know, the question is, if it's there, if you can point it to me, but how am I supposed to analyze that on a motion to dismiss in this context?

MR. WEINSTEIN:  I'm certainly not relying heavily on that point, Your Honor.  The main point I was trying to make is they haven't alleged anything that established there was this loosening and then this tightening.  Without the loosening, the tightening is not relevant.

THE COURT:  I see.

MR. WEINSTEIN:  I'm letting the Court know because it's in the record that -- the point on tightening is they haven't alleged any facts and so how could you even establish, how could you conclude when it happened, how could you conclude how significant it was, whether it was ongoing.

CMH       OCR       RMR       CRR       FCRR

57

I'm just observing for the Court that to the extent their theory is that this was some big change on an ongoing basis, the company was going to tighten its credit standards, that's actually bellied by the actual results that were reported in the very same investor call.

THE COURT:  Okay.

MR. WEINSTEIN:  And then on card loans, Your Honor, which is the last point, again, I think the statute of limitations point here is about as airtight as it can possibly be because the very basis for their allegation is what is disclosed on the November 2018 call, that they had, that they had decreased the size of card loans in the third quarter.  So they knew that without any possible dispute on November 19, 2018 that if they thought that gave them a claim, they had one year to bring the claim and they failed to do that.

Now, this whole issue, frankly, is only one paragraph of their opposition brief, the card loans, changing the size of the card loans, so it doesn't appear to be a big part of their case, but the statute of limitations point there is about as strong as it could possibly be.

THE COURT:  Now, in your brief, at least the opening brief on page 21, you talk about, well, we said that the card loans were decreasing, we could just figure it out from, you know, the registration statement.  Are you relying on that?

MR. WEINSTEIN:  Well, again, it's really kind of one

58

point that builds up to all these others.  It's not the main point but it again goes to the fact that there's no suggestion that the historical data that was disclosed was inaccurate. So, in other words --

THE COURT:  I understand that.  I mean, you know, this is unlike the first two categories, the preferred loan and the delinquency rate allegations where I take you to say, look, we dispute that this ever even happened.  Right?  And therefore, you're not looking back at the registration statement to saying we disclosed it, right, or anywhere else because it didn't happen, but here, I took you to say, look, if you slice the data, we actually told the world in September --

MR. WEINSTEIN:  Yes.

THE COURT:  -- that the card loan was decreasing on a per loan basis.

MR. WEINSTEIN:  That's correct, Your Honor.

So there's essentially at least three arguments. There's that argument which I believe is very important and, frankly, rock solid, there's the statute of limitations point which is the second one, and then the third point similar to what I was just describing on a different topic a moment ago is they haven't alleged anything to suggest that this decrease in the size of the card loans in one particular quarter is somehow material to the ongoing health of the company and,

59

again, just to sort of put a finer point on it --

THE COURT: And I want to focus on the first one just so I understand it, if you could.

I think you, on page 21, you cite to -- I just want to make sure I got this right. You cite to Exhibit A for this.

MR. WEINSTEIN: Correct.

THE COURT: Right? If you go to that, at page 22 to 23 --

MR. WEINSTEIN: Yes.

THE COURT: -- there's this chart, right? And I just want to understand what you're saying about it --

MR. WEINSTEIN: Yes.

THE COURT: -- which is I take it you're taking the total loan facilitation amount which is in millions and dividing it by the --

MR. WEINSTEIN: Number of loans.

THE COURT: -- card loan number facilitated.

MR. WEINSTEIN: That's exactly right, Your Honor.

THE COURT: That they're not in millions.

MR. WEINSTEIN: Just some basic math and you can see what the average size is.

THE COURT: So I did that math and I may be off but, you know, it's certainly, the part I don't understand about the comparison is you say it's okay to compare mid-year 2018

CMH        OCR        RMR        CRR        FCRR

60

to 2016, the initial year.  I think we're saying it's down 10 percent or 18 percent relative to the introductory year.

MR. WEINSTEIN:  Yes.  I think, Your Honor, the reason we cite page 8 as well, you have to -- it's basic math but you have to do it not just looking at page 22 and 23, but also looking at page 8 which shows for the two months of July and August, and from the data that's presented there, you can see that the average size of the card loans had gone down.

THE COURT:  But I'm extrapolating from a 6 or 8-month period to a full year period, right, and comparing that, not -- I mean is that an okay comparison?  Because we don't have month by month data.

MR. WEINSTEIN:  We don't have month by month but comparing it to the six-month period, and to the prior year, my belief is you would see that the size of the card loans had gone down.

THE COURT:  But if I look at 2017, right, it had gone up from 2017 and I just don't know why.

MR. WEINSTEIN:  And that's an additional point in our favor, Your Honor.  That's correct.  In other words, even if the card loans were being reduced, they're still larger than they were the prior year and the point I was about to make --

THE COURT:  I thought you were saying, I mean the part I don't get is your argument seems to be we told you the

61

average loan was decreasing.

Look at 22 and 23.  If I look there -- and compare 20, and page 8.  If I look there, I see that, you know, half year 2018 compared to 2016, there is a decrease, but my point or question is compared to 2017, it's actually an increase.

MR. WEINSTEIN:  Right.

THE COURT:  So it doesn't suggest that there's an overall decrease, plus we're in different orders of magnitude. Right?  I mean, there was $179 million of loan in 2016 but there's, you know, 13 billion worth of them in 2018.  So I don't know why you would get the impression from this data that the card loan business is decreasing.

MR. WEINSTEIN:  And so --

THE COURT:  On a per loan basis if that's what it is.

MR. WEINSTEIN:  You will see that there's been, at least for the past couple months, a real decrease in the card loan side.  The fact that it's higher still than 2017 is actually a point in our favor.

What they're trying to say is look at how much you had to reduce the size of your loans because you were worried about your credit risk.  It's actually still higher than it was in 2017.  The more important point that I was about to make, despite it could vary quarter to quarter, the company has to make decisions about how to adjust its risks along

CMH     OCR     RMR     CRR     FCRR

62

various metrics.  My point is they can't suggest that any tightening that happened by reducing the card loan size is somehow material because they haven't alleged any facts about that and, frankly, the next, the very next quarter, and this is in the record, the card loan side goes back up by 25 percent.

So my point is they're going to try to take some micro things that happened within a given quarter, that the data has already been provided to investors about and say somehow that establishes a claim, and I'm saying it doesn't for a variety of reasons, one is we gave you the data, two is there's nothing suggesting that's material and, in fact, the next quarter, it goes back up by 25 percent and, three, we told you this precise thing more than a year before you filed your complaint.

THE COURT:  In other words, if you disclose all the data underlying the card loans, whether it's on a total loan or per loan or aggregate loan volume in terms of millions of dollars, millions of dollars or millions of yuan, again, unless you allege that some of the data is false or faulty, you could never make a claim that you misstated the state of the card loan business.

MR. WEINSTEIN:  I don't think we have to go as far as saying never.

THE COURT:  Well, you could not in this case.

63

MR. WEINSTEIN:  Not in this case, but, again, the point I just want to make sure is not lost on the Court, that's one argument and there are three arguments.  There's a statute of limitations argument.

THE COURT:  I understand that.  I just want to make sure that I understood that species of argument that ties in which is no matter what CW2 says or CW1 says, although they don't speak about this issue.

MR. WEINSTEIN:  No.

THE COURT:  Right?  So you have to tie it to some of the statements that are made later on unless this data is flawed or alleged --

MR. WEINSTEIN:  They haven't alleged.

THE COURT:  If they haven't alleged on this claim, will fail.  That is their position.

MR. WEINSTEIN:  And, frankly, they spend one paragraph in their opposition.  I don't believe it's still part of their case.

THE COURT:  Understood.

MR. WEINSTEIN:  Thank you, Your Honor.

THE COURT:  Mr. Lieberman, feel free to go in whatever order these three topics have gone.  So if you like to start with preferred loans, go to delinquency and then do cards, but just let me know if you can so that I can organize my notes.

64

MR. LIEBERMAN:  Sure.

So speaking about the preferred loans, we've addressed already the statute of limitations issues, there is no doubt that when it comes to it, the defendants have admitted in November of 2018 that the preferred loans had dried up and so the question is really, you know, for -- you're talking about the results of the prior quarter ended September 30, 2018.  It doesn't mean drying up of the preferred loans, the inference that dry up occurred only in 11 days at the end of the quarter is, you know, strains any plausibility.

THE COURT:  So what I want to understand is if I just, I think paragraph -- I'm sorry.  Page 10 of your brief, right, under A, you say:  The complaint alleges that defendant decided to cease providing preferred loans and were already phasing out the product line.  Right?  Okay.

MR. LIEBERMAN:  Sorry.  One second.

Page 10?

THE COURT:  Under A, the first sentence.  Right?  When we talked about phasing out and what your complaint says and what the brief says, I don't want to focus on that.  When you cite to paragraphs 86 to 95 of the complaint, right, what I'm trying to understand is if I look at those paragraphs, what are the, where do I find the specific statements in the registration statement that is false?

CMH      OCR      RMR      CRR      FCRR

In other words, I want to know what the statement -- I don't have this issue on, at least I think on the next two categories, but at least on this one, I'm trying to figure out what the, at least what the allegation is that the registration statement, what is the statements that are alleged to be false.

MR. LIEBERMAN: So the statement is: Through the preferred loans, they were able to source a large number of borrowers for preferred loans which will drive continued growth in our borrowing base.

THE COURT: And where is that?

MR. LIEBERMAN: I'll find it.

THE COURT: It's not cited -- your complaint doesn't actually cite the paragraphs or the pages of registration statement. Is there a reason for that?

MR. LIEBERMAN: I apologize, Your Honor.

THE COURT: It's not a question of apology.

When you were reading that, were you reading from a complaint paragraph?

MR. LIEBERMAN: I believe it's in the complaint. I'm looking for it right now.

Yes, I'm, on paragraph 155, page 41.

THE COURT: So this statement is the one that you would say is what Confidential Witness 1 indicates is false.

MR. LIEBERMAN: The answer is yes but not only CW1.

66

Also, defendants' own admissions.  You have an admission here in November of 2018 saying that the business is drying up.

THE COURT:  Well, isn't that the statute of limitations claim?

MR. LIEBERMAN:  We can go on.

THE COURT:  What does the business has dried up, if that's the claim, that's barred by the statute of limitations, no?

MR. LIEBERMAN:  I'll give you the precise quotes.  Excuse me.

THE COURT:  That's not the question of the quote.  The question is if that's the basis of the claim --

MR. LIEBERMAN:  And then there's defendants are discussing how in July, these were market conditions that were impacting the company in July and August and this was something that was already improving.  So then there's discussion of that, even discussion of that in the registration statement, how market conditions were improving.

So the investors are somewhat left -- there was a statement --

THE COURT:  I'm sorry.  I need to be precise here because the law requires me to be.

So 155 is the paragraph that you're referring to that quotes a statement in the registration statement.  Are there any other ones?

CMH      OCR      RMR      CRR      FCRR

67

MR. LIEBERMAN:  Well, just going to -- you would go just to the next paragraph which discusses the growth in that. They give metrics which show clear growth in preferred loans and --

THE COURT:  Well, there's no allegation that there's, that that is false, right?

MR. LIEBERMAN:  Sure, but under item 303, there's an independent duty.

THE COURT:  Well, we're not in the 303 claims yet. Okay?  I'm just trying to figure out the statement about the preferred loans that you allege are false in the registration statement.  So we have one that's in 155.  I'm not talking about the trend claim.

MR. LIEBERMAN:  Okay.  And then paragraph 123, there's a statement that:  Since the beginning of the August of 2018, the amount of funding from individual investors on our platform has been recovering and our business performance has already started gradually improving.

THE COURT:  Why does that relate to preferred loans?

MR. LIEBERMAN:  Your Honor, I, again, we would say it's a statement broadly discussing the company's loan base which is not necessarily specifically addressing preferred loans but when you're making a statement that your borrowing base is increasing, and then you have a situation where your business is drying up, there's something clearly that has to

68

be disclosed.

THE COURT:  Maybe I misunderstood the law in this area which is quite, well, it could be, but that's not how this works, right?  I'm supposed to take a specific statement and determine whether it's false or not.  Okay?

My question is this is not, this is a particular statement about individual investors in our platform have been recovering which could be an allegation of falsity, right?  I understand that argument.  That's not what you're saying.  You're saying this somehow should be read to be referring to preferred loans and, therefore, this statement is false because the preferred loans business was being eliminated.

MR. LIEBERMAN:  Well, Your Honor, the law is not only that we have to identify a false statement.  That is clearly, that is a base of liability.  We also have to identify statements that trigger duty to disclose and to tell not just half truths but full truths.

So when you're speaking about how your investor base and your loan base is recovering and you've got a significant portion of your business that's drying up 22 percent, that would trigger a duty to say, hey, this is drying up.

THE COURT:  So what is the allegation or where's the basis to infer that this statement is false?  In other words, amount of funding has been recovering and business performance has gradually being improving, there's no allegation that

69

business as a whole was in the tank or the amount of funding from individual investors was not recovered, is there?

MR. LIEBERMAN:  I mean, the allegation, if we've made an allegation, and we say we do, that the business was discontinued.

THE COURT:  A business was discontinued.  Right? This is a general statement and I'm not trying to say you couldn't make out a falsity allegation.  I'm trying to ask you, well, A, is that your allegation and, B, where is it?

In other words, if you're saying that the business performance is not gradually improving, where is the evidence that I can draw the inference that that's a false statement?

MR. LIEBERMAN:  What I will say, Your Honor, is that triggers a duty to disclose that the preferred business was discontinued.

THE COURT:  That's not an argument in your brief anywhere about half truths or duty to disclose, right?

MR. LIEBERMAN:  Your Honor, I'll look at the brief, but --

THE COURT:  It's either a "yes" or "no" question.

MR. LIEBERMAN:  I don't have a ready answer to that question.  We have paragraph 155.

THE COURT:  All right.  So then we can talk about 155.  I'm not saying you can't make the allegation.  I'm trying to figure out where it is.

70

MR. LIEBERMAN:  Okay.

THE COURT:  So 155.  Anything else just so we exhaust the list of what the statements are in the registration statement about preferred loans that you allege are false?

MR. LIEBERMAN:  I mean, I would say, you know, again, paragraph 158.  There's a discussion about how they're continuing to broaden our product offerings and expand user base and enhance user acquisition and if the argument is understood, that attempt may be technically accurate but you've actually discontinued a line of business which is going to clearly cut against growth which, actually, at the end of the class period, defendants say you can't, you shouldn't anticipate the growth because we've cut off our preferred loan business, that's clearly something to say we're going to increase our user base, we're not telling you that we've just cut off one of our lines.

THE COURT:  I understand that argument but to understand its context, I need to know where 155 and 158 are in the registration statement.

MR. LIEBERMAN:  Okay.  Your Honor, that I'm going to have some trouble with, I apologize, because we had some issues with the registration statement bringing it in.

THE COURT:  Okay.  I mean, you can submit something afterwards.  I mean, the problem is it changes the pleading,

CMH      OCR      RMR      CRR      FCRR

71

right, because -- but go ahead.

MR. LIEBERMAN:  Okay.  So, Your Honor, we have --

THE COURT:  So I just want to exhaust the list.  155 and 158.  Anything else?

MR. LIEBERMAN:  Again, 159 where there's discussion about continued growth in our user base, both borrowers and investors, will be able to offer large credit line products to such individuals -- and, again, this is the under the heading Material statements and admissions regarding preferred loans.

We would argue while this statement is not specifically referring to preferred loans, when you're speaking about growing your user base and you're trying to convince investors, you have a growing user base.  Investors want to know that your customers are increasing across all lines.  I mean, you actually have a serious line here dropping off.

I would say under JinkoSolar in the Second Circuit, that renders this statement false that says it's clearly a half truth that needs further explains that.

THE COURT:  So if I understand this correctly, it's 155 through 161 basically, under that subheading, that you're saying is contradicted by or made false by either the disclosures made in March and/or the confidential witness on preferred loans?

MR. LIEBERMAN:  Correct.  And, in part, by November,

CMH        OCR        RMR        CRR        FCRR

72

we haven't disclaimed that there are certain statements in November that contradict the IPO statements.  We're just saying that it wasn't enough to raise a cause of action.

THE COURT:  That's a thin line to skate on.

MR. LIEBERMAN:  But I think it's a tie, a thin line. If it's a thin line, we would submit that it goes to investors.

THE COURT:  Well, it's not a question of whether it's a tie.  The term thin line meaning it's a distinction that it's very difficult to navigate for you for purposes of statute of limitations.  That's why I said it that way but go ahead.

MR. LIEBERMAN:  Okay.  So that on preferred loans, we have, so those are the statements.  We have the company's admissions that they had discontinued it made in May and we have the CW1 who says that he was, that they had clearly been decreasing it before he left and he was told that the entire line would be shut down which is something that is not just CW1 on its own, it's backed up by the defendant's own statement in May where he says we cut off the line.  You have CW1 saying you cut off the line.

THE COURT:  What do you make of their argument about that the statement about cutting off the line is a phasing out and that there is no statement of cutting off the line, it's a phasing out except to certain high wealth or high end

CMH     OCR     RMR     CRR     FCRR

73

borrowers?

MR. LIEBERMAN:  Right.  So I just want to pull up the precise statement.  Paragraph 33.

THE COURT:  And --

MR. LIEBERMAN:  So the argument is, as I understand it, that phasing, that it's not really a distinct -- it's a phasing out and what you have here is someone saying we literally discontinued that product line except only to serve some of the higher quality repeated borrowers and that basically drives to a lower balance in our loans.  It's argument, arguments about borrowers because growth and loan balance really ties to preferred loans.  So when we were talking about how general --

THE COURT:  Why am I to draw that distinction?

MR. LIEBERMAN:  Sorry?

THE COURT:  Why am I to draw that inference?

MR. LIEBERMAN:  Because the defendants draw that inference, that's why.  Because --

THE COURT:  I see.  Because no growth in our loan balance overall.

MR. LIEBERMAN:  Yes.  Defendant Tang says when I'm talking about preferred, you should make inferences not just about preferred, you should make inferences about our growth base generally.  Taking that, taking the defendants' statements at their own value, and taken in common sense also,

CMH        OCR        RMR        CRR        FCRR

74

because 22 percent of the company is loan issuance, so when you make a statement about your growth and you've cut off, like, a key segment of that growth, you've made a false statement. So it's false by, by, as we've said, CW1's statement, the May statement and in part --

THE COURT: And so from that statement, I'm sorry, it was 33?

MR. LIEBERMAN: Yes.

THE COURT: What is the inference to say that happened before the IPO?

MR. LIEBERMAN: Your Honor, we would argue it's, the inference is that there's a statement made in November discussing a phasing out and we would say -- where I'm saying now is what phasing out means and then if you look at when does that phasing out start to occur, it started to occur three quarters before the statement of phasing out was made which was well before the IPO which is to say in the past three quarters, we've phased out the product, so that statement was made in November.

THE COURT: I'm sorry. I lost the track.

So you're saying I can infer that the November statement was referring to pre-IPO activity based on a statement in November or in March that this occurred three months prior?

MR. LIEBERMAN: I want to get the November statement

75

to be precise.  The November statement is saying that three quarters prior to making that statement, we began to phase out the, we began to phase out the product.

THE COURT:  Okay.

MR. LIEBERMAN:  Right.  On paragraph 26, Your Honor, page 7.

THE COURT:  Of the complaint?

MR. LIEBERMAN:  Of the complaint, yes.

THE COURT:  Okay.

MR. LIEBERMAN:  I mean, the second to last sentence: Speaking specifically about preferred loans and contradicting statements in the registration statement, Defendant Tang told investors that demand for loans had dried up prompting significant reductions of preferred loans "over the last three -quarters."  And that's the same day he made the statement regarding phasing down.

THE COURT:  You don't have a cite to that in the actual exhibit, do you?

MR. LIEBERMAN:  No.

THE COURT:  Okay.

MR. LIEBERMAN:  I don't, with apologies.

THE COURT:  So if that's the case, right, that's a statement that, just so I understand, in November of 2018, Tang said according to you that preferred loans were decreasing over the last three quarters, meaning pre-IPO

76

because the IPO took place in October?

MR. LIEBERMAN:  Exactly.

THE COURT:  Okay.

MR. LIEBERMAN:  So the statement made in March and the context of the statement made in November with a CW1 allegation that by the time he had left, they were, it was already discontinued in certain key regions and it was told that he would discontinue the product.

THE COURT:  Well, where does it say -- let's look at what CW1 says.  Paragraph 86.

Where does it say discontinued in certain key regions?  Is that --

MR. LIEBERMAN:  So, Your Honor --

THE COURT:  Or 87.

MR. LIEBERMAN:  That's my characterization so let's get to the precise words.  Second sentence says:  However, he left the company in October 2018 because due to contraction of the preferred loan business, preferred loans were no longer being administered in the office located in the Guangzhou region of China where he worked.  He was told prior to his departure in October the company was not going to be facilitating preferred loans any longer.

So that's the key, the key region.

THE COURT:  You say key regions.

MR. LIEBERMAN:  Right.

77

THE COURT:  But let's stay with what is said.

How am I to read, "He was told prior to his departure was not going to be facilitating preferred loans any longer"?

So when prior?  Doesn't that matter here?

MR. LIEBERMAN:  Your Honor, it does matter but, again, looking at everything in context and looking at the differences holistically.  So when a low level employee is finally terminated because a decision has been made to discontinue loans --

THE COURT:  He wasn't terminated.  He left.

MR. LIEBERMAN:  He left.  So prior to his departure, he's told that.  Clearly, the decision is made at some point at a higher level in advance of that.  That's just one inference we would state, Your Honor, but we're not only relying on that fact.  We're relying on the fact that Tang himself said beforehand --

THE COURT:  That part I understand.  I'm trying to understand CW1 because I do understand the situation in which I'm supposed to give it, you know, give, you know, accept it for what it says, but I'm just trying to understand what it says which seems, you know, somewhat limited.  Right?  It's one office and prior to his departure which is unknown.

MR. LIEBERMAN:  Well, in October.

THE COURT:  And it talks about a future looking

78

event, no?

MR. LIEBERMAN:  I mean, he was told that the company was not going to facilitate referred loans any longer.  That coincides precisely with the statement made ultimately in May where defendant said that it was discontinued.

I mean, that's, and then that -- and to get more time and when it occurred, you would look at the November statement where it says decisions on this issue were being made three quarters before November.

THE COURT:  So, in other words, using what's said in November, I can infer that what CW1 was told is the same thing that the decision that took place pre-IPO?

MR. LIEBERMAN:  All the allegations, it should be the May statements, the November statements and the paragraph 86.  That's what we would say, Your Honor.

THE COURT:  Okay.  Let's talk about, let's talk about what's false about the statement in 155.

MR. LIEBERMAN:  They're saying the card capabilities as of September 19, 2018, that they are able to source a large number of borrowers for the program.  It's categorically false, that statement.

THE COURT:  Well, that's -- isn't this a forward looking statement?

MR. LIEBERMAN:  Forward looking, the case law is clear, talks about the future.  This is a statement of present

79

tense.

THE COURT:  So fair enough.  That seems right.

Okay.  And the idea about sourcing borrowers, right, what's false about that?

MR. LIEBERMAN:  You're not going to be able to source too many borrowers if you discontinue the products.

THE COURT:  No, that's a decision not to source borrowers, right, but it doesn't mean you could quit it if you wanted to, right?

MR. LIEBERMAN:  Well, the context is that which will drive the continued growth in our borrower base.  We can do this and we're going to do it.

THE COURT:  Okay.

MR. LIEBERMAN:  So that's clearly false when you have no knowledge that you can't do it because demand dried up but you don't intend do it, you cut off a whole entire business.

THE COURT:  Okay.

MR. LIEBERMAN:  Would Your Honor like me to continue on preferred loans?

THE COURT:  I'm happy to hear anything else you want to say on preferred loans but we can move to the other two areas.

MR. LIEBERMAN:  Okay.  So when it comes to omissions regarding card loans, there's paragraph 162 which we believe

80

there's a lot of discussion that somehow with respect to the size of these loans, we should have been able to do the math and our investors should have been able to do the math and figure out that these loans were on the decline.

You know, again, I'm not going to be able to perform these calculations here. We actually did the math and saw increases but, in any respect, clearly it's not a simple calculation because there's a lot of discussion missing. For investors to be on notice of a decreasing loan size, we don't think this is really plausible.

THE COURT: So I think you, your brief, right, you focus, I think the reason -- let's focus in on 163 on page 20 of your paragraph. You cite to paragraph 163, right?

MR. LIEBERMAN: Let me get to my brief and I apologize.

THE COURT: I think this is what defendants are saying this is the one paragraph devoted to this.

MR. LIEBERMAN: Yes.

THE COURT: Well --

MR. LIEBERMAN: Well, we cite to 112, 122, 125 and 195 so not all of that is card loans.

THE COURT: So focusing where you brought us, 163, right, two questions.

One: What page is this of the registration statement?

81

MR. LIEBERMAN:  On the registration statement, you are going to -- unfortunately, I'm not going to be able to answer that.  I can refer back to the complaint but not the registration statement.

THE COURT:  This is the complaint.

MR. LIEBERMAN:  Okay.  I understand.

THE COURT:  So what is the allegation about this falsity?  Because I thought what we were talking about was the average per loan value, right, as opposed to the number of borrowers or the total aggregate loan amount?

MR. LIEBERMAN:  Sure.

THE COURT:  Right?  And so this seems to be a statement about the scale of the revenue contribution which admittedly is impacted by the per loan amount, but in order for it to be a false statement, it has to be, you know, you have to say, look, we know at the time the statement is made that revenue contributions are less than that.

MR. LIEBERMAN:  And so, Your Honor, it would be, what we think is the common sense inference is if that, if you're, if you're, by defendant's own admission, if you're reducing the size of loans by 20, 25 percent which is what defendants admitted in November of 2018, that's clearly going to impact your ability to generate revenues.

THE COURT:  Not if you have more borrowers.

We're not talking about the preferred loan business

82

where the argument, the inference is easier.  We're talking not about a per loan basis.  We're talking about the total, potentially.

So if I decrease it by 25 percent but I have a 25 increase in the number of borrowers or I have some really big loans, the revenue -- this isn't a false statement, right?

MR. LIEBERMAN:  Well, no, Your Honor, because you're trying to give the investors, give them a full understanding of the relevant facts and not make half statements and what you're saying is you are going to increase your revenues and you have growth in the card loan business, and you've made a significant move that could potentially decrease on that business.

What you say is despite the fact that we made a decision to reduce our card loans by 20 to 25 percent, we still think we can grow this business and it can still be a contributing factor to revenue.  That would be a holistic statement.

THE COURT:  And so --

MR. LIEBERMAN:  And not telling investors we're going to increase this business but you've made -- it's a very --

THE COURT:  I thought it was a question of not whether or not there's an affirmative decision to decrease the business, right, but, rather, the actual sort of snapshot

83

picture of the business.

I thought that the allegation was, well, that's what's problematic; not that there was a decision like preferred loans where your argument is you got rid of it and you didn't tell us but here, I didn't understand, but if that's what you're saying, you know, that --

MR. LIEBERMAN:  That is what we're -- we're alleging the defendants had made a specific decision to reduce the --

THE COURT:  Card loan business?

MR. LIEBERMAN:  -- card loan business 20 to 25 percent and Your Honor has a good question, where do we allege that.  I assume that's the question.

THE COURT:  Yes.

MR. LIEBERMAN:  I hope I can dance well and find it quickly.

THE COURT:  Well, because I'm looking at just simply where you brought us, right, 162 through 164, which are the misstatements and omissions regarding card loans.

MR. LIEBERMAN:  Okay.  So I'm looking at paragraph 125 and 126, page 33 of the complaint.  In.

In his opening remarks on the November 19th call, Defendant Tang stated that the company "consciously reduced its average loan size because of concern of external economic environments and credit environments in the third quarter."

A conscious decision was made to reduce loan size

84

clearly at some point in the third quarter, in all likelihood --

THE COURT: This is an omission argument not in your brief.

MR. LIEBERMAN: I wouldn't -- I mean, we discussed the conscious -- that's what we're referring to when we're discussing that. I would take issue with Your Honor's statement there.

We say, page 20, section C, we talk about how data was presented regarding card loans and representations were made regarding card loans and we say that the complaint alleges support from defendant's own later statements that the company had consciously, prior to the start of the IPO, reduced both the size of card loans and the approval rate. That's stated explicitly in our brief.

THE COURT: So this is -- but, again, you run into the statute of limitations problem, don't you?

MR. LIEBERMAN: Your Honor, you would, you would potentially then -- you don't have a further, there is not a further disclosure after that period of time.

THE COURT: Okay. I understand. I was focused more on, which is my error, the paragraphs 163 and 164 and I see here you're making two sets of allegations here, 125 and 163 or 125, 126 and 263, sorry, 163.

MR. LIEBERMAN: It's 163.

CMH      OCR      RMR      CRR      FCRR

85

And Your Honor, but also -- okay. So but also if you look at paragraph 163, and this does touch about upon the statute of limitations issue because, in essence, the reason why the card loan statements are falsely misleading, it's really two-fold and the reason why it seems regarding growth of borrowing base other than the preferred loans is really twofold. One, there was a conscious decision to reduce the size and then two is there was a decision to decrease the approval rate and so the, the latter point, that's not disclosed until March of 20, of 2019. And so that's -- when we talk about notice of the claim and all these statute of limitations issues --

THE COURT: But if it's not -- taking what you just said, if it's not, you know, stated until March of 2019, that's barred by the statute of limitations.

MR. LIEBERMAN: If the first time it was disclosed --

THE COURT: March of 2019.

MR. LIEBERMAN: Yes. I apologize, Your Honor.

THE COURT: Okay. I thought you said November of 2018.

MR. LIEBERMAN: No.

So defendants, so that, in a sense, we'll admit there's argument around that issue on the, when it comes to the card loans, defendants will say and have said, well, you

CMH     OCR     RMR     CRR     FCRR

86

knew as of November, that you were reducing the card loan size but what they didn't know was that in the middle of the year, that they actually decreased the approval rate and you don't know that until the, you don't know that until March of 2019 which was during the statute of limitations period when you have the notice of claim, you know, and that's --

THE COURT:  Where is the approval rate part of this?

MR. LIEBERMAN:  The approval rate -- that's what we alleged in our brief.  It's alleged in paragraph 164.  We say it's false misleading statements because --

THE COURT:  Well, this is the whole part.  I understand you're argument about revenue contribution but --

MR. LIEBERMAN:  Well, no.  We said that the --

THE COURT:  I see.  The size of the card loan and the approval rate.

MR. LIEBERMAN:  And when Your Honor kind of, we had a discussion earlier about kind of conflating or relying, this was alleged in our complaint.  This is how we alleged, made these allegations.  We said the allegations regarding growth, the allegations regarding the card loans, the growth in businesses were false for a number of reasons and among them was the approval rate which the first inkling you have of an approval rate going down because of stricter standards is March of 2019.  So any -- what we would argue and I think we have good grounds to argue that, any claim regarding, that

87

touches upon something is false and misleading because of the approval rate, the first time you learn of that of any approval rate problems which touches upon growth generally, which touches upon card loan growth, all come into play and are all, the first time you learn of them is March of 2019.

THE COURT:  And that requires reading that to mean, for the pre-IPO, right?  Because, I mean, the statement about the middle is about one of those things, not all of them, right?

MR. LIEBERMAN:  Well, the statement about the middle is about the, is about the approval rate.

THE COURT:  Right.

MR. LIEBERMAN:  Yes.

THE COURT:  And then you ticked off a number of other items, right, so the point about knowing that what is false and when it was, the decision was made or when it was false was to understand the timing, the middle is what you're relying on.

MR. LIEBERMAN:  No, we're relying on the middle. We're saying that investors would be certainly an investor and a reasonable inference from reading that, middle would be in the middle of the year which is pre-IPO.

THE COURT:  From all of those things but sure.

MR. LIEBERMAN:  For approval rate.  That's all, that's all the relation is the approval rate.  The card

88

approval loans, well, he makes a statement that that decision was clearly made sometime in the third quarter because it's a discussion of third quarter earnings.

THE COURT: I was going back to, you said it's to reduce the size of the card loans and the approval rate?

MR. LIEBERMAN: Right.

THE COURT: And I was simply trying to understand the "middle" comment.

MR. LIEBERMAN: "Middle" comes only for the approval rate.

THE COURT: Okay.

MR. LIEBERMAN: So it's all going to be how this Court, to a degree, views the statute of limitations on these allegations, if you're looking --

THE COURT: Well, it's not about how I view them in the sense of, you know, but it's how the standards require me to view them.

MR. LIEBERMAN: Okay. But if the allegations of the complaint are this statement -- one of the allegations in the complaint are this statement is false and misleading because the approval rate was lowered. The only time, looking at that reason for falsity that we've identified, material statement, the only time that that, that one could have learned the falsity, the reason for falsity identified there is in March of 2019.

CMH        OCR        RMR        CRR        FCRR

89

THE COURT:  Okay.

MR. LIEBERMAN:  So that -- I mean, to be fair, let me just look at some other matters, but when we're talking about the, so then we can touch upon that also, but all things regarding card loan growth, that I feel is, you know, we've covered that discussion.

THE COURT:  My last question was just on 163, right?

MR. LIEBERMAN:  Sure.

THE COURT:  I understand this is not a forward looking statement.  I mean, I understand your point about the other statement we went through and why that present statement --

MR. LIEBERMAN:  And so, Your Honor, as we plan to explain the business scale with card loan, we expect revenue contribution by phone.

THE COURT:  I mean, that's sort of?

MR. LIEBERMAN:  Well, the planning to expand is not forward looking.  So the Second Circuit and courts applying it look at it.

THE COURT:  Okay.

MR. LIEBERMAN:  "We plan to expand" is not forward looking and so there's a plan to expand business scale, the Court would have to look at that in the context of present tense.

"We expect a revenue contribution from the card loan

CMH        OCR        RMR        CRR        FCRR

90

will continue to increase in the future enhance our profitability," well, it's, I would also argue it's not forward looking because, well, it's talking about current expectations so there's arguments both ways on whether it's forward looking or not.

Current expectations and a current expectation is that they do expect it, it's a statement of current belief, but the Court could potentially look at it as forward looking. We would argue that it's also talking about current expectations. If the Court is forward looking as if you're aware of statements that undercut those forward looking statements, if you're aware of statements that render those false, then you're not covered by the safe harbor.

THE COURT: Okay. Anything you want to say on delinquency rate or the confidential witnesses?

MR. LIEBERMAN: Sure. Just let me get the complaint.

Okay. So the statements there, the relevant statements relating to delinquency rates are paragraph 143 through 154 and we have two confidential informants, CW1 and CW2.

THE COURT: And just to be clear, the CW1 on this is the same as the CW1 on the preferred loans?

MR. LIEBERMAN: Yes, precisely. So he says that he was told by his manager not to be as detailed in his review

CMH        OCR        RMR        CRR        FCRR

91

and research of potential borrowers and this helped numbers prior to the IPO.

THE COURT:  And so just so I understand, I think it's paragraph 77, right, is still CW1 at this point?

MR. LIEBERMAN:  Yes.

THE COURT:  What is credit risk control?  It means a lot of different things to a lot of different institutions.

MR. LIEBERMAN:  Fair enough.

THE COURT:  It may be defined in the registration statement.  I don't know.  It's a particular nomenclature.

MR. LIEBERMAN:  Discussion of, said screening process for applicants became less rigorous, he's involved in screening for applicants.

THE COURT:  Maybe or maybe not, but I take it that's what he said.

MR. LIEBERMAN:  And he's reviewing and researching potential borrowers.  I mean, so that would be the screening process.  You're reviewing borrowers' applications.  Whether or not you approve them, I think that's the context of the allegations.

THE COURT:  Okay.

MR. LIEBERMAN:  And so CW2.

THE COURT:  But going back to 77, right, this statement is, the first sentence says -- sorry.  The second sentence says:  CW1 said the screening process became less

92

vigorous if the company wanted to distribute more loans.

Meaning if they wanted to do that, this is what they did.  Is that --

MR. LIEBERMAN:  Sure.  And then he was told to do that.  He was told to not be as detailed in his review and research.

THE COURT:  Okay.

MR. LIEBERMAN:  And then paragraph 99, CW2, who worked in the debt collection department at X Financial, he said that basically anyone with a credit card can be --

THE COURT:  Yes.  What is the debt collection department?

I mean, the point here is I get your argument that, look, I have to accept certain CWs, no matter what they say. I don't need their name, rank and serial number, but the absence of that goes to a kind of weight in how I can consider it, right, and so that's why I asked these questions.

MR. LIEBERMAN:  Fair enough.

We would -- we think the debt collection is a term of the industry that I think means if you're involved in the collection of loans and debts that are owed on loans and so it was his understanding is the screening for car loans was lacks and that's further supported by paragraph 100 which is the on line posts.

THE COURT:  Well, part of what I don't understand

93

is, right, it's -- so is that the only CW2 paragraph?  I may have been confused.

MR. LIEBERMAN:  I believe so.

THE COURT:  Okay.

MR. LIEBERMAN:  Because part of that weight also goes to whether or not it was confirmed by other allegations, to see if CW1 and CW2 confirm each other.

You have paragraph 100 confirming the allegations. You also have the company for a few things confirm lack of credit screening.  The fact that delinquencies went up 40 percent right after the IPO and the company ultimately had to tear down its screening right around that time.

THE COURT:  And what is the statement, I think it's paragraph 97, right, that you allege is the false statement?

MR. LIEBERMAN:  Well, it was, this is one of them but it's all the statements I said I'll get back to --

THE COURT:  Let's just focus on 97 because this is what you cite in your brief, right?

How is what CW1 or 2, what they say, how is that, what portion of what they say renders what portion of this paragraph false?

MR. LIEBERMAN:  In addition to paragraph 100.  We include that in the mix?

THE COURT:  Sure, that's fine.

MR. LIEBERMAN:  Okay.  I mean, the inference in

94

paragraph, I'm just going to quote it.  Leveraging data analysis and learning in analyzing a borrower's value of repayment capability and propensity, we have the capabilities to offer differentiating credit limits to borrowers based on individual credit assessment results.

THE COURT:  That just says depending on your credit profile, we can offer you credit products if we want to.  That's not what CW1 and CW2 is saying.

MR. LIEBERMAN:  Okay.  I'll go on.  Our rigorous data credit assessment has helped us to achieve a strategic balance between borrower expansion and asset quality control.

Asset quality control is making sure the people you sign on don't have high delinquency rates.  That would clearly touch upon --

THE COURT:  And what does it mean to say there's a strategic balance and that's what CW1 and CW2 says they're false?

MR. LIEBERMAN:  They're -- essentially, what they're saying is that they are told in the IPO to balance heavily on the side of lack of credit assessment and of taking on more loans.  It's very much backed up by the defendant's admission that they had to do something back in, they had to do something at the time, in mid 2018, to, because of issues of delinquencies, they had to ramp up their credit assessments and to lower their acceptance rates on loans.

95

It's -- these aren't just in isolation. You have the assessments of the CWs, you have the block site, you have the statements, and there's also statements regarding prime borrowers which we do talk about in our brief and those are in paragraphs 143 through 155, but you also know in the context of the company's own admissions, that something changed, there was a structural change that occurred in mid 2018 when they had to lower their acceptance. Obviously, they were not striking the strategic balance in a measured way as made clear by the company's own need to make a shift in its credit practices and by the spiking of their delinquency rates up to 40 percent.

So, again, the allegations of all of this is, we believe should be viewed holistically.

There was something between all those allegations and defendant's own admissions, there was something wrong in the credit policy. It's not just credit. It also deals with the applications and the, the application rates and something that made the company in mid 2018 to say -- sorry, I know Your Honor wants me to be precise, must be precise -- but, hey, there's something wrong in what we're doing, we have to change it, and that's backed up by the company's own actions, backed up by CW1, CW2, the internet postings and the spike in delinquency rates.

THE COURT: Okay. And that comes to light when?

96

MR. LIEBERMAN:  That comes to light no earlier than March 19, 2021.

THE COURT:  Okay.  And that's from paragraph 112?

MR. LIEBERMAN:  Yes.

THE COURT:  Okay.  One last question on your brief just on the confidential witness.

You say on page -- this is the -- now I remember. At the bottom of 18, top of 19, you say:  CW2 was in debt collection and in that capacity, necessarily dealt with the borrowers in default and reviewed files relating to borrowers and their initial approval.

How am I to draw that inference from 144?

MR. LIEBERMAN:  Again, Your Honor is pointing to what page?

THE COURT:  Bottom of 18, top of 19, which cites paragraph 144.

MR. LIEBERMAN:  Well, necessarily dealt with borrowers in default, I think I would say it's common sense, if you're in debt collection, you reviewed files related to the borrowers and initial approval.

THE COURT:  What I don't understand about debt collection is collecting on -- a loan is a debt and that's the part that I don't understand as opposed to bad debt collection.  Right?  In other words, people who are delinquent as opposed to I'm just in the collection area.

CMH        OCR        RMR        CRR        FCRR

97

MR. LIEBERMAN:  Okay.  I understand.

THE COURT:  Particularly, if it were some other business, I would understand the point, but this is, we're talking about a loan business so I'm trying to understand.

MR. LIEBERMAN:  Right.  And we understood -- we understood and maybe we can make clear that we are saying this is someone who's, the borrower's in default and you're trying to get them to pay and collect that debt.

THE COURT:  And I guess part of what I didn't understand is why then as a footnote that says even if this were not the case, which is, you know, the witness is providing information, I get that point, but it's kind of a weird thing to say when you're like, okay, even if turns out that this person wasn't involved in this, it's not a question about a legal point.  You're characterizing your own confidential witness, right?  So it's weird to say even if that was not what he was saying which is why it was puzzling to me.

MR. LIEBERMAN:  That might be weird.  I'm not going to discuss it.  I'm not going to disagree with that.

THE COURT:  I understand hypotheticals and alternative theories but when you're taking about a statement of fact of a confidential witness, it comes across as somewhat curious.

MR. LIEBERMAN:  Fair enough.

CMH        OCR        RMR        CRR        FCRR

98

THE COURT:  Okay.  All right.  So those are my questions on those three topics.  I don't have any other questions in this area.

I'm happy to, and I think, frankly, I don't have particular questions on those, on any items so I'm happy to hear any final thoughts from you, final thoughts from opposing counsel first and then final thoughts from you.

MR. LIEBERMAN:  Your Honor, I have nothing further --

THE COURT:  Okay.

MR. LIEBERMAN:  -- on Your Honor's questions.

THE COURT:  Okay.  I also realize that sometimes oral argument causes parties to want to add short briefing afterwards.  It's not required.  If you want to, I'm happy to hear it.

I also just want to confirm that the other defendants join X Financial's arguments in full that have been made today.  So you can stand up and say yes if that's the case.

MS. ENGEL:  Yes.  On behalf of Morgan Stanley & Co. LLC and Deutsche Bank Securities, we join X Financial defendant's argument in full.

THE COURT:  Okay.

MR. WEINSTEIN:  Your Honor, did you want to hear argument on the post-IPO?

99

THE COURT:  I don't need to hear.  I don't have any particularized questions.  I was just giving you an opportunity if you or your opposing counsel wanted to say anything to what has been raised by the last, you know, 25 minutes, I was giving you that opportunity.

MR. WEINSTEIN:  I appreciate that.  Maybe, Your Honor, literally, just a few minutes try to sum up on these three issues.

THE COURT:  Okay.  And certainly I'm happy to hear from you as well if you'd like.

MR. WEINSTEIN:  Your Honor, thank you for your time and I appreciate it.  I just want to speak for a few minutes and I'll try not to repeat myself too much but just try to sum up on these three points.

On the preferred loans, Your Honor, again, it depends entirely on the statement of a confidential witness who is not basing it on his own firsthand information but on what someone supposedly told him, that's just simply not enough under the case law and in any event, even if there were any doubt about that, the company was very clear in November 2018, more than a year before the complaint was filed, that if you want to look at our business, you should just look at our card loans so the claim would be timely in any event.

With respect to card loans and the decreasing size

100

of the card loans, again, the very basis of plaintiff's allegation and the only basis is what the company itself said on the November 2018 call and that was more than a year before the complaint was filed so there can't be any clearer case for the argument that the claim is timely.

With respect to the statement that the company expected revenue contributions from card loans to increase, there's nothing inconsistent between that and a one time decrease in the size of card loans. It didn't have to do with the size of any particular average size of the card loan. It had do with overall revenue contribution. It's clearly a forward looking statement and in any event, this whole issue is clearly untimely given the November 2018 disclosure.

Then with respect to this idea of loosening and then tightening credit standards, again, Your Honor, based on a confidential witness who provides no details of any kind, doesn't allege a company-wide change in policy, it can't possibly be enough to support a claim. The case law is clear that it doesn't and certainly the blog posts don't add anything.

So, Your Honor, I think when you combine the statute of limitations points with the actual substantive points on the alleged misstatements or omissions, we respectfully submit that the complaint should be dismissed with prejudice.

Thank you, Your Honor.

101

THE COURT:  Thank you.

Other counsel want to say anything about whether they're joining their arguments?  I assume that they are.

MS. DIAKOS:  Yes, Your Honor.  On behalf of the Cogency defendants, we're joining in X Financial's arguments.

MR. PISKORA:  Thank you, Your Honor.  On behalf of AMTD Global, we will also join in the argument.

I would just add to the argument presented today, it's in the briefing, that in addition to the company's own disclosures in November, and this goes to the issue of limitations, there were a number of analysts' reports and I think that some of the issues that were spoken about today including tightening policies, the growth of the company, are squarely addressed in those analyst reports and mandate that this complaint be dismissed with prejudice.

THE COURT:  Anything else from plaintiff?

MR. LIEBERMAN:  Your Honor, just one last point.

THE COURT:  Sure.

MR. LIEBERMAN:  While certain issues were questioned by analysts, clearly the market reaction after the disclosure of the March actions, the stock actually went up in November and didn't decline until they made revelations and, clearly, the market was not apprised of the significance of what we discussed here today until the March and May revelations.

Other than that, I want to thank Your Honor for your

102

time.  This has been an excellent exercise and I don't think I can talk anymore.  You did it very well.

THE COURT:  I thank all counsel for -- this is always fun for me.  It's not necessarily fun for everybody else because I get to ask questions and you have to answer them so thank you for indulging me.  It helped clarify a lot of things in terms of what's being alleged and where and what the arguments are and the primary arguments are very helpful to me.

If the parties would like to submit anything, they're welcome to in which case I will set a short deadline for that.  I don't -- I'm not suggesting it.  I'm not requiring it.  So you can also let me know by joint letter tomorrow if that's what you would like to do.

MR. LIEBERMAN:  We can discuss it among ourselves.

MR. WEINSTEIN:  I'd be happy to.

THE COURT:  And if you do submit something, I ask that it be letter briefs that are no longer than ten pages and that you submit them simultaneously within a few weeks, like between two to three weeks.

MR. LIEBERMAN:  Thank you, Your Honor.

MR. WEINSTEIN:  Thank you, Your Honor.

THE COURT:  Okay.  And thank you so much.  I wish you all continued health and have a nice day.

(Matter concluded.)

CMH      OCR      RMR      CRR      FCRR