UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X

XIANGDONG CHEN, on behalf of herself
and all others similarly situated

                  Plaintiff,

          -against-


X FINANCIAL, YUE TANG, JIE ZHANG,
SHAOYONG CHENG, DING GAO, SHENGWEN
RONG, ZHENG XUE, LONGGEN ZHANG, RICHARD
ARTHUR, COLLEEN A. DEVRIES, COGENCY
GLOBAL INC., MORGAN STANLEY & CO.
INTERNATIONAL PLC, MORGAN STANLEY & CO.
LLC, DEUTSCHE BANK SECURITIES INC.,
CHINA EVERBRIGHT SECURITIES (HK)
LIMITED, CHINA MERCHANTS SECURITIES
(HK) CO., LTD., AND AMTD GLOBAL MARKETS
LIMITED,

                Defendants.

---------------------------------------X

**MEMORANDUM AND ORDER**

19-CV-6908 (KAM)(SJB)

**MATSUMOTO, United States District Judge:**

        Plaintiffs Xiangdong Chen initiated the instant action on December 9, 2019, by filing a complaint against all defendants. (ECF No. 1, Compl.) On May 13, 2020, the Court appointed as Lead Plaintiffs Xiangdong Chen and Ke Zheng ("Plaintiffs"), the two members of X Financial Investor Group, and Pomerantz LLP as Lead Class Counsel. *See Xiangdong Chen v. X Fin.*, No. 19-CV-6908, 2020 WL 2478643, at *1 (E.D.N.Y. May 13, 2020) On July 13, 2020, Plaintiffs filed an amended complaint. (ECF No. 22, Am. Compl.) Defendants X Financial ("X Financial"

1

or "the Company"), Yue Tang, Shaoyong Cheng, Shengwen Rong, Zheng Xue, and Longgen Zhang (collectively, the "Individual Defendants")[1] moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) on March 8, 2021. (ECF No. 70, Mot. to Dismiss.) On March 9, 2021, the Court referred the motion to dismiss to the Honorable Sanket J. Bulsara, United States Magistrate Judge, for a Report and Recommendation ("R&R"). (Dkt. Order, Mar. 9, 2021.)

Presently before the Court is the R&R issued on December 9, 2021, by Judge Bulsara, recommending that the Court grant the defendants' motion to dismiss in its entirety, with leave to replead as to Plaintiffs' Exchange Act Sections 10(b) and 20(a) claims. (ECF No. 94, R&R). Judge Bulsara recommended that Plaintiffs' claims pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act be dismissed with prejudice because they are untimely. (*See id*.) Plaintiffs timely objected to the entirety of Judge Bulsara's R&R. (ECF No. 97, Pls. R&R Objections). Defendants responded in opposition to Plaintiffs' objections. (ECF No. 99, Defs. R&R Reply.) For the reasons set forth below, on *de novo* review, the Court denies Plaintiffs' objections, and affirms and adopts Judge Bulsara's R&R in its entirety.

---

[1] Tang, Zhang, and Cheng are referred to as the "Management Defendants." (Am. Compl. ¶ 52.)

## BACKGROUND

### I.   Factual Background

Upon *de novo* review, the Court incorporates by reference in its entirety the factual background provided in the R&R.  (R&R, pp. 3-11.)  By way of brief background, the R&R appropriately accepted as true, in considering the Defendants' motions, the following facts: X Financial is a financial technology company based in Shenzhen, China, that provides peer-to-peer online lending, which involves matching borrowers and lenders and collecting fees for facilitating loans.  (Am. Compl. ¶¶ 2, 66.)  The instant case is a securities class action brought by a group of investors who acquired American Depositary Shares ("ADSs") in XF's September 19, 2018, Initial Public Offering ("IPO").  In addition to X Financial and the Individual and Management Defendants, Plaintiffs also named Defendants Morgan Stanley & Co. LLC and Deutsche Bank Securities Inc. (together, the "Domestic Underwriter Defendants"), and Defendants Cogency Global Inc., Richard Arthur, and Colleen DeVries (collectively, the "Cogency Defendants").  (*See generally*, Am. Compl.)

As Plaintiffs describe in their Amended Complaint, in 2016, Chinese authorities began implementing rules and regulations in the peer-to-peer lending industry in which X Financial operated.  (*Id*. at ¶ 4.)  Though this period of

increased regulation by the Chinese authorities apparently resulted in the closure of many other peer-to-peer lenders, X Financial represented to potential investors that the Company had a positive financial future, based on certain representations regarding its specific business structure and policies. (*Id*. ¶¶ 6, 71-76.)

According to the allegations in Plaintiffs' Amended Complaint, these representations regarding X Financial's anticipated success were deliberately misleading. These misleading statements, according to Plaintiffs, were memorialized in X Financials' offering materials. Specifically, on August 28, 2018, X Financial filed with the SEC a registration statement on Form F-1 for the IPO, which, after several amendments,[2] was declared effective on September 18, 2018 (the Form F-1, together with all amendments, is the "Registration Statement"). On September 19, 2018, the day after the IPO, X Financial filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement. (*Id*. ¶ 7.) The following day, on September 20, 2018, X Financial filed a supplement to the Prospectus, which also forms part of the Registration Statement. (*See id*. at ¶ 138.)

A. Securities Act and Exchange Act Allegations

_____

[2] The Company filed amendments to the Form F-1 on September 10, 2018, September 12, 2018 and September 17, 2018. (Am. Compl. at ¶ 138.)

Plaintiffs allege that XF's IPO prospectus and Registration Statement contained false or misleading statements or omissions in violation of Sections 11 and 15 the Securities Act of 1933 ("Securities Act"). *See* 15 U.S.C. §§ 77k, 77l(a)(2), 77o(a).  Plaintiffs specifically allege that X Financial and other named defendants misrepresented three aspects of X Financial's business in the X Financial September 19, 2018, Registration Statement. (*Id*. ¶¶ 7, 20.)  These false statements involved alleged misrepresentations regarding: (1) the elimination of XF's preferred loan product line; (2) XF's ability to maintain low delinquency rates and attract prime borrowers; and, (3) policy changes that decreased the size of XF's card loans and the total loans facilitated by the company.

Plaintiffs also allege that XF made false or misleading statements or omissions on earnings calls and to the press after XF's IPO, in violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 under the Exchange Act. *See* 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5.

B. Relevant Factual Background

Plaintiffs allege that on November 19, 2018, the Company released its earnings for the period ending September 30, 2018 (the "Q3 2018 Earnings"), a period that ended eleven days after the September 19, 2018, IPO. (*Id*. ¶ 23.)  The Q3 2018

Earnings reflected reduced results for the Company, including a 21% decrease in the numbers of loans facilitated quarter-to-quarter, and a decrease of 32% in the value of those loans quarter-to-quarter. (*Id.* ¶179.)  But, on an earnings call that day (the "November 19 Call"), Defendants primarily blamed market conditions for the decreases in the number and value of loans. (*Id.* ¶ 26.)  During the November 19 Call, X Financial stated that in response to the increasing delinquency rates, the Company would be altering its credit policy, including approving fewer borrowers and decreasing the size of the average loan. (*Id.* ¶¶ 109, 185-186.)  Defendants also misleadingly assured investors that the market turmoil was no longer "at peak" and the "lack of funding that hampered loan facilitation was 'already over.'" (*Id.* ¶ 182-183, 201.)  Despite the Company's poor Q3 2018 Earnings and financial results, the stock price increased because of these reassurances from Defendants. (*Id.* ¶ 201.)

In financial reports and other public-facing disclosures, X Financial "shed further light" on the problems that began before the IPO. (*Id.* ¶¶ 176-194.)  Plaintiffs allege that "X Financial Defendants dribbled out the truth about the reality of their business in a series of partial disclosures, which painted an overly optimistic portrait of the Company's future." (*Id.* ¶ 176.)  On the March 19, 2019, earnings call

6

("March 19 Call") discussing the earnings report for the fourth quarter of 2018 ("Q4 2018 Earnings"), X Financial revealed that, like the Q3 2018 Earnings, the Q4 earnings report noted that delinquencies remained on the rise. (*Id*. ¶¶ 110-114.) As the Q4 2018 Earnings reflected, "[t]he delinquency rates for all outstanding loans that were past due for 31-90 days and 91-180 days as of December 31, 2018 were 3.54% and 5.28%, respectively, compared with 3.51% and 3.36%, respectively, as of September 30, 2018, and 1.47% and 1.35%, respectively, as of December 31, 2017." (*Id*. ¶ 110.) Also on the March 19 Call, Defendant Zhang explained that the rise in delinquencies was the result of June and July 2018 loans issued shortly before the IPO. (*Id*. ¶ 114.) Defendant Cheng separately admitted on the March 19 Call that contrary to what had been stated on the November 19, 2018, Call, the Company had reduced loan approval rates since before the IPO, Plaintiffs allege, which effectively amounted to altering the Company's business practices in a manner not reflected in the Registration Statement. (*Id*. ¶ 112.) Defendants had previously stated that the reduction in approval rates was a measure that would be implemented from Q3 2018 on. (*Id*. ¶¶ 109-110.)

On May 20, 2019, X Financial announced its Q1 2019 Earnings, reflecting that the loan facilitation amount was down, and reflecting lower average loan amounts. (*Id*. ¶¶ 131-132.)

7

On the corresponding May 21, 2019, investor call, Defendants allegedly admitted for the first time that the financial downturn was due to the Company discontinuing preferred loans—a decision that was made prior to the September 19, 2018, IPO. (*Id.* ¶¶ 131-134.)  Following a year of categorically poor overall performance by X Financial, the initial complaint in this action was filed on December 9, 2019. (*Id.* ¶¶ 134-137; ECF No. 1.)

## II.   Procedural Background

As referenced *supra*, on July 13, 2020, Plaintiffs filed an Amended Complaint. (ECF No. 22, Am. Compl.)  On March 8, 2021, the X Financial Defendants moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 70, Mot. to Dismiss.)  Plaintiffs opposed this motion.  (ECF No. 71, Pls. Opp.)  On March 8, 2021, the Domestic Underwriter Defendants filed a notice of joinder, through which they joined, adopted, and incorporated by reference all the arguments and authorities in the X Financial Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint, to the extent that the motion set forth grounds for the dismissal of Count I of the Amended Complaint.[3]  (ECF No. 72, Not. by Domestic

---

[3] Count I of the Amended Complaint alleges violations of Section 11 of the Securities Act of 1933 ("Securities Act") against all Defendants, and is the

Underwriter Defendants.)  Additionally on March 8, 2021, the Cogency Defendants filed a notice of joinder, by which they joined in, adopted, and incorporated by reference all arguments and authorities in the X Financial Defendants' Motion to Dismiss the Amended Complaint.  (ECF No. 73, Not. by Cogency Defendants.)  The Court referred the motions to dismiss to Judge Bulsara for a report and recommendation on March 9, 2021.  (Dkt. Order, Mar. 9, 2021.)

On December 9, 2021, Judge Bulsara issued an R&R, recommending that the Court grant the defendants' motion to dismiss in its entirety, with leave to replead granted in part and denied in part.  (ECF No. 94, R&R).  Plaintiffs timely objected to the entirety of Judge Bulsara's R&R.  (ECF No. 97, Pls. R&R Objections ("R&R Objections")).  On January 6, 2022, the X Financial Defendants responded in opposition to all of Plaintiffs' objections.  (ECF No. 99, Defs. R&R Opp. Reply.)  On January 6, 2022, the Domestic Underwriter Defendants filed a motion for joinder, joining in full the X Financial Defendants' opposition to Plaintiffs' objections to the R&R.  (ECF No. 100.) Additionally on January 6, 2022, the Cogency Defendants filed a notice of joinder, joining in full the X Financial Defendants' opposition to Plaintiffs' objections to the R&R.  (ECF No. 101.)

---

sole remaining cause of action alleged against the Domestic Underwriter Defendants.

**LEGAL STANDARDS**

**I.   Review of R&R**

A district court may refer a dispositive motion to a magistrate judge for a report and recommendation.  *See* 28 U.S.C. § 636(b)(1).  When a magistrate judge issues a report and recommendation, "any party may serve and file written objections."  *Id.; accord* Fed. R. Civ. P. 72(b) ("[A] party may serve and file specific written objections to the proposed findings and recommendations.").  The district court shall then review the portions of the report and recommendation to which a party has timely objected, as here, under a *de novo* review standard, and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  *Id.*  However, "[g]eneral or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error."  *New York City Dist. Council of Carpenters v. Allied Design & Constr., LLC*, 335 F. Supp. 3d 349, 351 (E.D.N.Y. 2018) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("[M]erely referring the court to previously filed papers or arguments does not constitute an adequate objection under  . . . Fed. R. Civ. P. 72(b) . . . .").

## II.   12(b)(6) Motion to Dismiss Standard

A complaint must be dismissed if it fails to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), a court evaluates the sufficiency of a complaint under a "two-pronged approach."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  First, courts are not bound to accept legal conclusions when examining the sufficiency of a complaint.  *See id*. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Second, the court must assume all well-pleaded facts are true, and then "determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.

## DISCUSSION

Judge Bulsara recommended that the Court dismiss the Amended Complaint for failure to state a claim.  (ECF No. 94, R&R at 2.)  The comprehensive R&R specifically recommended that Plaintiffs' Securities Act claims under Sections 11, 12(a)(2), and 15 should be dismissed with prejudice, because they were untimely, as Plaintiffs failed to bring their claims within the one-year statute of limitations.  (*Id*.)  The R&R further recommended that Plaintiffs' Exchange Act claims under Sections

10(b) and 20(a) be dismissed with leave to replead, as Plaintiffs had failed to adequately plead claims under the Exchange Act.  (*Id.*)  On *de novo* review, the Court finds that the claims in the Amended Complaint should be dismissed, with leave to replead the Sections 10(b) and 20(a) Exchange Act claims as provided herein.  As set forth below, the Court denies Plaintiffs' objections, and affirms and adopts Judge Bulsara's R&R in its entirety.

**I.  Plaintiffs' Objections**

    A. <u>Securities Act Section 12(a)(2) Claim</u>

        As a preliminary matter, as Plaintiffs note in their R&R Objections, Plaintiffs previously dismissed their Count II claim, without prejudice, by stipulation of dismissal against Defendants Morgan Stanley & Co. LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. International plc, China Everbright Securities (HK) Limited, China Merchants Securities (HK) Co., Ltd., and AMTD Global Markets Limited (collectively, the "Underwriter Defendants").  (ECF No. 63, Stipulation and Proposed Order; ECF No. 64, Stipulation and Order.) Count II alleged a claim under Section 12(a)(2) of the Securities Act against the Underwriter Defendants.  (ECF No. 63, Stipulation of Dismissal; ECF No. 64, Sept. 9, 2020, Stipulation and Order.) As Plaintiffs further note in their R&R Objections, despite the stipulation of dismissal (*see* Fed. R. Civ. P. 41(a)(1)(B)), the

R&R still adjudicated the dismissed Section 12(a)(2) claim.
(R&R at pp. 25-26, 32.)   To the extent that the stipulation of
dismissal was without prejudice, the Court denies Plaintiff's
objection and, on *de novo* review, affirms and adopts the portion
of the R&R recommending that Plaintiff's already dismissed
Section 12(a)(2) claim be dismissed, with prejudice, because it
is untimely.  (*See* R&R at p. 25 ("[the Section 12(a)(2)] claim
against the Underwriter Defendants is untimely for the same
reasons the section 11 claim is untimely.").)

     B. <u>Remaining Securities Act Claims</u>

          1. <u>Section 11 Claim</u>

          Plaintiffs allege Section 11 violations against all
Defendants.  (ECF No. 22, Am. Compl., ¶209.)   Section 11 of the
Securities Act imposes liability on issuers and other
signatories of a registration statement that, upon becoming
effective, "contain[s] an untrue statement of a material fact
or omit[s] to state a material fact required to be stated
therein or necessary to make the statements therein not
misleading."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715
(2d Cir. 2011) (citing 15 U.S.C. § 77k(a)).   In order to state a
claim under Section 11,

> the plaintiff must allege that: (1) she
> purchased a registered security, either
> directly from the issuer or in the
> aftermarket following the offering; (2) the
> defendant participated in the offering in a

13

> manner sufficient to give rise to liability
> under section 11; and (3) the registration
> statement "contained an untrue statement of
> a material fact or omitted to state a
> material fact required to be stated therein
> or necessary to make the statements therein
> not misleading.

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010).

Plaintiffs object to the R&R's recommendation that their Section 11 claims against all defendants be dismissed as untimely. Importantly, pursuant to the applicable statute of limitations articulated in Section 13 of the Securities Act of 1933, any claim under Section 11 must be timely brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]" 15 U.S.C. § 77m. The statute of limitations for a Section 11 claim begins either (a) upon the actual discovery of an untrue statement or (b) when "reasonable diligence" would have discovered the statement or omission. *Id*. Phrased differently, Section 11 claims "are barred if brought more than one year after actual or constructive notice of the claim." *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) (citing 15 U.S.C. § 77m) (emphasis added).

Plaintiffs object to the R&R's conclusion that their claims for violations of the Securities Act are untimely, and argue that their Section 11 claims were brought within the requisite one year deadline.  Plaintiffs filed the Complaint in this action on December 9, 2019. (ECF No. 1, Compl.) Accordingly, in order for Plaintiffs' Securities Act claims to be considered timely, Plaintiffs must have either (1) discovered Defendants' misrepresentations or omissions, or (2) have been able to discover the misrepresentations or omissions with "reasonable diligence," on or after December 9, 2018.  *See* 15 U.S.C. § 77m.

As the R&R notes, courts in this Circuit have split as to whether the so-called "inquiry notice" standard for reasonable diligence continues to apply to Securities Act claims after the Supreme Court's decision in *Merck & Co. v. Reynolds*, 559 U.S. 633, 130 S. Ct. 1784 (2010), and the Second Circuit's decision in *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011).[4]  For decades, the law of the Second Circuit for all securities fraud claims provided that a plaintiff was on "inquiry notice" when "public information would lead a reasonable investor to investigate the possibility of fraud[,]" and if a plaintiff failed to investigate at that

_____

[4] Both cases interpreted "reasonable diligence" specifically in the context of claims relating to Section 10 of the Exchange Act, and not in the context of Securities Act claims.

15

point, the "Circuit deemed the statute of limitations to start running on the day the plaintiff should have begun investigating." *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir.2006) (internal citations omitted).  In *Merck*, the Supreme Court rejected the "inquiry notice" standard which tied the limitations period to the commencement of an investigation, and held that "the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation [...] irrespective of whether the actual plaintiff undertook a reasonably diligent investigation."  559 U.S. at 653 (quotations omitted). *In City of Pontiac*, the Second Circuit relied on *Merck* and further elaborated that "the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id*. at 175.

       The R&R acknowledges that the Second Circuit has not specifically determined, post-*Merck* and post-*City of Pontiac*, whether the "inquiry notice" standard for reasonable diligence continues to apply to Securities Act claims.  (*See* R&R at p. 17 (citing in relevant part *Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442, 447 (2d Cir. 2015) ("We have never considered whether *Merck*

16

abrogates this circuit's existing 'inquiry notice' rule in favor of the discovery rule in Securities Act claims, an issue that divides the district courts in this circuit."); *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 n.2 (2d Cir. 2013) (noting continued application of "inquiry notice" to Securities Act is unresolved by Circuit)).  Both this Court and Judge Bulsara in the R&R note that, while the Second Circuit has not resolved whether inquiry notice continues to apply to Securities Act claims, other courts in this Circuit have applied the standards articulated in *Merck* and *City of Pontiac* to Securities Act claims, such as those alleged by Plaintiffs, under Sections 11, 12(a)(2), and 15.  (*See* R&R, p. 17); *see Horowitz v. Sunlands Tech. Grp.*, No. 19-cv-3744 (FB), 2021 WL 1224517, at *2 (E.D.N.Y. Mar. 31, 2021) (applying *City of Pontiac* reasonable diligence standard in evaluating statute of limitations for Securities Act Section 11 and Section 15 claims); *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 240 (E.D.N.Y. 2019) (applying standard articulated in *City of Pontiac* to statute of limitations analysis for Section 11 claim, though also invoking inquiry notice); *Rudman v. CHC Grp. LTD.*, 217 F. Supp. 3d 718, 724 (S.D.N.Y. 2016) (holding that the court did not need to decide whether *Merck* applied to Section 11 claims, and noting that district courts in this Circuit have split on whether *Merck* applies to the statute of limitations for claims under Sections

17

11, 12(a)(2), and 15, with a majority concluding that it does); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 762 (S.D.N.Y. 2012) (holding that the Supreme Court's invalidation of the inquiry notice standard for Exchange Act claims extends to claims brought under Sections 11 and 12(a)(2) of the Securities Act, collecting cases, and noting majority of courts in this Circuits have decided *Merck* applies in Securities Act cases)).

Importantly, on *de novo* review, the Court notes the Second Circuit decision in *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am.*, Inc., 873 F.3d 85 (2d Cir. 2017), which provided that post-*Merck*, "we still assume a reasonable plaintiff on inquiry notice would conduct further investigation, but the limitations period begins to run only when [...] the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately." *Id*. at 119. Accordingly, in the Second Circuit, regardless of whether inquiry notice continues to apply to Securities Act claims, even once inquiry notice is triggered, the limitations period will begin only when a plaintiff would have discovered sufficient information to plead a securities-law violation adequately.[5] *Id*.

---

[5] Notably, the Court in *Nomura* assumed only "*arguendo* that *Merck*, which involved the statute of limitations for claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), applies with equal force to the statute of

Whether applying inquiry notice (as amended by *Nomura*) or only the discovery by a reasonably diligent Plaintiff rule articulated in *City of Pontiac*, as explained below, the Court finds on *de novo* review that Plaintiffs' Section 11 claims are untimely. Here, Plaintiffs allege as the basis of their Section 11 claim three categories of material misstatements and omissions within the September 18, 2018, Registration Statement: (i) material misstatements and omissions regarding XF's ability to target investors able to repay loans and the Company's increasing delinquency rates; (ii) material misstatements and omissions regarding Preferred Loans; and (iii) material misstatements and omissions regarding Card Loans. (*See* ECF No. 97, Pls. R&R Objections, citing Am. Compl., ¶¶ 138-172.)

First, as to Plaintiffs' allegations of material misstatements and omissions regarding X Financial's ability to target prime investors and the company's increasing delinquency rates, the Court finds on *de novo* review that any associated Section 11 claim is untimely. As alleged in the Amended Complaint, the September 2018 Registration Statement contained a series of statements regarding the strength of X Financial's loans programs, the Company's controls and procedures for

---

limitations in Section 13 of the Securities Act." *Id*. at 119, n. 37 (internal citations omitted). Given this caveat in *Nomura*, the Court will, for the purposes of this Order, analyze Plaintiffs' claims under both an inquiry notice standard (as articulated by *Nomura*) and under the discovery rule described in *Merck* and *City of Pontiac*.

approving loans, proprietary credit assessment abilities, and even a chart capturing "a consistently low delinquency rate for its preferred loans" through the second quarter of 2018. (*Id.* ¶¶ 143-153.) Plaintiffs, in their Amended Complaint, allege that the Registration Statement did not reveal the company's pre-IPO rise in delinquency rates. (Am. Compl. ¶ 106 ("The Registration Statement admitted delinquency rates were on the rise . . . [b]ut [...] did not explain to investors that this increase was a growing trend that was continuing at the time of the IPO[.]")). As Plaintiffs allege in their Amended Complaint, though the September 2018 Registration Statement admitted delinquency rates were on the rise "[i]n 2016, 2017 and for the six months ended June 30, 2018[....] the Registration Statement did not explain to investors that this increase in delinquency was a growing trend that was continuing *at the time of the IPO*, nor did it disclose that X Financial was making policy changes because of the delinquency increases[.]" (*Id.* at ¶ 106.)

The Amended Complaint, however, further alleges, in relevant part, that X Financial disclosed the rising delinquency rates in excess of expectations during the November 19, 2018, Call. (*Id.* ¶ 108 ("[...] X Financial would admit on the November 19 Call that delinquency rates were greatly exceeding the

Company's internal expectations.")).[6]  The R&R states that the Complaint does not allege any further disclosure of information regarding the increasing delinquencies subsequent to the November 19 Call, and thus, logically, all that was necessary for Plaintiffs to allege that the Registration Statement contained misstatements regarding delinquency rates was disclosed during the November 19 Call.  (R&R at 20, "And there is nothing in the Complaint alleging there was additional information about delinquencies disclosed after the November 19 Call.").  Plaintiffs objected specifically to this conclusion in the R&R, and asserted that the Amended Complaint *did* include additional allegations as to disclosures about delinquency rates after the November 19, 2018 Call.  Plaintiffs are correct: the Amended Complaint specifically alleges that the earnings report on March 19, 2019, for the fourth quarter of 2018 ("Q4 2018 Earnings"), noted that delinquencies were still on the rise, with loans issued just prior to the IPO in June and July 2018 now surfacing as particularly problematic for investors. (*Id.* at ¶¶ 110, 114, "On the March 19 Call, Defendant Zhang explained that this rise in delinquencies was the result of loans facilitated in June and July 2018, shortly before the IPO[....]

---

[6] Additionally, though referenced but not specifically alleged in the Amended Complaint, during the November 19 Call, X Financial stated that it "saw [an] increase in delinquency," and that preferred loans had "a higher delinquency in Q3 than before[.]"  (ECF No. 70-1, Decl. of Brian S. Weinstein, ECF No. 70-8, Ex. F, Nov. 19 Call Tr. at 5).

Defendant Zhang admitted: 'And we noted that the delinquency
rate for the loan facilitated in June, July of 2018 actually
increased a lot in Q4[.]'.")

Plaintiffs' allegations that X Financial made
disclosures regarding delinquencies subsequent to the IPO and
November 19, 2018 Call does not alter the Court's finding that
Plaintiffs' Section 11 claim is untimely.  The November 19 Call
and its associated disclosures regarding increasing
delinquencies plainly put investors on notice "that
delinquencies were on the rise[,]" ... "'greatly exceeding the
Company's internal expectations.'"  (Am. Compl. ¶ 108.)  Thus,
reasonably diligent investors were provided information by the
November 19 earnings statement and call on which they could
bring timely claims.

Even assuming that inquiry notice remains applicable,
courts have held that inquiry notice is triggered when "storm
warnings" would alert an investor and prompt an investigation.
*See In re Bear Stearns*, 851 F. Supp. 2d as 762 (S.D.N.Y. 2012)
(Storm warnings are circumstances that arise and "'suggest to an
investor of ordinary intelligence the probability' that she has
a cause of action[,]" triggering the potential plaintiff's duty
to investigate) (internal citations omitted).  When a potential
plaintiff fails to investigate following storm warnings, the
statute of limitations begins to run on the date the storm

warnings triggered the duty to inquire.  *See Lentell v. Merrill*
*Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir.2005), *accord In re*
*IndyMac Mortgage-Backed Securities Litigation*, 718 F.Supp.2d
495, 502-03 (S.D.N.Y. 2010).  Here, the November 19, 2018, Call
provided storm warnings that triggered Plaintiffs' inquiry
notice, which could be negated if "the warning signs [were]
accompanied by reliable words of comfort from management."  *LC*
*Capital Partners LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148,
155 (2d Cir.2003).  Plaintiffs argue that such was the case
here, and Plaintiffs object to the R&R's characterization of the
assurances they received during the November 19 Call as
"generic."  (R&R Objections, p. 12.)  Plaintiffs cite the
reassurances of Defendant Tang on the November 19 Call as
sufficient to dissipate any storm warnings.  The Amended
Complaint alleges that Defendant Tang stated the following to
downplay concerns:

> For the existing loan book, because our risks are
> fully provisioned and fully being sell[sic] to the
> customers covered by the insurance company, so you
> actually don't need to worry about the existing loan
> book that much. That's the reason I think we feel this
> is a better way to present our business, just on the
> combined basis.

(Am. Compl. ¶ 188.)  The meaning of this statement is not clear,
and the statement cannot plausibly constitute "reliable words of
comfort."  Apart from these statements, Plaintiffs cite only to
what the R&R aptly terms "general puffery" made during the

November 19 Call.  (*See e.g., id.* ¶ 28 ("growth was on the

horizon"); ¶ 182 ("executives . . . sought to reassure investors

by stressing supposed growth.")).[7]  The Court agrees that these

forward-looking alleged assurances do not mitigate inquiry

notice, as an "investor of ordinary intelligence" would not

"reasonably rely" on such a statement to allay his or her

concerns about continually rising delinquencies at X Financial.

*See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 247

(S.D.N.Y. 2007) (citing *LC Capital Partners LP v. Frontier Ins.

Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003)).  On *de novo*

review, the Court agrees with the R&R, as is applicable to all

three categories of Plaintiffs' Section 11 allegations, that

"Plaintiffs do not identify anything that directly addresses the

three categories of false statements they base their claim

upon."  *See LC Cap. Partners*, 318 F.3d at 156 (Alleged

reassurances were unavailing where "'reassuring' statements by

---

[7] Plaintiffs appear to concede that their allegations in the Amended Complaint
further illustrate that the statements made during the November 19 Call
reflected misstatements and omissions about circumstances impacting the
Company *prior to* the IPO. (*See* Am. Compl. ¶ 26 ("As executives explained on
the call, the negative operational and financial results reported in the
day's press release had been caused by market and other problems that had
long preceded the IPO.");  ¶ 91 ("X Financial reported earnings[. . .] on
November 19, 2018, [and] noted for the first time: 'Xiaoying Preferred Loan
was adversely impacted[.]'"); ¶ 93 ("At the time of the IPO – which was only
11 days prior to the end of [the Q3 2018 Earnings quarter] – Defendants were
undoubtedly aware that X Financial's numbers were going to continue to
plummet.")).  Thus, based on Plaintiffs' allegations, as of the earnings
report and investor call on November 19, 2018, inquiry notice was triggered,
and reasonably diligent investors discovered facts and/or could have
discovered facts sufficient to bring timely claims.

management were mere expressions of hope, devoid of any specific steps taken to avoid under-reserving in the future.").

Finally, Plaintiffs argue that any revelations on the November 19 Call were downplayed by the subsequent stock price increase. (Am. Compl. ¶ 201.)  The stock price movement that Plaintiffs rely on, however, is not sufficient to negate the storm warnings or the resulting inquiry notice.  *See Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 829 (S.D.N.Y. 2010), *aff'd in pertinent part*, 601 F. App'x 59 (2d Cir. 2015) (noting that though stock price movements may be a "storm warning" sufficient to put plaintiffs on inquiry notice, they are not necessary, and lack of movement in stock price does not eliminate inquiry notice); *see also Yi Xiang v. Inovalon Holdings, Inc.*, 268 F. Supp. 3d 515, 524 (S.D.N.Y. 2017) ("decline in stock price is not necessarily required to put a plaintiff on notice" of a Securities Act claim).

The Court finds that the defendants' disclosures regarding the rising delinquencies discussed on the November 19 Call were sufficiently "company-specific" to "trigger a duty to investigate."  *Lentell*, 396 F.3d at 169. Even pivoting from an inquiry notice analysis to the standards in *Merck* and *City of Pontiac*, at the time of the November 19, 2018, Call, a "reasonable plaintiff would have

discovered sufficient information to plead a securities-law

violation adequately[.]" *City of Pontiac*, 637 F.3d at 174.

Second, as to Plaintiffs' allegations of material

misstatements and omissions regarding the Preferred Loans, the

Court finds that any associated Section 11 claims are also

untimely.  The September 2018 Registration Statement, as alleged

in the Amended Complaint, emphasized the importance of Preferred

Loans, described the Preferred Loans as one of the Company's

major products that would drive "continued" growth, and

projected a customer base that would continue to grow.  (Am.

Compl. ¶¶ 155-160.)  Plaintiffs argue that the defendants'

statements during the November 19 Call only foreshadowed the

misstatements and omissions related to the Preferred Loans in

the Registration Statement; but this argument is not borne out

by the Amended Complaint.  As reflected in Plaintiffs' Amended

Complaint, the November 19 Call disclosed that the Preferred

Loan product had been consistently reduced over the last three

quarters, and, as Plaintiffs themselves specifically allege, as

of at least November 19, 2018, they were notified that

"preferred loans were being intentionally phased out."  (*Id*. ¶

94.)  As the R&R correctly identified, the Complaint itself

alleges that the elimination of the Preferred Loans occurred

through X Financial's decision to "phase out" the program. (*Id*.

¶ 20 ("For example, at the time of the IPO, [X Financial] had

already decided to[. . . .] phase out the preferred loan

business."). Accordingly, on November 19, 2018, X Financial

informed investors on the call that Preferred Loans were being

phased out. Further, on the November 19 Call, Defendant Tang

stated that as the Card Loans now dominated X Financial's

business and dwarfed the Preferred Loans, "to understand our

business going forward," the investors "should *just focus* on

card loan[s]," a statement that reasonably could only be

interpreted as meaning that the Preferred Loans had been phased

out and eliminated. (ECF No. 70-1, Decl. of Brian S. Weinstein,

ECF No. 70-8, Ex. F, Nov. 19 Call Tr. at 5) (emphasis added).)

Critically, as the R&R notes,[8] and as this Court finds on *de novo*

review, the terms "phasing out" and "eliminating" or

"discontinuing" as related to the preferred loans are used

interchangeably by Plaintiffs in the Amended Complaint. (Am.

Compl. ¶ 88 (X Financial was "prior to the IPO, taking the first

steps in *eliminating* the product line, because Defendants

already knew it would be gone soon"); ¶ 93 ("At the time of the

IPO[....][X Financial was] indeed aware that they had already

chosen to *discontinue* the preferred loan product."); ¶ 94

("[P]referred loans were being intentionally *phased out*.")

---

[8] Though the R&R also notes that Plaintiffs use these terms interchangeably in
their *briefs*, Defendants' motion to dismiss, and this Court's decision
whether or not to affirm and adopt the R&R, must be decided strictly on the
face of Plaintiff's Amended Complaint and any materials incorporated by
reference.

(emphases added).)  Here, Plaintiffs plainly had inquiry notice as to the phasing out, discontinuation, and elimination of the preferred loans at least as of the call on November 19, 2018. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) ("Inquiry notice is a type of constructive notice that exists when uncontroverted evidence clearly demonstrates that the plaintiff should have discovered the violation.") Alternatively, whether or not inquiry notice continues to apply, Plaintiffs, as reasonable investors, would have "uncovered the facts constituting a violation[,]" as of at least November 19, 2018.  *City of Pontiac*, 637 F.3d at 174.

Third and finally, as to Plaintiffs' allegations of material misstatements and omissions regarding Card Loans, the Court finds that any associated Section 11 claim is also untimely.  As alleged in the Amended Complaint, the September 2018 Registration Statement emphasized the importance of Card Loans to X Financial's revenue, as there were more Card Loans with higher interest rates than Preferred Loans.  (Am. Compl. ¶ 162.)  The Registration Statement also stated:

> Xiaoying Card Loan is the most profitable product facilitated on our platform due to its higher service fee rate compared to our other products. As we plan to expand the business scale of Xiaoying Card Loan, we expect revenue contribution from Xiaoying Card Loan will continue to increase in the future and enhance our profitability.

(*Id*. ¶ 163.)   During the November 19 Call, Defendant Tang
disclosed that during the third quarter of 2018, X Financial
"consciously reduced [its] average loan size because of [its]
concern of external economic environment and credit environment.
. . . by about 20%[.]"[9]   (Weinstein Decl., Ex. F, ECF No. 70-8,
Nov. 19 Call Tr. at 2–3; Am. Compl. ¶ 125.).   The Amended
Complaint states that the Q3 2018 Earnings, reported on November
19, 2018, indicated a "tremendous reduction in loan size[.]"
(*Id*. ¶ 124.)   The reduction in average loan size "was news to
investors, as, while this decision was obviously made before the
IPO, it could not be found in the Registration Statement."   (*Id*.
¶ 125.)   On the November 19 Call, X Financial also stated that,
as the delinquency rates on card loans were high, it would
"tighten [the] credit policy" and "reject more applications" as
preventative measures. (*Id*. ¶ 109.)   As the Amended Complaint
also alleges, as of the November 19, 2018 Call, the change to
the credit policy and application rate had already occurred,
though unbeknownst to investors.   (*Id*.)

---

[9] Though the transcript of the November 19, 2018, Call does not make clear
whether "consciously reduc[ing] []average loan size" refers to *all* loans or
Card Loans specifically, the language in the transcript does indicate that,
at minimum, the reduction in average loan size included Card Loans. (ECF No.
70-8, Nov. 19 Call Tr. at 2–3 ("[W]e consciously reduced our average loan
size because of our concern of external economic environment and credit
environment. So you could look at the average loan size that we have on our
credit card loan during the Q3. We cut it down by about 20% from our normal
period.").)

The allegations in the Amended Complaint belie Plaintiffs' arguments that they did not have at least constructive notice of misstatements and omissions related to the Card Loans by November 19, 2018, the date of the Q3 2018 earnings report and investor call. As of November 19, 2018, Plaintiffs were provided sufficient information to plead a Section 11 claim alleging that the Registration Statement's plan for the expansion of the Card Loan program contained untrue statements or omissions of material facts.

The November 19, 2018, statements during the call provided an adequate basis upon which a reasonably diligent Plaintiff could have brought a sufficient Section 11 claim, as currently alleged in the Amended Complaint. *See In re Magnum Hunter*, 26 F. Supp. 3d at 302 (Disclosures do not have to "perfectly match the allegations that a plaintiff chooses to include in its complaint[,]" in order to trigger the statute of limitations under Section 13 of the Securities Act.). Plaintiffs' Objections arguing that they had "little reason to not believe X Financial[,]" because "[t]here was a well-publicized market problem in China in the summer of 2018[,]" are unavailing. (Pls. R&R Objections, p. 15.) Plaintiffs' subjective beliefs are not availing. Plaintiffs discovered, or could have and should have "discovered[,]" the alleged misstatements and omissions in the Registration Statement as of

30

November 19, 2018, well before the filing of the complaint in this action; indeed, they were directly provided with critical information during the November 19 Call. "The filing period commences when the plaintiff discovers (or should have discovered) the securities-law violation[;]" a "securities-law violation is discovered when the plaintiff learns sufficient information about [the violation] to ... plead it in a complaint with enough detail and particularity to survive a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss." *See Fed. Deposit Ins. Corp. v. Credit Suisse First Bos. Mortg. Sec. Corp.*, 414 F. Supp. 3d 407, 411 (S.D.N.Y. 2019) (citing *Nomura Holding Am., Inc.*, 873 F.3d at 119).

The Court recognizes that "[w]hether sufficient facts existed at [a particular] time is, by definition, a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage." *In re Bear Stearns*, 851 F. Supp. 2d at 763. Here, however, the record, including Plaintiffs' own allegations, reflects "uncontroverted evidence irrefutably demonstrat[ing] [that the Plaintiffs] discovered or should have discovered facts sufficient to adequately plead a claim" prior to the expiration of the one-year statute of limitations. *In re Bear Stearns*, 851 F. Supp. 2d at 763 (internal quotation marks omitted) (citing *Fed. Deposit Ins. Corp.*, 414 F. Supp. 3d at 412). After conducting a *de novo*

31

review, the Court affirms and adopts the portion of the R&R dismissing Plaintiffs' Section 11 claims, with prejudice, as Plaintiffs' Section 11 claims are untimely.

2. Section 15 Claim

Plaintiffs also bring a claim under Section 15 of the Securities Act against X Financial, the Individual Defendants, and Cogency Global. (Am. Compl. ¶¶ 228-233.) Section 15 provides a cause of action against "[e]very person who ... controls any person liable under [Sections 11 or 12(a)(2)] of this title." 15 U.S.C. § 77o. A claim under Section 15, therefore, is derivative and can only succeed if a plaintiff can first demonstrate liability under Section 11 or Section 12. See *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 760 (S.D.N.Y. 2012) (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir.2010)).

Because Section 15 claims are derivative, the one-year statute of limitations under Section 13, applicable to Section 11 claims, also applies to Section 15 claims. *See In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 183 (S.D.N.Y. 2012) ("Section 15 liability is derivative of liability under Sections 11 and 12[.]"). Accordingly, as the Court has found Plaintiffs' Section 11 claim to be untimely, Plaintiffs' Section 15 claim is likewise untimely. *See, e.g., Cross v. 21st Century*

*Holding Co.*, 00-CV-4333, 2001 WL 34808272, at *6 (S.D.N.Y. Aug. 6, 2001) ("A necessary element of a cause of action under section 15 is a primary violation of the Securities Act of 1933, such as a violation of section 11. [....] Because the Court has dismissed plaintiffs' section 11 claim as untimely, plaintiffs' section 15 claim necessarily fails."). Upon a *de novo* review, the Court affirms and adopts the portion of the R&R dismissing Plaintiffs' Section 15 Claim, with prejudice, as untimely.

      C. <u>Exchange Act Claims</u>

          1. <u>Section 10(b)</u>[10]

      Plaintiffs allege violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, against X Financial and the Management Defendants. (ECF No. 22, Am. Compl. ¶¶ 173-175.) To state a claim under Section 10(b) and the corresponding Rule 10b-5, a plaintiff must plead that a defendant, "in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *See Ganino v. Citizens Utilities Co.*, 228

---

[10] Though timeliness has not been raised as an issue with regard to Plaintiffs' Exchange Act claims, the Court notes for the avoidance of doubt that the statute of limitations for a Section 10(b) claim (and a derivative Section 20(a) claim) is two years. *See* Securities Exchange Act of 1934, §§ 10(b); 28 U.S.C.A. § 1658(b). Consequently, Plaintiffs' Exchange Act claims are timely.

F.3d 154, 161 (2d Cir. 2000) (citing *In re Carter-Wallace, Inc.*
*Sec. Litig.*, 150 F.3d 153, 155-56 (2d Cir. 1998); *San Leandro*
*Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801, 808 (2d Cir. 1996); *Acito v. IMCERA Group, Inc.*, 47
F.3d 47, 52 (2d Cir. 1995)).  The requisite state of mind for
purposes of a Rule 10b-5 claim is "an intent to deceive,
manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S.
185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).  The
required intent can be demonstrated "either (a) by alleging
facts to show that defendants had both motive and opportunity to
commit fraud, or (b) by alleging facts that constitute strong
circumstantial evidence of conscious misbehavior or
recklessness." *Ganino*, 228 F.3d at 168-69 (internal citations
omitted).  A failure to plead scienter, by whichever means, is
fatal to Plaintiffs' Section 10(b) claim.

Plaintiffs allege that the Management Defendants'
failure to disclose the decisions to decrease loan sizes, phase
out preferred loans, and implement policy changes before X
Financial's IPO demonstrates the requisite scienter, given that
these were decisions that involved executives at the highest
level of the company.  (Am. Compl. ¶ 195(b), (d), (f); ¶ 198
(Defendants Tang and Cheng "were responsible for decisions that
led to the tightening of credit requirements for loans and the
cessation of the preferred loan business.")).

34

Plaintiffs further allege in the Amended Complaint that the conduct of the Management Defendants indicates that they "either deliberately, recklessly or intentionally made the most significant misrepresentations and omissions contained in the Registration Statement and later statements[.]" (*Id*. at ¶ 195.)   Apparently, Plaintiffs do not base their scienter allegations on Management Defendants' motive and opportunity to commit fraud, but rather, on a theory that the Management Defendants demonstrated conscious misbehavior or recklessness. (*See* ECF No. 71, Pls. Opp., pp. 25-27.)   Accordingly, Plaintiffs must allege sufficient circumstantial indicia of fraud. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("[w]here motive is not apparent [. . . .] it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.").

Even assuming, as the Court must, that all well-pleaded facts in the Amended Complaint are true, *Iqbal*, 556 U.S. at 679, the Court finds on *de novo* review that the R&R appropriately concluded that Plaintiffs have failed to adequately plead scienter as to any of the Management Defendants.   Plaintiffs' allegations of scienter with regard to its Exchange Act claims are contained at paragraphs 195-199 of their Amended Complaint.   After *de novo* review, the Court agrees

35

with the well-reasoned R&R that Plaintiffs' allegations of
scienter are vague and conclusory.  At most, Plaintiffs appear
to allege that, given the Management Defendants' access to
Company information, they should have known their public
statements were false, and had a responsibility to correct those
public statements.  (*See, e.g.*, Am. Comp. ¶ 195(a) ("Management
Defendants had access to adverse information pertaining to the
Q3 of 2018 that they did not disclose to investors in the
Registration Statement[.]"); ¶ 196 ("The Management Defendants
had access to and were provided with copies of the documents and
statements alleged herein to be materially false and misleading
prior to or shortly after their issuance and/or had the ability
and opportunity to prevent their issuance or cause them to be
corrected.").)  Plaintiffs have not "'specifically identified
any reports or statements' or any dates or time frame in which
Defendants were put on notice of contradictory information."
*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian
Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010)
(citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex
Capital Inc.*, 531 F.3d at 196, *In re PXRE Group Ltd. Sec.
Litig.*, 600 F.Supp.2d 510, 539 (S.D.N.Y.2009)).

        To the extent that Plaintiffs argue that it would be
"virtually inconceivable" for the Management Defendants, in
their high-level position, not to have had access to relevant

36

information (Pls. Opp. at pp. 16-17), "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Loc. 773 Pension Fund*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) (citing *In re Sotheby's Holdings, Inc.*, No. 00-cv-1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.") (citations omitted)). Plaintiffs' most specific allegations regarding the Management Defendants still assert nothing more than broadly invoking the Management Defendants' high-level positions. (*See e.g.*, Am. Compl. ¶ 198 ("According to the Registration Materials, Tang had 'the ability to control or exert significant influence over important corporate matters[....] Defendant Cheng was the President of X Financial and a director of its Board at the time of the IPO and [....]thereafter. Both of them were responsible for steering the company.") It is also unclear *when* the Management Defendants "later admitted," as the Amended Complaint alleges, that "they were responsible for decisions that led to the tightening of credit requirements for loans and the cessation of the preferred loan business[.]" (*Id.*)

Moreover, Plaintiffs' allegations regarding Confidential Witnesses 1 and 2 ("CW1" and "CW2" respectively), without more, are insufficient to create a strong inference of conscious misbehavior or recklessness on the part of the Management Defendants. (*See e.g.*, Am. Compl. ¶ 77 ("[CW1], who worked in credit risk control at X Financial, from June 2017 through October 2018, said the screening process for applicants became less rigorous if the Company wanted to distribute more loans[....] [CW1] was told by his manager to not be as detailed in his review and research[.]").) Though this Court does not diminish the importance of confidential witnesses participating in the litigation process, the Court finds that the information attributed to Confidential Witnesses 1 and 2 in the Amended Complaint does not provide with any degree of specificity a connection between the Confidential Witnesses and the conscious misbehavior or recklessness of the Management Defendants. (*See id.* ¶¶ 77, 86-88, 99-100.)

Taking "collectively" all the relevant allegations in the Amended Complaint regarding scienter for purposes of a Section 10(b) claim, the Court finds that a "strong inference" of scienter has not been alleged. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "Great specificity" is not required in alleging scienter, provided that a plaintiff alleges enough facts to support "a strong inference

38

of fraudulent intent." *Ganino*, 228 F.3d at 169 (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999)).  Even so, "speculation and conclusory allegations will not suffice[.]"  *Id*.  As noted by the Second Circuit in *Novak*, a strong inference of fraudulent intent may be adequately pleaded based on factual allegations that defendants,

> (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor[.]

*Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  Here, Plaintiffs appear to rely on factor (3) which, as explained above, is insufficient to plead scienter.  Plaintiffs have alleged only a series of fundamentally conclusory, generalized facts regarding the Management Defendants' intent and/or recklessness.  The Court finds, on *de novo* review, that the R&R appropriately recommended that the Section 10(b) claim should be dismissed against all defendants for failure to allege scienter as required.  Plaintiffs' Section 10(b) claims are hereby dismissed.

     Though the Court dismisses Plaintiffs' Section 10(b) claim against all defendants, the Court finds that amending Plaintiffs' complaint would not be futile in this instance.  *See* Fed. R. Civ. P. 15(a) (A party may amend its pleading once as a

matter of right prior to the service of a responsive pleading, and otherwise by leave of the court).  The "court should freely give leave when justice so requires," and generally, upon granting a motion to dismiss, a court will allow leave to replead.  *See id; Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) (citing *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 50 (2d Cir. 1991)).  Plaintiffs are granted leave to replead their Section 10(b) claim.

>    2. Section 20(a)

Finally, Plaintiffs bring a claim under Section 20(a) of the Exchange Act, alleging control person liability against the Management Defendants. *See* 15 U.S.C. § 78t(a); (ECF No. 22, Am. Compl. ¶ 239.)  To state a claim under Section 20(a), a claimant must plead "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-cv-9992 (PAC), 2021 WL 5854075, at *8 (S.D.N.Y. Dec. 9, 2021) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).

As explained *supra*, Plaintiffs have not pled any viable primary violation of the Exchange Act under Section 10(b).  *See Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL

3871269, at *5 (2d Cir. Aug. 31, 2021) (a claim under Section 20(a) of the Exchange Act is properly dismissed where a complaint has failed to allege a primary violation of the securities laws under Section 10(b).).  The Court thus agrees with the R&R's recommendation that Plaintiffs' Section 20(a) claim should be dismissed.  As with Plaintiffs' Section 10(b) claim, Plaintiffs are granted leave to replead their Section 20(a) claim.

## CONCLUSION

For the foregoing reasons, upon *de novo* review, the Court respectfully denies Plaintiffs' objections, and affirms and adopts Judge Bulsara's thorough and well-reasoned R&R in its entirety.  Plaintiffs' Securities Act Sections 11, 12, and 15 claims are dismissed with prejudice, as the claims are untimely. Plaintiffs' Exchange Act Section 10(b) and Section 20(a) claims are dismissed, with leave to replead.  Plaintiffs shall file a Second Amended Complaint within (30) thirty days.  If Plaintiffs fail to file a Second Amended Complaint within thirty days,

judgment will be entered in favor of Defendants, and this case will be closed.

**SO ORDERED.**

Dated:     March 13, 2022
           Brooklyn, New York

                                    _____/s/_____

                                    **HON. KIYO A. MATSUMOTO**
                                    United States District Judge
                                    Eastern District of New York